UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Peter Parnell; Justin Richardson;
E.D.B., *by and through her parent
Whitney Morgan Donovan*; Z.T., *by
and through her parent Jane Doe*;
E.T., *by and through her parent Jane
Doe*; D.S., *by and through his
guardian and next friend Ann Roe*;
E.S., *by and through his guardian
and next friend Ann Roe*; and M.H.,
*by and through his guardian and
next friend Ann Roe*,

                    Plaintiffs,

          v.

School Board of Lake County,
Florida; Diane Kornegay, *in her
official capacity as Superintendent of
the Lake County School District*;
Manny Díaz, Jr., *in his official
capacity as Florida Commissioner of
Education*; Ben Gibson, *in his
official capacity as chair of the
Florida State Board of Education*;
Ryan Petty, *in his official capacity as
vice chair of the Florida State Board
of Education*; Monesia Brown, *in her
official capacity as a member of the
Florida State Board of Education*;
Esther Byrd, *in her official capacity
as a member of the Florida State
Board of Education*; Grazie P.
Christie, *in her official capacity as a
member of the Florida State Board of
Education*; Kelly Garcia, *in her
official capacity as a member of the
Florida State Board of Education*;

Case No. _____

**CHALLENGE TO THE
CONSTITUTIONALITY OF
FLORIDA 2022 HOUSE
BILL 1557 AND 2023 HOUSE
BILL 1069**

**PRELIMINARY AND
PERMANENT INJUNCTIVE
RELIEF REQUESTED**

**DECLARATORY RELIEF
REQUESTED**

**DEMAND FOR A JURY TRIAL**

and MaryLynn Magar, *in her official capacity as a member of the Florida State Board of Education,*

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Peter Parnell; Justin Richardson; E.D.B., by and through her parent Whitney Morgan Donovan; Z.T., by and through her parent Jane Doe; E.T., by and through her parent Jane Doe; D.S., by and through his guardian and next friend Ann Roe; E.S., by and through his guardian and next friend Ann Roe; and M.H., by and through his guardian and next friend Ann Roe, through their attorneys, Selendy Gay Elsberg PLLC and Kenny Nachwalter, P.A., for their complaint against the School Board of Lake County, Florida; Diane Kornegay, in her official capacity as Superintendent of the Lake County School District; Manny Díaz, Jr., in his official capacity as Florida Commissioner of Education; Ben Gibson, in his official capacity as chair of the Florida State Board of Education; Ryan Petty, in his official capacity as vice chair of the Florida State Board of Education; Monesia Brown, in her official capacity as a member of the Florida State Board of Education; Esther Byrd, in her official capacity as a member of the Florida State Board of Education; Grazie P. Christie, in her official capacity as a member of the Florida State Board of Education; Kelly Garcia, in her official capacity as a member of the

Florida State Board of Education; and MaryLynn Magar, in her official capacity as a member of the Florida State Board of Education, allege as follows:

## NATURE OF ACTION

1.      "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

2.      More than sixty years after the Supreme Court of the United States decided *Brown v. Board of Education*, universal public education continues to be one of our country's greatest attributes. Broad exposure and freedom to explore and examine innumerable areas of scholarship, art, and science, together with the rigorous development of critical thinking skills, are essential to training our young citizens for the privileges and responsibilities necessary for full participation in a high-functioning democratic society. Any attempt to diminish public education through misinformation and censorship directly threatens both our young people and the quality and competitiveness of our democracy.

3.    Florida has long guaranteed broad and free public education. Florida public schools promise to develop students into well-educated young adults who are prepared to embrace all of the challenges, privileges, and responsibilities of American citizenship, to live in an increasingly diverse world, and to compete successfully in the Florida, national, and global economies. Millions of parents choose Florida's public schools to educate their children consistent with this promise.

4.    Florida's public schools also offer rich stores of information designed to assist students in developing their own academic strengths while deepening intellectual curiosity and analytical rigor. Florida public schools offer libraries with appropriate reading material for all students, curated by expert educators. They provide valuable reading material that is not confined to the curricular material of classroom courses. The robust programmatic and material offerings of public school libraries in Florida are a cornerstone of the state's commitment to education.

5.    Florida public school libraries enrich students' educational experiences by fostering a love of reading and cultivating a culture of inquiry and literary appreciation. They encourage the independent exploration of ideas by providing an expansive range of literature and informational materials that allow students to explore subjects of personal and academic interest beyond what can be taught in the time students spend in the classroom. As the

Supreme Court has recognized, "'students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding.' The school library is the principal locus of such freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868 (1982) (plurality opinion) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

6.    In Lake County, Florida, those public school libraries previously included the award-winning children's book *And Tango Makes Three* ("*Tango*"). Many school districts nationwide have *Tango* on the shelves of their public school libraries, thereby permitting schoolchildren from K–12 to have continuous free access to read and enjoy this well-known and well-loved book.

7.    *Tango* tells the true story of two male penguins in New York City's Central Park Zoo. The penguins, named Roy and Silo, formed an enduring pair bond and, with the help of a conscientious zookeeper, adopted, hatched, and raised a penguin chick named Tango. Americans eagerly flocked to the Zoo each year to see the young penguin.

8.    *Tango* is a children's book. Its publisher recommends it for children between four and eight years old, but it is appropriate for all ages. It tells a true and heartwarming story, and it teaches students about animal behavior, adoption, diversity among family structures, and responsible family values. The book is factually accurate and contains no vulgarity, obscenity, or content that would not befit a school environment. The book has been acclaimed by

numerous literary groups. A copy of the book is attached hereto as Exhibit A.

9.    But in or before December 2022, the School Board of Lake County decided to deprive Lake County children of access to this award-winning and beloved work. The Board barred access to *Tango* for all students in kindergarten through third grade, expressly stating that its decision was based on Florida's 2022 House Bill 1557, a vague and overbroad statute that discriminates based on content and viewpoint by barring "[c]lassroom instruction … on sexual orientation or gender identity."

10.    The school district made no attempt to disguise the reason for its decision: it restricted students below the fourth grade from reading *Tango* because of H.B. 1557, as well as the content and viewpoint expressed in the book. It cited no legitimate pedagogical reason for its decision—nor could it: *Tango* was a library book, not part of the school curriculum; the book is factually accurate, non-vulgar, and non-obscene; *Tango* had previously stood on school library shelves; and *Tango* was restricted for illegitimate, narrowly partisan and political reasons.

11.    The restriction of students' access to *Tango* violates the First Amendment to the United States Constitution. By discriminating based on content and viewpoint, it infringes the authors' right to freedom of expression. By restricting access to a book, which was previously freely available, for narrowly partisan and political reasons, it infringes students' right to receive

information.

12.    The authors wrote *Tango* to spread a message of tolerance and equal treatment. They have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior, adoption, and family structures, whether similar to or different from their own—and the student plaintiffs wish to read *Tango* to learn about those very subjects.

13.    Schoolchildren are a uniquely important audience for the historical and scientific account *Tango* offers and the message the authors intend the book to convey. Because *Tango* was previously available in libraries and pulled or restricted based on its content and viewpoint, its restriction infringes students' right to receive information.

14.    Because *Tango*'s restriction in Lake County was specifically motivated and justified by the specter of enforcement of the vague and discriminatory H.B. 1557, that statute is unconstitutional as applied to these facts.

15.    *Tango* was restricted in Lake County public schools during the past school year—and those restrictions and the law that precipitated them, H.B. 1557, are just the beginning of Defendants' unconstitutional restrictions on children's library books. Florida has since passed 2023 House Bill 1069, which expands H.B. 1557's bar on "[c]lassroom instruction … on sexual orientation or gender identity" to cover prekindergarten through eighth grade. All the constitutional infirmities of H.B. 1557 apply equally to H.B. 1069, which

was signed into law on May 17, 2023 and will become effective on July 1, 2023.

16.    Plaintiffs seek to remedy both the harm already done to them under H.B. 1557 and the future harm they will suffer under both H.B. 1557 and H.B. 1069. They seek to restore *Tango* to public school libraries and to make the book accessible to students of all ages in Lake County public schools by the time the 2023–24 school year begins.

17.    Plaintiffs bring this suit to vindicate their First and Fourteenth Amendment rights and to stop the abhorrent and discriminatory practice of restricting access to books based on partisan, non-pedagogical motivations.

## THE PARTIES

### I.    Author Plaintiffs

18.    Plaintiff Peter Parnell is a playwright, television writer, and children's book author. He was a co-producer and executive story editor on the television show *The West Wing* and has written plays for Broadway and Off-Broadway. Parnell is a co-author of *And Tango Makes Three*. He is a resident of New York.

19.    Plaintiff Justin Richardson is an award-winning clinical and academic psychiatrist and a children's book author. He co-wrote the children's book *Christian, the Hugging Lion*—based on a true story about a lion born in captivity and reintroduced to the wild—with Parnell, which was published in 2010. Richardson is a co-author of *And Tango Makes Three*. He is a resident of

New York.

20.    Plaintiffs Parnell and Richardson are married to one another. They live together in New York City with their daughter. They are one of more than 700,000 married same-sex couples in the United States. Their daughter is one of at least 200,000 American children growing up with same-sex parents.

## II.    Student Plaintiffs

### 1.    E.D.B.

21.    E.D.B.'s family moved to Lake County, Florida, when E.D.B. was three years old. Since then, she has resided with her family in Mount Dora, Florida, a city in Lake County. E.D.B. is eight years old and is a rising fourth-grade student at Round Lake Charter School,[1] a public elementary school in Mount Dora. She brings suit by and through her mother, Whitney Morgan Donovan.

22.    E.D.B. and her family are Unitarian Universalists. Their faith teaches that each person has inherent worth and dignity. E.D.B. and her family understand their faith to require tolerance of all people, including LGBTQ+ people. E.D.B. knows that some of her classmates at Round Lake Charter School have same-sex parents. E.D.B. supports her classmates and their parents, in line with the tenets of her faith and the guidance of her parents.

_____

[1] H.B. 1069 makes it explicitly clear that the Ban "applies to charter schools."

23.    E.D.B. loves animals, art class, and LGBTQ+ stories, which her mother and her faith have encouraged her to engage with, given the family's desire to raise E.D.B. with compassion and respect for all people. Her favorite TV show is *The Owl House*, which is acclaimed for including a depiction of a same-sex relationship among its leading characters.

24.    E.D.B. wants to read *Tango* freely and openly at school because of her appreciation of the colorful, welcoming art style *Tango* uses to tell its story. E.D.B. would like to view *Tango*'s illustrations of penguins and is interested in the book because the story showcases two penguin dads who raise an adopted chick together, comparable to some of her classmates' family structures.

25.    E.D.B. wants to borrow *Tango* from her school library. She would do so this summer if she were able to do so. But in or before December 2022, Lake County Schools restricted access to *Tango* "per HB 1557" and made it available only to students in grades four and up. As a current third grader, E.D.B. cannot check out *Tango* now. E.D.B. would also check out *Tango* upon the commencement of her upcoming fourth-grade school year, beginning in fall of 2023. But by the time E.D.B. returns to school, Florida 2023 House Bill 1069, which extends H.B. 1557 through the eighth grade, will have taken effect, keeping *Tango* out of E.D.B.'s reach. If Lake County Schools' restrictions on *Tango* are removed, E.D.B. intends to check *Tango* out from her school library immediately.

### 2.    Z.T.

26.    Z.T. is a twelve-year-old girl who was raised in Rhode Island. Her parent and guardian, Jane Doe,[2] purchased a home in Mount Dora, Florida—a city within Lake County—in May 2023. Z.T. and Jane Doe moved to Lake County, Florida, on June 9, 2023, to allow Doe to care for an ailing family member. Z.T. brings suit by and through her parent and guardian, Jane Doe.

27.    Z.T. is a rising seventh-grade student. In advance of her move, she applied and was admitted to Pinecrest Academy, a public charter school in Tavares, Florida, the county seat of Lake County. She will begin classes at Pinecrest Academy when the school year begins on August 10, 2023.

28.    Z.T.'s favorite subjects in school are English and art. Because she, too, loves animals, she wants to be a veterinarian when she grows up. Z.T. also loves reading. She always carries a book, and if she completes all her chores each week, Doe will reward her with a new one. In Rhode Island, Z.T.'s home was walking distance from a public library. She would sometimes visit the library with one of the family's two dogs, Aphrodite. Z.T. enjoys books so much that she could spend the whole day in the stacks reading.

29.    Z.T. is also gay and has told her family that she's "going to be

---

[2] Jane Doe intends to promptly file a motion for leave to proceed pseudonymously.

married to a girl." Jane Doe and Z.T.'s fraternal twin sister E.T., fully support

Z.T.'s identity. At Z.T.'s request, the family attended Providence's Pride cele-

bration for each of the last three years.

30.    Z.T. has told her friends about her sexual orientation. Because of

her love of reading and her comfort with her own identity, Z.T. loves reading

LGBTQ+ stories. Her favorite books are about same-sex romances between

young adults.

31.    Z.T. wants to read *Tango* freely and openly at school because of her

love of animals and LGBTQ+ stories. Z.T. is drawn to *Tango*'s tolerant,

kindhearted, and family-friendly depiction of two parents of the same sex who

raise an adopted child—a family structure that she could someday have with

a future spouse. She is eager to read stories about alternative family struc-

tures—stories that depict adoption and show that not every child has to have

one father and one mother in order to be part of a responsible, loving family.

32.    Z.T. wants to check *Tango* out from her school library. She would

do so this summer, but, on information and belief, she will not have access to

Pinecrest Academy's school library until she begins school in August. Z.T.

would check out *Tango* upon the commencement of her upcoming seventh-

grade school year on August 10, 2023. By the time Z.T. begins school, Florida

2023 House Bill 1069, which extends H.B. 1557 through the eighth grade, will

have taken effect, keeping *Tango* out of her reach. If Lake County Schools'

restrictions on *Tango* are removed, Z.T. intends to check out *Tango* from her school library immediately upon entering her new school.

### 3.    E.T.

33.    E.T. is Z.T.'s fraternal twin sister. She is a twelve-year-old girl who was raised in Rhode Island. Her parent and guardian, Jane Doe, purchased a home in Mount Dora, Florida—a city within Lake County—in May 2023. E.T. and Jane Doe moved to Lake County, Florida, on June 9, 2023, to allow Doe to care for an ailing family member. E.T. brings suit by and through her parent and guardian, Jane Doe.

34.    E.T. is a rising seventh-grade student. In advance of her move, she applied and was admitted to Pinecrest Academy, a public charter school in Tavares, Florida, the county seat of Lake County. She will begin classes at Pinecrest Academy when the school year begins on August 10, 2023.

35.    E.T. loves animals and visual art. Her family has always fostered dogs, and E.T. loves the family's two adopted dogs, a Yellow Labrador mix and a Bernese Mountain Dog mix. In her spare time, E.T. combines her interests by painting detailed, delicate watercolors of animals.

36.    E.T. wants to read *Tango* freely and openly at school because of its detailed, hand-drawn illustrations of animals. E.T. would like to view *Tango*'s illustrations of penguins and is interested in the book because the story show-cases two penguin dads raising an adopted chick together—just like some of

her friends' parents. E.T. is also interested in the book because E.T. supports her sister, who is gay and may have a similar family structure in the future.

37.    E.T. wants to check *Tango* out from her school library. She would do so this summer, but, on information and belief, she will not have access to Pinecrest Academy's school library until she begins school in August. E.T. would check out *Tango* upon the commencement of her upcoming seventh-grade school year on August 10, 2023. By the time E.T. begins school, Florida 2023 House Bill 1069, which extends H.B. 1557 through the eighth grade, will have taken effect, keeping *Tango* out of her reach. If Lake County Schools' restrictions on *Tango* are removed, E.T. intends to check out *Tango* from her school library immediately upon entering her new school.

**4.    D.S.**

38.    D.S. is a six-year-old boy in the custody and care of his legal guardian, Ann Roe.[3] Roe is D.S.'s biological grandmother (or, as D.S. calls her, "MeMa"). Roe has custody over D.S. and lives with him in Mount Dora, Florida, together with his brother, E.S., and half-brother, M.H, who is not biologically related to Roe but is her chosen family member.

39.    D.S. attends public school in Lake County, Florida. D.S. attended

---

[3] Ann Roe intends to promptly file a motion for leave to proceed pseudonymously.

Beverly Shores Elementary School this past year but will transfer to Triangle Elementary School in the upcoming school year. He is entering first grade.

40.    D.S. enjoys reading books with his MeMa. He often receives new books through Dolly Parton's Imagination Library, in addition to thrifting donated books and checking books out from his school library.

41.    D.S. wants to read *Tango* because of his interest in different family structures. D.S.'s family looks different from the families of many of his friends and classmates at Beverly Shores Elementary School, who live in two-parent households in which all of the children are biologically related to each other and both of their parents. D.S.'s grandmother, Ann Roe, is the primary caregiver for D.S., E.S., and M.H., and intends to adopt them. In addition, D.S. is biologically related to Roe, E.S., and M.H., but M.H. is a chosen family member for Roe, to whom he is not biologically related. The family's nontraditional structure has made D.S. want to learn more about different types of family units, including families with adopted children.

42.    D.S. also wants to read *Tango* because of his fascination with animals and interest in becoming an "animal doctor" when he grows up. D.S. has a particular love of animals, including the family's three dogs. He also has a collection of toy animals, which he treasures. D.S. loves visiting the zoo with E.S., M.H., and his MeMa; the family recently visited the Central Florida Zoo in Sanford, Florida, to celebrate D.S.'s birthday. D.S.'s favorite animal is

currently the pangolin.

43.    D.S. wants to check *Tango* out from his school library in order to read the book with Ann Roe. He would do so this upcoming fall semester at Triangle Elementary School but will be unable to do so because access to *Tango* has been restricted for kindergarten through third graders in Lake County public schools. If Lake County Schools' restrictions on *Tango* are removed, D.S. intends to check out *Tango* from his school library as soon as the fall semester commences.

**5.    E.S.**

44.    E.S. is a five-year-old boy in the custody and care of his legal guardian, Ann Roe. Roe is E.S.'s biological grandmother (or, as E.S. calls her, "MeMa"). Roe has custody over E.S. and lives with him in Mount Dora, Florida, together with his brother, D.S., and half-brother, M.H, who is not biologically related to Roe but is her chosen family member.

45.    E.S., his brother D.S., his half-brother M.H, and his grandmother Roe are very close, and he views them all as one family.

46.    E.S. will enter kindergarten at Triangle Elementary School—a public school in Lake County, Florida—in the upcoming school year.

47.    E.S. enjoys reading books with his MeMa. He often receives new books through Dolly Parton's Imagination Library, in addition to thrifting donated books. E.S. is the biggest reader in the family and is usually the first to

pick books for MeMa to read to the children—after E.S. asks for MeMa to read them a particular book, D.S. and M.H. will often jump in with their own suggestions. E.S. is excited to start school this fall, where he will be able to pick new books to read from the Triangle Elementary School library.

48.     E.S. wants to read *Tango* because of his interest in different family structures. E.S.'s family looks different from the families of many other students at Triangle Elementary School, who live in two-parent households in which all of the children are biologically related to each other and both of their parents. E.S.'s grandmother, Ann Roe, is the primary caregiver for E.S., D.S., and M.H., and intends to adopt them. In addition, E.S. is biologically related to Roe, D.S., and M.H., but M.H. is a chosen family member for Roe, to whom he is not biologically related. The family's nontraditional structure has made E.S. want to learn more about different types of family units, including families with adopted children.

49.     E.S. wants to check *Tango* out from his school library in order to read the book with Ann Roe. He would do so this upcoming fall semester at Triangle Elementary School but will be unable to do so because access to *Tango* has been restricted for kindergarten through third graders in Lake County public schools. If Lake County Schools' restrictions on *Tango* are removed, E.S. intends to check out *Tango* from his school library as soon as the fall semester commences.

6.    **M.H.**

50.    M.H. is an eight-year-old boy in the custody and care of his legal guardian, Ann Roe. M.H. is not biologically related to Roe, but M.H. has lived with her since he was four months old. Like Roe's biological grandchildren, D.S. and E.S., M.H. calls Roe his "MeMa." Ann Roe has custody over M.H. and lives with him in Mount Dora, Florida, together with half-brothers D.S. and E.S. M.H. views Roe, D.S., E.S., and himself as a family.

51.    M.H. attends public school in Lake County, Florida. M.H. attended Beverly Shores Elementary School this past year but will transfer to Triangle Elementary School in the upcoming school year. He is entering third grade.

52.    M.H. enjoys reading books with his MeMa. He often receives new books through Dolly Parton's Imagination Library, in addition to thrifting donated books and checking books out from his school library.

53.    M.H. wants to read *Tango* because of his interest in different family structures. Roe intends to adopt M.H. Although D.S. and E.S. are biologically related to Roe, M.H. is Roe's chosen family member to whom she is not biologically related. M.H. has a close relationship with Roe, whom he views as part of his family even though she is not biologically related to him. M.H. likes to draw pictures of his family. M.H.'s pictures will often include MeMa, D.S., E.S., and himself with a heart next to the four figures: he tells MeMa that the drawings are of his family. The family's nontraditional structure has made him

18

want to learn more about different types of family units, including families with adopted children.

54.    M.H. wants to check *Tango* out from his school library in order to read the book with Ann Roe. He would do so this upcoming fall semester at Triangle Elementary School but will be unable to do so because access to *Tango* has been restricted for kindergarten through third graders in Lake County public schools. If Lake County Schools' restrictions on *Tango* are removed, M.H. intends to check out *Tango* from his school library as soon as the fall semester commences.

## III.    Lake County Defendants

55.    Defendant School Board of Lake County, Florida (the "Lake County Board"), is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.* It operates in Lake County, Florida, overseeing Lake County Schools, a public school district that serves over 45,000 primary and secondary school students. Its powers and duties include implementing and enforcing H.B. 1557 and will include implementing and enforcing H.B. 1069 when it goes into effect on July 1, 2023. *See id.* §§ 1001.42(8)(c)(3), (7); *see also id.* § 1001.42(15).

56.    Defendant Diane Kornegay is the Superintendent of Lake County Schools. In this role, Kornegay "[e]xercise[s] general oversight over the district school system" and enforces rules adopted by the Lake County Board. *Id.*

§ 1001.49. She is sued in her official capacity.

## IV.    Florida State Defendants

57.    Defendant Manny Díaz, Jr., is Florida's Commissioner of Education—the chief executive of the Florida Department of Education. Fla. Const. art. IX, § 1; Fla. Stat. § 20.15(2). As Commissioner, Díaz is responsible for enforcing H.B. 1557 and will be responsible for enforcing H.B. 1069 when it goes into effect on July 1, 2023. Fla. Stat. § 1001.42(8)(c)(7)(b)(I). He is sued in his official capacity.

58.    Defendant Ben Gibson is the Chair of the Florida State Board of Education (the "State Board"). The State Board oversees primary and secondary public education in Florida. Fla. Const. art. IX; Fla. Stat. § 20.15(1). The State Board supervises and regulates local public schools, including through the adoption of rules. It administers, enforces, and implements regulations pursuant to H.B. 1557 and will do the same for regulations pursuant to H.B. 1069 when the statute becomes effective on July 1, 2023. Fla. Stat. § 1001.42(8)(c)(7)(b)(I). The State Board's chair is responsible for enforcing H.B. 1557 and will be responsible for enforcing H.B. 1069 when it goes into effect. Gibson is sued in his official capacity.

59.    Defendant Ryan Petty is the Vice Chair of the State Board. The State Board oversees primary and secondary public education in Florida. Fla. Const. art. IX; Fla. Stat. § 20.15(1). The State Board supervises and regulates

local public schools, including through the adoption of rules. It administers, enforces, and implements regulations pursuant to H.B. 1557 and will do the same for regulations pursuant to H.B. 1069 when the statute becomes effective on July 1, 2023. Fla. Stat. § 1001.42(8)(c)(7)(b)(I). The State Board's vice chair is responsible for enforcing H.B. 1557 and will be responsible for enforcing H.B. 1069 when it goes into effect. Petty is sued in his official capacity.

60.    Defendants Monesia Brown, Esther Byrd, Grazie P. Christie, Kelly Garcia, and MaryLynn Magar are members of the State Board. The State Board oversees primary and secondary public education in Florida. Fla. Const. art. IX; Fla. Stat. § 20.15(1). The State Board supervises and regulates local public schools, including through the adoption of rules. It administers, enforces, and implements regulations pursuant to H.B. 1557 and will do the same for regulations pursuant to H.B. 1069 when the statute becomes effective on July 1, 2023. Fla. Stat. § 1001.42(8)(c)(7)(b)(I). The State Board's members are responsible for enforcing H.B. 1557 and will be responsible for enforcing H.B. 1069 when it goes into effect. They are sued in their official capacities.

## **JURISDICTION**

61.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and laws of the United States.

62.    This Court also has subject matter jurisdiction pursuant to 28

U.S.C. § 1343(a)(3) because Plaintiffs were deprived, under color of state law, of rights, privileges, and/or immunities secured by the Constitution of the United States.

## VENUE

63.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, the Lake County Defendants are residents of the Middle District of Florida, and, on information and belief, all other Defendants are residents of Florida.

64.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in the Middle District of Florida.

65.    Venue is proper in the Ocala Division because, on information and belief, the Lake County Defendants are residents of Lake County, Florida, and because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in Lake County, Florida.

## FACTUAL ALLEGATIONS

### I.    Florida Passes H.B. 1557 and H.B. 1069, Targeting Disfavored Speech

66.    Florida law guarantees that "all K-12 public school students are entitled to a uniform, safe, secure, efficient, and high quality system of education, one that allows students the opportunity to obtain a high quality

education" that is "made available without discrimination on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status." Fla. Stat. §§ 1002.20(1), (7).

67.     But in 2022, Florida did violence to its guarantee of "high quality education" by passing H.B. 1557, a vague and harsh statutory scheme also known as the Parental Rights in Education Act (the "Act").

68.     Section 1 of the Act provides, in relevant part, that "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." 2022 Fla. Laws ch. 22 (codified at Fla. Stat. § 1001.42(8)(c)(3)) (the "Ban").[4]

69.     In 2023, Florida made matters worse by passing a follow-on bill, H.B. 1069. Section 3 of that bill expands the Ban by providing, in relevant part, that "[c]lassroom instruction by school personnel or third parties on sexual

---

[4] The Florida Board of Education adopted a rule aimed at educators that mirrored the Ban by making it professional misconduct for educators to provide classroom instruction relating to sexual orientation or gender identity for kindergarten through third-grade students. *See* Fla. Admin. Code r. 6A-10.081(6). It has since adopted a new rule that expands the prior rule to also cover students in prekindergarten and students in grades four through twelve, aside from two exceptions for fourth- through twelfth-grade students. *See id.* r. 6A-10.081(7). That rule took effect on May 23, 2023.

orientation or gender identity may not occur in **prekindergarten** through **grade 8**," with two narrow exceptions for health education.[5] 2023 Fla. Laws ch. 105 (emphasis added) (to be codified at Fla. Stat. § 1001.42(8)(c)(3)). H.B. 1069 leaves the substantive provisions of the Ban untouched and, in relevant part, merely replaces "kindergarten" with "prekindergarten" and "grade 3" with "grade 8." Its facial purpose and effect are to apply the restrictions of H.B. 1557 to students from prekindergarten through eighth grade. H.B. 1069 will take effect, and thereby expand the Ban, on July 1, 2023. *Id.* § 9.

70.    The Ban is enforced by draconian penalties. In November 2022, the State Board enacted regulations implementing the Act. A Florida educator who intentionally violates the Ban now faces revocation of their teaching license. Fla. Admin. Code r. 6A-10.081(2). By threatening teachers, the Ban threatens students' ability to receive a meaningful, robust education.

---

[5] The first exception requires teaching sixth- through twelfth-grade students "the benefits of sexual abstinence as the expected standard and the consequences of teenage pregnancy." Fla. Stat. § 1003.42(2)(n)(3). The second exception allows district school boards to "provide [health education] instruction [regarding AIDS]" and requires that "[t]hroughout instruction [regarding AIDS], sexually transmitted diseases, or health education [about] human sexuality, a school shall … [t]each abstinence from sexual activity outside of marriage as the expected standard for … students while teaching the benefits of monogamous heterosexual marriage." Fla. Stat. § 1003.46. These exceptions are inapplicable to *Tango* because it is a children's library book that, on information and belief, is not part of the curriculum in Lake County health education classes.

71.    In addition, among other things, any "concern[ed]" or litigious parent may sue their school district over a violation of the Act. If they win, they may recover fees and costs. If the school district wins, it may not do the same. The prospect of such enforcement has a chilling effect on protected speech.

72.    The Ban is also enforced directly by school boards, which "shall exercise all powers and perform all duties" under H.B. 1557 and H.B. 1069. Fla. Stat. § 1001.42.

73.    The Ban does not expressly mention books or school libraries. But neither does it expressly exempt them. Because educational professionals and schools who are found to violate the Ban face crushing liability and loss of their livelihoods, the Ban has had a chilling effect on speech, which directly and negatively impacts children, authors, and public school libraries, not to mention the quality of Florida public education. The Ban's vagueness, in combination with its harsh penalties, make it more likely to be applied expansively—such as to public school libraries—at the expense of the authors' free speech rights and the students' right to receive information.

74.    The Ban has not only created a vague and harsh statutory regime; it has opened Florida public schools to the well-known harms associated with ideological censorship. Political and partisan censorship is the intent of the Ban. The Act's sponsor, Senator Dennis Baxley, indicated that the goal of the

Ban was to stop "the departure from the core belief systems and values."[6] In discussing the Ban during April 2022, Governor Ronald DeSantis likewise stated that "[t]hings like woke gender ideology have no place in the schools period."[7] Florida officials concede that the Ban is designed to censor or eliminate viewpoints disfavored by the State government from Florida public school libraries.[8]

75.    Among other things, the Ban is designed to discriminate against the viewpoint that same-sex relationships and families with same-sex parents

---

[6] Fla. S., recording of proceedings, at 08:09:30–08:12:00 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true.

[7] Fox News, *DeSantis: Education not indoctrination*, at 6:06–40, YouTube (Apr. 29, 2022), https://www.youtube.com/watch?v=12IVeeq2ydk [https://perma.cc/Q5N9-HSFD].

[8] As pictured below, Christina Pushaw, a spokesperson for Governor DeSantis, recently tweeted the image of a hand waving goodbye in response to the news that the majority of queer parents are considering leaving Florida because of H.B. 1557:



exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

76.    The patent content and viewpoint discrimination intended by the Ban became clear during the legislative process. By way of example, during deliberations on the Act, Senator Tina Polsky proposed an amendment to clarify that "sexual orientation" "means an individual's heterosexuality, homosexuality, or bisexuality." That amendment was voted down.[9] An amendment proposed by Republican Senator Jeff Brandes would have replaced "sexual orientation or gender identity" with "human sexuality or sexual activity." It too was voted down, despite Senator Brandes imploring his colleagues that "[i]f the intent [of H.B. 1557] is not to marginalize anyone, let's make sure we aren't."[10]

77.    The State thus proceeded with a Ban that uses the terms "sexual orientation" or "gender identity" without defining them (much less defining them to include all sexual orientations). Because of its imprecision, the Ban does not equally affect viewpoints on all sexual orientations. Instead, the Ban was intended invidiously to discriminate against a particular disfavored

---

[9] Fla. S., recording of proceedings, at 04:50:30–04:55:00 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true.

[10] Fla. S. Comm. on Appropriations, recording of proceedings, at 01:04:00–01:07:00 (Feb. 28, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_3xdlmr8t-202202281030&Redirect=true.

viewpoint and, through its vagueness, has been discriminatorily enforced to target only that disfavored viewpoint.

78.    The Ban's intentional vagueness did not end with its failure to define "sexual orientation" and "gender identity." It also uses the vague term "classroom instruction." Senator Lauren Book proposed an amendment that would have helped to resolve what constitutes "classroom instruction" under H.B. 1557 by excluding from that definition "instruction or discussion relating to" "family structures," "objective historical events," "bullying prevention," "discussions between students," and "questions asked by students and any answer."[11] This amendment was also voted down. The Ban did not adopt any definition of "classroom instruction," magnifying its chilling effect by leaving educators to wonder whether it applied to any mention of LGBTQ+ teachers' families, to teachers' references to students who have come out as LGBTQ+, to discussions during extracurricular activities, or to books and other materials in school libraries.

79.    The legislative process also made clear that legitimate pedagogical concerns were not the driving force behind the Ban. Had they passed, the amendments proposed by Senator Randolph Bracy and Representative Marie

---

[11] Fla. S., recording of proceedings, at 05:23:30–05:33:30 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true.

Paule Woodson would have clarified that H.B. 1557 "does not apply to any discussion between a student who identifies as transgender, gender nonconforming, non-binary, or otherwise LGBTQ+ and their peers." Instead, the final version of H.B. 1557 intentionally left open the ominous possibility that it required school districts to police conversations between students about their LGBTQ+ identities.[12] This threat impedes, rather than facilitates, a productive learning environment.

80.    The threat of the Ban's enforcement thus has a chilling effect that limits discussion of and the provision of school resources on factually accurate, age-appropriate topics, such as the simple fact that LGTBQ+ people and animals exist.

81.    As set forth below, the Ban has been applied in a discriminatory fashion to eliminate or restrict access to pedagogically appropriate material in public school libraries, with no legitimate justification. The Ban has recently been invoked as a basis to restrict kindergarten through third-grade students from accessing *Tango* in public school libraries in Lake County. On information

---

[12] Fla. S., recording of proceedings, at 05:33:30–05:37:00 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true; Fla. H.R, recording of proceedings, at 03:47:30–03:54:00 (Feb. 22, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_1az3it1i-202202221300&Redirect=true.

and belief, the Ban will imminently be applied to expand that restriction to cover pre-kindergarten through eighth-grade students.

## II. The Story of Tango and the Authorship of *And Tango Makes Three*

82.    *Tango* tells the true story of Roy and Silo, two male chinstrap penguins that resided at the Central Park Zoo. By 2004, Roy and Silo had been "completely devoted to each other" for "nearly six years."[13] Roy and Silo are pictured below:



---

[13] Dinitia Smith, *Love That Dare Not Squeak Its Name*, N.Y. Times (Feb. 7, 2004), https://www.nytimes.com/2004/02/07/arts/love-that-dare-not-squeak-its-name.html [https://perma.cc/K79J-THKF].

83.    A conscientious zookeeper noticed the relationship between the two penguins and correctly concluded that the penguins had formed a pair bond. The zookeeper observed the pair building a nest and attempting to incubate an egg-shaped rock. "At one time, [Roy and Silo] seemed so desperate to incubate an egg together that they put a rock in their nest and sat on it, keeping it warm in the folds of their abdomens."[14]

84.    To test their readiness to incubate a live egg, the zookeeper first gave the pair a dummy egg and observed their incubation behaviors. Betty and Porkey, another penguin pair, had previously hatched their own eggs but had never been able to successfully hatch more than one at a time. When Betty laid two fertile eggs, the zookeeper then gave one egg to Roy and Silo to allow both eggs to hatch and both chicks to thrive. Roy and Silo successfully incubated the egg and adopted and raised the resulting chick, which zookeepers named Tango.

85.    News outlets across the country reported on Roy, Silo, and Tango. When the Author Plaintiffs read about Roy, Silo, and Tango, they recognized that the penguins' tale was perfectly suited to a children's story. In their view, this was "a way to talk about this kind of family that [would] work at the level

---

[14] *Id.*

of a picture book and not a didactic 'it's O.K. to be different' story."[15]

86.    The Authors wrote *Tango*, and Simon & Schuster published it in 2005. It has since been published in 15 languages and on four continents. Simon & Schuster markets it as a fiction book most suitable for young children but appropriate for all ages.

87.    *Tango* is appropriate for children. It contains no obscenity or vulgarity of any kind. It does not contain any offensive language or sexually explicit content.[16]

88.    *Tango* is factually accurate. Roy, Silo, and Tango were all real, and the story of Roy and Silo's bond and Tango's adoption is nonfiction.[17] It is a biological fact that same-sex behavior is "a nearly universal phenomenon in the animal kingdom."[18] Tango offers children a heartwarming and accessible

---

[15] Jennifer 8. Lee, *A Baby for the Gay Authors Behind the Daddy Penguins*, N.Y. Times (Oct. 2, 2009), https://archive.nytimes.com/cityroom.blogs.nytimes.com/2009/10/02/a-baby-for-the-gay-authors-behind-the-daddy-penguins/ [https://perma.cc/C5EE-7K23].

[16] *See generally* Ex. A, Justin Richardson & Peter Parnell, *And Tango Makes Three* (2005).

[17] *See id.* at 32 (describing the factual basis of the story).

[18] *Same-Sex Behavior Seen in Nearly All Animals, Review Finds*, Sci. Daily (June 17, 2009), https://www.sciencedaily.com/releases/2009/06/090616122106.htm [https://perma.cc/PZA8-BQJ9].

introduction to an important area of animal science by telling the true story of easily relatable animals at a popular zoo. *Tango* helps children to learn about science through simple, non-vulgar words and illustrations.

89.  *Tango* is lauded. It is an American Library Association Notable Children's Book, a Bank Street Best Book of the Year, a Nick Jr. Family Magazine Best Book of the Year, an ASPCA Henry Bergh Children's Book Award winner, and a BookSense Children's Pick. It has received the Gustavus Myers Outstanding Book Award and the Sheffield Children's Book Award, and has received starred reviews in Kirkus Reviews, School Library Journal, Publishers Weekly, and Booklist. *Tango* is an Amazon Teachers' Pick and has been one of the top-selling books in Amazon's "Children's Books on Adoption" category for over 15 years. The book's cover is pictured below:



90.    *Tango* takes no position on policy. It does not lecture, hector, or tell children how to feel.

91.    *Tango*, instead, depicts a family just like the Authors' and hundreds of thousands of other families nationwide—two same-sex parents raising an adopted child together.[19] Its meaning, message, and viewpoint are simple: *Tango* says that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

92.    The Authors have a broader goal for *Tango* than merely selling

---

[19] There are also five million Americans who were adopted, like Tango.

copies or achieving critical acclaim. They seek to ensure the book is available to all interested readers, including in public school libraries for children who wish to learn about animal behavior, adoption, or family structures.

93.   *Tango* has been available in public school libraries nationwide for more than 15 years. There is no evidence that *Tango*'s presence in these libraries has ever caused disciplinary disruptions or harm of any kind at any school, anywhere, at any time.

## III.   The Lake County Defendants Restrict Students' Access to *Tango*, Citing H.B. 1557

94.   On or before December 11, 2022, Lake County Schools—administered by the Lake County Board—barred kindergarten through third-grade students in the district from accessing *Tango* in their public school libraries.

95.   In response to a public record request, the only explanation Lake County Schools provided is that *Tango* was "[a]dministratively removed due to content regarding sexual orientation/gender identification prohibited in HB 1557."[20] Speaking to media, Lake County Schools has stuck to its line: *Tango*'s presence on the shelves violates Florida law.[21]

---

[20] Ex. B (Lake County Schools' e-mail response to a public records request regarding "book challenges, reviews, removals, and restrictions.").

[21] Joshua Q. Nelson, *Florida school district bans book about real-life gay penguin relationship, citing Parental Rights law*, Fox News (Jan. 10, 2023) (school official quoted as saying *Tango* was removed "in alignment with Florida HB 1557"), https://www.foxnews.com/media/florida-school-district-bans-book-

96.    As recently as May 29, 2023, as pictured below, Lake County's school library catalog, Destiny, declared that *Tango* is restricted because of the Ban and identified "homosexuality" as among the book's subjects. A screenshot of the catalog, annotated with red boxes, is below:



97.    Indeed, a search of the same catalog reveals that Lake County is currently restricting 40 books, including *Tango*, "per HB 1557."[22] Thirty-seven

---

about-real-life-gay-penguin-relationship-citing-parental-rights-law [https://perma.cc/T2ZJ-Y646].

[22] *See* Ex. C (results of a search for "HB 1557" in the catalogs of all Lake County public school libraries) (last visited June 19, 2023). Although there are 44 results shown in Exhibit B, four of the results are duplicates.

out of these 40 books have been given labels by the library system as including content related to "[h]omosexuality," "[g]ay youth," "[g]ay parents," "[t]ransgender people," and other such terms associated with LGBTQ+ individuals. Three additional restricted books have not been given such labels by the library system, but they also contain content relating to LGBTQ+ issues and themes.[23] Just like *Tango*, each of the other 39 restricted books expresses a message of inclusion and tolerance, or simply acknowledges the existence, of LGBTQ+ individuals—a viewpoint disfavored by the Lake County Defendants.

98.    *Tango* is in imminent danger of being restricted even further. On information and belief, Lake County Schools will enforce H.B. 1069, which extends the Ban through grade eight, in the same discriminatory fashion that it has applied H.B. 1557. The relevant part of the statute, by its text, merely replaces H.B. 1557's "kindergarten" with "prekindergarten" and H.B. 1557's "grade 3" with "grade 8." On information and belief, Lake County Schools will apply H.B. 1069 to restrict access to *Tango* through grade eight.

---

[23] *Rise Up!: The Art of Protest* by Jo Rippon is described in the Destiny catalog system as including "[p]hotographs of protest posters celebrat[ing] the ongoing fight for … LGBT rights." The Kirkus Reviews description of *We Move the World* by Kari Lavelle on the Destiny catalog system states that "[t]he adult achievements celebrated [in the book] are progressive and diverse[,] … [including] Brazil's Pride parade … and the AIDS Memorial Quilt." Finally, *Milo Imagines The World* by Matt de la Peña contains an illustration of two people in dresses (one of whom is referred to as a woman in the story and the other whose gender is never identified) getting married to each other.

99.    In applying H.B. 1557 to restrict access to *Tango* in public school libraries, Lake County Schools, the Lake County Board, and the Board's executives discriminated on the basis of content and viewpoint: They barred students from accessing *Tango* because of its content—namely, the story of a same-sex animal couple with an adopted child—and its expressed viewpoint—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

100.    On information and belief, in applying H.B. 1069 to further restrict access to *Tango* in public school libraries, Lake County Schools, the Lake County Board, and the Board's executives will discriminate on the basis of content and viewpoint: They will bar students from accessing *Tango* because of its content—namely, the story of a same-sex animal couple with an adopted child—and its expressed viewpoint—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

101.    If Lake County Schools were not engaging in viewpoint discrimination, then it would not have limited its restriction of books to those exclusively featuring LGBTQ+ characters or discussing LGBTQ+-related content such as Pride parades. It would have barred students below the fourth grade from reading other books about animal behavior, families, or adoption that

lacked any LGBTQ+-related content. But Lake County Schools did no such thing, enforcing H.B. 1557 solely—in 40 different instances—against books depicting or endorsing the full equality of LGBTQ+ people.

102.  On information and belief, Lake County Schools has never cited, or considered citing, H.B. 1557 to restrict books featuring heterosexual families or relationships. The school district's enforcement of the Ban has suppressed one and only one point of view.

103.  Restricting access to *Tango* in public school libraries was not a legitimate regulation of curriculum because school libraries are not classrooms where a prescribed curriculum must be followed. Books in school libraries are, by nature, optional reading. Even if library shelves constituted curriculum, Lake County had no legitimate pedagogical purpose for barring students' access to *Tango*. *Tango* is age-appropriate for Lake County school students, including those below fourth grade; it contains no obscenity or vulgarity; and it is factually accurate. Lake County's prohibition on allowing kindergarten through third-grade students to access *Tango* in their school libraries violates the First Amendment by discriminating against the Author Plaintiffs on the basis of the content and viewpoint contained in *Tango*.

104.  To the extent that H.B. 1557, and regulations adopted by the State Defendants thereunder, mandate the restriction of *Tango*, H.B. 1557 and its implementing regulations violate the First Amendment by discriminating

against protected speech on the basis of content and viewpoint.

105.  To the extent that H.B. 1069 mandates the restriction of *Tango*, H.B. 1069 violates the First Amendment by discriminating against protected speech on the basis of content and viewpoint.

106.  The Authors have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior, adoption, and family structures, whether similar to or different from their own. Schoolchildren are a uniquely important audience for the scientific and historical account *Tango* offers and the message the Authors intend the book to convey.

107.  By censoring *Tango* and barring students below the fourth grade from accessing the book in Lake County public school libraries, Defendants have stripped the Authors' book of an essential aspect of its communicative value. They have also injured the reputation of the Authors and *Tango* by implicitly and falsely suggesting that the book contains obscene, vulgar, sexual, or age-inappropriate material that deserved to be banned—contrary to the wholesome, positive and family-friendly content of the book[24]—and have thereby deprived the Authors of more of their target audience and speech rights.

108.  The restriction of *Tango* has likewise infringed the Student

---

[24] *See generally* Ex A.

Plaintiffs' right to receive information. Students' access to books like *Tango* both preserves the right of *Tango*'s authors to speak and is essential to students' active and effective participation in the United States' pluralistic, diverse society. The Student Plaintiffs desire to read *Tango* to explore areas of interest and importance not covered in the prescribed curriculum. By restricting the Student Plaintiffs' access to *Tango* for narrowly partisan political reasons, the Lake County Defendants have prohibited them from doing so.

109.    E.D.B. wants to check *Tango* out at her first opportunity. She would check out *Tango* this summer, before her fourth-grade year begins in the fall, if she had access to it. She would check out *Tango* upon returning to school, if she had access to it. But by the time she returns to school, H.B. 1069 will have taken effect, extending the Ban to grades four through eight (as well as to prekindergarten). Because H.B. 1069 changes the grade levels to which the Ban applies but leaves the substance of the Ban untouched, the Lake County Defendants are highly likely to enforce it the same way they currently enforce H.B. 1557 but expanded to cover prekindergarten through eighth grade. The Lake County Defendants applied H.B. 1557 to restrict access to *Tango*, and the express purpose and effect of H.B. 1069 is to expand the restrictions of H.B. 1557 through grade eight as of July 1, 2023. E.D.B. thus faces a certainly impending injury that she will not be able to check out *Tango* at the start of the school year because H.B. 1069 will then be in force.

110. Z.T. wants to check out *Tango* at the beginning of the 2023–24 school year. She would check out *Tango* upon beginning school, if she had access to it. But by the time she begins school, H.B. 1069 will have taken effect, extending the Ban to grades four through eight (as well as to prekindergarten). Because H.B. 1069 changes the grade levels to which the Ban applies but leaves the substance of the Ban untouched, the Lake County Defendants are highly likely to enforce it the same way they currently enforce H.B. 1557 but expanded to cover prekindergarten through eighth grade. The Lake County Defendants applied H.B. 1557 to restrict access to *Tango*, and the express purpose and effect of H.B. 1069 is to expand the restrictions of H.B. 1557 through grade eight as of July 1, 2023. Z.T. thus faces a certainly impending injury that she will not be able to check out *Tango* at the start of the school year because H.B. 1069 will then be in force.

111. E.T. wants to check out *Tango* at the beginning of the 2023–24 school year. She would check out *Tango* upon beginning school, if she had access to it. But by the time she begins school, H.B. 1069 will have taken effect, extending the Ban to grades four through eight (as well as to prekindergarten). Because H.B. 1069 changes the grade levels to which the Ban applies but leaves the substance of the Ban untouched, the Lake County Defendants are highly likely to enforce it the same way they currently enforce H.B. 1557 but expanded to cover prekindergarten through eighth grade. The Lake County

Defendants applied H.B. 1557 to restrict access to *Tango*, and the express purpose and effect of H.B. 1069 is to expand the restrictions of H.B. 1557 through grade eight as of July 1, 2023. E.T. thus faces a certainly impending injury that she will not be able to check out *Tango* at the start of the school year because H.B. 1069 will then be in force.

112. D.S. wants to check *Tango* out at the beginning of the 2023–24 school year. He would check out *Tango* during the upcoming fall semester if he had access to the book in their school library. He will be unable to check out *Tango* from his school upon the commencement of the new school year because access to *Tango* has been restricted for kindergarten through third graders in Lake County public schools. If Lake County Schools' restrictions on *Tango* are removed, D.S. intends to check out *Tango* from his school library when the fall semester commences.

113. E.S. wants to check *Tango* out at the beginning of the 2023–24 school year. He would check out *Tango* during the upcoming fall semester if he had access to the book in his school library. He will be unable to check out *Tango* from his school upon the commencement of the new school year because access to *Tango* has been restricted for kindergarten through third graders in Lake County public schools. If Lake County Schools' restrictions on *Tango* are removed, E.S. intends to check out *Tango* from his school library when the fall semester commences.

114.  M.H. wants to check *Tango* out at the beginning of the 2023–24 school year. He would check out *Tango* during the upcoming fall semester if he had access to the book in his school library. He will be unable to check out *Tango* from their school upon the commencement of the new school year because access to *Tango* has been restricted for kindergarten through third graders in Lake County public schools. If Lake County Schools' restrictions on *Tango* are removed, M.H. intends to check out *Tango* from his school library when the fall semester commences.

115.  In the alternative, to the extent that H.B. 1557 and its implementing regulations do not mandate the restriction of *Tango*, the Act and regulations are unconstitutionally vague and overbroad. H.B. 1557 applies to "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity." The Act does not define "classroom instruction," "sexual orientation," or "gender identity," and does not limit the universe of "school personnel" or unspecified "third parties" subject to the Ban. *Tango* was a library book and not a part of a classroom curriculum. On information and belief, no classes in Lake County Schools prescribed *Tango* as part of their curriculum. And *Tango* does not provide instruction on sexual orientation or gender identity. It merely provides a factually accurate depiction of two animals of the same sex who formed a pair bond and raised a chick together. The vagueness of the Act caused or allowed Lake County Schools to adopt an overbroad

interpretation of the Ban, censor the Authors' book, and thereby infringe the Authors' freedom of expression and the Student Plaintiffs' right to receive information.

## CAUSES OF ACTION

### COUNT I
**First Amendment to the United States Constitution:**
**Content and Viewpoint Discrimination**
**Under H.B. 1557 and H.B. 1069**
**(Brought pursuant to 42 U.S.C. § 1983 by the Author Plaintiffs)**

116.  Plaintiffs incorporate paragraphs 1–20 and 55–106 by reference as though fully set forth herein.

117.  The First Amendment to the United States Constitution provides that the government "shall make no law … abridging the freedom of speech." U.S. Const. amend. I. The First Amendment is made applicable to the State of Florida by the Due Process Clause of the Fourteenth Amendment. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 243 (1936).

118.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A content-based regulation is unconstitutional unless the government "prove[s] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* "Viewpoint discrimination is … an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819,

829 (1995). It is "presumed to be unconstitutional," and "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

119. *And Tango Makes Three* is protected speech by the Author Plaintiffs. The Lake County Defendants previously permitted, purchased, and provided the book in public school libraries. The Lake County Defendants restricted access to the book within public school libraries based on the topic discussed, idea or message expressed, and opinion of the Author Plaintiffs—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children. The Lake County Defendants restricted *Tango* based on the threat of the State Defendants' enforcement of provisions of the Act that punish speech based on the topic discussed, idea or message expressed, and opinion of the speaker. The Lake County Defendants' action had no legitimate pedagogical purpose.

120. H.B. 1557 is unconstitutional as applied to the Author Plaintiffs by Defendants. Neither the Act nor its application here furthers a compelling interest or is narrowly tailored to achieving that interest.

121. H.B. 1069 is unconstitutional as it will be applied to the Author Plaintiffs by Defendants. Neither the Act nor its impending application here

furthers a compelling interest or is narrowly tailored to achieving that interest.

122. The enforcement of H.B. 1557 and the restriction of access to *Tango* were actions under color of state law that deprived the Author Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

123. The impending enforcement of H.B. 1069 and the expanded restriction of access to *Tango* are actions under color of state law that will deprive the Author Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

124. As a direct and proximate result of Defendants' unlawful conduct, the Author Plaintiffs have been and will be injured in their ability to express themselves, in violation of the First Amendment. This injury is continuing and irreparable. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

125. The Author Plaintiffs are entitled to a preliminary injunction requiring the Lake County Defendants to restore unrestricted student access to *Tango* in their jurisdiction before the first day of school on August 10, 2023, and throughout the pendency of this action.

126. The Author Plaintiffs are entitled to a declaratory judgment that H.B. 1557 and H.B. 1069 are unconstitutional and therefore void to the extent that they require the removal or restriction of any books—such as *Tango*—in school libraries. The Author Plaintiffs are further entitled to a declaratory

judgment that Defendants' actions violated the Author Plaintiffs' rights under the Constitution and laws of the United States.

127.   The Author Plaintiffs are entitled to a permanent injunction requiring the Lake County Defendants to restore unrestricted student access to *Tango* in their jurisdiction and prohibiting the State Defendants from enforcing H.B. 1557 or H.B. 1069 to require the removal or restriction of any books— such as *Tango*—in public school libraries.

## COUNT II
### First Amendment to the United States Constitution:
### Violation of Right to Receive Information
### Under H.B. 1557 and H.B. 1069
### (Brought pursuant to 42 U.S.C. § 1983 by the Student Plaintiffs)

128.   Plaintiffs incorporate paragraphs 1–17, 21–104, and 107–113 by reference as though fully set forth herein.

129.   The First Amendment to the United States Constitution "protects the right to receive information and ideas," and this right is violated by "the removal of books from the shelves of a school library" for the purpose of "deny[ing] … access to ideas with which [the government] disagree[s]." *Pico*, 457 U.S. at 866–67, 871. This right is incorporated to the States by the Due Process Clause of the Fourteenth Amendment. *See Grosjean*, 297 U.S. at 243.

130.   By restricting access to *Tango* for narrowly partisan, political reasons, Defendants have violated the Student Plaintiffs' right to receive information.

131.  E.D.B. desires to read *Tango* and would check it out from her school library if she could. *Tango* was previously available in her school library but access to the book was restricted by the Lake County Defendants pursuant to H.B. 1557 for narrowly partisan, political reasons. The book was restricted because of the content it contains—namely, the depiction of two same-sex penguins and their adoption of a penguin chick—and viewpoint it expresses—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

132.  As a direct and proximate result of Defendants' unlawful conduct, E.D.B. has been injured in her right to receive information and ideas. This injury is continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

133.  E.D.B. is presently unable to check out *Tango* from her school library and, on information and belief, E.D.B. will not be able to check out *Tango* once H.B. 1069 enters into force on July 1, 2023. At that point, H.B. 1069's provisions will extend the Ban to prekindergarten and grades four through eight without changing the Ban's substance. Accordingly, the Lake County Defendants are highly likely to enforce H.B. 1069 the same way they currently enforce H.B. 1557 and further restrict *Tango* up to grade eight for narrowly partisan, political reasons. E.D.B.'s injury to her right to receive information is therefore substantially likely to continue, presenting a certainly impending

injury. *See Dream Defs. v. Governor*, 57 F.4th 879, 887 (11th Cir. 2023).

134.  Z.T. desires to read *Tango* and would check it out from her school library when the school year begins if she could. *Tango* was previously available in the library of the school she will attend, but access to the book was restricted by the Lake County Defendants pursuant to H.B. 1557 for narrowly partisan, political reasons. The book was restricted because of the content it contains—namely, the depiction of two same-sex penguins and their adoption of a penguin chick—and the viewpoint it expresses—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

135.  As a direct and proximate result of Defendants' unlawful conduct, Z.T. will be injured in her right to receive information and ideas. This injury is continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

136.  On information and belief, Z.T. will not be able to check out *Tango* from her school library when the school year begins because H.B. 1069 enters into force on July 1, 2023. At that point, H.B. 1069's provisions will extend the Ban to prekindergarten and grades four through eight without changing the Ban's substance. Accordingly, the Lake County Defendants are highly likely to enforce H.B. 1069 the same way they currently enforce H.B. 1557 and further restrict *Tango* up to grade eight for narrowly partisan, political reasons. Z.T.

thus faces a certainly impending injury as a direct and proximate result of Defendants' conduct. *See Elrod*, 427 U.S. at 373; *Dream Defs.*, 57 F.4th at 887.

137.   E.T. desires to read *Tango* and would check it out from her school library when the school year begins if she could. *Tango* was previously available in the library of the school she will attend, but access to the book was restricted by the Lake County Defendants pursuant to H.B. 1557 for narrowly partisan, political reasons. The book was restricted because of the content it contains—namely, the depiction of two same-sex penguins and their adoption of a penguin chick—and viewpoint it expresses—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

138.   As a direct and proximate result of Defendants' unlawful conduct, E.T. will be injured in her right to receive information and ideas. This injury is continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

139.   On information and belief, E.T. will not be able to check out *Tango* from her school library when the school year begins because H.B. 1069 enters into force on July 1, 2023. At that point, H.B. 1069's provisions will extend the Ban to prekindergarten and grades four through eight without changing the Ban's substance. Accordingly, the Lake County Defendants are highly likely to enforce H.B. 1069 the same way they currently enforce H.B. 1557 and further

restrict *Tango* up to grade eight for narrowly partisan, political reasons. E.T. thus faces a certainly impending injury as a direct and proximate result of Defendants' conduct. *See Elrod*, 427 U.S. at 373; *Dream Defs.*, 57 F.4th at 887.

140.  D.S. desires to read *Tango* and would read *Tango* when the school year begins if it were available in his school library. He will be unable to do so because access to *Tango* has been restricted in his school library.

141.  *Tango* was previously available in D.S.'s school library, but access to the book was restricted by the Lake County Defendants pursuant to H.B. 1557 for narrowly partisan, political reasons. The book was restricted because of the content it contains—namely, the depiction of two same-sex penguins and their adoption of a penguin chick—and viewpoint it expresses—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

142.  As a direct and proximate result of Defendants' unlawful conduct, D.S. has been injured in his right to receive information and ideas. This injury is continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

143.  E.S. desires to read *Tango* and would read *Tango* when the school year begins if it were available in his school library. He will be unable to do so because access to *Tango* has been restricted in his school library.

144.  *Tango* was previously available in E.S.'s school library, but access

to the book was restricted by the Lake County Defendants pursuant to H.B. 1557 for narrowly partisan, political reasons. The book was restricted because of the content it contains—namely, the depiction of two same-sex penguins and their adoption of a penguin chick—and viewpoint it expresses—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

145.   As a direct and proximate result of Defendants' unlawful conduct, E.S. has been injured in his right to receive information and ideas. This injury is continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

146.   M.H. desires to read *Tango* and would read *Tango* when the school year begins if it were available in his school library. He will be unable to do so because access to *Tango* has been restricted in his school library.

147.   *Tango* was previously available in M.H.'s school library, but access to the book was restricted by the Lake County Defendants pursuant to H.B. 1557 for narrowly partisan, political reasons. The book was restricted because of the content it contains—namely, the depiction of two same-sex penguins and their adoption of a penguin chick—and viewpoint it expresses—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

148.  As a direct and proximate result of Defendants' unlawful conduct, M.H. has been injured in his right to receive information and ideas. This injury is continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

149.  H.B. 1557 is unconstitutional as applied to the Student Plaintiffs by Defendants. H.B. 1069 is unconstitutional as it will be applied to the Student Plaintiffs by Defendants. The restriction of *Tango* occurred for narrowly partisan, political reasons that were unrelated to legitimate pedagogical concerns and served no other legitimate state purpose. Instead, the restriction of access to *Tango* was rooted in animus against the viewpoint that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children, as demonstrated by the public record.

150. The enforcement of H.B. 1557 and the restriction of access to *Tango* were actions under color of state law that deprived the Student Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

151.  The impending enforcement of H.B. 1069 and the expanded restriction of access to *Tango* are actions under color of state law that will deprive the Student Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

152.  The Student Plaintiffs are entitled to a preliminary injunction

requiring the Lake County Defendants to restore unrestricted student access to *Tango* in their jurisdiction before the first day of school on August 10, 2023, and throughout the pendency of this action.

153.   The Student Plaintiffs are entitled to a declaratory judgment that H.B. 1557 and H.B. 1069 are unconstitutional and therefore void to the extent they require the removal or restriction of any books—such as *Tango*—in school libraries. The Student Plaintiffs are further entitled to a declaratory judgment that Defendants' actions violated their rights under the Constitution and laws of the United States.

154.   The Student Plaintiffs are entitled to a permanent injunction requiring the Lake County Defendants to restore unrestricted student access to *Tango* in their jurisdiction and prohibiting the State Defendants from enforcing H.B. 1557 or H.B. 1069 to require the removal or restriction of any books—such as *Tango*—in school libraries.

### COUNT III
**Fourteenth Amendment to the United States Constitution:**
**Vagueness of H.B. 1557 and H.B. 1069**
**(Brought pursuant to 42 U.S.C. § 1983 by all Plaintiffs)**

155.   Plaintiffs incorporate paragraphs 1–114 by reference as though fully set forth herein.

156.   Plaintiffs bring this claim in the alternative to Counts I and II.

157.   A statute is "void for vagueness if its prohibitions are not clearly

defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The requirement of clear definitions is of heightened importance where, as here, First Amendment rights are implicated. *See Smith v. Goguen*, 415 U.S. 566, 573 (1974).

158.  H.B. 1557 and H.B. 1069 are unconstitutional in violation of the Due Process Clause of the Fourteenth Amendment because they are void for vagueness.

159.  H.B. 1557 prohibits "[c]lassroom instruction" by "school personnel" or "third parties" on "sexual orientation" and "gender identity" in kindergarten through third grade—and H.B. 1069 expands this prohibition to cover prekindergarten through eighth grade—as well as in any other context where it is not "age-appropriate" or "developmentally appropriate." Each of these terms is vague and undefined. The law is unconstitutionally vague because (1) it fails to provide a person of ordinary intelligence with fair notice of what is prohibited, and (2) its lack of explicit standards authorizes and encourages arbitrary and discriminatory enforcement.

160.  H.B. 1069 is equally deficient because—despite expanding the scope of H.B. 1557 by applying the Ban across a broader range of grade levels—H.B. 1069 does nothing to clarify the vague terminology of H.B. 1557. H.B. 1069 presents the same unconstitutional vagueness as its predecessor, H.B. 1557.

161. The Lake County Defendants applied H.B. 1557 either beyond its scope or without an understanding of whether their actions were required by the Act because the Act's terminology failed to clarify whether the presence in a public school library of a factually accurate, non-vulgar, non-obscene book that depicts a same-sex relationship among penguins violates the Ban. The vagueness of the Act and the threat of enforcement by the State Defendants had a chilling effect by causing the Lake County Defendants to ban *Tango* or permitting them to do so through arbitrary and discriminatory enforcement. The Lake County Defendants thereby censored the Author Plaintiffs' book and transgressed the Author Plaintiffs' right to freedom of expression and the Student Plaintiffs' right to receive information.

162. On information and belief, the Lake County Defendants will apply H.B. 1069 either beyond its scope or without an understanding of whether their actions are required by the statute because the statute's terminology fails to clarify whether the presence in a public school library of a factually accurate, non-vulgar, non-obscene book that depicts a same-sex relationship among penguins violates the Ban. The vagueness of the statute and the threat of enforcement by the State Defendants will have a chilling effect by causing the Lake County Defendants to ban *Tango* or permitting them to do so through arbitrary and discriminatory enforcement. The Lake County Defendants will thereby censor the Author Plaintiffs' book and transgress the Author Plaintiffs' right

to freedom of expression and the Student Plaintiffs' right to receive information.

163.  The enforcement of H.B. 1557 and the restriction of access to *Tango* were actions under color of state law that deprived Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

164.  The impending enforcement of H.B. 1069 and the expanded restriction of access to *Tango* are actions under color of state law that will deprive Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

165.  As a direct and proximate result of Defendants' unlawful actions, the Author Plaintiffs have been and will be injured in their right to speak and the Student Plaintiffs have been and will be injured in their right to receive information. These injuries are continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

166.  Plaintiffs are entitled to a preliminary injunction requiring the Lake County Defendants to restore unrestricted student access to *Tango* in their jurisdiction before the first day of school on August 10, 2023, and throughout the pendency of this action.

167.  Plaintiffs are entitled to a declaratory judgment that H.B. 1557 and H.B. 1069 are unconstitutionally vague and therefore void to the extent

that they fail to clearly state whether they require the removal or restriction of any books—such as *Tango*—in public school libraries. They are further entitled to a declaratory judgment that H.B. 1557 and H.B. 1069 are unconstitutional and therefore void to the extent they require or may be read to require the removal or restriction of any books—such as *Tango*—in public school libraries. Plaintiffs are further entitled to a declaratory judgment that Defendants' actions violated Plaintiffs' rights under the Constitution and laws of the United States.

168.    Plaintiffs are entitled to a permanent injunction requiring the Lake County Defendants to restore students' unrestricted student access to *Tango* in their jurisdiction and prohibiting the State Defendants from enforcing H.B. 1557 or H.B. 1069 to require the removal or restriction of any books—such as *Tango*—in public school libraries.

## COUNT IV
### First Amendment to the United States Constitution: Overbreadth of H.B. 1557 and H.B. 1069
### (Brought pursuant to 42 U.S.C. § 1983 by all Plaintiffs)

169.    Plaintiffs incorporate paragraphs 1–114 by reference as though fully set forth herein.

170.    Plaintiffs bring this claim in the alternative to Counts I, II, and III.

171. A statute "may be invalidated as overbroad if 'a substantial

number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

172.  To the extent that H.B. 1557 and H.B. 1069 have any plainly legitimate sweep, they are unconstitutionally overbroad because they punish a substantial and disproportionate amount of protected free speech in relation to their purportedly legitimate sweep.

173.  Even to the extent that any applications of H.B. 1557 or H.B. 1069 could be interpreted to have a legitimate pedagogical purpose, the statutes are not narrowly tailored to that purpose but rather will be applied in a manner that infringes authors' right to freedom of expression and students' right to receive information, as H.B. 1557 was applied here and H.B. 1069 will be applied here.

174.  H.B. 1557 and H.B. 1069's overbroad restrictions are not justified by preventing disruption to the school environment, are unrelated to legitimate pedagogical concerns, and serve no other legitimate state purpose. Instead, the law is expressly discriminatory against protected speech on the basis of the content and viewpoint of that speech.

175. The enforcement of H.B. 1557 and the restriction of access to *Tango* were actions under color of state law that deprived Plaintiffs of rights,

privileges, or immunities secured by the Constitution and laws of the United States.

176.   The impending enforcement of H.B. 1557 and the expanded restriction of access to *Tango* are actions under color of state law that will deprive Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

177.   As a direct and proximate result of Defendants' unlawful actions, the Author Plaintiffs have been and will be injured in their right to speak, and the Student Plaintiffs have been and will be injured in their right to receive information. These injuries are continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

178.   Plaintiffs are entitled to a preliminary injunction requiring the Lake County Defendants to restore unrestricted student access to *Tango* in their jurisdiction before the first day of school on August 10, 2023, and throughout the pendency of this action.

179.   Plaintiffs are entitled to a declaratory judgment that H.B. 1557 and H.B. 1069 are unconstitutionally overbroad and therefore unenforceable. They are further entitled to a declaratory judgment that Defendants' actions violated Plaintiffs' rights under the Constitution and laws of the United States.

180.   Plaintiffs are entitled to a permanent injunction requiring the Lake County Defendants to restore unrestricted student access to *Tango* in

their jurisdiction and prohibiting the State Defendants from enforcing H.B. 1557 or H.B. 1069 to require the removal or restriction of any books—such as *Tango*—in public school libraries.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

*First*, a preliminary injunction requiring the Lake County Defendants to restore students' ability to access *Tango* regardless of grade level in Lake County public school libraries before the first day of school on August 10, 2023, and throughout the pendency of this action;

*Second*, a permanent injunction requiring the Lake County Defendants to restore students' ability to access *Tango* regardless of grade level in Lake County public school libraries;

*Third*, a declaratory judgment that H.B. 1557 (a) is unconstitutional and therefore unenforceable to the extent that it requires or may be read to require the removal or restriction of any materials in public school libraries, or (b) is unconstitutionally vague and/or overbroad and therefore unenforceable;

*Fourth*, a declaratory judgment that H.B. 1069 (a) is unconstitutional and therefore unenforceable to the extent that it requires or may be read to require the removal or restriction of any materials in public school libraries, or (b) is unconstitutionally vague and/or overbroad and therefore

unenforceable;

*Fifth*, a declaratory judgment that Defendants' actions violated Plaintiffs' rights under the Constitution and laws of the United States;

*Sixth*, a permanent injunction prohibiting the State Defendants from enforcing H.B. 1557 to require the removal or restriction of materials in public school libraries, or in the alternative, a permanent injunction prohibiting the State Defendants from enforcing H.B. 1557 in any manner;

*Seventh*, a permanent injunction prohibiting the State Defendants from enforcing H.B. 1069 to require the removal or restriction of materials in public school libraries, or in the alternative, a permanent injunction prohibiting the State Defendants from enforcing H.B. 1069 in any manner;

*Eighth*, an award of reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

*Ninth*, such other relief as the Court deems necessary and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable as a matter of right.

Dated:  New York, NY
        June 20, 2023

Respectfully submitted,

SELENDY GAY ELSBERG PLLC

By:    /s/        *Faith E. Gay*

Faith E. Gay (FBN 129593)
Lauren J. Zimmerman*
Max H. Siegel*
Nancy A. Fairbank*
Rachel Slepoi*
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lzimmerman@selendygay.com
msiegel@selendygay.com
nfairbank@selendygay.com
rslepoi@selendygay.com

Anna T. Neill (FBN 100945)
William J. Blechman (FBN 379281)
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: 305-373-1000
atn@knpa.com
wjb@knpa.com

*Counsel for Plaintiffs*

*(application for admission *pro hac vice*
forthcoming)