IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

PETER PARNELL, et al.,

      **Plaintiffs,**

v.                                                     Case No. 4:23-cv-414-AW-MAF

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA, et al.,

      **Defendants.**

_____/

## ORDER ON MOTIONS TO DISMISS

*And Tango Makes Three* is a children's book about two male penguins that, "with the help of a conscientious zookeeper, adopted, hatched, and raised a penguin chick named Tango." ECF No. 61 (FAC) ¶ 7. According to its authors, the book "says that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children." *Id.* ¶ 64. The book was available in Escambia County public school libraries, but the Escambia School Board voted to remove it. Lake County also removed the book from its school libraries but has since reinstated it.[1] The main

---

[1] The operative pleading is the First Amended Complaint (ECF No. 61). At this stage, the court must accept all well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017).

issue in this case is whether the school boards violated the First Amendment when they removed the book.[2]

Plaintiffs are the book's coauthors—Peter Parnell and Justin Richardson—along with eight-year-old Escambia County student B.G. The authors contend *Tango*'s removal violated their First Amendment right to freedom of expression (Count I). B.G., who sues through her father, claims a violation of her First Amendment right to receive information (Count II). Plaintiffs also bring an overbreadth challenge (Count IV) and an as-applied vagueness challenge (Count III) to Florida Statute § 1001.42(8)(c)(3), which they contend was the impetus behind *Tango*'s removal. FAC ¶¶ 35-58.

Defendants are the School Boards of Escambia and Lake Counties, the Superintendent of each, the Florida Education Commissioner, and all members of the Florida Board of Education. *Id.* ¶¶ 2-3, 11-13.

All Defendants have moved to dismiss. ECF Nos. 108, 109, 110. Having carefully considered the parties' written and oral arguments, the court now grants Lake County's motion, grants the State Defendants' motion, and grants in part Escambia County's motion.

_____

[2] I use "removed" as shorthand. Plaintiffs allege only that Lake County "barred kindergarten through third-grade students in the district from accessing *Tango* in their public school libraries." FAC ¶ 67. Lake County contends this was through an age restriction—not removal. *See, e.g.*, ECF No. 109 at 24-26. Neither side contends this makes a difference at this stage.

# I.

First, Defendants argue that Plaintiffs filed a shotgun complaint. A shotgun complaint is one that violates Rule 8(a)(2), Rule 10(b), or both, and that "fail[s] to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320, 1323 (11th Cir. 2015).

With 159 paragraphs across 60 pages, the amended complaint is not a "model of efficiency or specificity." *Id.* at 1325. There are at least some irrelevant factual allegations. And there are instances of Plaintiffs' referring to Defendants collectively, as opposed to more precisely identifying the specific Defendant or Defendants at issue. *See, e.g.*, FAC ¶ 126; *see also* ECF No. 130 at 85. But a complaint need not be perfect, and Plaintiffs' amended complaint does not make it "virtually impossible to know which allegations of fact are intended to support which claims." *See Weiland*, 792 F.3d at 1325 (cleaned up). I will not dismiss the amended complaint as a shotgun pleading.[3]

---

[3] This case began in the Middle District of Florida. *See* ECF No. 1. That court's transfer order said in a footnote that the amended complaint was "a prototypical shotgun complaint." ECF No. 79 at 3 n.1. But that footnote does not resolve the issue here, and as a matter of discretion, I decline to dismiss the complaint on that basis.

## II.

The next issue is jurisdiction. The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," U.S. Const. art. III, § 2, and standing is essential to the case-or-controversy requirement, *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc). At this stage, Plaintiffs must allege sufficient facts to support standing, *see Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008), which requires "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision," *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiffs have done this as to some Defendants but not others.

## A.

First, Plaintiffs do not have standing to sue the Commissioner of Education or members of the Board of Education (collectively, the State Defendants). Plaintiffs' asserted harm—*Tango*'s removal—is not traceable to those Defendants, and an injunction against those Defendants would not likely produce the book's return.

In arguing otherwise, Plaintiffs rely on a Florida law that limits classroom instruction on sexual orientation and gender identity. Fla. Stat. § 1001.42(8)(c)(3). (Like the parties, I will refer to this law as HB 1557.) Plaintiffs' theory is that the State Defendants enforce HB 1557, and the threat of enforcement caused the School

Board Defendants to remove *Tango*. FAC ¶¶ 14-15, 43-54, 116, 141. This theory does not work.

To start, HB 1557 does not apply to school library books. *See* Fla. Stat. § 1001.42(8)(c)(3). To be sure, Plaintiffs allege that Lake County initially removed *Tango* because someone thought HB 1557 required it. And Plaintiffs allege that HB 1557 may have been the initial impetus that brought *Tango* before the Escambia County Board. But none of this makes *Tango*'s removals traceable to the State Defendants' actions. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1272 (11th Cir. 2019) (finding no Article III standing where there was no "plausible causal chain" linking defendant's actions to plaintiffs' injuries). Plaintiffs have not alleged that the State Defendants took—or will take—action related to the book; they have alleged (at best) that others thought they might.

Plaintiffs likewise have not shown that an injunction precluding the State Defendants from enforcing HB 1557 would redress their purported injury. The redressability question hinges on whether the effect of a judgment on the defendant would significantly increase a plaintiff's likelihood of obtaining relief. *Lewis*, 944 F.3d at 1301. Speculation that an injunction might lead other parties to return or retain *Tango* is not enough. *See id.* at 1305 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment)).

Moreover, even if there were some ambiguity about HB 1557 and whether it might require school boards to remove *Tango* (and I conclude there is not), Plaintiffs would still have to show an imminent injury, and that imminent injury would be State Defendants' enforcing the law to remove *Tango*. *See Worthy v. City of Phenix City*, 930 F.3d 1206, 1215 (11th Cir. 2019).[4] Plaintiffs have not alleged facts showing such imminent enforcement, and the State Defendants have disclaimed any—asserting unequivocally that "HB 1557 does not even arguably regulate the provision of school-library books."[5] ECF No. 110 at 16.

Because Plaintiffs lack standing to sue the State Defendants, the Plaintiffs' claims against them will be dismissed without prejudice for lack of subject-matter jurisdiction. I therefore need not address the State Defendants' Eleventh Amendment or Qualified Immunity arguments.

---

[4] The Eleventh Amendment would preclude a damages claim against the State Defendants in their official capacities, *see Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999), and the lack of allegations about their individual conduct precludes damages in their individual capacities. Regardless, Plaintiffs clarified that they do not seek damages against the State Defendants. *See* ECF No. 130 at 28.

[5] Plaintiffs ask the court to take judicial notice of a settlement agreement some State Defendants entered in a separate case involving HB 1557. ECF No. 148. That settlement agreement makes no difference to the issue here, which is whether Plaintiffs have alleged sufficient facts. I therefore decline to take judicial notice.

**B.**

For Counts I and II, Plaintiffs have sufficiently alleged standing as to the Escambia County School Board but not the Superintendent. As to Counts III and IV, they have not sufficiently alleged standing as to any Defendant.

Plaintiffs have alleged an injury in fact. Plaintiff Authors allege an interest in sharing *Tango* in public school libraries. FAC ¶¶ 11-12, 65. Although Escambia argues this interest does not give rise to a constitutional claim, that conflates standing with the claim's merits. *See Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279 (11th Cir. 2017). Interference with the ability to distribute published material to an intended audience can give rise to an injury sufficient for Article III standing. *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963); *Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012). So too can removal of school library books. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.* (*ACLU*), 557 F.3d 1177, 1195 (11th Cir. 2009).

Plaintiffs allege B.G. sought to check out *Tango*—and asked her father about doing so—around March 2023. FAC ¶ 25. A fair inference from this is that she would borrow the book if it again became available. *See K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1043 (11th Cir. 2019) (noting that at pleading stage, courts must draw all reasonable inferences in plaintiffs' favor). I therefore disagree with Escambia's contention that B.G. alleges merely a "some day intention." *Cf.*

*Lujan*, 504 U.S. at 564 (noting that "'some day' intentions" are insufficient to constitute imminent injury).

It is true that B.G. could still access *Tango* through other means. And certainly if B.G.'s parents thought *Tango*'s absence would cause B.G. real harm, they could immediately get her the book elsewhere. But this practical reality does not affect the legal issue of Article III standing. *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) ("One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." (cleaned up) (quoting *Schneider v. State*, 308 U.S. 147, 163 (1939))). Plaintiffs have alleged a sufficient injury.

Plaintiffs have also sufficiently alleged traceability and redressability as to Counts I and II. Their injuries are directly traceable to the Escambia School Board's removal of *Tango*, and an injunction requiring the book's return would redress those injuries. *See Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (noting that traceability and redressability "often travel together"). Thus, as to Counts I and II, Plaintiffs have alleged facts supporting all elements of standing to sue the Escambia School Board.

Plaintiffs have not, however, plausibly alleged standing for individual-capacity claims against Escambia Superintendent Leonard. An individual-capacity claim "seek[s] to impose personal liability upon a government official for actions"

8

taken under color of state law. *Yeldell v. Cooper Green Hosp., Inc.,* 956 F.2d 1056, 1060 (11th Cir. 1992). But Plaintiffs have alleged no actions Superintendent Leonard took regarding *Tango*'s removal. Plaintiffs thus have not plausibly alleged that any harm is traceable to Superintendent Leonard's actions.

As to Counts III and IV, Plaintiffs lack standing to sue any Defendant. In these counts, Plaintiffs challenge HB 1557 as vague and overbroad, but they have not plausibly alleged that HB 1557 caused *Tango*'s removal or precludes its return. That an Escambia teacher who is not part of the Escambia School Board relied on the law is insufficient to link the Board's decision to HB 1557. Thus, there is no reason to think that prospective relief regarding HB 1557's constitutionality will remedy Plaintiffs' asserted harms.

Finally, I will briefly address Escambia's ripeness and mootness arguments, which I find unpersuasive. Escambia claims Florida Statute § 1006.28—which provides a method for parents to challenge the use of certain materials in schools— renders B.G.'s claim both unripe and moot because B.G. has not completed this process.

It is doubtful that § 1006.28 applies here: it deals with objections to the *use* of specific materials and says nothing of removals. But even if it applies, Escambia has not shown that it "render[s] the original controversy a mere abstraction." *Crown Media, LLC v. Gwinnett Cnty.*, 380 F.3d 1317, 1324 (11th Cir. 2004) (quoting

*Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir. 2000)). Nor has Escambia shown that B.G.'s claim is not "sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision-making by the court." *Baughcum v. Jackson*, 92 F.4th 1024, 1036 (11th Cir. 2024) (quoting *Elend v. Basham*, 471 F.3d 1199, 1211 (11th Cir. 2006)). B.G.'s claims against Escambia are neither unripe nor moot.[6]

## C.

As for the Lake County Defendants, Plaintiff Authors have sufficiently alleged standing as to their Count I damages claim. "[A] request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021); *accord Keister v. Bell*, 29 F.4th 1239, 1256 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 1020 (2023) (noting how a claim for nominal damages "checks the redressability box to establish standing"). Lake County argues that nominal damages will be unavailable, citing *Florida Education Ass'n v. State of Florida, Department of Education*, 2018 WL 10560520 (N.D. Fla. June 8, 2018). ECF No. 109 at 18-19. They may be right about that, but that is a merits question, and in addressing standing, courts must "assume that on the merits the plaintiffs

---

[6] To the extent Escambia raises an exhaustion argument, I reject that too. Plaintiffs generally need not exhaust state administrative remedies before bringing § 1983 actions. *Felder v. Casey*, 487 U.S. 131, 147 (1988).

would be successful in their claims." *Culverhouse v. Paulson & Co. Inc*., 813 F.3d 991, 994 (11th Cir. 2016) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)). The Author Plaintiffs have standing for their nominal-damages claim against Lake County.

The court lacks jurisdiction, though, as to Plaintiffs' claim for injunctive relief against Lake County. Lake County returned *Tango* to its libraries, and there is no reason to assume it would remove the book again. That makes Plaintiffs' request for injunctive relief moot. *See Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1285 (11th Cir. 2004) ("[A] challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated.").[7]

Finally, as Plaintiffs acknowledge, B.G. (who goes to school in Escambia County) has no standing to sue Lake County. ECF No. 130 at 85.

* * *

To summarize, Plaintiffs lack standing to sue the State Defendants. They lack standing to sue Superintendent Leonard in his individual capacity, but otherwise

---

[7] Mootness is a separate Article III issue from standing, which is determined at the time the complaint is filed. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1340 (11th Cir. 2014); *see also S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (noting that original complaint is what matters, even when complaint is later amended). Here, the original complaint alleged Lake County had not returned *Tango*. ECF No. 1 ¶¶ 96-98.

have standing to sue the Escambia County Defendants as to Counts I and II. Plaintiffs lack standing to sue the Escambia County Defendants as to Counts III and IV. The Author Plaintiffs have standing to sue the Lake County Defendants for nominal damages. But the court lacks jurisdiction as to any other claim against the Lake County Defendants.

## III.

Before moving to the merits of the remaining claims, I will address the Escambia and Lake County Defendants' immunity and *Monell* arguments.

## A.

First, Defendants argue that claims against the superintendents should be dismissed, and I agree. Plaintiffs sued the superintendents in both their official and individual capacities. Under Florida law, superintendents are executive officers of their respective school boards. Fla. Stat. § 1001.33; *see also Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1230 (11th Cir. 2022) (citing Florida law). So the official-capacity claims against the superintendents are duplicative of the claims against the school boards, making dismissal appropriate. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).

The individual-capacity claims fail too. As noted above, Plaintiffs lack standing for any individual-capacity claim against Superintendent Leonard. And Superintendent Kornegay is entitled to qualified immunity.

Public officials sued in their individual capacities have qualified immunity "when their conduct does not violate a constitutional right that was clearly established." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (quoting *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016)). "The doctrine shields 'all but the plainly incompetent or those who knowingly violate the law.'" *Crocker v. Beatty*, 995 F.3d 1232, 1239 (11th Cir. 2021) (quoting *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018)), *cert. denied*, 142 S. Ct. 845 (2022). A right is clearly established when "the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Echols*, 913 F.3d at 1323 (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Once Superintendent Kornegay raised qualified immunity and showed she was acting in her discretionary capacity (which no one disputes), Plaintiffs had the burden to show qualified immunity did not apply. *See Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1327 (11th Cir. 2003). Plaintiffs have not met their burden.

Plaintiffs point to no cases involving authors' rights to have their books remain in school libraries. They instead point to *ACLU* and *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). But *Pico* has no precedential value, *see ACLU*, 557 F.3d 1220, and *ACLU* itself never decided whether removing books implicated the First Amendment, *see id.* at 1230.

13

Plaintiffs have also not otherwise established that removing *Tango* was so obviously unconstitutional that prior case law was unnecessary. *See Loftus v. Clark-Moore*, 690 F.3d 1200, 1205 (11th Cir. 2012). Nor have they shown that general principles prohibiting content and viewpoint discrimination applied here with such "obvious clarity" that "every objectively reasonable government official facing the circumstances would know" that Kornegay's conduct was unconstitutional. *Id.*; *see also Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1284 (11th Cir. 1998) ("[W]e have held time and again that clearly established general principles of law will seldom if ever suffice to strip a defendant of qualified immunity.").

Whatever First Amendment rights the Author Plaintiffs may have here, they have not come close to showing that those rights are clearly established.[8]

## B.

Next, Escambia argues that the review process under Florida Statute § 1006.28 precludes liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Monell* limits municipality liability to instances in which a local government's policy or custom was the "moving force" behind the violation. *Monell*, 436 U.S. at 691 (1978). Plaintiffs can establish liability under *Monell* by "(1)

---

[8] Lake County also raises sovereign immunity but relies on statutes and cases addressing immunity from state-law tort claims. *See* ECF No. 109 at 21 (discussing Fla. Stat.§ 768.28); *id.* at 25 (citing *Florida Highway Patrol v. Jackson*, 288 So.3d 1179 (Fla. 2020), which involves a tort law claim). The Lake County Defendants have not shown that they are immune from § 1983 suits.

identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Chabad Chayil, Inc.*, 48 F.4th at 1229.

Assuming again that § 1006.28(2)(a)6 applies to book removals, the fact that the State can review the school board's decision if challenged does not change the school board's status as a final policymaker. Under Florida law, school boards are final policymakers for school-district policies. *See Chabad Chayil, Inc.*, 48 F.4th at 1230-31; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("[T]he authority to make municipal policy is necessarily the authority to make *final* policy."). Section 1006.28 itself reflects this reality. *See* § 1006.28(2)(a)1 ("Each district school board is responsible for the content of all instructional materials and any other materials used in a classroom, made available in a school or classroom library, or included on a reading list . . . ."). Plaintiffs have sufficiently alleged that *Tango*'s removal was based on Escambia's policy—that the School Board itself was the moving force behind the decision.

Lake County raises its own *Monell* argument, insisting Plaintiffs have not alleged Superintendent Kornegay was a final policymaker, meaning the Lake County School Board is not liable for her actions.[9] On this point, I agree.

"[C]ourts applying Florida law have long concluded . . . the school board is the policy-making body for the school district, while the superintendent is the chief executive officer of the school board and the chief administrator of the school district.'" *Chabad Chayil, Inc.*, 48 F.4th at 1230 (cleaned up) (quoting *Greene v. Sch. Bd. of Hamilton Cnty.*, 444 So. 2d 500, 501 (Fla. 1st DCA 1984)). Delegating decisionmaking discretion to Kornegay is not enough to make her a final policymaker under *Monell* if the Board retained "the power to review the exercise of that discretion." *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1264 (11th Cir. 2010) (quoting *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997)).

---

[9] The amended complaint does not directly allege that Kornegay removed *Tango*. Instead, it alleges that "Lake County Schools—administered by the Lake County Board—barred kindergarten through third-grade students in the district from accessing *Tango* in their public school libraries." ECF No. 61 ¶ 26. But Plaintiffs' response to the motions to dismiss attributes the removal to Kornegay. ECF No. 130 at 77 ("Superintendent Kornegay, exercising 'her general oversight over the district school system' to enforce the rules adopted by the Lake Board, '[a]dminstratively removed' *Tango* from access in school libraries to students in kindergarten through third grade." (citation omitted)). The amended complaint also attributes *Tango*'s return to Kornegay. ECF No. 61 ¶ 72.

Here, Plaintiffs have not plausibly alleged that Kornegay's actions regarding book restrictions and removals are exempt from meaningful review by the Board. Instead, the amended complaint suggests that the Board does review such decisions. *See* ECF No. 61 ¶ 74 (noting that Board ratified a "prior administrative decision to align the Lake County school district with the prevailing interpretation of [HB 1557]" and prohibited "personnel from following informal state guidance"). Plaintiffs have not otherwise alleged that the Board itself directed *Tango*'s removal or that an official policy or custom led to the removal. Plaintiffs therefore have not plausibly alleged that the Lake County School Board is liable. The claims against the Lake County School Board will be dismissed.

## C.

Finally, Escambia argues that its Board has legislative immunity. This argument, raised for the first time in Escambia's reply brief, relies on *Pernell v. Florida Board of Governors of State University*, 84 F.4th 1339 (11th Cir. 2023), which issued after Escambia filed its motion to dismiss. I doubt this case supports Escambia's argument, but at the least, it was not necessary to the legislative-immunity argument. Escambia therefore could have raised the argument before its reply, and I decline to consider the argument now. *See Reichmann v. Fla. Dep't of Corr.*, 940 F.3d 559, 579 (11th Cir. 2019) (noting that arguments first raised in reply briefs are generally waived).

## IV.

This leaves two claims (Counts I and II) against one Defendant (the Escambia School Board). I can now turn to the merits of those claims.

## A.

By all accounts, school officials enjoy substantial discretion in determining which books should be available in school libraries. *See ACLU*, 557 F.3d at 1220. But the issue of how and to what extent the First Amendment limits that discretion is surprisingly unsettled. Litigation over schools' book selections is not new. *See, e.g.*, *Pico*, 457 U.S. at 855-56. Yet the parties have not cited—and I have not found— any binding authority specifying the standard applicable here.

Both sides cite *Pico*, in which the Supreme Court considered some students' claim that a school board's removal of books "for 'social, political, and moral' reasons violated their First Amendment rights to have access to the books." *ACLU*, 557 F.3d at 1199 (quoting *Pico*). The circuit court held there was such a right, and the Supreme Court affirmed. *Id.* But the Supreme Court's decision was "badly fractured," and "[t]he result is that *Pico* is of no precedential value." *Id.* "It establishes no standard." *Id.* Some of the Justices in *Pico* would have sided with Plaintiffs here. *See Pico*, 457 U.S. at 856 (plurality) ("If [the school boards] intended by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in [their] decision, then [the

school boards] have exercised their discretion in violation of the Constitution." (note omitted)). Some would have sided with Defendants. *See id.* at 887 (Burger, C.J., joined by Powell, Rehnquist, and O'Connor, JJ., dissenting) (rejecting argument "that if a writer has something to say, the government through its schools must be the courier"). The bottom line is that just as *Pico* was unhelpful in *ACLU*, it is unhelpful here.

Defendants' principal argument is that the government-speech doctrine applies, foreclosing First Amendment scrutiny altogether. "Government speech is not regulated by the Free Speech Clause," *Dean v. Warren*, 12 F.4th 1248, 1264 (11th Cir. 2021), so if removing *Tango* (or selecting library books in general) was government speech, Plaintiffs' case ends quickly. Their remedy would be through the political process—not through the courts. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 468-69 (2009) ("Of course, a government entity is ultimately accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." (cleaned up)); *see also Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074 (11th Cir. 2015).

The government-speech argument has some force. Indeed, some courts have essentially said library curation is government speech. *See, e.g.*, *PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government

speaks through its selection of which books to put on the shelves and which books to exclude."); *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries, broadcasters, newspapers, museums, schools, and the like.'" (citing *Gittens*)). Others stop short but suggest that might be so. *See, e.g., United States v. Am. Library Ass'n*, 539 U.S. 194, 204, 207 (2003) (noting that "public libraries seek to provide materials that would be of the greatest direct benefit or interest to the community," that they thus "collect only those materials deemed to have requisite and appropriate quality," and that they do not "collect books in order to provide a public forum for the authors of books to speak" (cleaned up)).

Moreover, there are strong (if imperfect) parallels between decisions to select books for a public-school library and decisions about what monuments to put in a public park, *see Pleasant Grove City*, 555 U.S. at 460, what slogans to display on a license plate, *see Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), what banners to hang on a school fence, *see Mech*, 806 F.3d 1070, what artwork to exhibit at a city event, *see McGriff v. City of Miami Beach*, 84 F.4th 1330 (11th Cir. 2023), and what participants to allow in a parade, *Leake v. Drinkard*, 14 F.4th 1242 (11th Cir. 2021), all of which constitute government speech.

On the other hand, some authority suggests school-library curation implicates the First Amendment, making it *not* government speech. As noted above, several Justices in *Pico* saw it this way. *See* 457 U.S. at 866 (plurality) ("[W]e think that the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library."). Other courts have followed the same course. *See Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189-90 (5th Cir. 1995) (applying *Pico*); *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980) (suggesting schools may not "remove a book from the library as part of a purge of all material offensive to a single, exclusive perception of the way of the world"); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (similar); *Presidents Council, Dist. 25 v. Cmty. Sch. Bd. No. 25*, 457 F.2d 289, 293 (2d Cir. 1972) (similar).

In a related context, the Eleventh Circuit considered whether the First Amendment precluded a school board from "removing a previously approved textbook from an elective high school class because of objections to the material's vulgarity and sexual explicitness." *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1518 (11th Cir. 1989). The court upheld the school board's decision, but only after finding it was justified by a "legitimate concern" about the book's

appropriateness. *Id.* The court did not conclude that the school district's decision about which books to use was immune from First Amendment scrutiny.[10]

The bottom line is that it is unclear whether the government speech doctrine applies. *See ACLU*, 557 F.3d at 1202. This can be a difficult inquiry: "The line between a forum for private expression and the government's own speech is important, but not always clear." *Shurtleff v. City of Boston*, 596 U.S. 243, 248 (2022); *see also Mech*, 806 F.3d at 1074 ("The Supreme Court has not articulated a precise test for separating government speech from private speech . . . ."). And the question can be "a heavily fact-intensive one." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1223 (11th Cir. 2019); *see also Mech*, 806 F.3d at 1075. It can turn on, among other things, "the history of the

---

[10] In *Chiras v. Miller*, the Fifth Circuit concluded that the selection of curricular books was government speech. 432 F.3d 606, 616 (5th Cir. 2005). That court was critical of *Virgil*'s application of the "legitimate pedagogical concern" prong from *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), to a textbook's removal:

> [T]he *Virgil* court applied the *Hazelwood* standard without finding that any forum had been created by the school, ignoring a necessary precondition. Moreover, *Virgil* was decided before *Rust*, *Rosenberger*, *Forbes*, *Finley*, and *ALA*, and therefore did not have the benefit of the Supreme Court's clarification of the government's authority over its own message, whether it speaks through its own employees or through private parties. To the extent *Virgil* suggests that the selection of instructional materials by a school board is not generally government speech, we disagree.

432 F.3d at 617.

government's use of the medium for communicative purposes, the implication of government endorsement of messages carried over that medium, and the degree of government control over those messages." *Cambridge Christian Sch.*, 942 F.3d at 1223 (emphasis omitted).

At this early stage of the litigation, I cannot conclude that the government-speech doctrine will apply. On a developed record, there may be a different answer. *Cf. Shurtleff*, 596 U.S. at 248 (finding government speech on an evidentiary record); *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 64, 77 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 790 (2023) (holding city's legislative invocation constituted governments speech based on summary-judgment record that was "robust enough" to make that determination); *Mech*, 806 F.3d at 1073 (deciding government-speech issue on summary-judgment record). Indeed, it seems unlikely that a school library will be properly viewed as a forum for authors' expression. But the law holds that courts should not find government speech lightly. *Mech*, 806 F.3d at 1074. The potential for the government to "silence or muffle the expression of disfavored viewpoints" under the guise of government speech requires courts to "exercise great caution before extending [the] government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017); *see also Cambridge Christian*, 942 F.3d at 1223 (concluding "lower court was too quick to pull the trigger" in dismissing on government-speech grounds, while noting it was unclear "whether these claims will ultimately succeed"). For

23

these reasons, I cannot conclude now that the government-speech doctrine forecloses Plaintiffs' claim.[11]

## B.

With the government-speech doctrine out of the way (for now, at least), I address what standard applies to Plaintiffs' First Amendment claims. As noted above, the law in this area is unclear. *Pico* suggests that school officials may remove library books so long as the removal is not solely to suppress what officials deem to be inappropriate views on politics, religion, or other matters of opinion. 457 U.S. at 872. But, again, *Pico* is not binding. *ACLU*, 557 F.3d at 1200.

The parties point to the standard from *Hazelwood School District v. Kuhlmeier*, which held schools can restrict speech if the restrictions are "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273. But there are issues with applying this standard too. "The argument against applying the *Hazelwood* standard here is that this is not a school newspaper situation, and the speech at issue does not form part of a course of study in a school's curriculum. This is a school library book case." *ACLU*, 557 F.3d at 1202.

---

[11] It is possible, of course, that this case may never demand an answer to this question. In *ACLU*, the court did not resolve the government-speech issue because it concluded that even under the most favorable standard Plaintiffs sought, they could not succeed. *ACLU*, 557 F.3d at 1202-03, 1227. Here, too, if Plaintiffs cannot prove that the purpose in removing *Tango* was discriminatory or for non-pedagogical reasons (see below), the court may never need to resolve the government-speech issue.

The Eleventh Circuit describes the *Hazelwood* standard as "merely an application of [the nonpublic forum] standard to a curricular program." *Searcey v. Harris*, 888 F.2d 1314, 1319 (11th Cir. 1989). In a nonpublic forum, content-based discrimination is permissible if it is "reasonable," but viewpoint-based discrimination is prohibited. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998); *see also Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1306-07 (11th Cir. 2003).[12]

I need not resolve the question of the appropriate standard now, however, because Plaintiffs have plausibly alleged First Amendment claims under either *Pico*

---

[12] I reject Escambia's argument that there is no constitutional right to receive information. *See, e.g., Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (noting that it is "well established that the Constitution protects the right to receive information and ideas"); *Martin v. City of Struthers*, 319 U.S. 141, 143-44 (1943) (discussing how First Amendment "embraces the right to distribute literature and necessarily protects the right to receive it").

I also reject Plaintiffs' contention that strict scrutiny applies. *See* ECF No. 130 at 29-30. Plaintiffs offer no support for applying that standard in a public-school context. Instead, courts have repeatedly recognized that educators enjoy broad discretion. *See, e.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987) ("States and local school boards are generally afforded considerable discretion in operating public schools."); *Virgil*, 862 F.2d at 1520 ("In matters pertaining to the curriculum, educators have been accorded greater control over expression than they may enjoy in other spheres of activity."); *ACLU*, 557 F.3d at 1226 ("[V]irtually every judicial body that has commented on the matter [of school board authority] has acknowledged the need for broad discretionary powers in local school boards." (quoting *Zykan*, 631 F.2d at 1305)).

or *Hazelwood*. Under either standard, Plaintiffs have alleged enough to show the removal turned on a disagreement with *Tango*'s viewpoint. That is enough for now.

Escambia County argues I should conclude the true motivation was otherwise, based on reasons asserted at public meetings. At this stage, though, I must view all allegations in a light most favorable to Plaintiffs. Of course, Escambia will have the opportunity to dispute those allegations and to show that *Tango*'s removal was reasonably related to legitimate pedagogical concerns. But Plaintiffs' allegations are sufficient to survive a motion to dismiss.

<h2 style="text-align:center">CONCLUSION</h2>

The State Defendants' motion to dismiss (ECF No. 110) is GRANTED. The claims against the Florida Education Commissioner and all members of the Florida Board of Education are dismissed without prejudice for lack of subject-matter jurisdiction.

The Lake County Defendants' motion to dismiss (ECF No. 109) is also GRANTED. Claims against the Lake County Superintendent in her individual capacity are dismissed on the merits based on qualified immunity. Claims against the Lake County Superintendent in her official capacity are dismissed as duplicative of claims against the Lake County School Board. Claims against the Lake County School Board are dismissed on the merits based on *Monell*.

The Escambia County Defendants' motion to dismiss (ECF No. 108) is GRANTED in part. Claims against Superintendent Leonard in his individual capacity are dismissed without prejudice for lack of subject-matter jurisdiction. Claims against Superintendent Leonard in his official capacity are dismissed as duplicative of claims against the Escambia County School Board. Counts III and IV are dismissed without prejudice for lack of subject-matter jurisdiction. Counts I and II as against the Escambia County School Board will proceed. The Escambia County School Board must file an answer as to those counts within 14 days.

Plaintiffs and the Escambia County School Board must confer and, within 21 days, file a proposed litigation schedule.

SO ORDERED on April 25, 2024.

s/ *Allen Winsor*_____
United States District Judge