## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

PETER PARNELL, et al.,

       Plaintiffs,

vs.                       CASE NO.:  4:23-cv-00414-AW-MAF

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA, et al.

       Defendants.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Escambia County School Board ("Board"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby moves for entry of final summary judgment on Plaintiffs' First Amended Complaint ("Complaint"), and states:

## I.    INTRODUCTION

This case arises from Plaintiffs' belief that book authors and students have a First Amendment right to dictate what books should be made available in a public school library. Plaintiffs' strongly-held beliefs as to their constitutional rights regarding the book *And Tango Makes Three* ("*Tango*") and Escambia County public school libraries cannot stand.

First, an author does not have a First Amendment right to demand his book be made available in public school libraries. This is so because a local school board, as the duly-elected governmental body responsible for the content of the school library, has the First Amendment right to choose what message is conveyed through its curation of the library collection. The Board has the statutory duty to ensure the materials available in its libraries are suitable and appropriate for the grade level and age group served by their libraries. Plaintiffs Parnell and Richardson (the "Author Plaintiffs"), children's book authors, do not have a First Amendment right to override this decision and compel the Board to speak through inclusion of their book.

Second, a student does not have a First Amendment right to receive information the speaker does not the right to convey. Because the Author Plaintiffs do not have a constitutional right to have their book in a public school library, the student Plaintiff B.G. does not have a constitutional right to receive any book of her choosing.

Third, even if B.G. had a constitutional right, she has no standing because *Tango* was never available in her school library. As such, she cannot seek redress for the injuries claimed in this case. Further, because she has not brought a facial challenge to any policy or statute and has not sought class certification, B.G. does not have standing to seek redress on behalf of students at schools other than her own.

Finally, even if the Court found the school library shelf was a forum for private speech, Plaintiffs cannot meet their burden in demonstrating a constitutional violation. Plaintiffs can offer no evidence that the decision to remove *Tango* from elementary school libraries was not reasonable or was based on impermissible viewpoint discrimination.

While the First Amendment declares "Congress shall make no law . . . abridging the freedom of speech," Amend. I, U.S. Const., it does not provide a constitutional right to dictate what books go on a public school library shelf or to second guess the discretionary decisions of the local school board. Final summary judgment should be entered in the Board's favor.

## II.    STATEMENT OF UNDISPUTED FACTS

1.      The Board is a district school board constitutionally vested with the authority and duty to "operate, control and supervise all free public schools within the [Escambia County School District ("District")]." Art. IX, § 4(b), Fla. Const.; § 1001.32(2), Fla. Stat.; *see also* [D.E. 61, ¶ 26].

2.      As of February 2023, the Board's five members were: Kevin Adams, Paul Fetsko, Patricia Hightower, William Slayton, and David Williams. *See* [D.E. 215-1 (Declaration of Shenna Payne ("Payne Decl.") ¶ 5)].

3.      Under section 1001.42(8)(a), Florida Statutes (2022), the Board, "[i]n accordance with the provisions of chapters 1003 and 1006, [is to] provide for the

proper accounting for all students of school age, for the attendance and control of students at school, and for proper attention to health, safety, and other matters relating to the welfare of students."

4.    Pursuant to section 1001.42(9), Florida Statutes (2022), the Board is to "[p]rovide adequate instructional materials for all students in accordance with the requirements of chapter 1006."

5.    Section 1006.28(2)(a)1., Florida Statutes (2022), states: "Each district school board is responsible for the content of all materials made available in a school library whether otherwise purchased or made available." (cleaned up).

6.    Books made available in the Board's libraries are selected by District employees and purchased by the Board. *Id.* § 1006.28(2)(d). Each book in a school library bears a bar code or other ownership tag indicating it is the Board's property. [D.E. 215-2 (Def.'s Resps. to Pls.' First Set of Interrogs., Resp. No. 3)].

7.    Section 1006.28(2)(a)2.b., Florida Statutes (2022), states:

> Each district school board must adopt a policy regarding an objection by a parent or a resident of the county to the use of a specific material, which clearly describes a process to handle all objections and provides for resolution. The process must provide the parent or resident the opportunity to proffer evidence to the district school board that:
>
> . . .
>
> b.   Any material used in a classroom, made available in a school library, or included on a reading list contains content that is pornographic or prohibited under

4

s. 847.012, is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level and age group for which the material is used.

If the district school board finds that an instructional material does not meet the criteria under sub-subparagraph a. or that any other material contains prohibited content under sub-subparagraph b., the school district shall discontinue use of the material for any grade level or age group for which such use is inappropriate or unsuitable.

8.    At the time the Board voted to remove *Tango*, Escambia County Public Schools Policy 4.06 governed the proper procedure and process for the selection, review, restriction, and removal of book titles, as well as procedures for objecting to particular titles. *See* [D.E. 215-3 (Escambia Cnty. Sch. Bd. Pol'y 4.06 (effective February 2023))].

9.    The Author Plaintiffs are the authors of *Tango*. [D.E. 61, ¶¶ 17-18].

10.    The District has 32 elementary schools. Payne Decl. ¶ 6.

11.    As of February 20, 2023, *Tango* was available in five elementary schools. [D.E. 215-4 (Declaration of Bradley Vinson ("Vinson Decl.") ¶ 5)].

12.    Plaintiffs' expert Dr. April Dawkins opines *Tango* is relevant and appropriate for preschoolers through 2nd or 3rd grade.  [D.E. 215-5 (Dawkins Depo. Tr. 69:24-70:10)].

13.    Plaintiff B.G. is a student at Warrington Elementary School. [D.E. 61, ¶ 20]. At the time the Complaint was filed, she was in third grade. *Id.*

14.    The library at Warrington Elementary School never had a copy of *Tango*. [D.E. 119-1, ¶ 6].

15.    On or around August 24, 2022, Vicki Baggett submitted a challenge to *Tango*. [D.E. 61, ¶ 90].

16.    On February 20, 2023, the Board held a special meeting to consider a citizen's challenge to *Tango* per section 1006.28(2)(a)2. [D.E. 61, ¶ 101, D.E. 61-4]. On a motion to leave *Tango* in the school libraries, the motion failed 2-3. Board members Kevin Adams, Paul Fetsko, and David Williams voted "no" on the motion. *See* [D.E. 93-1, 10:02-13:08].

17.    As of this filing, the Board has only voted on ten books, pursuant to section 1006.28(2)(a)2. Vinson Decl. ¶ 6.

18.    To date, the Board has never voted to keep a challenged book in elementary school libraries. *Id.* at ¶ 7.

19.    On the same date Ms. Baggett challenged *Tango*, she also challenged *Drama* by Raina Telgemeier. *See* [D.E. 215-6 (*Drama* Challenge Form)]. Ms. Baggett's objection was "Indoctrination of LGBTQ; age inappropriate + content not relevant." *Id.* She noted the media was located in elementary and middle schools. *Id.*

20.    On March 20, 2023, the Board held a special meeting to consider a citizen's challenge to *Drama* per section 1006.28(2). [D.E. 215-7 (Notice of Meetings for the Escambia Cnty. Sch. Dist.)]. The Board voted on a motion to keep

*Drama* as middle and high school material. [D.E. 215-8 (Special Meeting Agenda Item for *Drama*)]. The motion carried, with four of five board members voting in favor of it. *Id.*

## III.   <u>MEMORANDUM OF LAW</u>

### A.   **Standard of Review**

On a summary judgment motion, disputes in the evidence must be resolved, and all reasonable inferences from the evidence must be drawn, in favor of the nonmoving party. The moving party must show that, when the facts are so viewed, it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is warranted if the plaintiff cannot make a showing sufficient to establish each element for which they bear the burden of proof. *Celotex Corp.*, 477 U.S. at 322-23. A plaintiff must offer some "concrete evidence from which a reasonable juror could return a verdict in [the plaintiff's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The party opposing summary judgment may not simply "rest upon mere allegations or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.*; *see also Celotex Corp.*, 477 U.S. at 324.

### B.   **The Author Plaintiffs Do Not Have a First Amendment Right to Have *Tango* Available in Public School Libraries**

The Author Plaintiffs claim a First Amendment violation based on content and viewpoint discrimination under section 1001.42(8)(c)(3), Florida Statutes

(hereinafter "HB 1557").[1] [D.E. 61, Count I]. The Author Plaintiffs claim *Tango* "is protected speech." *Id.* at ¶ 116.

The Free Speech Clause, however, restricts government regulation of private speech; it does not regulate government speech. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).

An author does not have a constitutional right to be included in a library collection. *Egli v. Chester Cnty. Libr. Sys.*, 394 F. Supp. 3d 497, 504 (E.D. Pa. 2019). This is so because the determination as to which books should be available on a public school library shelf is necessarily government speech. By allowing certain books to remain on a school library shelf, the Board conveys the message that it has determined that these books are suited to students' needs and their ability to comprehend and that they are appropriate for the grade level and age group for which they are used. § 1006.28(2)(a)2., Fla. Stat. (2022).

"No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." *Milliken v. Bradley*, 418 U.S. 717, 741 (1974). The Supreme Court has "long recognized that local school boards have broad

---

[1] The Court previously ruled that HB 1557 is not applicable to school library books. [D.E. 151 at 5].

discretion in the management of school affairs." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863 (1982) (plurality op.).

The "government undoubtedly has the authority to control its own message when it speaks or advocates a position it believes is in the public interest." *Chiras v. Miller*, 432 F.3d 606, 612 (5th Cir. 2005).

> In establishing and implementing certain governmental functions, the government, including its educational institutions, has the discretion to promote policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement.

*Id.* at 613 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 669 (1998); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585-86 (1998); *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 195 (2003)) ("*ALA*").

When the Board selects books to be made available in its school libraries, it is the government speaking, not the books' authors. Liability for this decision ultimately rests with the Board. *See* § 1006.28(2)(a)1., Fla. Stat. (2022); *see also id.* § 1006.28(2)(d)1.-2. (requiring school boards "[e]stablish and maintain a program of school library media services," ensure "[e]ach book made available" is "selected by a school district employee who holds a valid educational media specialist certificate," and "adopt procedures for developing library media center collections"). The Board effectively controls the message conveyed in its libraries because it exercises final approval authority over book selection. *Id.* § 1006.28(2)(d)1. Thus, it

is necessary to allow the Board editorial judgment over the content of the books made available in its school libraries, and the exercise of that judgment will necessarily reflect the viewpoint of the Board members.

The purpose of the school library is not to establish a forum for unfettered expression of the views from various authors who want their place on the library shelf. Rather, the purpose of the school library is to educate. However, because the school board serves *in loco parentis*, this educational purpose is coupled with the requirement to determine the suitability and age-appropriateness of such books. Simply because a library shelf contains a collection of seemingly disparate ideas and viewpoints, does not mean it is a forum for private speech. Otherwise, the Board would have no editorial control over the content of the materials.

In fact, a reasonable observer would perceive the inclusion of any particular book in a public school library as a statement by the school board that this book is suitable and age-appropriate for the students at that particular school. If, for example, an elementary school library included a *Playboy* magazine or a book depicting how to make a homemade bomb, a reasonable observer likewise would hold the Board accountable for such an oversight in judgment. As such, when the Board chooses to retain or remove a book on a school library shelf, it is speaking on behalf of itself— the government; therefore, this decision is not subject to the Free Speech Clause.

Government speech includes content discretion over speech the government presents to the public. *See, e.g.*, *Leake v. Drinkard*, 14 F.4th 1242, 1253 (11th Cir. 2021) (parade); *Ark. Educ. Television Comm'n*, 523 U.S. at 674 (broadcasted debate and university commencement); *Nat'l Endowment for the Arts*, 524 U.S. at 586 (art gallery). Government speech goes beyond content-based decisions to include viewpoint-based choices, too. For example, a city's decision as to what type of statue to erect was government speech that did not require even viewpoint neutrality. *Summum*, 555 U.S. at 470-73.

And, when the government speaks, it may refuse to endorse or freely remove speech of which it disapproves. *Leake*, 14 F.4th at 1248 (citing to *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074 (11th Cir. 2015)). Government speech is regulated by "the political process," not the Constitution. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

Public schools in Escambia County are creations of the State and many of their expressive decisions, including what books to make available in the library, are government speech. The selection of library inventory is government speech that does not trigger the Free Speech Clause of the First Amendment. *See, e.g.*, *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is

or is not expressed."); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (government speech does not violate First Amendment); *PETA, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."). In public schools, "expression delivered directly through the government or indirectly through private intermediaries" is government speech, and the school "is free to make subject-matter-based choices." *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1213 (11th Cir. 2004).

By way of example, in *Downs v. Los Angeles Unified School District*, 228 F.3d 1003, 1012 (9th Cir. 2000), a teacher brought suit against the school district challenging the constitutionality of the school's actions in refusing to allow him to post materials on a school bulletin board. The *Downs* court, in finding the teacher had no First Amendment right to post materials on the bulletin board, held "viewpoint neutrality" did not apply to the school district's action because all speech that occurred on the bulletin board was the school board's and district's. *Id.* at 1011-12. The court noted: "Were we to invoke the Constitution to protect Downs's ability to make his voice a part of the voice of the government entity he served, Downs would be able to do to the government what the government could not do to Downs: compel it to embrace a viewpoint." *Id.* at 1015.

Here, the curation of books in a school library is similar to the curation of the bulletin board in *Downs.* As in *Downs*, the Board owns the property in question—the library and the books within it—and the books within the library are subject to the Board's oversight. § 1006.28(2)(a)1., Fla. Stat. As such, the Author Plaintiffs cannot compel the Board to embrace a viewpoint or speak through the inclusion of *Tango* in elementary school libraries.

Plaintiffs' reliance on *Pico* does not support an opposite conclusion.[2] *Pico*'s narrow view of the right to remove books from school libraries predates the Supreme Court's explanation of the government-speech doctrine. Though the government speech doctrine is a mainstay of First Amendment law today, it was not applied by the Supreme Court until 1991, almost a decade after *Pico*, *see Rust v. Sullivan*, 500 U.S. 173, 193-95 (1991), and was still described as "recently minted" as late as 2009. *Summum*, 555 U.S. at 481 (Stevens, J., concurring); *see also Chiras*, 432 F.3d at 617.

Since *Pico*, courts have reiterated government speech includes the freedom "not to speak" and to "'speak through the removal' of speech that the government disapproves." *Mech*, 806 F.3d at 1074 (quoting *Downs*, 228 F.3d at 1012). And, the Author Plaintiffs cannot compel the government to speak. *See Dean v. Warren*, 12

---

[2] In addition, *Pico* lacks precedential value. *See* [D.E. 151 at 12]; *Am. Civ. Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1220 (11th Cir. 2009).

F.4th 1248, 1264 (11th Cir. 2021) (noting "Free Speech Clause does not restrict government speech," including a planned protest by a cheerleader in state university uniform); *see also Keeton v. Anderson Wiley*, 644 F.3d 865, 877 (11th Cir. 2011). Indeed, because Plaintiffs have no constitutional power to control school library inventories, a government's compilation of third-parties' expressive content is government speech. *Forbes*, 523 U.S. at 674.

The Eleventh Circuit has used three factors to distinguish government speech from private speech: history, endorsement, and control. *Leake*, 14 F.4th at 1248 (citing *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1230 (11th Cir. 2019)).

"The first factor—history—directs us to ask whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Id.* at 1232 (quoting *Walker*, 576 U.S. at 211). The second factor—endorsement—asks whether "observers reasonably believe the government has endorsed the message." *Mech*, 806 F.3d at 1076. "Finally, the control factor asks whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Cambridge*, 942 F.3d at 1234 (quoting *Walker*, 576 U.S. at 213). These factors are neither individually nor jointly necessary for speech to constitute government speech. *See Mech*, 806 F.3d at 1075-76.

    1)   <u>History</u>

For nearly 140 years the State of Florida has enshrined the right to public free schools for its citizens, and at one point even explicitly provided for expenditure of funds "for the purchase of school libraries and textbooks." Art. XII, § 11, Fla. Const. (1885).[3] Further, Policy 4.06 was adopted more than 30 years ago, and the primary law upon which it was based was first created over 20 years ago. *See* Ch. 2002-387, § 303, Laws of Fla. (creating section 1006.28, Florida Statutes, requiring district school boards to "[e]stablish and maintain a program of school library media services").

A broader historical overview supports the Board's position also. As public school libraries developed in the early twentieth century, "differences of opinion arose as to who should select, purchase, and regulate or supervise the use of the materials." Tom J. Cole, *The Origin and Development of School Libraries*, 37 Peabody J. of Educ. 87, 91 (Sept. 1959), https://www.jstor.org/stable/1490648; *see also* U.S. Dep't of Interior, *Public Libraries in the United States of America: Their History, Condition, and Management* 38–58 (1876), bit.ly/4dcouzw (providing a "historical sketch of common school libraries" in several states). However, by 1920, standard practice required "[b]ook selections" to "be made by the librarian with the approval of the principal." Am. Library Ass'n, Standard Library Organization and

---

[3]    Publicly     available     at:     http://library.law.fsu.edu/Digital-Collections/CRC/CRC-1998/conhist/1885con.html.

Equipment for Secondary Schools of Different Sizes 21 (1920). So too has the Board long exercised control over the selection of its library materials, conveying the message the chosen materials are of the "requisite and appropriate quality" and will most benefit and interest the community. *ALA*, 539 U.S. at 204.

Accordingly, the first factor weighs in the Board's favor. Since school boards have long had the authority to maintain and curate the content within public school libraries in Florida, these libraries have traditionally communicated messages on the government's behalf. *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1335 (11th Cir. 2023); *see also Cambridge*, 942 F.3d at 1232.

### 2) Endorsement

The endorsement factor asks whether the speech is closely identified with the government. *Cambridge*, 942 F.3d at 1232. The Eleventh Circuit has found activities "'observers would interpret [as] promoted, organized, and funded by the government as conveying some message on [its] behalf,' as '[government entities] typically do not organize and fund events that contain messages with which they do not wish to be associated.'" *McGriff*, 84 F.4th at 1336 (second alteration in original) (quoting *Leake*, 14 F.4th at 1250). Clearly, observers would interpret libraries maintained, organized, and funded by the Board as "conveying some message" on its behalf. *See, e.g.*, *Mech*, 806 F.3d at 1076 (finding banners hung on school fences and government property often closely identified the public mind with the government unit that owns

the land); *see also Gundy v. City of Jacksonville*, 50 F.4th 60, 78-79 (11th Cir. 2022) ("[T]he City Council's invocation can be closely identified in the public mind with the government because the City Council organizes that invocation, it provides the venue for the invocation, it selects the speaker for the invocation, and then it begins its business meeting.").

The books in the Board's libraries bear its imprimatur through their location on the shelves; they also include either a barcode, property stamp, or both indicating they are property of the school in which the book is kept. Def.'s Resps. to Pls.' First Set of Interrogs., Resp. No. 3. This imprimatur indicates they are Board property. *Id.*; § 1001.42(2), Fla. Stat.; *see also PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, No. 3:23-cv-10385-TKW-ZCB (N.D. Fla.), ECF No. 105-1 (Decl. of Bradley Vinson) ¶ 36.

And, even though the book at issue was authored by the Author Plaintiffs—private parties—"that a private party takes part in the propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." *Gundy*, 50 F.4th at 79 (internal quotations omitted). When a school makes certain books available on its library shelves to be read by its students, it is conveying the message it has approved these books as age-appropriate and suitable for students who patronize the library. Even though the books are authored by others, the Board speaks through the decision

as to what books to maintain on its library shelves. The endorsement factor is met here.

        3)   <u>Control</u>

The control factor looks at "whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Cambridge*, 942 F.3d at 1234 (quoting *Walker*, 576 U.S. at 213). The Eleventh Circuit has held "no case precedent says that the government must control every word or aspect of speech in order for the control factor to lean toward government speech." *Gundy*, 50 F.4th at 79 (citing *Cambridge*, 942 F.3d at 1235-36) (finding city exerted control over message conveyed by speakers because inviting speakers to give invocations inherently exhibits government control from outset of selection process); *see also McGriff*, 84 F.4th at 1334 (city controlled art installation and painting because "it contracted to commission and fund the artists' work; to control its exhibition, including by subjecting the art to the City Manager's approval; and to provide the space in which the exhibition was housed").

The Board controls the materials within its libraries because it provides and controls the library space itself: it purchases and takes ownership of the books and materials within, and subjects those materials to Board approval. § 1006.28(2)(d), Fla. Stat.; *see McGriff*, 84 F.4th at 1334; *cf. Shurtleff v. City of Boston*, 596 U.S. 243, 257 (2022) (noting in contrast to city in *Summum*—which "always selected which

monuments it would place in its park" and "typically took ownership over them"—and state board in *Walker*—which "maintained direct control over license plates by actively reviewing every proposal and rejecting at least a dozen"—City of Boston "ha[d] no comparable record" of control (cleaned up)). "Having bought the [book], the [Board's] decision to display it [and make it available for selection], or not display it, was classic government speech." *McGriff*, 84 F.4th at 1334. Plaintiffs identify no agreement between the Author Plaintiffs and the Board by which the former retain control over what the Board may and may not do with their book once purchased. That is because no such agreement exists, and once a book is purchased, it becomes the Board's prerogative to do with it—including whether to select or deselect it for availability—as it chooses. All three factors weigh in favor of the Board's actions serving as government speech.

"Because the Board must necessarily exercise its editorial discretion in selecting which private entities will convey the message the state selects, forum analysis and the viewpoint neutrality requirement are inapposite in this case. As a result, there is no forum to which [the Author Plaintiffs] can claim access as [an] author." *Chiras*, 432 F.3d at 615. Summary judgment should be entered on Count I.

### C. B.G.'s Claim, Which is Dependent on the Author Plaintiffs' Claim, Likewise Fails

With Count II, the student Plaintiff B.G. claims a First Amendment "right to receive" information, specifically *Tango* in her elementary school library. [D.E. 61, Count II].

The First Amendment protects both speakers and recipients of information. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976). "However, the cases interpreting the First Amendment do not contemplate that some speech may be restricted as to the speaker but not to the listener. The listener's right to receive information is reciprocal to the speaker's right to speak." *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015) (quoting *Pico*, 457 U.S. at 867 ("[T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them.")).

The First Amendment does not require the government to provide access to information it possesses on demand, and it certainly does not require the government to gather information. *See Gregg v. Barrett*, 771 F.2d 539, 547 (D.C. Cir. 1985). The First Amendment right to receive information requires only that the government not engage in conduct that impermissibly silences a willing speaker. Accordingly, when a First Amendment claim fails to allege a willing speaker's speech has been chilled, the claim should be dismissed for failing to state a claim. *Id.* at 546-49.

It logically follows B.G.'s First Amendment right to receive the viewpoints of *Tango*'s authors should flow from the Authors Plaintiffs' First Amendment right

to express those viewpoints. However, as stated above, the Author Plaintiffs do not have a First Amendment right to have their books on a public school library shelf and they cannot compel the Board to speak by requiring their book be made available. Because the Author Plaintiffs have no First Amendment right in this context, B.G. does not have a First Amendment right to receive those viewpoints. *See, e.g.*, *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1244 (N.D. Fla. 2022).

Further, the Board does not have a constitutional obligation to aid an author in reaching an audience. As Chief Justice Burger's dissent in *Pico* noted, regarding the notion of having an informed citizenry:

> [this] does not establish a *right* to have particular books retained on the school library shelves if the school board decides that they are inappropriate or irrelevant to the school's mission. Indeed, if the need to have an informed citizenry creates a "right," why is the government not also required to provide ready access to a variety of information? This same need would support a constitutional "right" of the people to have public libraries as part of a new constitutional "right" to continuing adult education.
>
> * * *
>
> The government does not "contract the spectrum of available knowledge" by choosing not to retain certain books on the school library shelf; it simply chooses not to be the conduit for that particular information. In short, even assuming the desirability of the policy expressed by the plurality, there is not a hint in the First Amendment, or

in any holding of this Court, of a "right" to have the
government provide continuing access to certain books.

*Pico*, 457 U.S. at 887-89 (Burger, C.J., dissenting). Here, because the Author

Plaintiffs do not have a right to have their book on the shelf, B.G. does not have a

concomitant right to receive that book in the method of her choosing.

### D.    B.G.'s Claim Fails Because She Lacks Article III Standing

Count II also fails because B.G. cannot establish standing for this claim. In

Count II, B.G. seeks a "permanent injunction requiring the Escambia County

Defendants to *restore* unrestricted student access to *Tango* in their jurisdiction."

[D.E. 61, ¶ 134 (emphasis added)]. However, *Tango* was never at her elementary

school. [D.E. 119-1 ¶ 6]. Accordingly, there is no book to restore to the shelves of

B.G.'s library.

In order to establish Article III standing, a plaintiff must establish their

purported injury will be "redressed" by a favorable decision of the court. *Lujan v.

Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, however, a judgment by the Court

against the Board ordering it "restore" unrestricted student access to *Tango* would

not significantly increase the likelihood of redressing B.G.'s purported injury

because *Tango* was never available at B.G.'s school.

Count II also fails as the relief sought is broader than B.G.'s standing.

"[S]tanding is not dispensed in gross," as "a plaintiff must demonstrate standing for

each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed.*

*Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

Again, B.G. seeks a "permanent injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdiction." [D.E. 61, ¶ 134]. But, B.G. has not brought a facial challenge to any law or policy or a putative class action. As such, she has no standing to seek relief on behalf of students at schools other than her own.

### E. Even if Forum Analysis Applied, the Removal of *Tango* was Constitutional

Assuming the curation of a public school library is not government speech, and the shelves of a public school library are somehow a forum for private expression, Plaintiffs still cannot prove a First Amendment violation through the removal of *Tango* from elementary school libraries.

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). The government's ability to restrict speech depends on the nature of the forum in which the speech occurs. *Walker*, 576 U.S. at 215; *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).

The Supreme Court has recognized four types of fora: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum. *See Walker*, 576 U.S. at 215-16. Content restrictions in the first two categories are reviewed under strict scrutiny, while regulations in the latter two survive so long as they are viewpoint neutral and reasonable. *McDonough v. Garcia*, 116 F.4th 1319, 1322 (11th Cir. 2024).

Plaintiffs do not plead the school library shelf is a forum or articulate which forum they believe it to be.[4] However, based on statements made during the hearing on the Board's Motion to Dismiss, it seems Plaintiffs contend the applicable forum is a nonpublic forum. [D.E. 140, 83:11-84:06].

The nonpublic forum, as the name suggests, is not really a public forum at all, and includes government property that "is not by tradition or designation a forum for public communication." *McDonough*, 116 F.4th at 1323 (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)). The First Amendment, after all, "does not guarantee access to property simply because it is owned or controlled by the government." *Id.*

---

[4] The Amended Complaint argues the application of HB 1557 does not further a compelling interest and is not narrowly tailored to achieving that interest, [D.E. 61, ¶ 117], suggesting Plaintiffs believe the library shelf is a public forum or limited public forum; however, it is clear those do not apply here. *See* [D.E. 140, 63:06-65:10, 83:11-84:06]. Moreover, the Court already "reject[ed] Plaintiffs' contention that strict scrutiny applies." [D.E. 151 at 25 n.12].

In a nonpublic forum, control over access can be based on speaker identity or subject matter so long as the distinctions drawn are reasonable in light of the purpose served by the forum and viewpoint neutral. *Uptown Pawn & Jewelry, Inc. v. City of Hollywood*, 337 F.3d 1275, 1280 (11th Cir. 2003) (citing *United States v. Kokinda*, 497 U.S. 720, 730 (1990)).

> 1)    The Removal of *Tango* from Elementary Schools Was Reasonable

Plaintiffs do not plead the removal of *Tango* from elementary schools was <u>not</u> reasonable. Instead, they plead the removal served "no legitimate pedagogical purpose." [D.E. 61, ¶¶ 107, 116, 130]. This is an inapplicable standard.

The decision to restrict access need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation. *Uptown Pawn*, 337 F.3d at 1280. For a speech restriction to be upheld as reasonable, "the government must avoid [its] haphazard and arbitrary enforcement." *Cambridge*, 942 F.3d at 1243.

The Supreme Court has stated "common sense . . . is sufficient in this Court to uphold a regulation under reasonableness review." *Kokinda*, 497 U.S. at 734-35. Hence, the Court only need ask whether it is "intuitively obvious or common sensical" that the restriction is reasonable. *Uptown Pawn*, 337 F.3d at 1281 (citing *Perry*, 460 U.S. at 53-54); *Perry*, 460 U.S. at 53-54 ("[T]he reasonableness of the limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication

to take place . . . . The variety and type of alternative modes of access present here compare favorably with those in other nonpublic forum cases where we have upheld restrictions on access.").

Florida law mandates challenged library materials that are "not suited to student needs and their ability to comprehend" or are "inappropriate for the grade level and age group for which the material is used" shall be discontinued. § 1006.28(2)(a)2.b., Fla. Stat. (2022). The Board determined, in its discretion, that *Tango* was not suitable or appropriate for elementary school students. [D.E. 93-1, 10:02-13:08].

As the Eleventh Circuit has stated:

> Federal courts should not arrogate to themselves power over educational suitability questions. Such questions are the perfect example of a core educational policy matter within the exclusive province of local school boards.

*Am. Civ. Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1225-26 (11th Cir. 2009). Further, the Supreme Court has repeatedly instructed:

> By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.

*Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("[T]he Court has repeatedly emphasized

the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."). Thus, the Court should not second guess the Board's determination that *Tango* was not age appropriate or suitable for elementary school children.

Further, there has been no haphazard enforcement of section 1006.28(2)(a)2. In fact, the Board has never voted to retain a challenged book in elementary schools. This supports the notion that the Board, in its judgment, has determined certain topics are just not suitable or appropriate for the younger grades.

Moreover, the Author Plaintiffs cannot make a showing they are prevented from reaching their audience by providing the book by other means (by, for example, attaching a copy of the book to the Complaint in this case, [D.E. 61-1]). And, B.G. cannot make a showing that she is prevented from gaining access to *Tango* from another source such as the public library. This fact supports the conclusion the decision to remove *Tango* from elementary school libraries was reasonable. *See Uptown Pawn*, 337 F.3d at 1281 (finding the plaintiff made no showing that it was prevented from advertising using other mediums); *Perry*, 460 U.S. at 53-54.

"The doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Mahanoy Area Sch. Dist. v. B.L.*

*ex rel. Levy*, 594 U.S. 180, 189 (2021). A student's choice of library book is made in a school library, outside the view of their parents. As such, the Board stands in the place of the students' parents in such a situation and is responsible for protecting *all* students from material that may not be deemed age appropriate by certain students' parents. Simply because some parents may believe their kindergarten student is able to comprehend the discussion of where babies come from, does not mean all parents are comfortable with introducing this topic at an earlier age. As such, the Board's responsibility is to protect the most protected or developmentally immature students from content their parents may deem age-inappropriate, even if other parents disagree.

And, even accepting Plaintiffs' theory the Board removed *Tango* on the basis of HB 1557, such a decision is not unreasonable. If the Florida Legislature determined certain subject matter was not appropriate for *classroom instruction* for kindergarten through third grade, it was not unreasonable for the Board to believe such content was also not appropriate *library material* for those same grades. *See* HB 1557.

Common sense dictates the decision of the Board was reasonable based on a determination of educational suitability. A federal court should not second-guess the decision made by a local school board as to what topics are age-appropriate. Such a reckoning is better served through the electoral process.

2)    The Removal of *Tango* from Elementary Schools Was Not
Based on Viewpoint Discrimination

Plaintiffs claim *Tango* "was physically pulled from school library shelves"
based on HB 1557 and "an abundant record of discriminatory animus." [D.E. 61, ¶
9]. Plaintiffs allege the Board removed *Tango*, "repeatedly invoking" HB 1557. *Id.*
Yet, despite these allegations, there is no evidence the Board removed *Tango* based
on HB 1557. [D.E. 93-1, 10:02-13:08].

Plaintiffs also allege the Board voted to remove *Tango* based on the topics,
ideas, and opinions of the Author Plaintiffs—"namely, that same-sex relationships
and families with same-sex parents exist; that they can be happy, healthy, and loving;
and that same-sex parents can adopt and raise healthy children." [D.E. 61, ¶ 116].

Viewpoint discrimination occurs when the "specific motivating ideology or
the opinion or perspective of the speaker is the rationale for the restriction."
*Rosenberger*, 515 U.S. at 829 (citing *Perry*, 460 U.S. at 46). But, there is no evidence
the Board removed *Tango* based on the view that: (1) same-sex relationships and
parents exist; (2) they can be happy, healthy and loving; or (3) same-sex parents can
adopt and raise healthy children.

*Tango* reached the Board based on a citizen's challenge under section
1006.28(2)(a)2. That statute has not been challenged by Plaintiffs. There can be no
question the statute is viewpoint neutral. And the statute has the presumption of
constitutionality until its invalidity is judicially declared. *Davies Warehouse Co. v.*

*Bowles*, 321 U.S. 144, 153 (1944); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 254 (5th Cir. 1974).[5]

As such, Plaintiffs have the burden in demonstrating the policy was used in a way that discriminated based on the Author Plaintiffs' viewpoint or was enforced arbitrarily. *Gundy v. City of Jacksonville*, 528 F. Supp. 3d 1257, 1265 (M.D. Fla. 2021) (citing *Cambridge*, 942 F.3d at 1240), *aff'd*, 50 F.4th 60 (11th Cir. 2022); *Cleveland v. City of Cocoa Beach*, 221 F. App'x 875, 879 (11th Cir. 2007); *see also* [D.E. 180, 58:02-58:03, 58:17-58:18 (Court commenting on Plaintiffs' burden and that the Board "do[es not] have any burden in this case")]. They cannot satisfy this burden based on the record.

First, Plaintiffs have no direct evidence the Board voted to remove *Tango* based on the Author Plaintiffs' viewpoint. In order to meet their burden, Plaintiffs have to prove that *all three* Board members who voted to remove *Tango* did so for viewpoint discriminatory reasons. This is so because under Florida law the Board acts as one. § 1001.42, Fla. Stat.; *see Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("Because policymaking authority rests with the Commission as an entity, the County can be subject to liability only if the Commission itself acted with an unconstitutional motive."); *Mason v. Vill. of El Portal*, 240 F.3d 1337, 1340

---

[5] Fifth Circuit decisions decided prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1208 (11th Cir. 1981).

(11th Cir. 2001) (finding there can be no municipal liability unless three members of a five member counsel shared the purported illegal motive); *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994) ("The plaintiffs concede that, under Alabama law, final policymaking authority rests with the entire five-member City Council and the Mayor . . . ."); *accord City of Hallandale Beach v. Rosemond*, 388 So. 3d 826, 834 (Fla. 4th DCA 2024) ("The city can be subject to whistleblower retaliation liability only if the employee had presented competent substantial evidence at trial that Commissioners Lazarow and Lima-Taub, like Vice Mayor London, may have acted with retaliatory motives in voting to suspend and terminate the employee.").

Plaintiffs cannot prove all three board members had a discriminatory motive. First, not one of the three Board members expressly stated they were voting to remove *Tango* based on the Authors Plaintiffs' views that: (1) same-sex relationships and families with same-sex parents exist; (2) they can be happy, healthy, and loving; or (3) same-sex parents can adopt and raise healthy children. [D.E. 61, ¶ 116]. *See* [D.E. 93-1, 10:02-13:08]. And given the legislative nature of the Board members' actions, [D.E. 191 at 3-5], these actions carry a presumption of constitutionality. *Close v. Glenwood Cemetery*, 107 U.S. 466, 475 (1883) ("Every legislative act is to be presumed to be a constitutional exercise of legislative power until the contrary is clearly established[.]"); *see also McDonald v. Bd. of Election*,

394 U.S. 802, 809 (1969) ("Legislatures are presumed to have acted constitutionally . . . ."); *cf. United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.").

Instead, Plaintiffs will likely ask this Court to infer from public comments that the Board members' true motivation was based on discriminatory animus. But, even with the request for an inference, Mr. Fetsko's statements make plain his reason for removal was based on introduction of the concept of "where babies come from" at a young age, not that there was a same-sex relationship. [D.E. 93-1, 11:13-12:15].

Plaintiffs cannot meet their burden in demonstrating all three Board members "intended by their removal decision" to deny access to *Tango* based on ideas with which they disagreed and that such intent "was the decisive factor" in their decision. *Pico*, 457 U.S. at 871.

This is all the more apparent in the fact the Board, in voting on other books, made clear the presence of same-sex characters was not a decisive factor in determining whether a book should be removed from a school library. In addition to *Tango*, Vicki Baggett also challenged the book *Drama* by Raina Telgemeier. Mrs. Baggett indicated her reason for objection was "Indoctrination of LGBTQ; age inappropriate + content not relevant." [D.E. 215-6]. Despite this objection, and

despite Plaintiffs' beliefs as to the Board members' animus to same-sex characters, the Board voted to keep *Drama* in middle schools and high schools.[6] If the Board's discriminatory intent was the decisive factor in voting to remove *Tango*, it is not clear why then the Board would vote to keep *Drama* in school libraries. It must be because there was no discriminatory intent and because *Tango* was not removed based on viewpoint discrimination.

Plaintiffs cannot meet their burden in demonstrating *Tango* was removed from elementary school libraries based on viewpoint discrimination. At most, Plaintiffs can speculate as to the true motives of the Board members, but they cannot *prove* that such motives were discriminatory as opposed to a determination that *Tango* was not suitable or appropriate for elementary school students.

## IV.   <u>CONCLUSION</u>

**WHEREFORE**, Defendant, Escambia County School Board, respectfully requests this Court enter an order granting final summary judgment in its favor and against Plaintiffs, as set forth herein, and for any other relief that is just and proper.

---

[6] The Board voted to remove *Drama* only from elementary school libraries. [D.E. 215-8].

## <u>CERTIFICATE OF WORD COUNT</u>

I certify that this Memorandum complies with the word count limitation set forth in Local Rule 7.1(F) because this Memorandum contains 7,759 words, excluding the parts exempted by said Local Rule.

Respectfully submitted,

/s Samantha C. Duke
J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783

and

SAMANTHA C. DUKE
Florida Bar No.: 0091404
E-mail sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 1400
Orlando, FL 32801
Tel:  407.872-7300
Fax: 407.841-2133

Attorneys for Defendant Escambia County School Board

34

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 22, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: **Faith Elizabeth Gay at fgay@selendygay.com, Anna Theresa Neill at aneill@knpa.com**, Lauren J. **Zimmerman at lzimmerman@selendygay.com, Masha Simonova at msimonova@selendygay.com, William Jay Blechman at wblechman@knpa.com and Alexandra Butler at abutler@selendygay.com (Counsel for Plaintiffs)**.

/s Samantha C. Duke
J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783

and

SAMANTHA C. DUKE
Florida Bar No.: 0091404
E-mail sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 1400
Orlando, FL 32801
Tel:  407.872-7300
Fax: 407.841-2133

Attorneys for Defendant Escambia County School
Board