# Exhibit 2

**From:**       "Baggett, Victoria" <VBaggett@ecsdfl.us>
**Sent:**       Thur 11/2/2023 10:48:54 PM (UTC)
**To:**         "Odom, Ellen" <eodom@ecsdfl.us>
**Subject:**    Re: Parnell v. ECSB, et al.

My cell phone is 8504497662. Thanks

On Thu, Nov 2, 2023 at 4:34 PM Baggett, Victoria <VBaggett@ecsdfl.us> wrote:

> Hello,
> I have a question. Could you call me at your convenience?
> 8503276776
>
> On Wed, Oct 18, 2023 at 7:41 AM Odom, Ellen <eodom@ecsdfl.us> wrote:
>
>> You too!
>>
>> On Wed, Oct 18, 2023 at 6:36 AM Baggett, Victoria <VBaggett@ecsdfl.us> wrote:
>>
>> Thank you for the update. Have a great week.Vicki
>>
>> On Tue, Oct 17, 2023 at 5:04 PM Odom, Ellen <eodom@ecsdfl.us> wrote:
>>
>>> Good evening!
>>> I wanted to let you know the plaintiffs have withdrawn their motion for preliminary
>>> injunction in the Parnell case.  The injunction hearing originally set for October 24 and 25
>>> has been cancelled.
>>> I will keep you posted on any upcoming developments with discovery which may involve
>>> or impact you.
>>> Best regards,
>>> Ellen Odom
>>>
>>> On Thu, Oct 5, 2023 at 12:06 PM Baggett, Victoria <VBaggett@ecsdfl.us> wrote:
>>>
>>> Thank you for the update.  I'll try to call later.
>>> Vicki
>>>
>>> On Thu, Oct 5, 2023 at 11:51 AM Odom, Ellen <eodom@ecsdfl.us> wrote:
>>>
>>>> FYI, we have been given until October 9 to file motions for protective order and October
>>>> 13 to file any responses, so I will not likely have a clear answer for you until after the
>>>> 13th. Feel free to call if you wish to discuss.
>>>>
>>>> On Thu, Oct 5, 2023 at 11:39 AM Odom, Ellen <eodom@ecsdfl.us> wrote:
>>>>
>>>> Good morning!

**Exhibit 1**

You may be aware that the School Board is being sued on two fronts regarding the removal of books.  In the more recent case, Parnell v. ECSB, the plaintiffs specifically are challenging the removal of *And Tango Makes Three*.  We are vigorously defending.

I wanted to make you aware that the plaintiffs are seeking to have you testify at a preliminary injunction hearing which is presently scheduled for October 24 and 25.  We are trying to prevent that, since, while you filed the initial challenge, you played no role in the ultimate decision.  I will let you know once the judge has ruled whether or not your testimony is relevant.

Please let me know if you have any questions or concerns, or wish to discuss further.

Best regards,
Ellen Odom

--
Ellen D. Odom
General Counsel
School Board of Escambia County, Florida
850-469-6362
eodom@ecsdfl.us

This communication may contain privileged and confidential information intended only for the addressee(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please notify the sender by reply email and destroy all copies of the original message. Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing. Florida has broad public records laws and virtually all written communications are public records unless specifically deemed confidential pursuant to state or federal law.

**High Contrast**  OFF  ON

Find it Fast »

# Library



## Ms. Laura Johnson

Librarian, Yearbook

**Email:** ljohnson3@ecsdfl.us

Resources
**Citing Sources**
**Justification for Use of Educational Media from Outside Sources in Classroom**
**Where to Locate the K-12 Library Access Form, including Parent Permission to Checkout YA Titles**
**Parental Permission Form for Access to Restricted Titles**
**Novel Study Parent Letter Template for YA Titles (middle schools)**
**Novel Study Parent Letter Template**
**New Legislation: Reading Lists, Use of Outside Media, and School Libraries FAQ**

# Destiny



Destiny Collections and Destiny Discover

# Library Advisory Council

**Members:**

- Megan Carroll – Media Specialist
- Kelly Gurganus – Parent/Teacher
- Nicholas Shivers – Teacher
- Candice Greenwell – Teacher
- Ean Lundy – Teacher
- Jennifer Luker – Testing Coordinator
- Gerry Pippins – administrator
- Gayle Weaver– Community Member
- Michael Sherrill – administrator

**Agenda:**

Agenda for LAC Meetings

**Minutes:**

Minutes for LAC Meetings

**Collection Development Plans**

Collection Development Plans

# Copyright

| Copyright Defined | Copyright is the legal protection provided to a creator for his or her work - books, videos, magazine articles, paintings, illustrations and cartoons, even e-mail messages. |
|---|---|
| **Rights of the Owner** | The copyright holder has the right to reproduce the work in copies, make derivative or modifications of the work, distribute the work to the public, as well as publicly perform or display the work. |
| **Fair Use** | Fair Use provides certain rights to educators. Each of the following four factors must be |

| | considered in determining Fair Use: purpose and character of the use, nature of the copyrighted work, amount and substantiality of the material used, and the effect of the use on the potential market. |
|---|---|
| **Fair Use Test** | Brevity - the relative amount copied, should be brief. Spontaneity - the inspiration and decision did not allow time to write for copyright permission. Cumulative effect - the combination of small uses that amount collectively to such a proportion that economic is done. |
| **Guidelines for Classroom Copy** | Poetry - a complete poem, if less than 250 words or an excerpt of not more than 250 words. Article, story, essay - less than 2,500 words, if complete: 1,000 words or 10%, if an excerpt. Chart, graph, diagram, drawing, cartoon, or picture - 1 per book or periodical. Picture books - 2 published pages or less than 10 of a work. |
| **Rights of the Educator - Audiovisual Materials** | Educators can display a perform audiovisual materials if all these conditions are met:<br><br>• Shown as a part of an instructional lesson and written into the lesson plan<br>• Shown by students, instructors or guest lecturers<br>• Shown in a classroom or other school location devoted to instruction<br>• Shown in a face-to-face setting<br>• Shown only to students or educators<br>• Shown, using a legitimate copy |
| **Multimedia Guidelines** | The guidelines specify limits on the use of the copyrighted materials for multimedia productions. Typical portion limits are as follow:<br><br>• Motion media - up to 10% or three minutes, whichever is less<br>• Text - up 10% or 1,000 words, whichever is less<br>• Music - up to 10% or 30 seconds, whichever is less, of the music and |

|  | lyrics<br>• Photos and images - up to five works from an author; up to 10% or 15 works, whichever is less, from a collection |
|---|---|
| **Video** | Off-air recordings - may be freely taped from regular broadcast channels (but not from those which charge a fee), following these guidelines:<br><br>• Made only at the request of and used by individual teachers<br>• Retained for a period not to exceed the first 45 consecutive calendar days after the recording<br>• Used only once by individual teachers in the course of relevant teaching activities (and repeated once, only when instructional reinforcement is necessary)<br>• Used only for teacher evaluation purposes after the first 10 days<br>• Copy right notice is included<br>Rented or purchased videos:<br>• Must be used in face-to-face teaching<br>• Used only in the classroom or similar place of instruction<br>• May not be sued for recreational entertainment |

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

**Exhibit 3**

| | |
|---|---|
| Peter Parnell, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.    4:23-CV-AW-MAF |
| School Board of Lake County | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                Victoria G. Baggett

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
N/A

| Place: Lexitas SunTrust Tower, #603 Pensacola, FL 32502 | Date and Time: 08/05/2024 9:30 am |
|---|---|

The deposition will be recorded by this method:    stenographic and audiovisual

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See rider attached hereto as Exhibit 1. A copy of the Complaint is attached hereto as Exhibit 2.

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    07/01/2024

                *CLERK OF COURT*
                                                OR
_____        _____
        *Signature of Clerk or Deputy Clerk*                /s/ Faith E. Gay
                                                        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
 Peter Parnell, et al.                                                    , who issues or requests this subpoena, are:
Selendy Gay PLLC, 1290 Avenue of the Americas, New York, New York 10104

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  4:23-CV-AW-MAF

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                        *Server's signature*

                                                        _____
                                                        *Printed name and title*

                                                        _____
                                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***

    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Peter Parnell, et al., | |
| Plaintiffs, | Case No. 4:23-cv-414-AW-MAF |
| v. | |
| School Board of Escambia County, Florida, | |
| Defendant. | |

## RIDER TO SUBPOENA OF VICTORIA G. BAGGETT

## EXHIBIT 1

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, Plaintiffs Peter Parnell, Justin Richardson, and B.G. (each, a Plaintiff, and together, "Plaintiffs"), by and through their attorneys, hereby request that Victoria G. Baggett produce the documents in the Document Requests (each, a "Request," and together, the "Requests") below for inspection and copying at the offices of Kenny Nachwalter, P.A., 1441 Brickell Avenue, Suite 1100, Miami, FL, 33131, within 14 days of service hereof and in accordance with the Instructions and Definitions set forth below.

## INSTRUCTIONS

1. These Requests require you to produce all documents within your possession, custody, or control, including documents in the possession of any representative or agent that has acted or is acting on your behalf. For avoidance of doubt,

in addition to searching your tangible records, You are required to search every plat-form, application, and program on your mobile phone, tablet, computer, and any other personal device that is reasonably likely to contain documents responsive to these Requests.

2.    You are to produce documents in response to these Requests in their entirety and as kept in the ordinary course, together with any addenda, attachments, drafts, and non-identical copies.

3.    Each Request shall be construed independently and not limited by any other Request. The use of the singular in any Request should also be deemed the use of the plural, and vice versa.

4.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Requests all responses that might otherwise be construed to be outside of its scope.

5.    If any requested document is withheld or redacted under a claim of privilege, state with specificity the claim of privilege or other basis to withhold or redact the document, and for each portion withheld or redacted provide the following information in writing: (i) the author(s) and recipient(s) of the documents (including, where applicable their e-mail addresses); (ii) the date of the document; (iii) the type of document); and (iv) a description of the subject matter of the document, in a

manner sufficient to allow them to be described to the Court for ruling on the privilege or other reason asserted.

6.    If You object to the production of any Documents called for by a Request, You shall state with particularity the reasons for Your objection. If You fail to produce a Document, or any part of a Document, on the grounds that such Document is no longer in Your possession, custody, or control, You shall state what disposition was made of that Document and when the disposition was made.

7.    If you are aware of any documents responsive to any request that have been lost or destroyed, identify the documents and provide the following information: (i) the sender; (ii) the recipient(s); (iii) the source of the documents (e.g., e-mail, computer drive, hard-copy files); (iv) the date the documents were lost or destroyed; (v) the reason the documents were lost or destroyed.

8.    Unless otherwise indicated, the Documents requested include all Documents in Your possession, custody, or control. You shall produce any Document that refers to a Document that is responsive to any Request, including routing slips, transmittal memoranda, letters, emails, comments, or evaluations. You shall produce any Document that is attached to or associated with a Document that is responsive to any Request.

9.    All documents shall be produced electronically and shall be Bates labeled and produced in single page Group IV Tiffs (except that excel spreadsheets

3

should be produced in native format); with OCR at the document level; and with the following load files: LFP, OPT and DAT. The following metadata shall be provided: BEGDOC, ENDDOC, BEGATTACH ENDATTACH, PageCt, Author, To, Cc, Bcc, Custodian, Date Sent, Date Received, Date Created, Subject, FileName, Date-LastMod, and MD5Hash.

10.    Drafts or non-identical copies are to be considered separate Documents for purposes of these Requests. Any drafts and copies of each responsive Document shall be produced, as shall all copies of such Documents that are not identical in any respect, including copies reflecting handwritten notes, markings, stamps, or interlineations. Copies are also non-identical if associated with non-identical Documents or Communications. The author(s) of all handwritten notes should be identified.

11.    You shall produce each Document in its entirety without deletion or redactions, except as subject to applicable privileges, regardless of whether You consider the entire Document to be responsive to these Requests.

12.    These Requests are continuing in nature. If, subsequent to Your production of Documents, You obtain, locate, create, or otherwise become aware of a Document that would have been included in the production had it been in Your possession at the time of the production, You shall promptly produce that Document to Plaintiffs by supplemental production.

13.    The masculine gender of any word used herein includes the feminine, the singular includes the plural, and vice versa. The present tense shall be construed to include the past tense and vice versa.

14.    References to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

15.    These Requests are served without prejudice to Plaintiffs' right to serve additional Requests for the production of Documents.

16.    Unless otherwise specified, the date range applicable to these Requests is January 1, 2022 to the present.

### DEFINITIONS

1.    "*Tango*" means the book *And Tango Makes Three* written by Peter Parnell and Justin Richardson.

2.    "H.B. 1557" means 2022 Florida House Bill 1557.

3.    "H.B. 1069" means 2023 Florida House Bill 1069.

4.    "And" and "or" mean and/or.

5.    "Any," "all," and "each" mean any, all, each, and every.

6.    "Communication(s)" means written, spoken, and electronic transmission of information or requests for information, including internal or external conversations, telephone calls, meetings, discussions, conferences, seminars, letters, memoranda, voicemails, facsimiles, telecopies, telexes, e-mails, text messages and

any other form of instant messages, and online postings to any related party or third party.

7.    The terms "concerning," "concern," "reflecting," "reflect," "relate to," "relating to," "regarding," "refer to," or "referring to," each mean having any relationship or connection to, concerning, begin connected to, commenting on, responding to, containing, constituting, showing, memorializing, describing, analyzing, reflecting, pertaining to, compromising identifying, discussing, evidencing, or otherwise establishing a reasonable, logical, or causal connection.

8.    "Document(s)" means the broadest definition of that term under Federal Rule of Civil Procedure 26, including both ESI and non-ESI information, and including books, papers, writings, drawings, graphs, charts, photographs, sound recordings, voicemail and other transcripts, images, electronic documents, electronic mail, and other data or data compilations from which information can be obtained, either directly or after conversion into a reasonably useable form.

9.    "ESI" means all web-based communications, email and other electronic communications, electronically stored documents, records, images, graphics, recordings, calendars, system usage logs, contact manager information, telephone logs, internet usage files, deleted files, cache files, user information, voicemails, drafts, reports, presentations, recordings, text messages, other digitalized documents, and electronic files of any kind.

10.    "Including" means including but not limited to. "Includes" has a correlative meaning.

11.    "Person" means, without limitation, natural persons and individuals, sole proprietorships, general and limited partnerships, profit and non-profit corporations, unincorporated associations, other business entities, and governments, agents, employees or instrumentalities of government or legal entities.

12.    "You" and "Your" mean Victoria G. Baggett.

13.    "District" means the Escambia County School District located in Florida.

14.    "School Board" means the School Board of Escambia County, Florida, consisting of members Kevin Adams, Paul H. Fesko, David Williams, Patty Hightower, and Bill Slayton.

15.    "Library Material" means any book or other object available for checkout, inspection, or review in Florida public school libraries or media centers.

16.    "Book Challenge" means and refers to any challenge, petition, appeal, or correspondence submitted by any Person, including by You, with the aim of removing or restricting access to any Library Material in the District's media centers or any other Florida public school district media center.

17.     "Moms for Liberty" means the 501(c)(4) nonprofit organization called Moms for Liberty, any local chapter or subchapter thereof, and any other organization that operates under the name "Moms for Liberty."

18.     LGBTQ+ refers to a Person who identifies as lesbian, gay, bisexual, transgender, queer, homosexual, or pansexual, or who is non-heterosexual, non-heteroromantic, non-cisgendered, gender-queer, non-binary, or questioning their sexual orientation, romantic preferences, or gender identity.

19.     Any reference to a Person shall be interpreted to include both that Person and that Person's agents, representatives, advisors, or employees.

20.     Any reference to a business or legal entity or association shall be interpreted to include both that Person and that Person's subsidiaries, affiliates, joint ventures, predecessors, successors, assigns, and all such entities' past or present officers, employees, directors, partners, members, managers, representatives, advisors, or agents.

## **DOCUMENT REQUESTS**

1.     All Documents and Communications to, from, or copying any prior or current District employee or agent, including without limitation members of the School Board, the District superintendent, and the District coordinator of media services, concerning Book Challenges or the removal or restriction of any Library Materials in any public school district in Florida.

8

2.      All Documents and Communications to, from, or copying any current or former official, employee, or agent of the State of Florida, concerning Book Challenges or the removal or restriction of any Library Materials in any public school district in Florida.

3.      All Documents and Communications concerning *Tango*, including without limitation Communications to, from, or copying any current or former District employee or agent, and any current or former official, employee, or agent of the State of Florida.

4.      All Documents and Communications concerning each Library Material for which you submitted a Book Challenge or assisted in the submission of a Book Challenge in any public school district in Florida, including without limitation notes, annotations, and highlighting.

5.      All Documents and Communications to, from, or copying any current or former District employee or agent, including without limitation members of the School Board, the District superintendent, and the District coordinator of media services, concerning H.B. 1557 or H.B. 1069.

6.      All Documents and Communications to, from, or copying any current or former official, employee, or agent of the State of Florida, concerning H.B. 1557 or H.B. 1069.

7.    All Documents and Communications concerning the District's contemplated, potential, or actual removal or restriction of Library Materials containing any LGBTQ+ content, including but not limited to LGBTQ+ characters and/or the discussion of LGBTQ+-related historical or contemporary events, in the libraries of any or all schools within the District.

8.    All Documents and Communications to, from, or copying any member or agent of Moms for Liberty concerning Library Materials that contain LGBTQ+ content.

9.    Documents and Communications sufficient to show each meeting of the School Board, or of any subset or committee thereof, You have attended.

10.    All Documents and Communications concerning any advice or feedback You provided to any Person, including without limitation, members of the School Board, the District superintendent, and the District coordinator of media services, and any advisors or associates thereof, as to the permissible bases by which Library Materials can be removed or restricted from District public school libraries.

11.    All Documents and/or Communications to, from, or copying any member of the School Board concerning the termination of former District Superintendent Timothy Smith, including but not limited to any criticism of his actions or the rationale for the termination.

12. All Documents and Communications concerning any complaints regarding your work as a District employee or any disciplinary review or action contemplated or taken against You by the District.

13. All Documents and Communications concerning this litigation and any of the allegations in the Complaint.

14. All Documents and Communications regarding or reflecting public statements you have made about Book Challenges, H.B. 1557, H.B. 1069, Library Materials that contain LGBTQ+ content, and Persons who identify as LGBTQ+, including all social media posts, news articles, and interviews.

Dated:  New York, NY
          July 1, 2024

Anna T. Neill (FBN 100945)
William J. Blechman (FBN 379281)
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: 305-373-1000
atn@knpa.com
wjb@knpa.com

Respectfully submitted,

SELENDY GAY PLLC

/s/ Faith E. Gay
Faith E. Gay (FBN 129593)
Lauren J. Zimmerman*
Masha Simonova*
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lzimmerman@selendygay.com
msimonova@selendygay.com

*Counsel for Plaintiffs*

*(admitted pro hac vice)

12

# Exhibit 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| Peter Parnell; Justin Richardson; and B.G., *by and through her parent Raymond Guillory*, | Case No. 5:23-cv-00381 (BJD) (PRL) |
| Plaintiffs, | **CHALLENGE TO THE CONSTITUTIONALITY OF FLORIDA STATUTES § 1001.42(8)(c)(3)** |
| v. | |
| School Board of Lake County, Florida; Diane Kornegay, *Superintendent of the Lake County School District, in her official and individual capacities*; School Board of Escambia County, Florida; Keith Leonard, *Superintendent of the Escambia County School District, in his official and individual capacities*; Manny Díaz, Jr., *Florida Commissioner of Education, in his official and individual capacities*; Ben Gibson, *chair of the Florida State Board of Education, in his official and individual capacities*; Ryan Petty, *vice chair of the Florida State Board of Education, in his official and individual capacities*; Monesia Brown, *a member of the Florida State Board of Education, in her official and individual capacities*; Esther Byrd, *a member of the Florida State Board of Education, in her official and individual capacities*; Grazie P. Christie, *a member of the Florida State Board of Education, in her official and individual capacities*; Kelly Garcia, *a member of the Florida State Board of Education, in* | **PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF REQUESTED**<br><br>**DECLARATORY RELIEF REQUESTED**<br><br>**DEMAND FOR A JURY TRIAL** |

*her official and individual capacities*; and MaryLynn Magar, *a member of the Florida State Board of Education, in her official and individual capacities*,

    Defendants.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Peter Parnell; Justin Richardson; and B.G., by and through her parent Raymond Guillory, through their attorneys, Selendy Gay Elsberg PLLC and Kenny Nachwalter, P.A., for their complaint against the School Board of Lake County, Florida; Diane Kornegay, Superintendent of the Lake County School District, in her official and individual capacities; the School Board of Escambia County, Florida; Keith Leonard, Superintendent of the Escambia County School District, in his official and individual capacities; Manny Díaz, Jr., Florida Commissioner of Education, in his official and individual capacities; Ben Gibson, chair of the Florida State Board of Education, in his official and individual capacities; Ryan Petty, vice chair of the Florida State Board of Education, in his official and individual capacities; Monesia Brown, a member of the Florida State Board of Education, in her official and individual capacities; Esther Byrd, a member of the Florida State Board of Education, in her official and individual capacities; Grazie P. Christie, a member of the Florida State Board of Education, in her official and

individual capacities; Kelly Garcia, a member of the Florida State Board of Education, in her official and individual capacities; and MaryLynn Magar, a member of the Florida State Board of Education, in her official and individual capacities, allege as follows:

## NATURE OF ACTION

1.      "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

2.      More than sixty years after the Supreme Court of the United States decided *Brown v. Board of Education*, universal public education continues to be one of our country's greatest attributes. Broad exposure and freedom to explore and examine innumerable areas of scholarship, art, and science, together with the rigorous development of critical thinking skills, are essential to training our young citizens for the privileges and responsibilities necessary for full participation in a high-functioning democratic society. Any attempt to diminish public education through misinformation and censorship directly threatens both our young people and the quality and competitiveness of our

democracy.

3.      Florida has long guaranteed broad and free public education. Florida public schools promise to develop students into well-educated young adults who are prepared to embrace all of the challenges, privileges, and responsibilities of American citizenship, to live in an increasingly diverse world, and to compete successfully in the Florida, national, and global economies. Millions of parents choose Florida's public schools to educate their children consistent with this promise.

4.      Florida's public schools also offer rich stores of information designed to assist students in developing their own academic strengths while deepening intellectual curiosity and analytical rigor. Florida public schools offer libraries with appropriate reading material for all students, curated by expert educators. They provide valuable reading material that is not confined to the curricular material of classroom courses. The robust programmatic and material offerings of public school libraries in Florida are a cornerstone of the state's commitment to education.

5.      Florida public school libraries enrich students' educational experiences by fostering a love of reading and cultivating a culture of inquiry and literary appreciation. They encourage the independent exploration of ideas by providing an expansive range of literature and informational materials that allow students to explore subjects of personal and academic interest beyond

what can be taught in the time students spend in the classroom. As the Supreme Court has recognized, "'students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding.' The school library is the principal locus of such freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868 (1982) (plurality opinion) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

6. In Lake County, Florida, and Escambia County, Florida, those public school libraries historically included the award-winning children's book *And Tango Makes Three* ("*Tango*"). Many school districts nationwide have *Tango* on the shelves of their public school libraries, thereby permitting schoolchildren from K–12 to have continuous free access to read and enjoy this well-known and well-loved book.

7. *Tango* tells the true story of two male penguins in New York City's Central Park Zoo. The penguins, named Roy and Silo, formed an enduring pair bond and, with the help of a conscientious zookeeper, adopted, hatched, and raised a penguin chick named Tango. Americans eagerly flocked to the Zoo each year to see the young penguin.

8. *Tango* is a children's book. Its publisher recommends it for children between four and eight years old, but it is appropriate for all ages. It tells a true and heartwarming story, and it teaches students about animal behavior, adoption, diversity among family structures, and responsible family values.

5

The book is factually accurate and contains no vulgarity, obscenity, or content that would not befit a school environment. The book has been acclaimed by numerous literary groups. A copy of the book is attached hereto as Exhibit A.

9.      But in or before December 2022 and February 2023, the Lake County and Escambia County School Boards, respectively, decided to deprive children of access to this award-winning and beloved work. The Lake County Board barred access to *Tango* for all students in kindergarten through third grade, expressly stating that its decision was based on Florida's 2022 House Bill 1557, codified at Fla. Stat. § 1001.42(8)(c)(3), a vague and overbroad statute that discriminates based on content and viewpoint by barring "[c]lassroom instruction … on sexual orientation or gender identity." In Escambia County, *Tango* was physically pulled from school library shelves, again based on the statute and an abundant record of discriminatory animus. This decision followed a detailed review process during which local elementary-school educators and community members found the book highly appropriate for a school library environment. But the Escambia County School Board ignored this review and removed the book, repeatedly invoking § 1001.42(8)(c)(3).

10.     The school districts made no attempt to disguise the reason for their decisions: They restricted students below the fourth grade from reading *Tango* in Lake County and pulled the book off school library shelves in Escambia County because of § 1001.42(8)(c)(3), as well as the content and viewpoint

expressed in the book. They cited no legitimate pedagogical reason for their decisions—nor could they: *Tango* was a library book, not part of the school curriculum; the book is factually accurate, non-vulgar, and non-obscene; *Tango* had previously stood on school library shelves; and educators within Escambia County found the book appropriate school library material, only to be overruled by officials who disapprove of *Tango* for illegitimate, narrowly partisan, political reasons.

11.    The removal of *Tango*—including its de facto removal from the hands of kindergarten through third-grade students in Lake County schools, who were barred from accessing the book in their school libraries, and its physical removal from Escambia County elementary school libraries—violates the First Amendment to the United States Constitution. By discriminating based on content and viewpoint, it infringes the authors' right to freedom of expression. By restricting access to a book, which was previously freely available, for narrowly partisan, political reasons, it infringes students' right to receive information.

12.    The authors wrote *Tango* to spread a message of tolerance and equal treatment. They have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior, adoption, and family structures, whether similar to or different from their own—and B.G. wishes to read *Tango* to learn about those very subjects.

13.     Schoolchildren are a uniquely important audience for the histori-cal and scientific account *Tango* offers and the message the authors intend the book to convey. Because *Tango* was previously available in libraries and pulled or restricted based on its content and viewpoint, its removal infringes B.G.'s right to receive information.

14.     Because *Tango*'s removal in Lake and Escambia Counties was spe-cifically motivated and justified by the specter of enforcement of the vague and discriminatory § 1001.42(8)(c)(3), that statute is unconstitutional as applied to these facts.

15.     Plaintiffs seek to remedy both the harm already done to them un-der § 1001.42(8)(c)(3) and the ongoing and future harm they will suffer under the statute. They seek to restore *Tango* to public school libraries and to make the book accessible to students of all ages in Lake County and Escambia County public schools.

16.     Plaintiffs bring this suit to vindicate their First and Fourteenth Amendment rights and to stop the abhorrent and discriminatory practice of removing books based on partisan, non-pedagogical motivations.

## **THE PARTIES**

### I.     **Author Plaintiffs**

17.     Plaintiff Peter Parnell is a playwright, television writer, and chil-dren's book author. He was a co-producer and executive story editor on the

8

television show *The West Wing* and has written plays for Broadway and Off-Broadway. Parnell is a co-author of *And Tango Makes Three*. He is a resident of New York.

18.    Plaintiff Justin Richardson is an award-winning clinical and academic psychiatrist and a children's book author. He and Parnell co-wrote the children's book *Christian, the Hugging Lion*—based on a true story about a lion born in captivity and reintroduced to the wild—which was published in 2010. Richardson is a co-author of *And Tango Makes Three*. He is a resident of New York.

19.    Plaintiffs Parnell and Richardson are married to one another. They live together in New York City with their daughter. They are one of more than 700,000 married same-sex couples in the United States. Their daughter is one of at least 200,000 American children growing up with same-sex parents.

## II.    Student Plaintiff B.G.

20.    B.G. was born and raised in Escambia County, Florida. She resides with her family in Pensacola, Florida, a city in Escambia County. B.G. is eight years old and is a third-grade student at Warrington Elementary School, the same school that her father attended. She brings suit by and through her parent, Raymond Guillory.

21.    B.G. loves animals, so much so that she wants to be a veterinarian when she grows up. When B.G. was three years old, she convinced her father

9

to adopt a dog from a local rescue; the family now includes multiple dogs and cats. Aware of B.G.'s interest in animals from an early age, B.G.'s grandmother made her a large collection of cloth animal figurines—all of which B.G. was proudly able to identify at just two years of age.

22. B.G. is a voracious reader and entered Warrington Elementary School's gifted program last year. While she used to read books together with her father, Raymond Guillory, each week, B.G. has been reading on her own for approximately the past two years.

23. The majority of books that B.G. currently reads are about animals, including books about insects, dinosaurs, dogs, and sharks. B.G. uses books to learn about animal species from across the world: B.G. would like to read *Tango* in part because she wants to learn more about penguins, which are not native to Florida.

24. Art is one of B.G.'s favorite subjects in school, and she has a particular affinity for books with detailed illustrations. B.G. primarily depicts animals in her drawings: B.G. would like to read a copy of Tango in part because of the book's beautiful drawings of penguins.

25. B.G. also has LGBTQ+ family members and is interested in LGBTQ+ issues. She is interested in *Tango*'s depiction of a same-sex pair bond in nature and of adoption by same-sex parents. In or around March 2023, B.G. endeavored to check out *Tango* and asked her father if she could do so. Her

father accurately informed her that the book was no longer available through her school library because it had been removed: Warrington Elementary School is a public school located in Escambia County, and Escambia County Schools pulled *Tango* from library shelves in February of 2023. B.G.'s desire to check out and read *Tango* persists today. She intends to check out and read the book if the book is restored to the Warrington Elementary School library.

## III. School Defendants

### A. Escambia County Defendants

26.     Defendant the School Board of Escambia County, Florida (the "Escambia County Board") is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.* It operates in Escambia County, Florida, overseeing a public school district that serves over 37,000 primary and secondary school students. Its powers and duties include implementing and enforcing § 1001.42(8)(c)(3). *See id.* § 1001.42(8)(c)(3), (7); *see also id.* § 1001.42(15).

27.     Defendant Keith Leonard is the Superintendent of the Escambia County School District. In this role, Leonard "[e]xercise[s] general oversight over the district school system" and enforces rules adopted by the Escambia County Board. *Id.* § 1001.49. He is sued in his official and individual capacities.

### B. Lake County Defendants

28.     Defendant School Board of Lake County, Florida (the "Lake County Board"), is a district school board organized and governed pursuant to

Fla. Stat. § 1001.34 *et seq.* It operates in Lake County, Florida, overseeing Lake County Schools, a public school district that serves over 45,000 primary and secondary school students. Its powers and duties include implementing and enforcing § 1001.42(8)(c)(3). *See id.* §§ 1001.42(8)(c)(3), (7); *see also id.* § 1001.42(15).

29.    Defendant Diane Kornegay is the Superintendent of Lake County Schools. In this role, Kornegay "[e]xercise[s] general oversight over the district school system" and enforces rules adopted by the Lake County Board. *Id.* § 1001.49. She is sued in her official and individual capacities.

## IV.    Florida State Defendants

30.    Defendant Manny Díaz, Jr., is Florida's Commissioner of Education—the chief executive of the Florida Department of Education. *See* Fla. Const. art. IX, § 1; Fla. Stat. § 20.15(2). As Commissioner, Díaz is responsible for enforcing § 1001.42(8)(c)(3). *See* Fla. Stat. § 1001.42(8)(c)(7)(b)(I). He is sued in his official and individual capacities.

31.    Defendant Ben Gibson is the Chair of the Florida State Board of Education (the "State Board"). The State Board oversees primary and secondary public education in Florida. Fla. Const. art. IX; Fla. Stat. § 20.15(1). The State Board supervises and regulates local public schools, including through the adoption of rules. It administers, enforces, and implements regulations pursuant to § 1001.42(8)(c)(3). Fla. Stat. § 1001.42(8)(c)(7)(b)(I). The State

12

Board's chair is responsible for enforcing § 1001.42(8)(c)(3). Gibson is sued in his official and individual capacities.

32.     Defendant Ryan Petty is the Vice Chair of the State Board. The State Board oversees primary and secondary public education in Florida. Fla. Const. art. IX; Fla. Stat. § 20.15(1). The State Board supervises and regulates local public schools, including through the adoption of rules. It administers, enforces, and implements regulations pursuant to § 1001.42(8)(c)(3). Fla. Stat. § 1001.42(8)(c)(7)(b)(I). The State Board's vice chair is responsible for enforcing § 1001.42(8)(c)(3). Petty is sued in his official and individual capacities.

33.     Defendants Monesia Brown, Esther Byrd, Grazie P. Christie, Kelly Garcia, and MaryLynn Magar are members of the State Board. The State Board oversees primary and secondary public education in Florida. Fla. Const. art. IX; Fla. Stat. § 20.15(1). The State Board supervises and regulates local public schools, including through the adoption of rules. It administers, enforces, and implements regulations pursuant to § 1001.42(8)(c)(3). Fla. Stat. § 1001.42(8)(c)(7)(b)(I). The State Board's members are responsible for enforcing § 1001.42(8)(c)(3). They are sued in their official and individual capacities.

## JURISDICTION

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and laws of the United States.

35. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) because Plaintiffs were deprived, under color of state law, of rights, privileges, and/or immunities secured by the Constitution of the United States.

## VENUE

36. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, the Lake County Defendants are residents of the Middle District of Florida, and, on information and belief, all other Defendants are residents of Florida.

37. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in the Middle District of Florida.

38. Venue is proper in the Ocala Division because, on information and belief, the Lake County Defendants are residents of Lake County, Florida, and because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in Lake County, Florida.

## FACTUAL ALLEGATIONS

## I. Florida Enacts Fla. Stat. § 1001.42(8)(c)(3), Targeting Disfavored Speech

39. Florida law guarantees that "all K-12 public school students are entitled to a uniform, safe, secure, efficient, and high quality system of education, one that allows students the opportunity to obtain a high quality

14

education" that is "made available without discrimination on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status." Fla. Stat. §§ 1002.20(1), (7).

40.   But in 2022, Florida did violence to its guarantee of "high quality education" by passing H.B. 1557, a vague and harsh statutory scheme also known as the Parental Rights in Education Act (the "Act").

41.   Section 1 of the Act provides, in relevant part, that "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." 2022 Fla. Laws ch. 22 (codified at Fla. Stat. § 1001.42(8)(c)(3)) (the "Ban").[1]

42.   In 2023, Florida made matters worse by passing a follow-on bill, H.B. 1069. Section 3 of that bill expanded the Ban by providing, in relevant part, that "[c]lassroom instruction by school personnel or third parties on

---

[1] The Florida Board of Education adopted a rule aimed at educators that mirrored the Ban by making it professional misconduct for educators to provide classroom instruction relating to sexual orientation or gender identity for kindergarten through third-grade students. *See* Fla. Admin. Code r. 6A-10.081(6). It has since adopted a new rule that expands the prior rule to also cover students in prekindergarten and students in grades four through twelve, aside from two exceptions for fourth- through twelfth-grade students. *See id.* r. 6A-10.081(7). That rule took effect on May 23, 2023.

sexual orientation or gender identity may not occur in **prekindergarten** through **grade 8**," with two narrow exceptions for health education.[2] 2023 Fla. Laws ch. 105 (emphasis added) (codified at Fla. Stat. § 1001.42(8)(c)(3)). H.B. 1069 left the substantive provisions of the Ban untouched and, in relevant part, merely replaced "kindergarten" with "prekindergarten" and "grade 3" with "grade 8." Its facial purpose and effect are to apply the restrictions of H.B. 1557 to students from prekindergarten through eighth grade. H.B. 1069 took effect, and thereby expanded the Ban, on July 1, 2023. *Id.* § 9.

43. The Ban is enforced by draconian penalties. In November 2022, the State Board enacted regulations implementing the Act. A Florida educator who intentionally violates the Ban now faces revocation of their teaching license. Fla. Admin. Code r. 6A-10.081(2). By threatening teachers, the Ban threatens students' ability to receive a meaningful, robust education.

---

[2] The first exception requires teaching sixth- through twelfth-grade students "the benefits of sexual abstinence as the expected standard and the consequences of teenage pregnancy." Fla. Stat. § 1003.42(2)(n)(3). The second exception allows district school boards to "provide [health education] instruction [regarding AIDS]" and requires that "[t]hroughout instruction [regarding AIDS], sexually transmitted diseases, or health education [about] human sexuality, a school shall … [t]each abstinence from sexual activity outside of marriage as the expected standard for … students while teaching the benefits of monogamous heterosexual marriage." Fla. Stat. § 1003.46. These exceptions are inapplicable to *Tango* because it is a children's library book that, on information and belief, is not part of the curriculum in Lake County or Escambia County health education classes.

44.     In addition, among other things, any "concern[ed]" or litigious parent may sue their school district over a violation of the Act. If they win, they may recover fees and costs. If the school district wins, it may not do the same. The prospect of such enforcement has a chilling effect on protected speech.

45.     The Ban is also enforced directly by school boards, which "shall exercise all powers and perform all duties" under § 1001.42(8)(c)(3). Fla. Stat. § 1001.42.

46.     The Ban does not expressly mention books or school libraries. But neither does it expressly exempt them. Because educational professionals and schools who are found to violate the Ban face crushing liability and loss of their livelihoods, the Ban has had a chilling effect on speech, which directly and negatively impacts children, authors, and public school libraries, not to mention the quality of Florida public education. The Ban's vagueness, in combination with its harsh penalties, make it more likely to be applied expansively—such as to public school libraries—at the expense of the authors' free speech rights and the students' right to receive information.

47.     The Ban has not only created a vague and harsh statutory regime; it has opened Florida public schools to the well-known harms associated with ideological censorship. Political and partisan censorship is the intent of the Ban. The Act's sponsor, Senator Dennis Baxley, indicated that the goal of the

Ban was to stop "the departure from the core belief systems and values."[3] In discussing the Ban during April 2022, Governor Ronald DeSantis likewise stated that "[t]hings like woke gender ideology have no place in the schools period."[4] Florida officials concede that the Ban is designed to censor or eliminate viewpoints disfavored by the State government from Florida public school libraries.[5]

48. Among other things, the Ban is designed to discriminate against the viewpoint that same-sex relationships and families with same-sex parents

---

[3] Fla. S., recording of proceedings, at 08:09:30–08:12:00 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true.

[4] Fox News, *DeSantis: Education not indoctrination*, at 6:06–40, YouTube (Apr. 29, 2022), https://www.youtube.com/watch?v=12IVeeq2ydk [https://perma.cc/Q5N9-HSFD].

[5] As pictured below, Christina Pushaw, a spokesperson for Governor DeSantis, recently tweeted the image of a hand waving goodbye in response to the news that the majority of queer parents are considering leaving Florida because of H.B. 1557:



exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

49.     The patent content and viewpoint discrimination intended by the Ban became clear during the legislative process. By way of example, during deliberations on the Act, Senator Tina Polsky proposed an amendment to clarify that "sexual orientation" "means an individual's heterosexuality, homosexuality, or bisexuality." That amendment was voted down.[6] An amendment proposed by Republican Senator Jeff Brandes would have replaced "sexual orientation or gender identity" with "human sexuality or sexual activity." It too was voted down, despite Senator Brandes imploring his colleagues that "[i]f the intent [of H.B. 1557] is not to marginalize anyone, let's make sure we aren't."[7]

50.     The State thus proceeded with a Ban that uses the terms "sexual orientation" or "gender identity" without defining them (much less defining them to include all sexual orientations). Because of its imprecision, the Ban does not equally affect viewpoints on all sexual orientations. Instead, the Ban was intended invidiously to discriminate against a particular disfavored

---

[6] Fla. S., recording of proceedings, at 04:50:30–04:55:00 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true.

[7] Fla. S. Comm. on Appropriations, recording of proceedings, at 01:04:00–01:07:00 (Feb. 28, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_3xdlmr8t-202202281030&Redirect=true.

19

viewpoint and, through its vagueness, has been discriminatorily enforced to target only that disfavored viewpoint.

51.    The Ban's intentional vagueness did not end with its failure to define "sexual orientation" and "gender identity." It also uses the vague term "classroom instruction." Senator Lauren Book proposed an amendment that would have helped to resolve what constitutes "classroom instruction" under H.B. 1557 by excluding from that definition "instruction or discussion relating to" "family structures," "objective historical events," "bullying prevention," "discussions between students," and "questions asked by students and any answer."[8] This amendment was also voted down. The Ban did not adopt any definition of "classroom instruction," magnifying its chilling effect by leaving educators to wonder whether it applied to any mention of LGBTQ+ teachers' families, to teachers' references to students who have come out as LGBTQ+, to discussions during extracurricular activities, or to books and other materials in school libraries.

52.    The legislative process also made clear that legitimate pedagogical concerns were not the driving force behind the Ban. Had they passed, the amendments proposed by Senator Randolph Bracy and Representative Marie

---

[8] Fla. S., recording of proceedings, at 05:23:30–05:33:30 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true.

Paule Woodson would have clarified that H.B. 1557 "does not apply to any discussion between a student who identifies as transgender, gender nonconforming, non-binary, or otherwise LGBTQ+ and their peers." Instead, the final version of H.B. 1557 intentionally left open the ominous possibility that it required school districts to police conversations between students about their LGBTQ+ identities.[9] This threat impedes, rather than facilitates, a productive learning environment.

53.    The threat of the Ban's enforcement thus has a chilling effect that limits discussion of and the provision of school resources on factually accurate, age-appropriate topics, such as the simple fact that LGTBQ+ people and animals exist.

54.    As set forth below, the Ban has been applied in a discriminatory fashion to eliminate or restrict access to pedagogically appropriate material in public school libraries, with no legitimate justification. The Ban was invoked as a basis to restrict kindergarten through third-grade students from accessing *Tango* in public school libraries in Lake County and to remove *Tango* from

---

[9] Fla. S., recording of proceedings, at 05:33:30–05:37:00 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true; Fla. H.R, recording of proceedings, at 03:47:30–03:54:00 (Feb. 22, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_1az3it1i-202202221300&Redirect=true.

school libraries in Escambia County.

## II. The Story of Tango and the Authorship of *And Tango Makes Three*

55. *Tango* tells the true story of Roy and Silo, two male chinstrap penguins that resided at the Central Park Zoo. By 2004, Roy and Silo had been "completely devoted to each other" for "nearly six years."[10] Roy and Silo are pictured below:



56. A conscientious zookeeper noticed the relationship between the

---

[10] Dinitia Smith, *Love That Dare Not Squeak Its Name*, N.Y. Times (Feb. 7, 2004), https://www.nytimes.com/2004/02/07/arts/love-that-dare-not-squeak-its-name.html [https://perma.cc/K79J-THKF].

two penguins and correctly concluded that the penguins had formed a pair bond. The zookeeper observed the pair building a nest and attempting to incubate an egg-shaped rock. "At one time, [Roy and Silo] seemed so desperate to incubate an egg together that they put a rock in their nest and sat on it, keeping it warm in the folds of their abdomens."[11]

57.     To test their readiness to incubate a live egg, the zookeeper first gave the pair a dummy egg and observed their incubation behaviors. Betty and Porkey, another penguin pair, had previously hatched their own eggs but had never been able to successfully hatch more than one at a time. When Betty laid two fertile eggs, the zookeeper then gave one egg to Roy and Silo to allow both eggs to hatch and both chicks to thrive. Roy and Silo successfully incubated the egg and adopted and raised the resulting chick, which zookeepers named Tango.

58.     News outlets across the country reported on Roy, Silo, and Tango. When the Author Plaintiffs read about Roy, Silo, and Tango, they recognized that the penguins' tale was perfectly suited to a children's story. In their view, this was "a way to talk about this kind of family that [would] work at the level of a picture book and not a didactic 'it's O.K. to be different' story."[12]

---

[11] *Id.*

[12] Jennifer 8. Lee, *A Baby for the Gay Authors Behind the Daddy Penguins*, N.Y.           Times           (Oct.           2,           2009),

59.    The Authors wrote *Tango*, and Simon & Schuster published it in 2005. It has since been published in 15 languages and on four continents. Simon & Schuster markets it as a fiction book most suitable for young children but appropriate for all ages.

60.    *Tango* is appropriate for children. It contains no obscenity or vulgarity of any kind. It does not contain any offensive language or sexually explicit content.[13]

61.    *Tango* is factually accurate. Roy, Silo, and Tango were all real, and the story of Roy and Silo's bond and Tango's adoption is nonfiction.[14] It is a biological fact that same-sex behavior is "a nearly universal phenomenon in the animal kingdom."[15] Tango offers children a heartwarming and accessible introduction to an important area of animal science by telling the true story of easily relatable animals at a popular zoo. *Tango* helps children to learn about science through simple, non-vulgar words and illustrations.

---

https://archive.nytimes.com/cityroom.blogs.nytimes.com/2009/10/02/a-baby-for-the-gay-authors-behind-the-daddy-penguins/ [https://perma.cc/C5EE-7K23].

[13] *See generally* Ex. A, Justin Richardson & Peter Parnell, *And Tango Makes Three* (2005).

[14] *See id.* at 32 (describing the factual basis of the story).

[15] *Same-Sex Behavior Seen in Nearly All Animals, Review Finds*, Sci. Daily (June 17, 2009), https://www.sciencedaily.com/releases/2009/06/090616122106.htm [https://perma.cc/PZA8-BQJ9].

62.  *Tango* is lauded. It is an American Library Association Notable Children's Book, a Bank Street Best Book of the Year, a Nick Jr. Family Magazine Best Book of the Year, an ASPCA Henry Bergh Children's Book Award winner, and a BookSense Children's Pick. It has received the Gustavus Myers Outstanding Book Award and the Sheffield Children's Book Award, and has received starred reviews in Kirkus Reviews, School Library Journal, Publishers Weekly, and Booklist. *Tango* is an Amazon Teachers' Pick and has been one of the top-selling books in Amazon's "Children's Books on Adoption" category for over 15 years. The book's cover is pictured below:



63.  *Tango* takes no position on policy. It does not lecture, hector, or tell children how to feel.

64.     *Tango*, instead, depicts a family just like the Authors' and hundreds of thousands of other families nationwide—two same-sex parents raising an adopted child together.[16] Its meaning, message, and viewpoint are simple: *Tango* says that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

65.     The Authors have a broader goal for *Tango* than merely selling copies or achieving critical acclaim. They seek to ensure the book is available to all interested readers, including in public school libraries for children who wish to learn about animal behavior, adoption, or family structures.

66.     *Tango* has been available in public school libraries nationwide for more than 15 years. There is no evidence that *Tango*'s presence in these libraries has ever caused disciplinary disruptions or harm of any kind at any school, anywhere, at any time.

## III.    The Lake County Defendants Restrict Students' Access to *Tango*, Citing H.B. 1557

67.     On or before December 11, 2022, Lake County Schools—administered by the Lake County Board—barred kindergarten through third-grade students in the district from accessing *Tango* in their public school libraries.

68.     In response to a public record request, the only explanation Lake

---

[16] There are also five million Americans who were adopted, like Tango.

26

County Schools provided is that *Tango* was "[a]dministratively removed due to content regarding sexual orientation/gender identification prohibited in HB 1557."[17] Speaking to media, Lake County Schools has stuck to its line: *Tango*'s presence on the shelves violates Florida law.[18]

69.   As recently as May 29, 2023, as pictured below, Lake County's school library catalog, Destiny, declared that *Tango* was restricted because of the Ban and identified "homosexuality" as among the book's subjects. A screenshot of the catalog, annotated with red boxes, is below:

---

[17] Ex. B (Lake County Schools' e-mail response to a public records request regarding "book challenges, reviews, removals, and restrictions.").

[18] Joshua Q. Nelson, *Florida school district bans book about real-life gay penguin relationship, citing Parental Rights law*, Fox News (Jan. 10, 2023) (school official quoted as saying *Tango* was removed "in alignment with Florida HB 1557"), https://www.foxnews.com/media/florida-school-district-bans-book-about-real-life-gay-penguin-relationship-citing-parental-rights-law [https://perma.cc/T2ZJ-Y646].



70.     Indeed, a search of the same catalog revealed that Lake County previously restricted 40 books, including *Tango*, "per HB 1557."[19] Thirty-seven out of these 40 books have been given labels by the library system as including content related to "[h]omosexuality," "[g]ay youth," "[g]ay parents," "[t]ransgender people," and other such terms associated with LGBTQ+

---

[19] *See* Ex. C (results of a search for "HB 1557" in the catalogs of all Lake County public school libraries) (last visited June 19, 2023). Although there are 44 results shown in Exhibit B, four of the results are duplicates. Shortly after the filing of this case, Lake County purportedly removed restrictions on some of these books, and thus the library catalog presently does not reflect all previous restrictions.

individuals. Three additional restricted books have not been given such labels by the library system, but they also contain content relating to LGBTQ+ issues and themes.[20] Just like *Tango*, each of the other 39 restricted books expresses a message of inclusion and tolerance, or simply acknowledges the existence, of LGBTQ+ individuals—a viewpoint disfavored by the Lake County Defendants.

71.     On June 21, 2023—just one day after the commencement of this litigation—counsel for the State Defendants contacted counsel for the Lake County Defendants and provided a copy of a brief filed by the State Defendants six months earlier in another litigation, which purportedly claims that § 1001.42(8)(c)(3) does not apply to school library books. The State Defendants did not share the brief, or the position taken therein, with the Lake County Defendants until after the commencement of this litigation. Similarly, to date, the State Defendants have not engaged in any rulemaking or issued any official guidance to Florida school boards notifying them that § 1001.42(8)(c)(3) does not apply to school library books.

---

[20] *Rise Up!: The Art of Protest* by Jo Rippon is described in the Destiny catalog system as including "[p]hotographs of protest posters celebrat[ing] the ongoing fight for … LGBT rights." The Kirkus Reviews description of *We Move the World* by Kari Lavelle on the Destiny catalog system states that "[t]he adult achievements celebrated [in the book] are progressive and diverse[,] … [including] Brazil's Pride parade … and the AIDS Memorial Quilt." Finally, *Milo Imagines The World* by Matt de la Peña contains an illustration of two people in dresses (one of whom is referred to as a woman in the story and the other whose gender is never identified) getting married to each other.

72. Purportedly based on this June 21, 2023 communication, Defendant Kornegay claims to have removed the grade-level restriction on *Tango* and other restricted books. She has insisted that the Lake County Defendants' restriction of *Tango* represented "an attempt to follow [§ 1001.42(8)(c)(3)]" and was "further supported by" Florida Department of Education guidance, which "instructed Florida school districts to 'err on the side of caution' when selecting and maintaining age appropriate school library books." The Lake County Defendants pointed to a "manual about educators acting carefully and conservatively and [*sic*] implementing HB 1557" and stated that "[g]iven the penalties for violating 2022 House Bill 1557, a statement from the Florida Department of Education to err on the side of caution was not ignored." In sum, the Lake County Defendants asserted that they restricted *Tango* because that is what they believed the law required but, upon the State Defendants' communication to them, they learned the State's litigation position that "[their] understanding was apparently incorrect," and reversed course in response to the State Defendants' "interpretation."

73. Despite Defendant Kornegay's purported decision, *Tango* remains prominently marked "RESTRICTED FROM CLASSROOM INSTRUCTION" in the Lake County Schools library catalog. A current screenshot of the catalog, annotated with a red box, is below:

30



74.    After the July 26, 2023 oral argument on a motion for a prelimi-

nary injunction in this action, but before this Court issued a decision, the Lake

County School Board adopted a resolution, in which the Board stated that it

"ratifie[d] the prior administrative decision to align the Lake County school

district with the prevailing interpretation of Section 1001.42(8)(c)3 [*sic*], Flor-

ida Statutes." The resolution did not specify what the "prior administrative

decision" was, nor did it explain what the "prevailing interpretation" of Sec-

tion 1001.42(8)(c)(3) is. The resolution prohibited Lake County public school

personnel from following further informal guidance from the State Defendants

(but not earlier informal guidance or future formal guidance) and required

school personnel to follow state laws and rules promulgated by the State Board

of Education.

75.     Like Defendant Kornegay's decision, the Lake County School Board's decision to adopt this vague resolution while a motion was under advisement was ad hoc, unreasoned, designed to moot this litigation, and did not represent an unambiguous government policy. Nor have the Lake County Defendants evinced any commitment to their purportedly changed course: *Tango* remains prominently marked "RESTRICTED FROM CLASSROOM INSTRUCTION" in the Lake County Schools library catalog.

76.     In addition to *Tango*'s continued restrictions, Lake County has marked another book previously restricted under § 1001.42(8)(c)(3) the same way. Thirty-two of the previously restricted LGBTQ+-related books remain tagged as "review pending," and one previously restricted book is no longer listed in the school library catalog at all. A screenshot of one of the restricted books' catalog entries, annotated with a red box, is below:



77.     These continued restrictions only on books depicting LGBTQ+ history, families, and characters reveal that Defendant Kornegay's actions and

the Lake County School Board's post-hearing resolution were unreasoned, ad hoc, pretextual, designed solely to moot this litigation, and have not affected the Lake County Defendants' pattern of viewpoint discrimination.

78.     In applying § 1001.42(8)(c)(3) to restrict access to *Tango* in public school libraries, Lake County Schools, the Lake County Board, and the Board's executives discriminated on the basis of content and viewpoint: They barred students from accessing *Tango* because of its content—namely, the story of a same-sex animal couple with an adopted child—and its expressed viewpoint—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

79.     If Lake County Schools were not engaging in viewpoint discrimination, then it would not have limited its restriction of books to those exclusively featuring LGBTQ+ characters or discussing LGBTQ+-related content such as Pride parades. Nor would it continue to restrict 34 of those same books today. It would have barred students below the fourth grade from reading other books about animal behavior, families, or adoption that lacked any LGBTQ+-related content. But Lake County Schools did no such thing, enforcing § 1001.42(8)(c)(3) solely—in 40 different instances—against books depicting or endorsing the full equality of LGBTQ+ people.

80.     On information and belief, Lake County Schools has never cited,

or considered citing, § 1001.42(8)(c)(3) to restrict books featuring heterosexual families or relationships. The school district's enforcement of the Ban has suppressed one and only one point of view.

81. The viewpoint-discriminatory restriction of access to 40 books; the continued viewpoint-discriminatory restriction of access to 34 books; and the ambiguous, unreasoned decisions of the Lake County Defendants only after this case was filed demonstrate a clear likelihood that the Lake County Defendants' unconstitutional conduct will recur—indeed, it has not ceased with respect to a substantial number of books, including its affirmative and unexplained restriction on classroom instruction of *Tango*.

82. Restricting access to *Tango* in public school libraries was not a legitimate regulation of curriculum because school libraries are not classrooms where a prescribed curriculum must be followed. Books in school libraries are, by nature, optional reading. Even if library shelves constituted curriculum, Lake County had no legitimate pedagogical purpose for barring students' access to *Tango*. *Tango* is age-appropriate for Lake County school students, including those below fourth grade; it contains no obscenity or vulgarity; and it is factually accurate. Lake County's prohibition on allowing kindergarten through third-grade students to access *Tango* in their school libraries violates the First Amendment by discriminating against the Author Plaintiffs on the basis of the content and viewpoint contained in *Tango*.

34

83.     To the extent that § 1001.42(8)(c)(3), and regulations adopted by the State Defendants thereunder, mandate the restriction of *Tango*, § 1001.42(8)(c)(3) and its implementing regulations violate the First Amendment by discriminating against protected speech on the basis of content and viewpoint.

84.     The Authors have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior, adoption, and family structures, whether similar to or different from their own. Schoolchildren are a uniquely important audience for the scientific and historical account *Tango* offers and the message the Authors intend the book to convey.

85.     By censoring *Tango* and barring students below the fourth grade from accessing the book in Lake County public school libraries, Defendants stripped the Authors' book of an essential aspect of its communicative value. They also injured the reputation of the Authors and *Tango* by implicitly and falsely suggesting that the book contains obscene, vulgar, sexual, or age-inappropriate material that deserved to be banned—contrary to the wholesome, positive and family-friendly content of the book[21]—and thereby deprived the Authors of more of their target audience and speech rights.

86.     In the alternative, to the extent that § 1001.42(8)(c)(3) and its

---

[21] *See generally* Ex A.

implementing regulations do not mandate the restriction of *Tango*, the statute and regulations are unconstitutionally vague and overbroad. Section 1001.42(8)(c)(3) applies to "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity." The statute does not define "classroom instruction," "sexual orientation," or "gender identity," and does not limit the universe of "school personnel" or unspecified "third parties" subject to the Ban. *Tango* was a library book and not a part of a classroom curriculum. On information and belief, no classes in Lake County Schools prescribed *Tango* as part of their curriculum. And *Tango* does not provide instruction on sexual orientation or gender identity. It merely provides a factually accurate depiction of two animals of the same sex who formed a pair bond and raised a chick together. The vagueness of the Act caused or allowed Lake County Schools to adopt an overbroad interpretation of the Ban, censor the Authors' book, and thereby infringe the Authors' freedom of expression.

## IV. The Escambia County Defendants Remove *Tango* Without Attempting to Hide Their Animus Toward *Tango*'s Viewpoint

87. Vicki Baggett is an English teacher at Northview High School in Century, Florida, which is within the Escambia County School District.

88. Ms. Baggett has been accused by multiple former students of engaging in openly racist and homophobic behavior, including allegations that Ms. Baggett told her tenth-grade English class that the Bible says it is a "sin

for races to mix together" and that she opposed "race mixing" because she "didn't want everyone to turn the same color eventually."[22]

89.     Ms. Baggett has submitted "challenge forms" seeking the removal of at least 116 books from school libraries in Escambia County.

90.     On or about August 24, 2022, Ms. Baggett submitted a challenge form seeking the removal of *Tango* from Escambia County school libraries, stating her reason for objection as "LGBTQ agenda using penguins" and claiming that the purpose of *Tango* was "indoctrination." Ms. Baggett asserted that *Tango* should not be used as educational media for any age group. This challenge form is pictured below:

---

[22] Judd Legum, *Florida English teacher pushing book bans is openly racist and homophobic, students allege*, Popular Information (Jan. 9, 2023), https://popular.info/p/florida-english-teacher-pushing-book [https://perma.cc/2T9M-2X8Y].

**REQUEST FOR THE RECONSIDERATION OF EDUCATIONAL MEDIA**

School: _Northview High School_

Requested Initiated By: _Vicki Baggett_

Telephone: ███████ Address: ███████

City: _Century_ State: _FL_ Zip code: _32535_

**Please Check Media Type**

X Book ___ Film ___ Videocassette

___ Periodical ___ Filmstrip ___ Record    _Set I_

___ Pamphlet ___ Cassette ___ Computer Software   _# 7_

___ Laser Videodisc ___ Kit Other:___

Title: _And Tango Makes Three_

Author: _Justin Richardson_

Publisher or Producer:___

1. Reasons for Objections: _LGBTQ agenda using penguins_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _Yes_

3. What are the strengths of this educational media? _none_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _Yes_

5. What do you believe is the purpose of this educational media? _indoctrination_

6. For what age group would you recommend this educational media? _none_

7. Where was the educational media located in the school system? _elementary schools_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_  Date: _8-24-22_

91. On November 16, 2022, Ms. Baggett submitted a letter in support of her challenge form. Her letter cited H.B. 1557 and recited the text of the Ban:

> Florida's House Bill 1557 states that "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through Grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards."

38

She claimed that "[o]ur libraries are an extension of our classrooms" and that "[t]he library is actually the classroom for the Media Specialist; therefore, if the Media Specialists allow books that openly violate state and federal law, then should not these employees be held accountable for books in their domain, just as regular classroom teachers?" Ms. Baggett capitalized on the fact that the State Defendants' regulations implementing the Act could threaten the livelihood of media specialists if classified as falling within the undefined terms "school personnel" and "third parties."

92.    Ms. Baggett later stated in a December 2022 interview that she objected to *Tango* because if young students read the book, "that idea would pop into the second grader's mind … that these are two people of the same sex that love each other."[23] In other words, her animus was explicitly motivated by the content of the book and the viewpoint it expresses.

93.    The Escambia County District Materials Review Committee—composed of one elementary school media specialist, one administrator, one teacher, and one parent, as well as a community member—undertook a careful review process to evaluate whether *Tango* should be removed from school

---

[23] Judd Legum, *Meet the Florida English teacher trying to ban 150 books from school libraries*, Popular Information (Dec. 20, 2022), https://popular.info/p/meet-the-florida-english-teacher [https://perma.cc/9R9F-VGE8].

district libraries. As part of this process, each Escambia County elementary school's Library Advisory Council—each composed of, at least, the library's media specialist, two teachers, one parent, and one community member—was given an opportunity to provide input on *Tango*. Of the eleven Library Advisory Councils that submitted feedback, eight determined that *Tango* had "literary, artistic, political or scientific value for [its] suggested audience" and that it presented "concepts in a manner appropriate to the ability and maturity level of the suggested audience."[24]

94.    The eight local Library Advisory Councils finding that *Tango* had educational value—including the Library Advisory Council at Warrington Elementary School, which B.G. attends—offered well-reasoned explanations of their conclusion, such as that "[t]he book provides the process of how penguins take care of their eggs" and that *Tango* "shows how animals behave and it is based on a true story." By contrast, none of the three Library Advisory Councils that found that *Tango* lacked educational value was able to offer *any* explanation for that finding, all leaving that question blank on the input forms they submitted.

---

[24] Ex. D, *Board Appeal, And Tango Makes Three* 41–62, Sch. Bd. of Escambia Cty. (Feb. 20, 2023).

95.     The same three Library Advisory Councils that found that *Tango* was inappropriate for the ability and maturity level of elementary school students gave threadbare and/or pretextual justifications, if any, for these conclusions. Ensley Elementary and West Pensacola Elementary's Library Advisory Councils offered no explanation at all for their findings on this factor. Beulah Elementary's Library Advisory Council asserted the book was age-inappropriate because "[v]ery young students may not understand the word 'male'" and that "if [young students] do [understand the word 'male'] they may be confused as to why 2 male penguins are sitting on an egg." These explanations beggar belief, but even if they are true, then they are reasons to offer *Tango* as reading material, not to ban it. Children who do not know the word "male" should learn it, and children who are confused about real-world animal behavior likewise deserve the opportunity to explore the topic. And any purported concern that children would be confused as to why two male penguins are sitting on an egg reflects outright viewpoint discrimination: The Library Advisory Council at issue simply disliked and sought to discriminate against the viewpoint that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

96.     During the review process, both community members and school library personnel noted the direct relevance of *Tango* to the family structures

41

of elementary school students in Escambia County schools. A.K. Suter Elementary School's Library Advisory Council reported that "[w]e have students with two moms. It is important they see themselves and family situations in books" and that *Tango* would make "[s]tudents with two same-sex parents … feel represented." Blue Angels Elementary School's Library Advisory Council noted, "In nature there are same sex relationships and there are children in our schools who have parents in a same sex relationship—two dads or two moms. The children need read [*sic*] a book that shows their family." A comment from a community member stated that "we … need to be cogni[zant] of the fact that some of our students, whose parents are taxpayers, come from same-sex families and books with no sexual content should not be excluded from the library simply because someone feels that same-sex families are repulsive. Books in school libraries should mirror the population it serves."[25]

97. After soliciting and assessing this feedback from the Library Advisory Councils and community members, examining the text of H.B. 1557, and conducting its own intensive review of *Tango*,[26] the District Materials Review Committee voted unanimously that *Tango* should be available in all Escambia County elementary, middle, and high school libraries. The Committee firmly

---

[25] *Id.* at 63.

[26] *See generally id.*

concluded that there was "NO evidence of LGBTQ indoctrination" in *Tango*, nor any inappropriate sexual content in the story. Furthermore, the Committee found that *Tango* had educational value for elementary school students, in the form of "[s]cientific facts about penguins" and teaching "[t]olerance of differences of others."[27]

98.    The District Materials Review Committee decided that the book was age-appropriate. Nothing about it was sexual; it used simple words; it was not "lengthy or preachy." Neither did it "push for an agenda" or "say one thing is better than another." "The act of being 'in love' itself is not, in [the Committee's] opinion, harmful to the well being of minors."[28]

99.    Ms. Baggett appealed. In her appeal letter, she invoked H.B. 1557 as the applicable prohibition. The materials distributed to the school board deciding the appeal included a copy of H.B. 1557, which was expressly described as a "Relevant Florida State Statute[.]"[29]

100.    In preparation for the school board meeting where it would consider Ms. Baggett's appeal, the Escambia County Board solicited input from its community. The Board received seven written comments. Every comment

---

[27] *Id.* at 8–12.

[28] *Id.*

[29] *Id.* at 1–2.

supported keeping *Tango* on shelves. The evidence before the Board was over-whelming. The community's opinion was clear.

101. Nevertheless, on February 20, 2023, the Escambia County School Board voted, three to two, to remove *Tango* from all 32 school libraries in the district. All three books on the agenda that night featured non-heterosexual or transgender main characters.

102. At the school board meeting, those speakers who supported *Tango*'s removal explicitly expressed animus towards the book's point of view.

103. One speaker, Joshua Luther, accused the Authors of "telling the story … to normalize a redefinition of the institution of marriage." He later asked the Escambia County Board point-blank whether its members believed sodomy was a sin. Mr. Luther's point could not have been clearer. *Tango* was gay-friendly, and therefore it needed to be removed from the library.

104. There was nothing else objectionable about *Tango*. And in fact, no speaker that night condemned *Tango* on any other grounds.

105. But when faced with hostility towards *Tango*'s message, the Escambia County Board joined in the discriminatory condemnation of the Authors' viewpoint. Board member David Williams voted to remove *Tango* because "[t]he fascination is still on that it's two male penguins raising a chick."[30]

---

[30] Brooke Leigh Howard, *Florida School District Bans a Book on… Penguins*,

Board members Kevin Adams and Paul Fetsko agreed, and, with a majority, the Escambia County Board chose to censor the Authors' speech, enforcing § 1001.42(8)(c)(3) by removing *Tango* and the message it contains.

106.   In applying § 1001.42(8)(c)(3) to remove *Tango* from school libraries, the Escambia County Defendants discriminated on the basis of content and viewpoint: They removed *Tango* because of its content—namely, the story of a same-sex animal couple—and its expressed viewpoint—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

107.   Removing *Tango* from school libraries was not a legitimate regulation of curriculum because school libraries are not classrooms where a prescribed curriculum must be followed. Books in school libraries are, by nature, optional reading. Even if library shelves constituted curriculum, Escambia County Schools had no legitimate pedagogical purpose for removing *Tango*. *Tango* is age-appropriate for Escambia County students; contains no obscenity or vulgarity; and is factually accurate. Escambia County's removal of *Tango*

---

Daily Beast (Feb. 22, 2023), https://www.thedailybeast.com/and-tango-makes-three-florida-school-district-bans-a-book-on-penguins [https://perma.cc/DS45-FUHU].

from library shelves violated the First Amendment by discriminating against the Author Plaintiffs on the basis of content and viewpoint.

108.  To the extent that § 1001.42(8)(c)(3), and regulations adopted by the State Defendants thereunder, mandated the removal of *Tango*, § 1001.42(8)(c)(3) and its implementing regulations violate the First Amendment by discriminating against protected speech on the basis of content and viewpoint.

109.  The Authors have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior and family structures, whether similar to or different from their own. Schoolchildren are a uniquely important audience for the historical account *Tango* offers and the message the Authors intend the book to convey.

110.  By censoring *Tango* and prohibiting the book from Escambia County school libraries, Defendants have stripped the Authors' book of an essential aspect of its communicative value. They have also injured the reputation of the Authors and *Tango* by implicitly and falsely suggesting that the book contains obscene, vulgar, sexual, or age-inappropriate material—contrary to the facial content of the book, *see* Ex. A—and have thereby deprived the Authors of more of their target audience and speech rights.

111.  The removal of *Tango* has likewise infringed B.G.'s right to receive information. Students' access to books like *Tango* both preserves the right of

*Tango*'s authors to speak and is essential to students' active and effective participation in a pluralistic, contentious society. B.G. desires to read *Tango* to explore areas of interest and importance not covered in the prescribed curriculum. By removing *Tango* from school libraries for narrowly partisan, political reasons, the Escambia County Defendants have prohibited her from doing so. B.G. has attempted to check *Tango* out of her school library and has been unable to do so because the book is no longer available there.

112.   In the alternative, to the extent that § 1001.42(8)(c)(3) and its implementing regulations do not mandate the removal of *Tango*, the statute and regulations are unconstitutionally vague and overbroad. Section 1001.42(8)(c)(3) applies to "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity." The statute does not define "classroom instruction," "sexual orientation," or "gender identity," and does not limit the universe of "school personnel" or unspecified "third parties" subject to the Ban. *Tango* was a library book and not a part of a classroom curriculum. On information and belief, no classes in Escambia County Schools prescribed *Tango* as part of their curriculum. And *Tango* does not provide instruction on sexual orientation or gender identity. It merely provides a factually accurate depiction of two animals of the same sex who formed a pair bond and raised a chick together. Escambia County Schools' removal of *Tango* from libraries therefore was not mandated by § 1001.42(8)(c)(3), but the vagueness

47

of the statute caused or allowed Escambia County Schools to adopt an over-

broad interpretation of the Ban, censor the Authors' book, and thereby infringe

the Authors' freedom of expression and B.G.'s right to receive information.

## CAUSES OF ACTION

### COUNT I
**First Amendment to the United States Constitution:**
**Content and Viewpoint Discrimination**
**Under Fla. Stat. § 1001.42(8)(c)(3)**
**(Brought pursuant to 42 U.S.C. § 1983 by the Author Plaintiffs)**

113.  Plaintiffs incorporate paragraphs 1–19, 26–85, and 87–110 by ref-

erence as though fully set forth herein.

114.  The First Amendment to the United States Constitution provides

that the government "shall make no law … abridging the freedom of speech."

U.S. Const. amend. I. The First Amendment is made applicable to the State of

Florida by the Due Process Clause of the Fourteenth Amendment. *See*

*Grosjean v. Am. Press Co.*, 297 U.S. 233, 243 (1936).

115.  "Government regulation of speech is content based if a law applies

to particular speech because of the topic discussed or the idea or message ex-

pressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A content-based

regulation is unconstitutional unless the government "prove[s] that the re-

striction furthers a compelling interest and is narrowly tailored to achieve that

interest." *Id.* "Viewpoint discrimination is … an egregious form of content dis-

crimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819,

48

829 (1995). It is "presumed to be unconstitutional," and "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

116. *And Tango Makes Three* is protected speech by the Author Plaintiffs. The School Defendants previously purchased, provided, and permitted access to the book in public school libraries. The School Defendants removed the book from public school libraries or restricted access to the book within public school libraries based on the topic discussed, idea or message expressed, and opinion of the Author Plaintiffs—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children. The School Defendants removed or restricted *Tango* based on the threat of the State Defendants' enforcement of provisions of the Act that punish speech based on the topic discussed, idea or message expressed, and opinion of the speaker. The School Defendants' action had no legitimate pedagogical purpose.

117. Fla. Stat. § 1001.42(8)(c)(3) is unconstitutional as applied to the Author Plaintiffs by Defendants. Neither the statute nor its application here furthers a compelling interest or is narrowly tailored to achieving that interest.

118. The enforcement of § 1001.42(8)(c)(3) and the restriction of access to *Tango* are actions under color of state law that have deprived the Author

Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

119. As a direct and proximate result of Defendants' unlawful conduct, the Author Plaintiffs have been and will be injured in their ability to express themselves, in violation of the First Amendment. This injury is continuing and irreparable. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

120. The Author Plaintiffs are entitled to a preliminary injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdiction immediately, and throughout the pendency of this action.

121. The Author Plaintiffs are entitled to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutional and therefore void to the extent that it requires the removal or restriction of any books—such as *Tango*—in school libraries. The Author Plaintiffs are further entitled to a declaratory judgment that Defendants' actions violated the Author Plaintiffs' rights under the Constitution and laws of the United States.

122. The Author Plaintiffs are entitled to a permanent injunction requiring the Escambia County Defendants to restore *Tango* to library shelves where it has been removed and prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of any books—such as *Tango*—in public school libraries.

123. The Author Plaintiffs are entitled to nominal damages.

## COUNT II
### First Amendment to the United States Constitution:
### Violation of Right to Receive Information
### Under Fla. Stat. § 1001.42(8)(c)(3)
### (Brought pursuant to 42 U.S.C. § 1983 Against the State Defendants
### and the Escambia County Defendants by B.G.)

124. Plaintiffs incorporate paragraphs 1–16, 20–27, 30–66, and 87–111 by reference as though fully set forth herein.

125. The First Amendment to the United States Constitution "protects the right to receive information and ideas," and this right is violated by "the removal of books from the shelves of a school library" for the purpose of "deny[ing] … access to ideas with which [the government] disagree[s]." *Pico*, 457 U.S. at 866–67, 871. This right is incorporated to the States by the Due Process Clause of the Fourteenth Amendment. *See Grosjean*, 297 U.S. at 243.

126. By restricting access to *Tango* for narrowly partisan, political reasons, Defendants have violated B.G.'s right to receive information.

127. B.G. desires to read *Tango* and would read *Tango* if it were available in her school library. She asked her father to help her check out *Tango* at her elementary school. She and her father have been unable to do so because the book is no longer available in B.G.'s school library.

128. *Tango* previously was available in B.G.'s school library but was removed by the Escambia County Defendants pursuant to § 1001.42(8)(c)(3) for

narrowly partisan, political reasons. The book was removed because of the content it contains—namely, the depiction of two same-sex penguins and their adoption of a penguin chick—and the viewpoint it expresses—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

129.   As a direct and proximate result of Defendants' unlawful conduct, B.G. has been injured in her right to receive information and ideas. This injury is continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

130.   Fla. Stat. § 1001.42(8)(c)(3) is unconstitutional as applied to the B.G. by Defendants. The removal of *Tango* occurred for narrowly partisan, political reasons that were unrelated to legitimate pedagogical concerns and served no other legitimate state purpose. Instead, the removal of access to *Tango* was rooted in animus against the viewpoint that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children, as demonstrated by the public record.

131.   The enforcement of § 1001.42(8)(c)(3) and the restriction of access to *Tango* were actions under color of state law that have deprived B.G. of rights, privileges, or immunities secured by the Constitution and laws of the United States.

132.   B.G. is entitled to a preliminary injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdiction immediately, and throughout the pendency of this action.

133.   B.G. is entitled to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutional and therefore void to the extent it requires the removal or restriction of any books—such as *Tango*—in school libraries. B.G. is further entitled to a declaratory judgment that the Escambia County and State Defendants' actions violated her rights under the Constitution and laws of the United States.

134.   B.G. is entitled to a permanent injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdiction and prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of any books—such as *Tango*—in school libraries.

135.   B.G. is entitled to nominal damages.

### COUNT III
**Fourteenth Amendment to the United States Constitution:
Vagueness of Fla. Stat. § 1001.42(8)(c)(3)
(Brought pursuant to 42 U.S.C. § 1983 by all Plaintiffs)**

136.   Plaintiffs incorporate paragraphs 1–112 by reference as though fully set forth herein.

137.   Plaintiffs bring this claim in the alternative to Counts I and II.

53

138.    A statute is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The requirement of clear definitions is of heightened importance where, as here, First Amendment rights are implicated. *See Smith v. Goguen*, 415 U.S. 566, 573 (1974).

139.    Fla. Stat. § 1001.42(8)(c)(3) is unconstitutional in violation of the Due Process Clause of the Fourteenth Amendment because it is void for vagueness.

140.    Section 1001.42(8)(c)(3) prohibits "[c]lassroom instruction" by "school personnel" or "third parties" on "sexual orientation" and "gender identity" in prekindergarten through eighth grade—as well as in any other context where it is not "age-appropriate" or "developmentally appropriate." Each of these terms is vague and undefined. The law is unconstitutionally vague because (1) it fails to provide a person of ordinary intelligence with fair notice of what is prohibited, and (2) its lack of explicit standards authorizes and encourages arbitrary and discriminatory enforcement.

141.    The School Defendants applied § 1001.42(8)(c)(3) either beyond its scope or without an understanding of whether their actions were required by the statute because the statute's terminology failed to clarify whether the presence in a public school library of a factually accurate, non-vulgar, non-obscene book that depicts a same-sex relationship among penguins violates the Ban.

54

The vagueness of the statute and the threat of enforcement by the State Defendants had a chilling effect by causing the School Defendants to ban *Tango* or permitting them to do so through arbitrary and discriminatory enforcement. The School Defendants thereby censored the Author Plaintiffs' book and transgressed the Author Plaintiffs' right to freedom of expression and B.G.'s right to receive information.

142.   The enforcement of § 1001.42(8)(c)(3) and the restriction of access to *Tango* were actions under color of state law that deprived Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

143.   As a direct and proximate result of Defendants' unlawful actions, the Author Plaintiffs have been and will be injured in their right to speak and B.G. has been and will be injured in her right to receive information. These injuries are continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

144.   Plaintiffs are entitled to a preliminary injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdictions immediately, and throughout the pendency of this action.

145.   Plaintiffs are entitled to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutionally vague and therefore void to the extent that it fails to clearly state whether it requires the removal or restriction of any books—such as *Tango*—in public school libraries. They are further entitled

55

to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutional and therefore void to the extent they require or may be read to require the removal or restriction of any books—such as *Tango*—in public school libraries. Plaintiffs are further entitled to a declaratory judgment that Defendants' actions violated Plaintiffs' rights under the Constitution and laws of the United States.

146.   Plaintiffs are entitled to a permanent injunction requiring the Escambia County Defendants to restore *Tango* to library shelves where it has been removed and to restore students' unrestricted student access to *Tango* in their jurisdictions and prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of any books—such as *Tango*—in public school libraries.

147.   Plaintiffs are entitled to nominal damages.

## COUNT IV
### First Amendment to the United States Constitution: Overbreadth of Fla. Stat. § 1001.42(8)(c)(3)
### (Brought pursuant to 42 U.S.C. § 1983 by all Plaintiffs)

148.   Plaintiffs incorporate paragraphs 1–112 by reference as though fully set forth herein.

149.   Plaintiffs bring this claim in the alternative to Counts I, II, and III.

150.   A statute "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's

plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

151.  To the extent that § 1001.42(8)(c)(3) has any plainly legitimate sweep, it is unconstitutionally overbroad because it punishes a substantial and disproportionate amount of protected free speech in relation to its purportedly legitimate sweep.

152.  Even to the extent that any applications of § 1001.42(8)(c)(3) could be interpreted to have a legitimate pedagogical purpose, the statute is not narrowly tailored to that purpose but rather has and will be applied in a manner that infringes authors' right to freedom of expression and students' right to receive information, as it was applied here.

153.  Section 1001.42(8)(c)(3)'s overbroad restrictions are not justified by preventing disruption to the school environment, are unrelated to legitimate pedagogical concerns, and serve no other legitimate state purpose. Instead, the law is expressly discriminatory against protected speech on the basis of the content and viewpoint of that speech.

154.  The enforcement of § 1001.42(8)(c)(3) and removal and restriction of access to *Tango* are actions under color of state law that have deprived Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

155.  As a direct and proximate result of Defendants' unlawful actions, the Author Plaintiffs have been and will be injured in their right to speak, and B.G. has been and will be injured in her right to receive information. These injuries are continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

156.  Plaintiffs are entitled to a preliminary injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdiction immediately, and throughout the pendency of this action.

157.  Plaintiffs are entitled to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutionally overbroad and therefore unenforceable. They are further entitled to a declaratory judgment that Defendants' actions violated Plaintiffs' rights under the Constitution and laws of the United States.

158.  Plaintiffs are entitled to a permanent injunction requiring the Escambia County Defendants to restore *Tango* to library shelves where it has been removed and to restore unrestricted student access to *Tango* in their jurisdictions and prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of any books—such as *Tango*—in public school libraries.

159.  Plaintiffs are entitled to nominal damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

*First*, a preliminary injunction requiring the Escambia County

Defendants to restore *Tango* to Escambia County public school libraries from which it has been removed;

*Second*, a permanent injunction requiring the Escambia County Defendants to restore students' ability to access *Tango* in Escambia County public school libraries;

*Third*, a declaratory judgment that § 1001.42(8)(c)(3) is (a) unconstitutional and therefore unenforceable to the extent that it requires or may be read to require the removal or restriction of any materials in public school libraries, or (b) unconstitutionally vague and/or overbroad and therefore unenforceable;

*Fourth*, a declaratory judgment that Defendants' actions violated Plaintiffs' rights under the Constitution and laws of the United States;

*Fifth*, a permanent injunction prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of materials in public school libraries, or in the alternative, a permanent injunction prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) in any manner;

*Sixth*, nominal damages for the violation of Plaintiffs' First and Fourteenth Amendment rights;

*Seventh*, an award of reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

*Eighth*, such other relief as the Court deems necessary and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury for all issues so triable as a matter of right.

Dated:  New York, NY        Respectfully submitted,
       August 25, 2023

SELENDY GAY ELSBERG PLLC


By:    <u> /s/     *Faith E. Gay*       </u>
     Faith E. Gay (FBN 129593)
     Lauren J. Zimmerman*
     Max H. Siegel*
     Masha Simonova**
     Nancy A. Fairbank*
     SELENDY GAY ELSBERG PLLC
     1290 Avenue of the Americas
     New York, NY 10104
     Tel: 212-390-9000
     fgay@selendygay.com
     lzimmerman@selendygay.com
     msiegel@selendygay.com
     msimonova@selendygay.com
     nfairbank@selendygay.com

     Anna T. Neill (FBN 100945)
     William J. Blechman (FBN 379281)
     KENNY NACHWALTER, P.A.
     1441 Brickell Avenue, Suite 1100
     Miami, FL 33131
     Tel: 305-373-1000
     atn@knpa.com
     wjb@knpa.com

     *Counsel for Plaintiffs*

     *(admitted *pro hac vice*)

     **(application for admission *pro hac vice* pending)

**Request Response #12**

**All Documents and Communications concerning any complaints regarding your work as a District employee or any disciplinary review or action contemplated or taken against You by the District.**

Allegations from complaint were based solely on a liberal blogger's Twitter feeds and articles concerning Book Challenges in Escambia County.

**Exhibit 4**



# THE SCHOOL DISTRICT OF ESCAMBIA COUNTY

75 NORTH PACE BOULEVARD, PENSACOLA, FL 32505
PHONE 850/432-6121, FAX 850/469-6379
www.escambia.k12.fl.us
MALCOLM THOMAS, SUPERINTENDENT

### Counseling Session Summary and Strategies for Improvement

DATE: April 4, 2023

I certify that a Counseling Session was held, and the employee was advised she had the right to union representation.

SUMMARY: The allegations included interpersonal relationships regarding fairness, maintaining a respectful environment, exploitive and abusive conduct; also, improper conduct regarding students, to include but not limited to improper influence, and avoiding appearances of impropriety regarding students.

STRATEGIES: Maintain adherence to the state standards for subject matter. Make certain to understand the culture of all students for which you provide instruction. Review all context of instruction along lesson content to better prepare my students for lessons undertaken.

Keith Leonard
Assistant Superintendent
Human Resource Services

Affirmative action/equal opportunity employer

**Exhibit 5**

# Meet the Florida English teacher trying to ban 150 books from school libraries

JUDD LEGUM

DEC 20, 2022

♡ 288    💬 69    Share



High school English teacher Vicki Baggett speaking to a local media outlet,
Studio 850 in September 2020.

*When Wilma Rudolph Played Basketball* is a book about the childhood of Wilma Rudolph, a legendary sprinter who won three gold medals at the 1960 Olympic games in Rome. The book, which is 32 pages long, is geared toward readers in elementary school.

The story focuses on Rudolph's childhood and the obstacles she had to overcome to achieve success. Rudolph, for example, had polio as a child and was forced to wear a leg brace. She was told by a doctor that she would never be able to walk without the brace. But Rudolph was determined.

As a Black child in the American South, Rudolph also faced racial discrimination and segregation. But Rudolph overcame both her physical limitations and societal prejudice to become a world-champion sprinter.

It is a wholesome and inspirational story. But *When Wilma Rudolph Played Basketball* is one of nearly 150 books that Vicki Baggett, a high school English teacher, is seeking to ban



Exhibit 6

from school libraries in Escambia County, Florida. According to a challenge form submitted by Baggett on August 24, the purpose of *When Wilma Rudolph Played Basketball* is "race-baiting," and the book is not appropriate for any student.



Discover more from Popular Information

Independent accountability journalism.

Over 338,000 subscribers

Type your email...

**Subscribe**

Continue reading  ›

Sign in

In an interview with Popular Information, Baggett said the book "t... those who are not black." She describes the book, which is a true story of Rudolph's experience, as "very anti-white."

At one point in the book, Rudolph reflects on how hard her mother worked as a maid for a white family. "There is something not right about this," Rudolph said. "White folks got all the luxury, and we black folks got the dirty work." This reflected the reality of life in Tennessee in the 1940s.

Baggett didn't dispute the book was accurate but insisted it would make white students "feel uncomfortable" because "they are being white-shamed." She said the book was inappropriate because "not all whites treated blacks like this." Baggett added that "not all blacks do drug crimes, like a lot of people say."

Baggett said she challenged the book because she believed it violated the [Stop WOKE Act](#), legislation pushed by Governor Ron DeSantis (R) and signed into law in April 2022. The legislation, among other things, prohibits instructing students that they "must feel guilt, anguish… because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex." The Stop WOKE Act applies to classroom instruction, but Baggett believes it also applies to library books.

Pressed on whether her interpretation of the Stop WOKE Act would allow any instruction about historical prejudice, Baggett suggested that *When Wilma Rudolph Played Basketball*

might be appropriate for children starting in fourth grade. This directly contradicts what she wrote on the form, which states it is inappropriate for all grade levels.

Baggett's social media accounts raise more questions about her approach to racial issues. In 2015, Baggett posted a picture of the Confederate Flag on her Facebook page.



Baggett said she posted the flag because "everyone in my clan fought in the Civil War" and she was not "ashamed of that." Baggett added that she was a member of the Daughters of the Confederacy, which has been designated as part of the Neo-Confederate movement. As recently as 2018, the group's website stated: "Slaves, for the most part, were faithful and devoted. Most slaves were usually ready and willing to serve their masters."

Baggett said she did not believe the photo of the Confederate Flag she posted on Facebook could make her students uncomfortable. She said her students "know me very well" and "my best friend is a black woman."

Baggett's challenge of *When Wilma Rudolph Played Basketball* prompted a review of the book on November 28 by an Escambia School District committee comprised of teachers, administrators, parents, and community members. That group considered the views of Baggett and advisory counsels formed at 11 individual elementary schools in the district.

All 11 school advisory councils that met to discuss *When Wilma Rudolph Played Basketball* rejected Baggett's arguments. They found the book was appropriate for elementary school

students. Comments included: "This book details the true struggle of prejudice faced by the main character," "There are no questionable elements to this book," and "Biographies of successful African-Americans are important to have as part of a diverse library collection."

The Escambia School District committee has not yet issued a decision regarding Baggett's challenge. If Baggett loses, she could appeal to the Escambia County School Board, which appears sympathetic to her point of view. The board has already sided with Baggett after her challenge of a different book, *The Perks of Being a Wallflower*, was rejected by the school district.

The district is dealing with a flood of book challenges, and nearly all of them were filed by Baggett. She is responsible for 148 of the 150 book challenges in Escambia this year.

## Indoctrinating second graders with penguins

Baggett's challenges are not limited to books she believes handle racial issues inappropriately. She has also challenged numerous books for allegedly violating the Parental Rights in Education Act, also known as the "Don't Say Gay" law. The law, signed by DeSantis in March 2022, states that "classroom instruction by school personnel… on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students." Although the law states it applies to classroom instruction, Baggett believes it applies to library books.

Among the books challenged by Baggett is *And Tango Makes Three*. The book is the true story of two male Penguins, Roy and Silo, who lived in the Central Park Zoo. The pair build a nest together, and — after the zookeeper provides them with an egg — they raise an adopted child, Tango. There is no sexual content in the book.

Baggett alleged the book promoted the "LGBTQ agenda using penguins." On the form, Baggett said she believes the purpose of the book is "indoctrination."

In an interview, Baggett said she objected to *And Tango Makes Three* because it exposes students to "alternate sexual ideologies." She noted that, at one point in the story, the zookeeper says, "these two penguins must be in love." That, she says, is sexual "innuendo" and K-3 students are "too young to even be concerned about sex." (Baggett's challenge says the book is inappropriate for all grade levels.)

Baggett explained her objections in more detail: "I think what would happen is a second grader would read this book, and that idea would pop into the second grader's mind… that these are two people of the same sex that love each other." Baggett said that was "perfectly fine for some families" but "perfectly not fine for others."

She said she challenged the book because she believed it violated the law. Asked if she personally thinks that second graders should not read *And Tango Makes Three*, Baggett said her opinion was "irrelevant." Baggett did say she supports the Parental Rights in Education Act because she believes that "kids need to be kids."

Baggett's challenge to *And Tango Makes Three* was also considered at the November 28 meeting of the Escambia School District committee. Nine of the eleven school-level advisory committees who reviewed Baggett's objection rejected her arguments: "[T]he message is one of compassion and tolerance," "The concepts in this book are appropriate and depict true events," and "Families are families." Two school advisory committees agreed with Baggett. The district committee has not issued a final decision.

## The difference between The Handmaid's Tale and Hustler

In addition to challenging books for elementary school students, Baggett has challenged dozens of books for high school students, primarily objecting to sexual content. Books Baggett has challenged on this basis include *Perks of Being a Wallflower*, *Beloved*, *Slaughterhouse-Five*, and *Water for Elephants*.

Baggett considers many of these books pornography and believes their presence in schools a violation of Florida's child pornography laws. In a letter to school administrators, Baggett called for the school employees who purchased *Perks of Being a Wallflower* — one of NPR's best 100 teen books —  to be "held accountable for actually making these sorts of books available to our children."

Baggett told Popular Information that she has a "really good test" to determine whether a novel with sexual content is actually pornography. According to Baggett, "[i]f I could not walk up to you and start saying to you in a conversational tone" anything written in the book "and know that I'm not going to be in trouble," then that book is pornographic and should be excluded from the library.

Baggett's test, however, does not comport with Florida or federal law. Florida's law prohibits books in school libraries that both contain "explicit and detailed verbal descriptions or narrative accounts of sexual excitement, or sexual conduct" *and* are"harmful to minors."

Florida law and Supreme Court precedent affirm that not every book with explicit sexual content is harmful to minors. The Supreme Court laid out the standard for obscenity in the 1973 case of *Miller v. California*. The *Miller test* defines obscenity as work that appeals to "purient interests," depicts sexual conduct in a "patently offensive way," and "taken as a whole, lacks serious literary, artistic, political, or scientific value."

Jonathan Friedman, the director of free expression and education programs at PEN America, explained that the *Miller* test means people like Baggett cannot "take a single image or paragraph and say the book is obscene or harmful to minors." Rather, the law requires an evaluation of the book as a whole. That's why high school students can read *The Handmaid's Tale*, which has graphic descriptions of sexual violence, but not Hustler Magazine. In other words, context matters. (One of the books Baggett is challenging is the graphic novel version of *The Handmaid's Tale.)*

Under Baggett's test, how could a school offer sex education? A teacher could not, in a casual hallway conversation, describe to a student the mechanics of oral sex. But that does occur in sexual education classes. Most people understand that, in that context, the information is not harmful to minors.

Baggett said that the high school where she teaches does not offer a sex education class. According to Baggett, her school's biology teacher covers some related topics but does not "discuss oral sex in that formal fashion" because "it is not her place." Baggett said that she also believed it "is not the school's place" to offer sex education. She said that people who support sex education in schools "assume that the teacher knows what they are doing" and "do not understand what's happening in public education."

In her challenges, Baggett claims the American Library Association, which recommends many of the books Baggett is challenging, is "pushing porn in… public educational institution[s]."

## Restrict first, ask questions later

While Baggett's views may not be widely shared her efforts have already restricted dozens of books from Escambia students. Every book that Baggett labels as "pornography" is immediately placed in a "restricted" section of the library. Students can only access these books if they receive special permission from their parents.

125 books are currently under restrictions as a result of Baggett's challenges. They will remain in restricted status until the challenge process is complete. Although Baggett began filing challenges in August, thus far, only one book has made it through the process. And the list of restricted books continues to grow. Baggett submitted 11 additional books on December 2. All of them have been restricted indefinitely.

This kind of restriction has been deemed illegal in the past. In 2002, a federal court in Arkansas ruled that requiring a permission slip to check out Harry Potter books from a school library was unconstitutional. In Escambia, the school district is restricting books challenged by Baggett under a draft policy that, as of this week, has not been approved by

the school board. It's unclear why. An official from Escambia County Schools involved in processing the book challenges declined to comment.

Baggett is looking for even more aggressive action. She has repeatedly asked school officials to identify the librarians or other school employees responsible for purchasing the books she has challenged. Baggett said that, ultimately, she believes her colleagues "can and will be prosecuted" for felonies under Florida's child pornography laws.



> ### Popular Information
>
> ### How to ban 3600 books from school libraries
>
> This year, at least 102 books have been removed from the shelves of school libraries in Clay County, Florida. Many of these books were pulled at the request of one man: Bruce Friedman. A conservative activist and longtime resident of New York, Friedman moved to Clay County this Ma...
>
> **Read more**
>
> 2 years ago · 211 likes · 68 comments · Judd Legum and Rebecca Crosby



288 Likes  ·  4 Restacks

← Previous          Next →

## 69 Comments

Write a comment...



**Peter**  Dec 20, 2022

At what point do the rest of the people get to push back against this nonsense? I find it hard to believe that this woman represents even a significant minority of the parents in the district, let alone in the state? Is it that librarians and school boards have been intimidated by implied or explicit threats? Is it because that radicals have taken over the school board? Or is it that people are just too tired to fight off every one of these attacks on critical thinking? Frankly it seems to me that she needs to be challenged to prove her allegations before any book is removed from the shelf. Claim that Wilma Rudolph leads to white shaming? Prove it. Document the cases. Then maybe we'll talk.

LIKE (85)    REPLY    SHARE

6 replies

 **BabsPHL**  Dec 20, 2022

It's apparent that Gandy Baggett is a DANDY BIGOT!! How the H*** does one pathetic confederate worshiping cracker get to make the rules for Florida libraries??? This has got to stop. A minority fringe is vomiting all over the rights of the rest of us! Florida and DeSantis are poster children for book burning, bigotry, racism, and all the other evils that X45 hatched, and they're all thriving in the SOUTH. SHAME ON ALL OF THEM!

LIKE (64)    REPLY    SHARE

11 replies

**67 more comments...**

© 2024 Popular Information LLC · Privacy · Terms · Collection notice
Substack is the home for great culture

# Florida English teacher pushing book bans is openly racist and homophobic, students allege

JUDD LEGUM

JAN 09, 2023

 329    💬 56                    Share



Northview High School English teacher Vicki Baggett during an
interview with Studio 850 in September 2022. (Screenshot via Facebook)

Vicki Baggett, an English teacher at Northview High School in Florida, is pushing
for the Escambia County School District to remove nearly 150 books from school
libraries. In an interview last month, Baggett told Popular Information that she is
challenging books like *When Wilma Rudolph Played Basketball* — the story of a
sprinter who overcame racial discrimination to become an Olympic champion —

Exhibit 7

because she's concerned the book could make white students "feel uncomfortable." Baggett said she has "a responsibility to protect minors" from this kind of content.

While Baggett claims she is keeping inappropriate content away from children, her former and current students tell Popular Information that Baggett openly promoted racist and homophobic beliefs in class.

Peggy Sunday, who graduated from Northview in 2021, told Popular Information that, during a 10th-grade English class, Baggett said she opposed interracial marriage. "[Baggett] said in the Bible somewhere it says that it is a sin for races to mix together and that whites are meant to be with whites and blacks are meant to be with blacks," Sunday alleged. About 15 students, from a variety of racial backgrounds, were enrolled in the class.

Another student in the same class, Stone Pressley, recalled the same incident. Pressley said that Baggett said she was opposed to "race mixing" because "she wanted to preserve cultures" and "didn't want everyone to turn the same color eventually." Pressley said that although Baggett had a reputation for controversial remarks, he found Baggett's comments on interracial relationships "shocking." After the incident, Pressley recalled asking his science teacher if it was possible, as Baggett claimed, for everyone to be "the same color one day."

Another student in the class, Hamza Jacobs, confirmed Baggett's comments opposing "race mixing." A fourth student in the class, who asked to remain anonymous due to the nature of the allegations and Baggett's standing in a small community, also confirmed the episode.

Sunday said that Baggett is throughout Northview as an "openly racist teacher." Sunday worked at a local pool and, one day, Baggett asked her about "the black-to-white" ratio. According to Sunday, Baggett then asked two Black students if they "knew how to swim" because "most black people don't know how to swim." The incident was confirmed by one of the Black students targeted by Baggett, who asked to remain anonymous. That student said Baggett "asked me and another girl

of color in my class 'could we swim because black people usually can't.'" Jacobs and Pressley also confirmed the incident.

A Black student in the class also alleged Baggett said that "she didn't understand why black people get tattoos in black ink" because "you can't even see them." Pressley and Sunday confirmed the incident. Sunday and Jacobs recalled Baggett frequently commenting on the hair of a Black female student. Sunday said Baggett questioned why the young woman wore hair extensions and asked if her hair "was heavy or hurt her."

Popular Information previously reported that, in 2015, Baggett posted an image of the Confederate Flag to her Facebook page. In the December 2022 interview, Baggett defended the posting, because "everyone in my clan fought in the Civil War" and she was not "ashamed of that." Baggett added that she was a member of the Daughters of the Confederacy, which has been designated as part of the Neo-Confederate movement.

The Escambia County School District did not answer a detailed list of questions about Baggett's behavior but did provide the following statement to Popular Information: "We categorically condemn any form of discriminatory speech. Our mission is to reach all students, regardless of race, background, or gender identity."

Baggett did not respond to multiple requests for comment about the allegations made by her students. She has, however, continued to submit challenges to books in Escambia County school libraries. Most recently, Baggett challenged a bestselling book of poetry available in high school libraries, *The Sun and Her Flowers*, on January 5.

## Baggett accuses a student of "faking being a lesbian"

Both Sunday and Pressley recalled another incident involving Baggett that "the whole school talked about." According to Sunday, Baggett told a 10th-grade student that her sister, who had a girlfriend, was "faking being a lesbian for attention." Baggett allegedly said that "nobody's born that way."

The incident was confirmed by a student, who asked to remain anonymous, who witnessed Baggett's comments. Popular Information also confirmed the identity of the targeted student and her sister but is not publishing their identities due to the nature of the allegations.

In September 2019, a Northview parent emailed principal Michael Sherrill objecting strenuously to Baggett's classroom conduct. (The email was obtained by Popular Information on the condition that the identity of the parent not be disclosed.) In the letter, the parent accused Baggett of "a toxic and hostile learning environment for her students" and asked that "a full investigation of her actions be conducted."

The letter states that Baggett "has expressed her utter distaste for homosexuals to her students." According to the parent, Baggett "stated she thinks homosexuals are DUMB/STUPID for wearing the rainbow and pink colors because, according to Mrs. Baggett, that is the way that Hitler marked homosexual males during the Holocaust." (The pink triangle was used by Nazis but has been reclaimed by the LGBTQ community as a symbol of pride.) The parent expressed concern that these comments would make students in her class feel "judged" and "humiliated."

Many of the books challenged by Baggett have LGBTQ themes. Among the books challenged by Baggett is *And Tango Makes Three*. The book is the story of two male penguins, Roy and Silo. The pair build a nest together and raise an adopted child, Tango. Baggett alleges the book promotes the "LGBTQ agenda using penguins." On the form, Baggett said she believes the purpose of the book is "indoctrination."

In the December 2022 interview with Popular Information, Baggett said *And Tango Makes Three* includes sexual "innuendo" and K-3 students are "too young to even be concerned about sex." Baggett explained that she objected to the book because if a second grader read the book "that idea would pop into the second grader's mind... that these are two people of the same sex that love each other." Baggett's challenge says the book is inappropriate for all grade levels.

8/26/24, 11:16 AM
A Florida English teacher is pushing to ban a book that is openly racist and homophobic, argues a college
Case 4:23-cv-00414-AW-MAF   Document 220-2   Filed 11/22/24   Page 99 of 216

The September 2019 parent letter also claims that Baggett "openly stated that men and women should 'Know Their Role.'" Baggett allegedly said that "men are the protectors and the women are the nurturers" and that is why "women have the children and the men go to work to provide and protect the women."

The parent demanded their child "be removed from Mrs. Baggett's classroom effective immediately." But the parent told Popular Information that no action was taken in response to their complaint. The school did not address the specific allegations in the letter, and Principal Sherrill told the parent that Baggett was "a good person."

A former student in Baggett's class told Popular Information that, despite her "wild" conduct in class, "a lot of people were scared" to complain to administrators about Baggett. Northview is a small high school, with about 90 people in each graduating class, and Baggett has taught English at Northview for more than 30 years.

## Inside Baggett's classroom today

Baggett is seeking to remove books like *When Wilma Rudolph Played Basketball* from Escambia County libraries, claiming texts that detail historic discrimination amount to "race-baiting." The form Baggett submitted to the school district says *When Wilma Rudolph Played Basketball* "opines prejudice based on race" and is inappropriate for students in any grade.

But a current student in Baggett's 12th grade English class told Popular Information that Baggett's curriculum includes texts that cover racial issues in crude terms. Popular Information is withholding the name of the student because the student is a minor and is currently enrolled in Baggett's class.

Among the texts covered in Baggett's 12th grade English class this academic year was *A Good Man Is Hard to Find* by Flannery O'Connor, an acclaimed but controversial author. (See "How Racist Was Flannery O'Connor?" in the New Yorker.) In *A Good Man Is Hard to Find*, a man named Edgar Atkins Teagarden

courts a woman by leaving a watermelon at her doorstep every Saturday carved with his initials — E.A.T. The punchline is that a Black child, referred to in the story with the n-word, ate the watermelon because he interpreted Teagarden's initials as an invitation.

According to the student, Baggett played an audio version of the story that included the unredacted racial slur. During the classroom discussion, Baggett also allegedly spelled out the n-word, which the student said made many of her classmates uncomfortable. Another student in the class posted a screenshot of the of the passage from *A Good Man Is Hard to Find* with the n-word to social media, commenting that it was a "regular day in Ms. Baggett's class."

Baggett previously told Popular Information that her 12th grade class included texts with the n-word. But Baggett claimed that when the text was read in the classroom, she "basically skipped over" the part of the book that included the slur because it was her job to make "students all feel comfortable." (During the December 2022 interview, Baggett herself used the racial slur in full oin describing the incident.) Baggett declined to name the text, so it's unclear if it was *A Good Man Is Hard to Find* or another story.

There is nothing particularly unusual about including a Flannery O'Connor story in a 12th grade English class. But it highlights a troubling contradiction in Baggett's approach. Baggett maintains that *A Good Man Is Hard to Find* is appropriate for high school students but books like *When Wilma Rudolph Played Basketball* and *And Tango Makes Three* are inappropriate and should be removed from all school libraries.



329 Likes  ·  2 Restacks

[← Previous]  [Next →]

# 56 Comments





**Heidi Jo**   Jan 9, 2023

Every national teacher and educational organization needs to disqualify Bagget as a teacher loudly. Would be great if a Florida org had the courage. She is a scourge on our educational system.

♡ LIKE (82)    ▢ REPLY    ⬆ SHARE                                              ⋯

**Chris R**   Jan 9, 2023

Interesting that these folks only worry about the "discomfort" of White, straight students. Actually, they project their own discomfort onto the students who look like them.

Why would a student be "uncomfortable" about reading about racism in the past? It's really these racist teachers who are uncomfortable being confronted with their own beliefs under scrutiny. No one feels uncomfortable about something they personally had nothing to do with. They can feel empathy for the victims of past actions.

Baggett is a sorry excuse for a teacher. Can her license be revoked?

♡ LIKE (79)    ▢ REPLY    ⬆ SHARE                                              ⋯

**54 more comments...**

© 2024 Popular Information LLC · Privacy · Terms · Collection notice
Substack is the home for great culture

| From: | Baggett, Vicki [VBaggett@ecsdfl.us] |
|---|---|
| Sent: | 5/16/2022 9:33:33 AM |
| To: | White, Michelle [MWhite5@ecsdfl.us] |
| CC: | Rowell, Jessica [JRowell@ecsdfl.us]; Barbara Luker [bluker@ecsdfl.us]; Gerry Pippins [GPippins@ecsdfl.us]; Michael Sherrill [MSherrill@ecsdfl.us]; Tracie Carollo [tcarollo@escambia.k12.fl.us]; Timothy Smith [tsmith@ecsdfl.us]; Lesa Morgan [LMorgan@ecsdfl.us]; Steve Marcanio [smarcanio@ecsdfl.us]; Brian Alaback [balaback@ecsdfl.us] |
| Subject: | Re: "Into the Wild" |

My question again: WHO READ THESE BOOKS BEFOREHAND in order for them to be placed on a list for teachers to select?

On Mon, May 16, 2022 at 8:21 AM White, Michelle <MWhite5@ecsdfl.us> wrote:
  Ms. Baggett,

  The process for selecting the titles has been stated in previous emails and there have been no reconsideration requests for these titles.  As stated in the policy, any resident, employee, or parent of a student of the school district may raise objections.  Once the form has been submitted a committee will be formed to evaluate and make a decision.

  Thank you,
  Michelle

On Fri, May 13, 2022 at 8:40 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
  Thank you. I will. My ultimate concern is -- am I the only person in this entire district questioning the fact that our district bought these books and made them available to teachers and students (thereby actually putting a stamp of approval on them)? Who in the district read these books beforehand? Ms. Rowell has admitted to reading these two books that I have mentioned, but obviously decided her individual opinion was not important, or maye she felt the subject matter and language was age-appropriate. Did anyone else vet these books?
  Did no one else on these so-called committees believe that these books should not even be considered for instruction? What type of instruction are we opting for? Can you confirm that there has not been a "Formal Request for Reconsideration of Educational Media" for either of these books, Do parents have this option as well because I will certainly let them know about it.

  On Fri, May 13, 2022 at 3:27 PM White, Michelle <MWhite5@ecsdfl.us> wrote:
    Ms. Baggett,

    As previously discussed you have the option of whether or not to use the titles in question as a part of your instruction and students are also given an opportunity to opt-out of any particular novel study.  If you feel that the titles in question should not be available for any teacher to use as a part of their instruction you may begin the "Formal Request for the Reconsideration of Educational Media" process.  The policy and form can be found on the School Libraries website:  https://ecsd-fl.schoolloop.com/school_libraries.  If you wish to proceed with this request, please fill out the form located on the website and submit it to your principal Mr. Sherrill.

    Thank you,
    Michelle

  On Fri, May 13, 2022 at 2:10 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
    Jessica,



Secondly, if you are saying you are NOT recommending these books, then why purchase them. If you ARE recommending these (as is evidenced because these were purchased for the students and teachers to use) then I wonder if the district is truly aware of some of the "pornographic" material held within. If the district is not aware, then why not? Before spending any funds on anything, shouldn't you know what you are purchasin? Blame this on committees, teams, whoever you want. It all goes back to providing legitimate resources and materials, purchased with tax payer funds, that teachers can definitely use within the classroom.

Let's go back to what you wrote about appropriateness. Do you think the district would back ANY teacher covering a book within his or her class about using sandwich bags as condoms? Apparently, they would have to since the district provided the books for the teachers. Perhaps our district should take note of what is going on in Walton County with this very thing.

On Fri, May 13, 2022 at 1:42 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
  The bottom line is -- who actually read the books that were selected?  Did grade-level directors or Ms. White? Since you read them, wouldn't it have been helpful to at least have provided some sort of "language" rating or content list for the teachers to decide, etc.? Just as you trust that teachers will preview material as part of their instructional planning, the teachers trust that the resources you provide have also been previewed by those of you assisting with selections. If multiple teachers and other departments were included in this process, then it is evident that many people are "passing the buck" to someone else to provide insight. Again, make this helpful and beneficial to teachers (as I have done with my email) by providing them with what to expect in language and content. This is how downtown can truly assist teachers with content, etc.  I also beg to differ with you about "an individual making a district decision." By providing various classroom sets of novels, the district has already made  the decision that these books are appropriate for high school students. That, in itself, is unbelievable to me, especially after reading some of this content.

On Fri, May 13, 2022 at 1:19 PM Rowell, Jessica <JRowell@ecsdfl.us> wrote:
  Good afternoon,

  I am unsure as to where to begin, as there are a few inaccuracies regarding the procedure for book selection provided in your account. I have included Lesa Morgan and Michelle White in my response, as they were part of this process.

  Upon adoption of Savvas as the ELA Core curriculum, the Secondary ELA Department shared the list of novels that accompanied our purchase with our Literacy Leaders. Novels listed were separated by which grade-level and instructional unit they supported. The instructions provided to each Literacy Leader was to work with your site-based team to eliminate novels that you 1) had an objection/aversion to teaching, 2) already had multiple copies/class sets at your site, or 3) did not feel were appropriate content.  If any title was struck through from a school site, it did not make the ballot that was sent to all teachers for final selection.  Once the ballots were cast, the titles that received the highest percentage of votes were sent to the grade-level directors and Michelle White for further consideration and review.

  The novels are NOT required instruction, which is why they are not listed on the district scope and sequence or curriculum guides. Secondary ELA trusts that teachers will preview material as part of their instructional planning to ensure appropriateness, as each class is unique. I have read both novels mentioned, but it is not best practice for an individual to make a district decision. That is why multiple teacher leaders and other departments were included in this process.

Jessica K. Rowell
Secondary ELA Specialist

E-ECSD_PR 039674

Escambia County School District
(850) 469-5409 -- Office
" Literacy is a bridge from misery to hope." -- Kofi Annan


On Fri, May 13, 2022 at 12:47 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
Since I was told that the ELA downtown department did not pre-read the books before ordering classroom sets for teachers to use, I thought I would send you the language breakdown by chapter for this book by Jon Krakauer called "Into the Wild." This way, teachers who are considering using this in their classes will not be blindsided and can get parental approval ahead of time. I really thought and assumed that was something you did for the teachers, since you are so vetted into our classroom curriculum and books. I am personally very disappointed in this part of the curriculum that you did not address. The below is from "Into the Wild" that was ordered (You said based on teachers' suggestions) for the 11th grade. I found 20 minutes without students during my planning period one day and tried to pre-read some of "Perks of Being a Wallflower," the book you ordered for 12th grade. After reading about "blow jobs" and how a young couple sneaked out one night to have sex, but because they forgot condoms, they used plastic sandwich bags instead, I decided to scrap that book as well. As for me and mine, we will stick with the classics and with age-appropriate literature that will not cause my students and their parents to wonder about this teacher's integrity. Thank goodness my own children were never subjected to this when they were in high school, even as individual required reading.

Chapter 1: p. 6--"Hell";  "F--k"
Chapter 3: p. 17--"godd--n"; p. 18--"da-n"
Chapter 4: p. 26--"hell"; "sh-t"
Chapter 7: p. 62--"God---n";  "God---n"; p. 64--"hell"; "fu-k"; "bi--h"; "God--n"
        p. 65--"Get laid"; p. 66--"Godd--n"; p. 68--"da-n"
Chapter 8: p. 71--"da-n" "dumbassedness";  p. 79--"sh-t"; p. 84--"hell"; "sh-t"; p. 84--"fu-kin"
Chapter 9: p. 96--"da-n"; "hell"
Chapter 10--p. 101--"Fu--yu"; "da-n"
Chapter 11--p. 116--"da-n"
Chapter 12--p. 118--"ass"; p. 125--"Fu--ing"
Chapter 15--p. 148--"ass"; p. 151--"fu--ed up"; (twice); "orgy"; p. 152--"making love";
    p.154--"fu--ing rest"
Chapter 17--p. 176--"hell"; p. 177-"hell"
Chapter 18--p. 189--"hell"


--
Michelle White
Coordinator of Media Services
Escambia County School District
2005 N 6th Ave
Pensacola, Fl 32503
(850) 696-7235
(850) 595-0030 ext. 290
mwhite5@ecsdfl.us

E-ECSD_PR 039675

Submit a Helpdesk Ticket using the email addresses listed below to submit questions, request assistance, or support for textbooks:

Textbook: textbooksupport@ecsd.zendesk.com


--
Michelle White
Coordinator of Media Services
Escambia County School District
2005 N 6th Ave
Pensacola, Fl 32503
(850) 696-7235
(850) 595-0030 ext. 290
mwhite5@ecsdfl.us
Submit a Helpdesk Ticket using the email addresses listed below to submit questions, request assistance, or support for textbooks:
Textbook: textbooksupport@ecsd.zendesk.com

E-ECSD_PR 039676

**From:** Adams, Kevin [KAdams2@ecsdfl.us]
**Sent:** 5/20/2022 4:22:12 PM
**To:** Timothy Smith [tsmith@ecsdfl.us]
**Subject:** Fwd: Help with content material
**Attachments:** FinalBoardletter.pdf

Superintendent,

I would recommend removing the books the district purchased until district staff has verified them as within state guidelines and age-appropriate.  I do not believe it is up to each of our teachers across the district to decide whether the district purchased material is age-appropriate or not.

I would appreciate quick action and response to this matter.  I would also appreciate an update on this situation.

Thank you,
Kevin L. Adams, Chair
Escambia County School Board Member, District 1
Office:  (850) 469-6137
Cell:  (850) 449-8692
Fax:  (850) 469-6273
75 North Pace Boulevard
Pensacola, FL  32505

Under Public Records Florida law, virtually all written communications to or from School District Personnel are public records available to the public and media upon request. E-mail sent or received on the School District system will be considered public and will only be withheld from disclosure if deemed confidential pursuant to State or Federal Law.

---------- Forwarded message ---------
From: **Baggett, Vicki** <VBaggett@ecsdfl.us>
Date: Fri, May 20, 2022 at 4:11 PM
Subject: Help with content material
To: Kevin Adams <kadams2@ecsdfl.us>, Paul Fetsko <pfetsko@ecsdfl.us>, Laura Edler <ledler@ecsdfl.us>, Patricia Hightower <phightower@ecsdfl.us>, William Slayton <bslayton@ecsdfl.us>, <GovernorRon.Desantis@eog.myflorida.com>

Board Members and Gov. DeSantis:
Please see attached concerning literary content concerns.
Thanks, Vicki Baggett



**Exhibit 9**

E-ECSD_PR 039395

Vicki Baggett
Northview High School
Escambia County, FL
Bratt, FL 32535

May 20, 2022

Dear Escambia County Board Members and Gov. Ron DeSantis:

It is after much deliberation that I send you the following email, but as a 30-year veteran high school English teacher, a mother, and a taxpaying citizen for this county and state, I will not remain silent.  What I see happening in the curriculum of public education is beyond alarming. It is sickening and abhorrent. First and foremost, I applaud you, Gov. DeSantis, for your push to eliminate all types of bias in curriculum.  Our children should never be subjected to any forms of one-sided indoctrination, especially under the guise of "education."  My purpose in writing this to you all today, however, is to bring your attention to a rather more obvious resource – and that is literature provided and offered at the high school level. (I cannot write about the middle school offerings because I have not researched their supplemental materials firsthand.)

Having a master's degree in English, I am very partial to literature, and this being my 30th year in the classroom, I was very eager to try our new My Perspectives Curriculum.  The program itself offers many supplemental materials for teachers, including online resources as well as worksheets, etc. Better yet, the curriculum and scope and sequence was certainly one with which I knew would work. Now, at the end of the year, however, a much larger problem has become evident, in my opinion.

With this new adoption of textbooks, our Language Arts Departments could receive classroom sets of one (1) novel for each grade level. With a list of over 700 books that our district could have chosen from, SOMEONE (I have asked who this someone was 4 times to my supervisor.) narrowed the list for English teachers down to about 4 or 5 per grade level. We were told to select books on the following criteria:  "1) had an objection/aversion to teaching, 2) already had multiple copies/class sets at your site, or 3) did not feel were appropriate content" (Jessica Rowell, English Supervisor, email). District-wide majority votes solidified one book per grade level for high schools.  Our selections were as follows, and we received 50 books of each to be an optional book study within our classes:
9th—"If I Stay"
10th—"The Fault in Our Stars"
11th—"Into the Wild"
12th—"Perks of Being a Wallflower"

I currently teach 11th grade honors English, 12th grade English, 12th grade honors English and Dual Enrollment at Northview High School. Within the past four weeks, my 11th grade students and I prepared to read, listen to the audio and discuss "Into the Wild," a true story about a young man who travels to Alaska and ultimately dies from starvation while there. I even ordered the movie for us to watch after we completed the book. The students were completely excited after I even showed them the trailer from the movie, indicating the plot of this book. I, for one, have

E-ECSD_PR 039396

never read this book and did not think that I needed to pre-read, since our district put their stamp of approval on this book (as well as the others) as a classroom set **(which legally means the district is encouraging and would back a teacher if he or she chose to use this book as a teaching tool in class). Within minutes, my students and I are lambasted with the "F" word continuously. I had to constantly beep out the audio; however, the students simply skimmed over the bad words.

***I took the time to go through and show you which words were on which pages below.
**Explicit Language from "Into the Wild" by John Krakauer.**

Chapter 1: p. 6--"Hell"; "F--k"
Chapter 3: p. 17--"godd--n"; p. 18--"da-n"
Chapter 4: p. 26--"hell"; "sh-t"
Chapter 7: p. 62--"God---n"; "God---n"; p. 64--"hell"; "fu-k"; "bi--h"; "God--n"
           p. 65--"Get laid"; p. 66--"Godd--n"; p. 68--"da-n"
Chapter 8: p. 71--"da-n" "dumbassedness"; p. 79--"sh-t"; p. 84--"hell"; "sh-t"; p. 84--"fu-kin"
Chapter 9: p. 96--"da-n"; "hell"
Chapter 10--p. 101--"Fu--yu"; "da-n"
Chapter 11--p. 116--"da-n"
Chapter 12--p. 118--"ass"; p. 125--"Fu--ing"
Chapter 15--p. 148--"ass"; p. 151--"fu--ed up"; (twice); "orgy"; p. 152--"making love";
           p.154--"fu--ing rest"
Chapter 17--p. 176--"hell"; p. 177-"hell"
Chapter 18--p. 189--"hell"


This situation with this book made me quickly grab the 12th grade classroom set that was purchased by my district **"Perks of Being a Wallflower" by Stephen Chbosky,** a book I had not begun yet with my 12th graders. Immediately I found that although this book had the "F" word many times, the explicit language was mild compared to the sexual content:

p. 12—"And I opened the door to the basement, and my sister and this boy were naked. He was on top of her, and her legs were draped over either side of the couch."

p. 21—"I was with Sam. We were both naked. And her legs were spread over the sides of the couch. And I woke up. And I had never felt that good in my life."

p. 21—"Do you know what 'masturbation' is? I think you probably do because you are older than me. But just in case, I will tell you. Masturbation is when you rub your genitals until you have an orgasm. Wow!

p. 31—"She grabbed his penis with her hands and started moving it. I wish I could describe this a little more nicely without using words like penis, but that was the way it was. After a few minutes, the boy pushed the girl's head down, and she started to kiss his penis. She was still crying. Finally, she stopped crying because he put his penis in her mouth, and I don't think you can cry in that position."

p. 44—When most people left, Brad and Patrick went into Patrick's room. They had sex for the first time that night. I don't want to go into detail about it because it's pretty private stuff, but I will say that Brad assumed the role of the girl in terms of where you put things."

p. 110—"Patrick kept making jokes that I would get an 'erection.' I really hoped this wouldn't happen. Once, I got an erection in class and had to go to the blackboard.

p. 158—"They start to make out. The stereo's playing, and they're just about to 'do it' when Parker realizes he forgot the condoms. They're both naked on this putting green. They both want each other. There's no condom. So, what do you think happened? …They did it doggie-style with one of the sandwich bags!"

p. 159—"There was a guy named Carl Burns and everyone called him C.B. And one day C.B. got so drunk at a party that he tried to "f—k" the host's dog.

p. 159—"And there was this guy they called 'Action Jack' because supposedly he was caught masturbating at a drunk party. .."

There is plenty of more about masturbation, beastialty, and sex in this book. I hope you get my point.


As head of the English department at my school, I obtained the 9th and 10th grade classroom sets of novels and started reading. These books have major sexual themes and situations as well . The 10th grade book, **"The Fault in Our Stars"** references sodomy, Hazel who "screws everybody" and is "no longer a virgin" and plenty of profanity: Shi**ier (1,) Godd*** (5), Bada** (2), ba****ds (3), He** (2), sh** (6,) bi***(1), bullsh** (9), a** (2), A**hole (2), A**clown (1), Fu**ing (1). The 9th grade book, **"If I Stay,"** is primarily loaded with "F" and "S—t" language, but it has a very provocative foreplay session between the two main characters, which implies orgasm with the ending of the pretend cello practice.

My question to our Governor and our Board Members, what is the purpose of any of this? Is this a concerted effort to pull our children into this type of behavior? This indecency? Of all of the books we have available to us, including other books of the 700 that our new textbook inventory provided, why were these chosen? Who chose them? No one will answer me, other than the media specialist who basically "passed the buck" on my question and suggest that I fill out a form to have these books removed. Was it her job to pre-read these? Was it the English supervisor's role?

No one can "censor" all books coming into a high school, but when books are purchased for as classroom sets for classroom usage, someone needs to be held accountable as to pre-reading these books. No one in my district will assume or admit to this responsibility, including Superindent Dr. Tim Smith, who has yet to answer any of my emails. Ms. Lesa Morgan, head of Secondary Education, however, just today, emailed me wanting to set up a meeting for Monday: "I am trying to schedule a meeting for Monday morning at Northview to include district level

staff and Northview administration to meet with you to discuss your concerns and questions" (Morgan, email).

### Are school board members responsible?

Yesterday, our staff and students were informed that thanks to our superintendent, Michelle White, the director of Media Services and our school board, a book distribution was to take place with all of our students. The students could choose from 1300 titles of high-interest books for young people. (See email in attached email list.) Imagine my surprise when a student returned to my class with a graphic novel entitled "The Girl from the Sea," which was a book encouraging secret lesbian relationships. (See pictures attached.)  When this student realized the content of this book, she quickly placed the book on my desk because she said her parents would be appalled. She said she wished she could now "undo seeing these pictures."



As a teacher, I have spent my life trying to encourage and uphold morality in pursuit of beneficial knowledge, but this is being sabotaged by my own school district, the one group I should be able to trust. Is this what we have become in public education.  What will happen when we have no teachers willing to stand in the gap for these students? I was informed I was the ONLY teacher in this district who had questioned these books. What does that say for any of us?

The four books mentioned above should have never been purchased as potential classroom sets. By doing so, this was a green light for any English teacher to use within his or her class. I shudder to think how parents would react to these books being used in class, and passing this off to the teacher to pre-read is another example of passing things on down the line. If that is the case, do we even need downtown departments? Teachers need trusted and tried resources. They need to know they can depend on those in the funnel to assist them. These books , including the graphic novel above, are not appropriate for classroom discussions or dissemination (with

E-ECSD_PR 039399

pictures – how nice). Someone needs to be responsible for reading and vetting ALL resources that our taxpayers' monies purchase under the umbrella of education. If there is no time to do this, then do not purchase the materials. Do not expect teachers to pre-read everything thrown their way when most of us are already so buried under responsibilities to begin with.

Our kids deserve better. Florida deserves better. I hope that you can find a solution to this and truly discuss this with parents and teachers because I am sure this will soon be a hot topic (All of the graphic novels are now gone in our library.) I also hope you can get some communication from our superintendent and our district personnel, especially the main question I have: Who read these books and gave the green light for their purchase and use in the classroom? Not one person has answered that for me, and only two people have even responded to my email. Perhaps Ms. Morgan will do this on Monday, with her district-level associates in tow.  Will my own school board and governor help in this troubling situation and shirking of responsibility by my own school district?


Sincerely,

Vicki Gandy Baggett, M.A.T.


(Emails follow)



**Emails sent and received:**

**On May 13, I immediately emailed my English supervisor and copied this to others in the department and my principal, assistant principal, asking who made the ultimate decisions to purchase these books to be used as a potential classroom teaching tool. (See below)**

On Fri, May 13, 2022 at 12:47 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
Since I was told that the ELA downtown department did not pre-read the books before ordering classroom sets for teachers to use, I thought I would send you the language breakdown by chapter for this book by Jon Krakauer called "Into the Wild." This way, teachers who are considering using this in their classes will not be blindsided and can get parental approval ahead of time. I really thought and assumed that was something you did for the teachers, since you are so vetted into our classroom curriculum and books. I am personally very disappointed in this part of the curriculum that you did not address. The below is from "Into the Wild" that was ordered (You said based on teachers' suggestions) for the 11th grade. I found 20 minutes without students during my planning period one day and tried to pre-read some of "Perks of Being a Wallflower," the book you ordered for 12th grade. After reading about "blow jobs" and how a young couple sneaked out one night to have sex, but because they forgot condoms, they used plastic sandwich bags instead, I decided to scrap that book as well. As for me and mine, we will stick with the

E-ECSD_PR 039400

classics and with age-appropriate literature that will not cause my students and their parents to wonder about this teacher's integrity. Thank goodness my own children were never subjected to this when they were in high school, even as individual required reading.

1.  **The response I received was that teachers voted on the books; however, my English supervisor admitted she had read both of these two books.**

On Fri, May 13, 2022 at 1:19 PM Rowell, Jessica <JRowell@ecsdfl.us> wrote:
Good afternoon,

I am unsure as to where to begin, as there are a few inaccuracies regarding the procedure for book selection provided in your account. I have included Lesa Morgan and Michelle White in my response, as they were part of this process.

Upon adoption of Savvas as the ELA Core curriculum, the Secondary ELA Department shared the list of novels that accompanied our purchase with our Literacy Leaders. Novels listed were separated by which grade-level and instructional unit they supported. The instructions provided to each Literacy Leader was to work with your site-based team to eliminate novels that you 1) had an objection/aversion to teaching, 2) already had multiple copies/class sets at your site, or 3) did not feel were appropriate content.  If any title was struck through from a school site, it did not make the ballot that was sent to <u>all</u> teachers for final selection.  Once the ballots were cast, the titles that received the highest percentage of votes were sent to the grade-level directors and Michelle White for further consideration and review.

The novels are NOT required instruction, which is why they are not listed on the district scope and sequence or curriculum guides. Secondary ELA trusts that teachers will preview material as part of their instructional planning to ensure appropriateness, as each class is unique. I have read both novels mentioned, but it is not best practice for an individual to make a district decision. That is why multiple teacher leaders and other departments were included in this process.


Jessica K. Rowell
Secondary ELA Specialist
Escambia County School District
(850) 469-5409 -- Office
" Literacy is a bridge from misery to hope." -- Kofi Annan

2.  **I again emailed downtown (with several copies to others):**
        On Fri, May 13, 2022 at 1:42 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
The bottom line is -- who actually read the books that were selected?  Did grade-level directors or Ms. White? Since you read them, wouldn't it have been helpful to at least have provided some sort of "language" rating or content list for the teachers to decide, etc.? Just as you trust that teachers will preview material as part of their instructional planning, the teachers trust that the resources you provide have also been previewed by those of you assisting with selections. If multiple teachers and other departments were included in this process, then it is evident that

many people are "passing the buck" to someone else to provide insight. Again, make this helpful and beneficial to teachers (as I have done with my email) by providing them with what to expect in language and content. This is how downtown can truly assist teachers with content, etc.  I also beg to differ with you about "an individual making a district decision." By providing various classroom sets of novels, the district has already made  the decision that these books are appropriate for high school students. That, in itself, is unbelievable to me, especially after reading some of this content.

**3.  I further added this to my email:**

On Fri, May 13, 2022 at 2:10 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:

Jessica,
Secondly, if you are saying you are NOT recommending these books, then why purchase them. If you ARE recommending these (as is evidenced because these were purchased for the students and teachers to use) then I wonder if the district is truly aware of some of the "pornographic" material held within. If the district is not aware, then why not? Before spending any funds on anything, shouldn't you know what you are purchasin? Blame this on committees, teams, whoever you want. It all goes back to providing legitimate resources and materials, purchased with tax payer funds, that teachers can definitely use within the classroom.
Let's go back to what you wrote about appropriateness. Do you think the district would back ANY teacher covering a book within his or her class about using sandwich bags as condoms? Apparently, they would have to since the district provided the books for the teachers. Perhaps our district should take note of what is going on in Walton County with this very thing.

**4.  Finally, I receive a response from the Director of Media Services, indicating that if I object to a book, I should fill out a form.**

On Fri, May 13, 2022 at 3:27 PM White, Michelle <MWhite5@ecsdfl.us> wrote:
Ms. Baggett,

As previously discussed you have the option of whether or not to use the titles in question as a part of your instruction and students are also given an opportunity to opt-out of any particular novel study.  If you feel that the titles in question should not be available for any teacher to use as a part of their instruction you may begin the "Formal Request for the Reconsideration of Educational Media" process.  The policy and form can be found on the School Libraries website:  https://ecsd-fl.schoolloop.com/school_libraries.  If you wish to proceed with this request, please fill out the form located on the website and submit it to your principal Mr. Sherrill.

Thank you,
Michelle

**5.  Again , my response to Ms. White:**

On Fri, May 13, 2022 at 8:40 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
Thank you. I will. My ultimate concern is -- am I the only person in this entire district questioning the fact that our district bought these books and made them available to teachers and

students (thereby actually putting a stamp of approval on them)? Who in the district read these books beforehand? Ms. Rowell has admitted to reading these two books that I have mentioned, but obviously decided her individual opinion was not important, or maye she felt the subject matter and language was age-appropriate. Did anyone else vet these books?

Did no one else on these so-called committees believe that these books should not even be considered for instruction? What type of instruction are we opting for? Can you confirm that there has not been a "Formal Request for Reconsideration of Educational Media" for either of these books, Do parents have this option as well because I will certainly let them know about it

6. **Ms. White's response to me:**
   On Mon, May 16, 2022 at 8:21 AM White, Michelle <MWhite5@ecsdfl.us> wrote:
   Ms. Baggett,

   The process for selecting the titles has been stated in previous emails and there have been no reconsideration requests for these titles.  As stated in the policy, any resident, employee, or parent of a student of the school district may raise objections.  Once the form has been submitted a committee will be formed to evaluate and make a decision.

   Thank you,
   Michelle

7. **My question yet again**
   **Baggett, Vicki <VBaggett@ecsdfl.us>** May 16, 2022, 8:33 AM (4 days ago)

   to Michelle, Jessica, Barbara, Gerry, Michael, Tracie, Timothy, Lesa, Steve, Brian

   My question again: WHO READ THESE BOOKS BEFOREHAND in order for them to be placed on a list for teachers to select?

   **Email concerning Book Distribution Books:**
   8.On Thu, May 19, 2022 at 9:06 AM Robinson, Alison <ARobinson2@ecsdfl.us> wrote:
   LIBRARY BOOK DISTRIBUTION
   Our superintendent, along with Michelle White, the director of Media Services, and our school board approved a book distribution to take place with all of our students. These are fiction and non-fiction titles, over 1300 in all, that are of high-interest to young adults. We just received these books and the turnaround is very tight. I will have a list of all students to highlight as they pick up the books they choose. They are not required to come or to pick out books if they are not interested. If you have any spare time in your classes, even if a small group of students wants to come, please send them starting today. they will be able to choose two at first, then probably an additional one as soon as everyone has had a chance to go through. Let me know if you have any questions.
   Alison

E-ECSD_PR 039404

Case 4:23-cv-00414-AW-MAF    Document 220-2    Filed 11/22/24    Page 117 of 216

 **Gmail**

Clean Books <cleanlibraries@gmail.com>

---

## 4 additional books

Clean Books <cleanlibraries@gmail.com>      Tue, May 14, 2024 at 6:27 PM
To: "Sanbornlt@santarosa.k12.fl.us" <Sanbornlt@santarosa.k12.fl.us>, "Michelle.Salzman@myfloridahouse.gov"
<Michelle.Salzman@myfloridahouse.gov>, "pedenst@santarosa.k12.fl.us" <pedenst@santarosa.k12.fl.us>,
"HeweyEA@santarosa.k12.fl.us" <HeweyEA@santarosa.k12.fl.us>, "mannydiaz@fldoe.org" <mannydiaz@fldoe.org>,
"barberk@santarosa.k12.fl.us" <barberk@santarosa.k12.fl.us>, "GovernorRon.Desantis@eog.myflorida.com"
<GovernorRon.Desantis@eog.myflorida.com>, "ElliottCW@santarosa.k12.fl.us" <ElliottCW@santarosa.k12.fl.us>,
"WitterR@santarosa.k12.fl.us" <WitterR@santarosa.k12.fl.us>, "ThorpeM@santarosa.k12.fl.us"
<ThorpeM@santarosa.k12.fl.us>, "BostonCN@santarosa.k12.fl.us" <BostonCN@santarosa.k12.fl.us>, "paul.burns@fldoe.org"
<paul.burns@fldoe.org>

Please find attached 6 books found in Santa Rosa County School libraries. These books contain numerous 847 violations,
including oral sex, masturbation, "grinding," "fingering, " etc.  Please choose better books. Thanks, Vicki Baggett/Sharon
White/ Sharon Regan

The Guest List
Rana Joon and the One and Only Now
I'm Glad My Mom Died
The Day of the Jackal (pictures)

---

**4 attachments**


20240514_181837 .jpg
981K


20240514_181855 .jpg
1244K


**Exhibit 10**

20240514_181846.jpg



1068K

20240514_181906.jpg

School: _Northview High School_

Requested Initiated By: _Vicki Baggett_

Telephone: ▮▮▮▮ Address: ▮▮▮▮

City: _Century_ State: _FL_ Zip code: _32535_

**Please Check Media Type**

X Book
___ Film
___ Videocassette

___ Periodical
___ Filmstrip
___ Record

___ Pamphlet
___ Cassette
___ Computer Software

___ Laser Videodisc
___ Kit
Other: ___

_Set 1_
_# 9_

Title: _Beyond Magenta_

Author: _Susan Kuklin_

Publisher or Producer: ___

1. Reasons for Objections: _Sexually explicit; LGBTQIA content_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _Yes_

3. What are the strengths of this educational media? _none_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _yes_

5. What do you believe is the purpose of this educational media? _total indoctrination_

6. For what age group would you recommend this educational media? _none_

7. Where was the educational media located in the school system? _Middle school & high school_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_ Date: _8-24-22_

Exhibit 11

# REQUEST FOR RECONSIDERATION OF EDUCATIONAL MEDIA

School: _Northview High School_

Requested Initiated By: _Vicki Baggett_

Telephone: ▨▨▨▨  Address: ▨▨▨▨

City: _Century_  State: _FL_  Zip code: _32535_

Set #3
#11

## Please Check Media Type

| | | |
|---|---|---|
| X Book | __ Film | __ Videocassette |
| __ Periodical | __ Filmstrip | __ Record |
| __ Pamphlet | __ Cassette | __ Computer Software |
| __ Laser Videodisc | __ Kit | __ Other: _____ |

Title: _GLBTQ_

Author: _Kelly Huegel_

Publisher or Producer: _____

1. Reasons for Objections: _indoctrination of LGBTQ_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _yes_

3. What are the strengths of this educational media? _None_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _yes_

5. What do you believe is the purpose of this educational media? _indoctrination_

6. For what age group would you recommend this educational media? _adults_

7. Where was the educational media located in the school system? _High School_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_  Date: _8-24-22_

Exhibit 12

**From:** Baggett, Vicki [VBaggett@ecsdfl.us]
**Sent:** 7/14/2022 8:52:38 PM
**To:** Kevin Adams [KAdams2@ecsdfl.us]
**Subject:** Fwd: Information
**Attachments:** Perks of Being a Wallflower Committee Decision.pdf; FinalBoardletter.pdf

Mr. Adams,
Please find attached the 4 to 3 vote to KEEP this novel as an optional classroom study for ANY teacher at Northview. My next step is to go to the Asst. Supt. of Curriculum, which I will do. Thanks for your assistance as well. I am also including excerpts that I sent you from my email on May 20.
Vicki Baggett

---------- Forwarded message ---------
From: **Sherrill, Michael** <MSherrill@ecsdfl.us>
Date: Thu, Jul 14, 2022 at 6:21 PM
Subject: Information
To: Vicki Baggett <VBaggett@ecsdfl.us>


Good Evening Mrs. Baggett,

Here is the information that I spoke to you about on the phone.  Please let me know if you have any questions, and I will include Michelle White's phone numbers.

(850) 595-0030 Ext. 290 and (850) 6967235

Thanks.


--
Michael Sherrill
Principal
Northview High School

**Exhibit 13**

# THE SCHOOL DISTRICT OF ESCAMBIA COUNTY
## LIBRARY MEDIA SERVICES
### School Materials Review Committee Recommendation

Attach Citizen's Request for Recommendation of Instructional Materials (Name of Form)

Author: Stephen  Chlosky  Title or Item: The Perks of Being a Wallflower

School: Northview High School                    School no. 1231  Date  7/13/22

1. Name and titles of School Review Committee Members:
    Name: Raja Atallah, Academic Advisor
    Name: Michael Sherrill , Principal
    Name: Megan Carroll, Librarian
    Name: Gerry Pippins, Assistant Principal
    Name: Wes Summerford, PE/Football Coach
    Name: Brandy White, Dean/Parent
    Name: Michelle White, Coordinator of Media Services

2. Meeting date(s), time(s) and location(s):

| Date | 6/13/22 | Time 8:00 a.m. | Location Northview High School |
|------|---------|----------------|--------------------------------|
| Date | 7/13/22 | Time 11:30 a.m. | Location Northview High School |

3. Committee recommendations:

The committee voted 4:3 recommending the novel remain as an optional title for a teacher to use as a class novel study for seniors at Northview High School.  The Justification for Use of Outside Media form will still need to be submitted to and approved by the school administration before use in the classroom . An approved letter must also be sent home for parent approval.

4. Reason(s):

The concerns raised in the complaint are part of the characters' development throughout the novel.  These concerns do not outweigh the potential discussions and literary value of the novel enough to remove it as an option for any teacher to use at Northview High School.  A teacher wishing to conduct a novel study with this title will still need to follow the ECSD guidelines and procedures for the use of outside media.

5. Next Steps:
The principal will inform the complainant, in writing, of the committee's decision.

The complainant may appeal the decision, in writing, to the Assistant Superintendent of Curriculum and Instruction.  A district committee will then be formed to evaluate the material.  The complainant shall have the right to proffer evidence for the committee's consideration that:

Any material used in a classroom, made available in a school library, or included on a reading list contains content that is pornographic or prohibited under s.847.012, F.S., is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level and age group for which the material is used.

Vicki Baggett
Northview High School
Escambia County, FL
Bratt, FL 32535

May 20, 2022

Dear Escambia County Board Members and Gov. Ron DeSantis:

It is after much deliberation that I send you the following email, but as a 30-year veteran high school English teacher, a mother, and a taxpaying citizen for this county and state, I will not remain silent.  What I see happening in the curriculum of public education is beyond alarming. It is sickening and abhorrent. First and foremost, I applaud you, Gov. DeSantis, for your push to eliminate all types of bias in curriculum.  Our children should never be subjected to any forms of one-sided indoctrination, especially under the guise of "education."  My purpose in writing this to you all today, however, is to bring your attention to a rather more obvious resource – and that is literature provided and offered at the high school level. (I cannot write about the middle school offerings because I have not researched their supplemental materials firsthand.)

Having a master's degree in English, I am very partial to literature, and this being my 30th year in the classroom, I was very eager to try our new My Perspectives Curriculum.  The program itself offers many supplemental materials for teachers, including online resources as well as worksheets, etc. Better yet, the curriculum and scope and sequence was certainly one with which I knew would work. Now, at the end of the year, however, a much larger problem has become evident, in my opinion.

With this new adoption of textbooks, our Language Arts Departments could receive classroom sets of one (1) novel for each grade level. With a list of over 700 books that our district could have chosen from, SOMEONE (I have asked who this someone was 4 times to my supervisor.) narrowed the list for English teachers down to about 4 or 5 per grade level. We were told to select books on the following criteria:  "1) had an objection/aversion to teaching, 2) already had multiple copies/class sets at your site, or 3) did not feel were appropriate content" (Jessica Rowell, English Supervisor, email). District-wide majority votes solidified one book per grade level for high schools.  Our selections were as follows, and we received 50 books of each to be an optional book study within our classes:
9th—"If I Stay"
10th—"The Fault in Our Stars"
11th—"Into the Wild"
12th—"Perks of Being a Wallflower"

I currently teach 11th grade honors English, 12th grade English, 12th grade honors English and Dual Enrollment at Northview High School. Within the past four weeks, my 11th grade students and I prepared to read, listen to the audio and discuss "Into the Wild," a true story about a young man who travels to Alaska and ultimately dies from starvation while there. I even ordered the movie for us to watch after we completed the book. The students were completely excited after I even showed them the trailer from the movie, indicating the plot of this book. I, for one, have

E-ESCD_PR 029236

never read this book and did not think that I needed to pre-read, since our district put their stamp of approval on this book (as well as the others) as a classroom set **(which legally means the district is encouraging and would back a teacher if he or she chose to use this book as a teaching tool in class).  Within minutes, my students and I are lambasted with the "F" word continuously. I had to constantly beep out the audio; however, the students simply skimmed over the bad words.

***I took the time to go through and show you which words were on which pages below.
**Explicit Language from "Into the Wild" by John Krakauer.**

Chapter 1: p. 6--"Hell";  "F--k"
Chapter 3: p. 17--"godd--n"; p. 18--"da-n"
Chapter 4: p. 26--"hell"; "sh-t"
Chapter 7: p. 62--"God---n";  "God---n"; p. 64--"hell"; "fu-k"; "bi--h"; "God--n"
        p. 65--"Get laid"; p. 66--"Godd--n"; p. 68--"da-n"
Chapter 8: p. 71--"da-n"" "dumbassedness";  p. 79--"sh-t"; p. 84--"hell"; "sh-t"; p. 84--"fu-kin"
Chapter 9: p. 96--"da-n"; "hell"
Chapter 10--p. 101--"Fu--yu"; "da-n"
Chapter 11--p. 116--"da-n"
Chapter 12--p. 118--"ass"; p. 125--"Fu--ing"
Chapter 15--p. 148--"ass"; p. 151--"fu--ed up"; (twice); "orgy"; p. 152--"making love";
        p.154--"fu--ing rest"
Chapter 17--p. 176--"hell"; p. 177-"hell"
Chapter 18--p. 189--"hell"


This situation with this book made me quickly grab the 12th grade classroom set that was purchased by my district **"Perks of Being a Wallflower" by Stephen Chbosky,** a book I had not begun yet with my 12th graders. Immediately I found that although this book had the "F" word many times, the explicit language was mild compared to the sexual content:

p. 12—"And I opened the door to the basement, and my sister and this boy were naked.  He was on top of her, and her legs were draped over either side of the couch."

p. 21—"I was with Sam. We were both naked. And her legs were spread over the sides of the couch. And I woke up. And I had never felt that good in my life."

p. 21—"Do you know what 'masturbation' is? I think you probably do because you are older than me. But just in case, I will tell you. Masturbation is when you rub your genitals until you have an orgasm. Wow!

p. 31—"She grabbed his penis with her hands and started moving it. I wish I could describe this a little more nicely without using words like penis, but that was the way it was. After a few minutes, the boy pushed the girl's head down, and she started to kiss his penis. She was still crying. Finally, she stopped crying because he put his penis in her mouth, and I don't think you can cry in that position."

E-ESCD_PR 029237

p. 44—When most people left, Brad and Patrick went into Patrick's room. They had sex for the first time that night. I don't want to go into detail about it because it's pretty private stuff, but I will say that Brad assumed the role of the girl in terms of where you put things."

p. 110—"Patrick kept making jokes that I would get an 'erection.' I really hoped this wouldn't happen. Once, I got an erection in class and had to go to the blackboard.

p. 158—"They start to make out. The stereo's playing, and they're just about to 'do it' when Parker realizes he forgot the condoms. They're both naked on this putting green. They both want each other. There's no condom. So, what do you think happened? …They did it doggie-style with one of the sandwich bags!"

p. 159—"There was a guy named Carl Burns and everyone called him C.B. And one day C.B. got so drunk at a party that he tried to "f—k" the host's dog.

p. 159—"And there was this guy they called 'Action Jack' because supposedly he was caught masturbating at a drunk party. .."

There is plenty of more about masturbation, beastialty, and sex in this book.  I hope you get my point.


As head of the English department at my school, I obtained the 9th and 10th grade classroom sets of novels and started reading. These books have major sexual themes and situations as well . The 10th grade book, **"The Fault in Our Stars"** references sodomy, Hazel who "screws everybody" and is "no longer a virgin" and plenty of profanity: Shi**ier (1,) Godd*** (5), Bada** (2), ba****ds (3), He** (2), sh** (6,) bi***(1), bullsh** (9), a** (2), A**hole (2), A**clown (1), Fu**ing (1).  The 9th grade book, **"If I Stay,"** is primarily loaded with "F" and "S—t" language, but it has a very provocative foreplay session between the two main characters, which implies orgasm with the ending of the pretend cello practice.

My question to our Governor and our Board Members, what is the purpose of any of this? Is this a concerted effort to pull our children into this type of behavior? This indecency? Of all of the books we have available to us, including other books of the 700 that our new textbook inventory provided, why were these chosen. Who chose them? No one will answer me, other than the media specialist who basically "passed the buck" on my question and suggest that I fill out a form to have these books removed. Was it her job to pre-read these? Was it the English supervisor's role?

No one can "censor" all books coming into a high school, but when books are purchased for as classroom sets for classroom usage, someone needs to be held accountable as to pre-reading these books. No one in my district will assume or admit to this responsibility, including Superindent Dr. Tim Smith, who has yet to answer any of my emails. Ms. Lesa Morgan, head of Secondary Education, however, just today, emailed me wanting to set up a meeting for Monday: "I am trying to schedule a meeting for Monday morning at Northview to include district level

staff and Northview administration to meet with you to discuss your concerns and questions" (Morgan, email).

### Are school board members responsible?

Yesterday, our staff and students were informed that thanks to our superintendent, Michelle White, the director of Media Services and our school board, a book distribution was to take place with all of our students. The students could choose from 1300 titles of high-interest books for young people. (See email in attached email list.) Imagine my surprise when a student returned to my class with a graphic novel entitled "The Girl from the Sea," which was a book encouraging secret lesbian relationships. (See pictures attached.)  When this student realized the content of this book, she quickly placed the book on my desk because she said her parents would be appalled. She said she wished she could now "undo seeing these pictures."



As a teacher, I have spent my life trying to encourage and uphold morality in pursuit of beneficial knowledge, but this is being sabotaged by my own school district, the one group I should be able to trust. Is this what we have become in public education.  What will happen when we have no teachers willing to stand in the gap for these students? I was informed I was the ONLY teacher in this district who had questioned these books. What does that say for any of us?

The four books mentioned above should have never been purchased as potential classroom sets. By doing so, this was a green light for any English teacher to use within his or her class. I shudder to think how parents would react to these books being used in class, and passing this off to the teacher to pre-read is another example of passing things on down the line. If that is the case, do we even need downtown departments? Teachers need trusted and tried resources. They need to know they can depend on those in the funnel to assist them. These books , including the graphic novel above, are not appropriate for classroom discussions or dissemination (with

pictures – how nice). Someone needs to be responsible for reading and vetting ALL resources that our taxpayers' monies purchase under the umbrella of education. If there is no time to do this, then do not purchase the materials. Do not expect teachers to pre-read everything thrown their way when most of us are already so buried under responsibilities to begin with.

Our kids deserve better. Florida deserves better. I hope that you can find a solution to this and truly discuss this with parents and teachers because I am sure this will soon be a hot topic (All of the graphic novels are now gone in our library.) I also hope you can get some communication from our superintendent and our district personnel, especially the main question I have: Who read these books and gave the green light for their purchase and use in the classroom? Not one person has answered that for me, and only two people have even responded to my email. Perhaps Ms. Morgan will do this on Monday, with her district-level associates in tow.  Will my own school board and governor help in this troubling situation and shirking of responsibility by my own school district?

Sincerely,

Vicki Gandy Baggett, M.A.T.

(Emails follow)

**Emails sent and received:**

**On May 13, I immediately emailed my English supervisor and copied this to others in the department and my principal, assistant principal, asking who made the ultimate decisions to purchase these books to be used as a potential classroom teaching tool. (See below)**

On Fri, May 13, 2022 at 12:47 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
Since I was told that the ELA downtown department did not pre-read the books before ordering classroom sets for teachers to use, I thought I would send you the language breakdown by chapter for this book by Jon Krakauer called "Into the Wild." This way, teachers who are considering using this in their classes will not be blindsided and can get parental approval ahead of time. I really thought and assumed that was something you did for the teachers, since you are so vetted into our classroom curriculum and books. I am personally very disappointed in this part of the curriculum that you did not address. The below is from "Into the Wild" that was ordered (You said based on teachers' suggestions) for the 11th grade. I found 20 minutes without students during my planning period one day and tried to pre-read some of "Perks of Being a Wallflower," the book you ordered for 12th grade. After reading about "blow jobs" and how a young couple sneaked out one night to have sex, but because they forgot condoms, they used plastic sandwich bags instead, I decided to scrap that book as well. As for me and mine, we will stick with the

E-ESCD_PR 029240

classics and with age-appropriate literature that will not cause my students and their parents to wonder about this teacher's integrity. Thank goodness my own children were never subjected to this when they were in high school, even as individual required reading.

1.  **The response I received was that teachers voted on the books; however, my English supervisor admitted she had read both of these two books.**

On Fri, May 13, 2022 at 1:19 PM Rowell, Jessica <JRowell@ecsdfl.us> wrote:
Good afternoon,

I am unsure as to where to begin, as there are a few inaccuracies regarding the procedure for book selection provided in your account. I have included Lesa Morgan and Michelle White in my response, as they were part of this process.

Upon adoption of Savvas as the ELA Core curriculum, the Secondary ELA Department shared the list of novels that accompanied our purchase with our Literacy Leaders. Novels listed were separated by which grade-level and instructional unit they supported. The instructions provided to each Literacy Leader was to work with your site-based team to eliminate novels that you 1) had an objection/aversion to teaching, 2) already had multiple copies/class sets at your site, or 3) did not feel were appropriate content. If any title was struck through from a school site, it did not make the ballot that was sent to all teachers for final selection. Once the ballots were cast, the titles that received the highest percentage of votes were sent to the grade-level directors and Michelle White for further consideration and review.

The novels are NOT required instruction, which is why they are not listed on the district scope and sequence or curriculum guides. Secondary ELA trusts that teachers will preview material as part of their instructional planning to ensure appropriateness, as each class is unique. I have read both novels mentioned, but it is not best practice for an individual to make a district decision. That is why multiple teacher leaders and other departments were included in this process.

Jessica K. Rowell
Secondary ELA Specialist
Escambia County School District
(850) 469-5409 -- Office
" Literacy is a bridge from misery to hope." -- Kofi Annan

2.  **I again emailed downtown (with several copies to others):**

On Fri, May 13, 2022 at 1:42 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
The bottom line is -- who actually read the books that were selected? Did grade-level directors or Ms. White? Since you read them, wouldn't it have been helpful to at least have provided some sort of "language" rating or content list for the teachers to decide, etc.? Just as you trust that teachers will preview material as part of their instructional planning, the teachers trust that the resources you provide have also been previewed by those of you assisting with selections. If multiple teachers and other departments were included in this process, then it is evident that

many people are "passing the buck" to someone else to provide insight. Again, make this helpful
and beneficial to teachers (as I have done with my email) by providing them with what to expect
in language and content. This is how downtown can truly assist teachers with content, etc. I also
beg to differ with you about "an individual making a district decision." By providing various
classroom sets of novels, the district has already made the decision that these books are
appropriate for high school students. That, in itself, is unbelievable to me, especially after
reading some of this content.

**3.  I further added this to my email:**

On Fri, May 13, 2022 at 2:10 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:

Jessica,
Secondly, if you are saying you are NOT recommending these books, then why purchase them.
If you ARE recommending these (as is evidenced because these were purchased for the students
and teachers to use) then I wonder if the district is truly aware of some of the "pornographic"
material held within. If the district is not aware, then why not? Before spending any funds on
anything, shouldn't you know what you are purchasin? Blame this on committees, teams,
whoever you want. It all goes back to providing legitimate resources and materials, purchased
with tax payer funds, that teachers can definitely use within the classroom.
Let's go back to what you wrote about appropriateness. Do you think the district would back
ANY teacher covering a book within his or her class about using sandwich bags as condoms?
Apparently, they would have to since the district provided the books for the teachers. Perhaps
our district should take note of what is going on in Walton County with this very thing.

**4.  Finally, I receive a response from the Director of Media Services, indicating that if I
     object to a book, I should fill out a form.**
On Fri, May 13, 2022 at 3:27 PM White, Michelle <MWhite5@ecsdfl.us> wrote:
Ms. Baggett,

As previously discussed you have the option of whether or not to use the titles in question as a
part of your instruction and students are also given an opportunity to opt-out of any particular
novel study.  If you feel that the titles in question should not be available for any teacher to use
as a part of their instruction you may begin the "Formal Request for the Reconsideration of
Educational Media" process.  The policy and form can be found on the School
Libraries website:  https://ecsd-fl.schoolloop.com/school_libraries.  If you wish to proceed with
this request, please fill out the form located on the website and submit it to your principal Mr.
Sherrill.

Thank you,
Michelle

**5.  Again , my response to Ms. White:**
      On Fri, May 13, 2022 at 8:40 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
Thank you. I will. My ultimate concern is -- am I the only person in this entire district
questioning the fact that our district bought these books and made them available to teachers and

students (thereby actually putting a stamp of approval on them)? Who in the district read these books beforehand? Ms. Rowell has admitted to reading these two books that I have mentioned, but obviously decided her individual opinion was not important, or maye she felt the subject matter and language was age-appropriate. Did anyone else vet these books?

Did no one else on these so-called committees believe that these books should not even be considered for instruction? What type of instruction are we opting for? Can you confirm that there has not been a "Formal Request for Reconsideration of Educational Media" for either of these books, Do parents have this option as well because I will certainly let them know about it

6. **Ms. White's response to me:**
   On Mon, May 16, 2022 at 8:21 AM White, Michelle <MWhite5@ecsdfl.us> wrote:
   Ms. Baggett,

   The process for selecting the titles has been stated in previous emails and there have been no reconsideration requests for these titles. As stated in the policy, any resident, employee, or parent of a student of the school district may raise objections. Once the form has been submitted a committee will be formed to evaluate and make a decision.

   Thank you,
   Michelle

7. **My question yet again**
   **Baggett, Vicki <VBaggett@ecsdfl.us>**  May 16, 2022, 8:33 AM (4 days ago)

   to Michelle, Jessica, Barbara, Gerry, Michael, Tracie, Timothy, Lesa, Steve, Brian

   My question again: WHO READ THESE BOOKS BEFOREHAND in order for them to be placed on a list for teachers to select?

   **Email concerning Book Distribution Books:**
   8.On Thu, May 19, 2022 at 9:06 AM Robinson, Alison <ARobinson2@ecsdfl.us> wrote:
   LIBRARY BOOK DISTRIBUTION
   Our superintendent, along with Michelle White, the director of Media Services, and our school board approved a book distribution to take place with all of our students. These are fiction and non-fiction titles, over 1300 in all, that are of high-interest to young adults. We just received these books and the turnaround is very tight. I will have a list of all students to highlight as they pick up the books they choose. They are not required to come or to pick out books if they are not interested. If you have any spare time in your classes, even if a small group of students wants to come, please send them starting today. they will be able to choose two at first, then probably an additional one as soon as everyone has had a chance to go through. Let me know if you have any questions.
   Alison

E-ESCD_PR 029244

**From:**       Baggett, Vicki [VBaggett@ecsdfl.us]
**Sent:**       8/8/2022 7:56:40 AM
**To:**         Kevin Adams [KAdams2@ecsdfl.us]
**Subject:**    Fwd: Another one that I will fill the form out for as well.
**Attachments:** Set 1 of several sets.docx

I was just emailed that this list will go directly to Michelle White. I will have a new list later this week.

---------- Forwarded message ---------
From: **Baggett, Vicki** <VBaggett@ecsdfl.us>
Date: Fri, Aug 5, 2022 at 3:38 PM
Subject: Re: Another one that I will fill the form out for as well.
To: Smith, Timothy <tsmith@ecsdfl.us>

Here is the first set of novels that I have checked and found within our libraries in this district. All of these on this list need to be reviewed for extremely questionable content. All of these listed are part of media collections; however, some teachers have used these as classroom sets in the past. I will have another list next week. Do I need to send this list to Michelle White as well, since you can consider this a request for a review of all of these on this list? Please advise.
Thanks, Vicki

On Thu, Aug 4, 2022 at 9:10 PM Smith, Timothy <tsmith@ecsdfl.us> wrote:
Ms. Baggett,

If you would, please send me all of the concerning titles you have identified thus far. From this point forward, you need to only address those emails to me. I will respond accordingly. When you do send the list, please indicate if the book is part of a class set or part of the media center collection.

There has been a significant level of complexity added to this matter. I speculate these titles have been in our collections for some time and now we have a formal process in place that will take time to implement. I too am concerned about the content you have identified. If I am correct, our process to review the first book is approaching.

Tim Smith, Ed.D.
Superintendent
Escambia County School District

On Thu, Aug 4, 2022 at 3:17 PM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
Mr. Marcanio,

Here is another book I found that our district provides in our high school libraries. I am filling out the form for this one today as well. We have a serious problem in this district. I am working as hard as I can, but we need accountability. Someone needs to be responsible for reading these books before purchasing and providing for children.



**Exhibit 14**

This book shows explicit sex acts, positions, sodomy, incest, sex abuse and molestation. Below is from the chapter called "Losing My Virginity Twice."

*"There was so much excitement running through my body. This was much more than losing my virginity. For once, I was consenting to the sexual satisfaction of my body. This moment also confirmed that sex could look how I wanted it to look. And that it could be passionate and kind, but most importantly, fun and satisfying. His body felt great in my mouth.*

*"I came up after a while and kissed him again. We both got up and went into his bedroom, where we got completely naked. He took off his clothes and immediately lay on his stomach. I then took off my shirt, and then my boxer briefs. I got behind him. There was moonlight coming through the shades of the dark room. Two Black boys under the glow of blue moonlight. How poetic, dare I say ironic?*

*"Now, I was scared as hell. One, because I didn't know what I was doing and clearly, he did. Two, because it was still college, and my fear of word getting out that I was inexperienced or bad in bed would have been too big of a campus rumor. Let alone that I was having sex with men and a friend of someone in my chapter.*

*"For the first few minutes, we dry humped and grinded. I was behind him, with my stomach on his back as we kissed. After a few minutes of fun and games, he got up and went to his nightstand, where he pulled out a condom and some lube. He then lay down on his stomach. I knew what I had to do even if I had never done it before. I had one point of reference, though, and that was seven-plus years of watching pornography. Although the porn was heterosexual, it was enough of a reference point for me to get the job done.*

*"I remember the condom was blue and flavored like cotton candy. I put some lube on and got him up on his knees, and I began to slide into him from behind. I tried not to force it because I imagined that it would be painful; I didn't want this moment to be painful. So I eased in, slowly, until I heard him moan.*

*"As we moved, I could tell he was excited—I was, too, but the pride in me told me not to show it. I felt like I was in control and proud of myself for getting it right on the first try—all the while still being nervous. I wanted to stay dominant in that moment. We went at it for about fifteen minutes before I started to get that feeling. Weakness in the legs, numbness in the waist. I finally came and let out a loud moan—to the point where he asked me to quiet down for the neighbors. I pulled out of him and kissed him while he masturbated. Then, he also came.*

*"That night was glorious. I had conquered a fear and had sex with a man on my own terms. The years of suppressing my identity and not dating or kissing had all come down to this one magical night in an apartment on the outskirts of Richmond, Virginia. I didn't want to leave, and he didn't make me. I did, however, get up to make a phone call to one of my line brothers. I left him a voicemail saying that I had finally had sex."*

Set 1 of several sets

Provided by Vicki Baggett on August 5, 2022

English Teacher @ Northview High School

List of Books that should be evaluated based on explicit sexual content, graphic language, themes, vulgarity and political pushes that Escambia County, Florida currently has available in school libraries. Many of these books have already been removed from shelves in several other Florida counties and in other states. The ones listed below have been confirmed through "DESTINY" to be available at our schools. I will be providing several sets of book titles as I go through various books in question. I am an avid reader, but my extensive English background (Masters in English) has allowed me to read all sorts of novels, including all listed below. (HS)—high school; (MS)—middle school; (ES)—elementary school

1. The Absolutely True Diary of a Part-Time Indian by Sherman Alexie- (MS) and (HS)—bullying; racism; vulgar language; violence
2. Ace of Spades by Abike-Iyimide, Faridah (MS) and (HS)—Sexual obscenities; suicide; language; abuse; LGBTQ themes
3. A Court of Mist and Fury by Sarah J. Maas (HS)—predatory sexual behavior; rape glorification; graphic sexual scenes
4. A Court of Frost and Starlight by Sarah J. Maas (HS)—predatory sexual behavior; rape glorification; graphic sexual scenes
5. A Court of Wings and Ruin by Sarah J. Maas (HS)—predatory sexual behavior; rape glorification; graphic sexual scenes
6. All Boys Aren't Blue by George M. Johnson (HS)—extreme sexual content; violent language; disturbing scenes
7. And Tango Makes Three by Justin Richardson (ES)—political gay agenda about two gay penguins who "fall in love" and who adopt
8. Angus, Thongs and Full-Frontal Snogging by Georgia Nicolson (HS)—Crude language; explicit sex; LGBTQ content
9. Beyond Magenta by Susan Kuklin (MS) and (HS)—sexually explicit; LGBTQ1A content
10. Black Girl Unlimited: The Remarkable Story of a Teenage Wizard by Echo Brown (HS)—Explicit language; racial division and white grievances
11. Boy2Girl by Terence Blacker (HS)—Transgenderism; sexualizes children
12. The Black Flamingo by Dean Atta (HS)—sexualizes children; transgenderism
13. Forever by Judy Blume (HS)-graphic sexual content
14. The Handmaid's Tale by Margaret Atwood (HS)-
15. The Hate U Give by Angie Thomas—(MS)—age inappropriate; totally anti-cop agenda
16. Hear These Voices: Youth at the Edge of the Millennium by Anthony Allison (HS)—sexually explicit told in story form
17. The House of Spirits by Isabel Allende (HS)—explicit sexual content
18. Infandous by Elana K. Arnold- (HS)-rape, incest, obscenities, graphic sex; detail sex scenes between husband and wife and then daughter and father

19. Lucky by Alice Sebold—(HS)-graphic sexual content
20. Speak by Laurie Halse Anderson- (HS)—graphic content; biased against males
21. Me and Earl and the Dying Girl by Jesse Andrews (HS)—explicit sexual content and language
22. New Kid by Jerry Craft (ES) and (MS) and (HS)—full of woke agenda; anti-whiteness
23. The Nowhere Girls by Amy Reed (HS)—graphic sex
24. Out of Darkness by Ashley Perez (HS)—graphic depictions of abuse and sexual scenes; anal sex
25. The Poet X by Elizabeth Avevedo (MS) and (HS)—Sexual activity; masturbation themes; abuse
26. Ready or Not (All-American Girl Series) by Meg Cabot (MS) and (HS)—sexual content; graphic language and sexual scenes; entire story line is ready for sex or not
27. Thirteen Reasons Why by Jay Asher (MS)—raping, bullying; suicide scenes
28. Push by Sapphire (HS)—graphic sexual content
29. Red Hood by Elana K. Arnold-(HS)- rape, incest, vulgar language
30. Sorted: Growing Up, Coming Out, and Finding My Place by Jackson Bird (HS)—Pushing transgenderism
31. Stamped from the Beginning: The Definitive History of Racist Ideas in America by Ibram X Kendi—(HS)—marginalizes only white people but claims to marginalize all people
32. What Girls Are Made Of-(HS)-extreme sexual content
33. The 1619 Project—by Nicole Jones (MS)—This book is still in our district even though it has already been banned in Florida because of factual errors in American history, especially those related to slavery.

E-ECSD_PR 000150

**From:**       Adams, Kevin [KAdams2@ecsdfl.us]
**Sent:**       8/31/2022 9:19:36 AM
**To:**         Baggett, Vicki [VBaggett@ecsdfl.us]
**Subject:**    Re: Book question

I don't know, sooner or later we will have a chance to see how our board will vote on this type of situation.  We can definitely have books that you and I see as unsatisfactory, but a majority on a  committee or board says is okay.

On Wed, Aug 31, 2022 at 9:49 AM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
  This is incredible to me. I wonder if the new board member would be a friend to us in this area.

 On Wed, Aug 31, 2022 at 8:02 AM Adams, Kevin <KAdams2@ecsdfl.us> wrote:
   Vicki,

   Thanks for checking.

   St. John's seems to have a good process with a district wide committee that provides a recommendation to the Superintendent, who then forwards the recommendation to the board.

   St. John board is majority Republican, but the vote was 3-2 to keep the book in circulation with restrictions.

   Book debate: St. Johns County school district keeps 8 books, some with restrictions

   https://www.staugustine.com/story/news/education/2022/08/27/st-johns-county-school-board-keeps-8-books-restricts-some/7896620001/

   On Wed, Aug 31, 2022, 5:39 AM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
     Good morning,
     Fortunately, we do not have "The Book is Gay" in our school district; however, we have 54 books that are marked under the keyword "transgender" available for all school levels (elementary, middle and high). Several of these I have put on my list submissions, including "Beyond Magenta," by Susan Kuklin which has explicit scenes of a 6-year-old child (sexually abused) performing oral sex on older men and deciding he likes it.  "From six up, I used to kiss other guys in my neighbourhood, make out with them, and perform oral sex on them. I liked it. I used to love oral. And I touched their you-know-whats. We were really young but that's what we did."  The account goes on to describe paedophiles masturbating. The author does not qualify that the acts were harmful or illegal.

     I am so concerned about all of this. I am already working on my 4th list. It is extensive. We need a house-cleaning of all libraries in this country. I have currently been requested to share my lists with Santa Rosa County, which I have gladly done. They seem to be more aggressive that we are being.
     Vicki


     On Tue, Aug 30, 2022 at 10:31 PM Adams, Kevin <KAdams2@ecsdfl.us> wrote:
       Vicki,

       When you have time please check and verify if we have this book in our system.  Thanks, Kevin



E-ECSD_PR 047063

https://www.theflstandard.com/book-in-tampa-middle-school-library-has-instructions-on-anal-sex-and-hookup-apps/

E-ECSD_PR 047064

**From:** Adams, Kevin [KAdams2@ecsdfl.us]
**Sent:** 10/10/2022 6:26:01 AM
**To:** Baggett, Vicki [VBaggett@ecsdfl.us]
**Subject:** Re: Process for Challenging Education Media Materials

Thanks for the quick feedback and all you do for our kids!

On Mon, Oct 10, 2022 at 7:17 AM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
I just finished going through the proposal. I believe this is excellent, and I wish we would have had this all along. My only concern:
on p. 11, D 1. and D. 3--Final selection for library content rests with Media Specialists, and in #3 with principals. What will happen when this is not followed? One thing I have found in doing all of the research on these books is that you CANNOT depend on book summaries and the fact that they may have won some awards. Many times, even the simple summaries of the books provided to librarians do NOT tell the true story about what is inside.  Just as teachers are responsible for what they ultimately bring into their classes, I really hope media specialists and principals realize they are totally responsible for what is allowed in the library.

Secondly, I appreciate the fact that we have done away with the school-level committee. That is useless and too time-consuming. If a book is not fit for one school, it isn't fit for any in our district.

I submitted an additional 10 books on Friday, and I noticed on the online Media section for our district, that another parent has submitted a few as well. I am glad our area is making this a priority.
Thank you for your feedback, also, in doing what is decent and right for our next generation.
Vicki

On Mon, Oct 10, 2022 at 5:58 AM Adams, Kevin <KAdams2@ecsdfl.us> wrote:
Thank you!

On Mon, Oct 10, 2022 at 6:12 AM Baggett, Vicki <vbaggett@ecsdfl.us> wrote:
Looking at it now. Will have comments to you shortly.

On Sunday, October 9, 2022, Adams, Kevin <KAdams2@ecsdfl.us> wrote:
Vicki,

Please review the attached proposed new policy that will be discussed in the morning workshop and provide any concerns, or suggested edits.

Thank you,
Kevin L. Adams, Chair
Escambia County School Board Member, District 1
Office:  (850) 469-6137
Cell:  (850) 449-8692
Fax:  (850) 469-6273
75 North Pace Boulevard
Pensacola, FL  32505

Under Public Records Florida law, virtually all written communications to or from School District Personnel are public records available to the public and media upon request. E-mail sent or received on the School District system will be considered public and will only be withheld from disclosure if deemed confidential pursuant to State or Federal Law.

**Exhibit 16**

| | |
|---|---|
| **From:** | Baggett, Vicki [VBaggett@ecsdfl.us] |
| **Sent:** | Mon 4/24/2023 1:41:32 PM (UTC) |
| **To:** | Fetsko, Paul [PFetsko@ecsdfl.us] |
| **Subject:** | Re: Alabama News |

You're welcome!

On Mon, Apr 24, 2023 at 8:28 AM Fetsko, Paul <PFetsko@ecsdfl.us> wrote:

> Thank you for sharing this information with me and the other Board members.
>
> On Mon, Apr 24, 2023 at 6:17 AM Baggett, Vicki <VBaggett@ecsdfl.us> wrote:
>
>> *Dear Board Members, Superintendent and Other Staff:*
>>
>> *Thought I would send this to you, in case you had not heard about it.
>> Thanks for holding the line and doing what is right for our children. Be
>> encouraged.*
>>
>> *Vicki Baggett*
>>
>>
>> *From:* Maiola, Gina <Gina.Maiola@governor.alabama.gov>
>> *Sent:* Friday, April 21, 2023 2:12 PM
>> *Subject:* Update from Governor Kay Ivey: Alabama Department of Early
>> Childhood Education
>>
>>
>>
>> Good afternoon:
>>
>>
>>
>> Last week, it was brought to the Administration's attention that there
>> was concerning content in a pre-K educator resource book, content that is
>> simply not in line with what the Ivey Administration or the people of
>> Alabama stand for or believe.
>>
>>
>>
>> Immediately, Governor Ivey sought review and upon confirming with the
>> Alabama Department of Early Childhood Education (ADECE) that this book is,
>> in fact, a book distributed in this state, the governor directed ADECE
>> Secretary Barbara Cooper to send a memo to disavow this book and to
>> immediately discontinue its use.
>>
>>
>>
>> Governor Ivey has made the decision to have a change in leadership at the
>> department and accepted Dr. Cooper's resignation immediately. Governor Ivey
>> remains appreciative for her service to the state and passion for early
>> childhood education. In addition to expanding service to the number of
>> four-year-olds, Dr. Cooper has helped put an increased focus on students in
>> lower-performing areas and has even been a champion for computer science

Exhibit 17

>> education in the state. However, Governor Ivey strongly believes that woke
>> concepts have no place at any level of education in the state of Alabama
>> and should not be taking away from the overall mission of improving
>> educational outcomes for students.
>>
>>
>>
>> Governor Ivey issued the following statement:
>>
>>
>>
>> "The education of Alabama's children is my top priority as governor, and
>> there is absolutely no room to distract or take away from this mission. Let
>> me be crystal clear: Woke concepts that have zero to do with a proper
>> education and that are divisive at the core have no place in Alabama
>> classrooms at any age level, let alone with our youngest learners. We want
>> our children to be focused on the fundamentals, such as reading and math.
>>
>>
>>
>> "Alabama's First Class Pre-K is the best in the country, and those
>> children are at too critical of a juncture in their educational journeys
>> and development to get it wrong. I remain confident in the wonderful
>> teachers we have in pre-K classrooms around our state and in the necessity
>> of our children receiving a strong start to their educational journeys in
>> our First Class Pre-K program. I thank Dr. Cooper for her service, but I
>> believe it is best we continue this historically strong program on its
>> forward trajectory under new leadership." *– Governor Kay Ivey*
>>
>>
>>
>> Dr. Jan Hume will serve as the interim secretary of the ADECE while
>> Governor Ivey makes a decision on a permanent secretary to lead the
>> department in the immediate future.
>>
>>
>>
>> ---
>>
>>
>>
>> For added context on some of the governor's concern that this resource
>> book contained a woke agenda, the book invokes ideas for teachers that
>> there are "larger systemic forces that perpetuate systems of White
>> privilege" or that "the United States is built on systemic and structural
>> racism." Also included for four-year-olds to learn is that "LGBTQIA+ need
>> to hear and see messages that promote equality, dignity and worth." The
>> glossary includes equally disturbing concepts that the Ivey Administration
>> and the people of Alabama in no way, shape or form believe should be used
>> to influence school children, let alone four-year-olds.
>>
>>
>>
>> Governor Ivey does not stand for these concepts. For as long as she is
>> governor, Alabama will be focused on ensuring our students are receiving a
>> quality education.

>>
>>
>>
>> Gina Maiola
>>
>> *Communications Director*
>>
>>
>>
>> Office of Governor Kay Ivey
>>
>> 600 Dexter Avenue • Montgomery, AL • 36130
>>
<https://www.google.com/maps/search/600+Dexter+Avenue+%E2%80%A2+Montgomery,+AL+%E2%80%A2+36130+Office:+334?entry=gmail&source=g>
>>
>> Office: 334
>>
<https://www.google.com/maps/search/600+Dexter+Avenue+%E2%80%A2+Montgomery,+AL+%E2%80%A2+36130+Office:+334?entry=gmail&source=g>-242-0493
>> • Fax: 334-242-4495
>>
>>
>>
>> Gina.Maiola@governor.alabama.gov
>>
>> https://governor.alabama.gov
>>
> --
>
> THIS RESPONSE IS INTENDED SOLELY FOR THE ADDRESSEE LISTED.  FORWARDING
> THIS EMAIL TO ANY OTHER BOARD MEMBER IS EXPRESSLY PROHIBITED.
>

**And Tango Makes Three by Justin Richardson**
**Board Appeal**
**February 20, 2023, 5:30 pm**

**Table of Contents**

| Item | Page |
|------|------|
| **Appeals** | |
| Appeal to School Board | Pg. 2-7 |
| District Materials Review Committee Decision | Pg. 8-13 |
| Request for Reconsideration | Pg. 14 |
| Additional Input for Committee Consideration | Pg. 15-18 |
| **Relevant Florida State Statutes** | |
| HB 7, HB 1557, FS 847.012, FS 847.001 | Pg. 19-20 |
| HB 1557 Clarification in State's Motion to Dismiss – Equality Florida Lawsuit | Pg. 21-24 |
| **ECPS Board Policy** | |
| ECPS School Board - School Library Media Center and Other Educational Media Policy | Pg. 25-37 |
| **Professional Reviews and School/Community Input** | |
| Professional Reviews | Pg. 38-40 |
| School Library Advisory Council Input | Pg. 41-62 |
| Community Input | Pg. 63 |
| **District Materials Committee Documents** | |
| Committee Member Review Form (to be completed prior to decision meeting) | Pg. 64-66 |
| Sample Ballot | Pg. 67 |



ECSD000020



Jan. 20, 2023

Escambia County, Florida School Board Members
Pensacola, FL

RE:  Appeal to "And Tango Makes Three" and "When Aidan Became a Brother"

Please consider this an appeal to a District Materials Review Committee Decision, dated Jan. 11, 2023. Florida's HB 1557 Parental Rights in Education Bill reinforces the innate right of parents in regards to the care and upbringing of their children, even in the public school setting. Among other aspects of the bill, classroom instruction on sexual orientation, gender identity or racial bias in kindergarten through Grade 3 or in a manner that is not age appropriate or developmentally appropriate for children is strictly prohibited, and a "parent of a student may bring an action against a school district to obtain a declaratory judgment that a school district procedure or practice violates this paragraph and seek injunctive relief" through monetary awards.

A book called "And Tango Makes Three"  and another one called "When Aidan Became a Brother" have passed the District Material Review Committee to be left in elementary schools, based on a District Policy 9.A.3.a,c,d,e – which includes  (a)"Nurture the development of recreational/listening/viewing, cultural appreciation, and aesthetic values;"  (C)"Foster respect for diverse roles available to all people in today's society; "  (d)"Provide education media that reflects differing and/or opposing viewpoints;" and (e) "Provide a comprehensive collection appropriate to the library media center."

**"And Tango Makes Three"**

For **"And Tango Makes Three,"** the committee further writes that "This story does not push LGBTQA+ agenda. The mention of 'love' between penguins is made by the zookeeper. The act of egg care of by both male and female chinstrap penguins, so the 'pair of males' warming the egg is still within categorically correct behavior."  Further, the committee notes that "This is a cute book about real life events . . . The act of being 'in love' itself is not, in my [no reference as to who **MY** is], harmful to the well-being of minors." Some comments from committee members include, "How do you know the penguins are gay? They could just be best friends. . . Having 2 (sic) same sex parents is not considered abnormal in our society."

Escambia County's Destiny Program has the following information about "And Tango Makes Three" under "Overview."

"At New York City's Central Park Zoo, **two male penguins fall in love** and start a family by taking turns sitting on an abandoned egg until it hatches." Destiny also lists a related subject of "**Homosexuality**" up under this book. (**See Images #1 and #2**).

Further it is noted, several quotes from this book indicate there is a relationship between the two male penguins: "They did not spend much time with girl penguins . . . Instead Roy and Silo wound their necks around each other."  Also, the zookeeper's comment of "They must be in love" solidifies the idea of sexual alternatives, and clearly identifies the author's purpose. Just as a child cannot know what is in a book until he or she reads it, a school district is tasked with assisting parents who believe it is their

==responsibility and not a school's responsibility to introduce alternate sexualities to their younger children at an appropriate time , thus protecting their innocence until they are more mature.==

### "When Aidan Became a Brother"

For **"When Aidan Became a Brother,"** some committee members have written that the overall purpose, theme or message of the material is for "encouraging and accepting transgender children," and "to promote understanding and acceptance of transgender people," while another member has written that it is "suitable for older readers."  With direct excerpts ranging from "everyone thought he was a girl . .. and he wore clothes that other girls like wearing . . . but Aidan didn't feel like any kind of girl. He was really another kind of boy"  to sentences like "It took everyone some time to adjust, and they learned a lot from other families with transgender kids like him," the author's intent is clear, but this is true only for more mature readers. Most young children cannot even understand the ideas being presented. Again, even Escambia County's Destiny program reveals this book is about "Aidan, a transgender boy . . " (See Image #3) with related subjects below, which include "**transgender people**" (See Image #4).

**Clearly, this is an open admission as to the type of book (in this case, these two books), the district has made available to elementary students in our district, even those in K-3. Whether I, or you agree or disagree with this availability is not the task at hand. The issue is should this book be made available to younger students in our schools, based on HB 1557?**

### Conclusion

I am certain as School Board members, you understand the mammoth task you have of deciding what is considered developmentally or age-appropriate for students, accurately regarding standards established by the state.  The state law must govern if this book is to remain in hands-reach of K-3 students. According to Florida Statute 1006.28 (2)(b) any material used in a classroom, made available in a school library, or included on a reading list . . . and is not suited to student needs and their ability to comprehend the material presented, should be considered for removal. The issue here is instructional material vs. individual optional material; however, that answer is simple:  **Students MUST read a library book in order to know what it is about; therefore, for younger students, there is no prior warning of the message in a book, unless parents are aware of content ahead of time and can delay the introduction of this book until the child is older.** Individual library check out or perusing option cannot be used as an argument for younger children, when they are too young to base their decisions on their parents' wishes. We, as a district, do not have a rating system for books, especially regarding HB 1557. Perhaps that is an option our district could consider for parents who choose to interpret Florida's Parental Rights Law as applying to school libraries as well.

Opinions on alternate lifestyles are irrelevant. Our school district must draw a clear line on what is acceptable and unacceptable content for K-3, using the State Parental Rights Bill as a legal guide.

**See illustrations on next pages.

ECSD000022



**Image #1**—"And Tango Makes Three"

ECSD000023



**Image 2**--From Escambia County Destiny's Website showing Related Subjects for "And Tango Makes Three."

ECSD000024

From "When Aidan Became a Brother"



**Image #3**—"When Aidan Became a Brother"



**Image 4**--Escambia County Destiny Program, Related Subjects for "When Aidan Became a Brother"

ECSD000026

# Escambia County Public Schools
## District Materials Review Committee Decision

**Attach Request for Reconsideration of Educational Media**

**Author**: Justin Richardson        **Title or Item**: And Tango Makes Three

**Material Type:** Elementary library book

1. **District Committee Review Committee**

   1 elementary media specialist, 1 elementary administrator, 1 elementary teacher, 1 elementary parent, 1 community member

2. **Meeting date(s), time(s) and location(s):**

   11/28/22      5:30 pm - 6:30 pm      Spencer Bibbs

   1/4/23         5:00 pm - 6:00 pm      Spencer Bibbs

3. **Committee Decision (will stand for 1 year unless appealed to the ECSD School Board)**

   The committee voted 5:0 recommending that And Tango Makes Three by Justin Richardson be available in all elementary, middle, and high school ECPS libraries.

4. **Committee Comments Regarding the Titles:**

   **Could this work be considered offensive in any way due to:**

   Manner characters are presented

   **Are questionable elements of this work an important part of the overall development of the story or text?**

   Yes

   This book discusses penguin behaviors found in nature.

   The whole story is about the male penguins who live together.  If you took away that element there is literally no story.

   No

2022-2023 Item 1.7, "And Tango Makes Three"                    Page 1 of 6

## Escambia County Public Schools
### District Materials Review Committee Decision

I found NO evidence of LGBTQ indoctrination.  How do you know the penguins are gay? They could just be best friends. This story does not have any offensive sexual behavior and it does not encourage excessive interest in sexual matters.  Having 2 same sex parents is not considered abnormal in our society.  Many of the students in our district have same sex parents.

There are no questionable elements in the story.  This is based on a true story about penguins.

**This work is most suitable for which grades?**

PK - 5, K-5

**Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience?**

Yes

The fact that this couple (2 male penguins) hatch and care for an egg/baby penguin is unique.  Tolerance of differences of others. Scientific facts about penguins. Problem/resolution.

Literary - helps us understand those around us.  Scientifically - this is a true story.

Animal behavior.  Scientific fact 2 male penguins will hatch and raise an egg.

This is a nonfiction story about penguins. The art is relevant to the story.

**What is the overall purpose, theme or message of the material?**

It shows how people/animals can work together to care for others.  Not all families are the same, but all have love. Facts about penguins and community.

There is no "one size fits all" family.  Our county population reflects this.  You don't need to agree with someone to respect them.

This book was written to tell about how penguins hatch their offspring.  It explains to readers that hatching the egg (keeping it warm) is a shared responsibility of both parents.

2022-2023 Item 1.7, "And Tango Makes Three"    Page 2 of 6
Board Appeal, And Tango Makes Three    Pg. 9 of 67
February 20, 2023

ECSD000028

# Escambia County Public Schools
## District Materials Review Committee Decision

Creatures taking care of each other.

**Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience?**

Yes

The story and illustrations are easy for children to understand and would hold their attention.  The information covered is age appropriate.

There is nothing sexual about the book.  It uses simple words.  It's not lengthy or preachy.

The concept of penguins hatching their eggs is done in a simplistic manner with beautiful illustrations.

The story is easy to read. The pictures enhance the story.

**Are illustrations appropriate for the suggested audience's developmental age?**

Yes

**Will reading or listening to this work result in a more compassionate understanding of human beings?**

Yes

Teaches compassion for those who are not exactly like those around us.  Shows that everyone (penguins) has love to give.

Everyone is different. The ending even explains that the original parents of the egg were not adequately able to care for it.  There are many lessons here.

This story lets students know that animals also work together as a community to raise their young.  The zookeeper found an egg that needed to be cared for and he gave it to Roy and Silo. They took care of the egg and it hatched.

Humans should care for neglected or abandoned children in the same way Silo and Roy cared for Tango.

2022-2023 Item 1.7, "And Tango Makes Three"                    Page 3 of 6

ECSD000029

# Escambia County Public Schools
## District Materials Review Committee Decision

**Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups?**

Yes

Appreciation of minority groups or different cultures.

We respect everyone regardless of their circumstances.

The book shows compassion toward a penguin that has no one to care for it. People should care for each other as well.

**NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state education standards?**

Yes

Animal behavior

The book supports caring for others.

**Additional Thoughts:**

You keeping your child from checking out a book is not going to change their sexual orientation.

Legistation:

HB 7 - N/A, not part of any curriculum, only contained in the self-selected titles section.

HB 1557 - Equality Florida vs Ron Desantis, No. 4:22-cv-134-AQ-MJF PAGE 19/60 - "No one should think that HB 1557 prohibits incidental references in literature to a gay or transgender person or to a same-sex couple. Such references, without more, are not "instruction on" those topics.

FS 847.012 - N/A, does not qualify under FS 847.001 definitions "Harmful to minors"

ECSD000030

## Escambia County Public Schools
### District Materials Review Committee Decision

District Policy 9.A.3.a,c,d,e - Meet the personal needs and interests of students, including materials that:

.a. Nurture the development of recreational/listening/viewing, cultural appreciation, and aesthetic values;
c. Foster respect for the diverse roles available to all people in today's society
d. Provide education media that reflects differing and/or opposing viewpoints; and
e. Provide a comprehensive collection appropriate to the library media center

District Policy 9.C.2,4,6 - It is the duty of the District to provide a wide range of materials of different levels of difficulty, with diversity of appeal and representing different points of view taking into account the varied interests ,abilities, and maturity levels of the pupils being served. The utilization of any specific item in educational media does not necessarily mean that the school or the District advocates or endorses the contents of the item.

> 2. Provide materials for teachers and students that will stimulate growth in knowledge, literacy appreciation, aesthetic values and ethical standards;
> 4. Provide education media that reflects differing and/or opposing viewpoints;
> 6. Provide age-appropriate materials in multiple genres to encourage students to read for pleasure and information.

This story does not push LGBTQA+ agenda. The mention of "love" between penguins is made by the zookeeper. The act of egg care of by both male and female chinstrap penguins, so the "pair of males" warming the egg is still within categorically correct behavior.

This piece of literature can help to promote acceptance of non-traditional family settings. Bearing in mind, this is a dramatization of actual events. There is no push for an agenda or mention of normalizing this behavior.

This is a cute book about real life events. It does not "opine" or say one thing is better than another. The act of being "in love" itself is not, in my opinion, harmful to the well being of minors.


5. **Next Steps**

The Assistant Superintendent of Curriculum and Instruction will inform the complainant, in writing, by certified US mail, of the committee's decision.

# Escambia County Public Schools
## District Materials Review Committee Decision

The complainant may appeal the decision to the School Board. The appeal must be made in writing to the Superintendent within ten (10) days of receipt of notification of the district-level committee decision.

A decision on the complaint will be made at the next regularly scheduled Board meeting unless the request for appeal is filed within fourteen (14) days of the Board meeting.  In that instance, the matter will be heard at the following regular Board meeting.

The Board shall review all evidence and materials presented at the district committee level. If the complainant wishes to proffer additional evidence, it must be presented to the Superintendent no less than eight (8) days prior to the meeting at which the matter will be heard.

The complainant will be afforded the opportunity to offer additional arguments in support of their position.

The public shall be afforded an opportunity to comment before the Board makes a final decision.

The Board reserves the right to use outside expertise if necessary to help in its decision making.

The Board decision will be final, and the Superintendent will implement the decision.

Decisions on reconsidered materials will stand for five (5) years before new requests for reconsideration of those items will be entertained.

School: _____ Northview High School _____

Requested Initiated By: _____ Vicki Baggett _____

Telephone: ▓▓▓▓▓▓▓▓▓ Address: ▓▓▓▓▓▓▓▓▓

City: _____ Century _____ State: _FL_ Zip code: _32535_

### Please Check Media Type

| | | |
|---|---|---|
| X Book | ____ Film | ____ Videocassette |
| ____ Periodical | ____ Filmstrip | ____ Record |
| ____ Pamphlet | ____ Cassette | ____ Computer Software |
| ____ Laser Videodisc | ____ Kit | Other: ____ |

*Set I*
*# 7*

Title: _____ And Tango Makes Three _____

Author: _____ Justin Richardson _____

Publisher or Producer: _____

1.    Reasons for Objections: _____ LGBTQ agenda using penguins _____

2.    Have you read, viewed, and/or listened to the entire educational media to which you object? _____ Yes _____

3.    What are the strengths of this educational media? _____ None _____

4.    Are you aware of the judgment of this educational media by literary and authoritative critics? _____ Yes _____

5.    What do you believe is the purpose of this educational media? _____ Indoctrination _____

6.    For what age group would you recommend this educational media? _____ None _____

7.    Where was the educational media located in the school system? _____ elementary schools _____

8.    On what date(s) was the material utilized for instruction? _____ N/A _____

Signature of Complainant: _Vicki Baggett_    Date: _8-24-22_

Board Appeal, And Tango Makes Three
February 20, 2023

Pg. 14 of 67

ECSD000033

Complainant input as noted in submitted list #1
8/5/22

7. And Tango Makes Three by Justin Richardson (ES)—political gay agenda about two gay penguins who "fall in love" and who adopt

ECSD000034

Superintendent Dr. Tim Smith
Kevin Adams
Steve Marcanio
Michelle White
Gov. DeSantis

Nov. 16, 2022

### RE: Additional Evidence for K-5 picture books

Please find below additional evidence to consider in the removal of "And Tango Makes Three," by Justin Richardson, "When Aidan Became a Brother," by Kyle Lukoff, "When Wilma Rudolph Played Basketball" by Mark Weakland, "Stella Brings the Family," by Mirian Schiffer, and "Draw Me a Star," by Eric Carle.

Florida's House Bill 1557 states that "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through Grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." Florida's CRT bill prohibits indoctrinating students based on race, especially for primary and elementary students.

Without question, common sense must prevail when dealing with what is made available to children, especially those who are at our youngest grade levels (primary and elementary). Personal opinions are irrelevant. The bottom line is, according to law, if a K-3 classroom teacher has books in his/her classroom that question gender or sexual orientation, then those books must be removed, or the teacher is in jeopardy or being fired or losing his/her certification. If there is a book that might make a child feel guilt based on his or her race or gender, then the book should be removed. Media Specialists are charged with overseeing this process. The same is true for the books in the library. Our libraries are an extension of our classrooms. Legally, anything that is in the library is fair game for classroom usage, including read-alouds by the teacher or guests. If that is not the case, then our district is implying that we are offering books that CANNOT be read aloud in the classroom, whether because of content or language.

The library is actually the classroom for the Media Specialist; therefore, if the Media Specialists allow books that openly violate state and federal law, then should not these employees be held accountable for books in their domain, just as regular classroom teachers? Media Specialists have been made aware of these books, as have the school administrators, district committees, school board, and superintendent. However, it is not simply up to the Media Specialists – especially not when those above that position have responsibility for what is in the facility as well.

According to Florida Statute 1006.28 (2)(b) any material used in a classroom, made available in a school library, or included on a reading list . . . and is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level and age group for which the material is used, should be reviewed and potentially removed based on particular content, including pornography, religious or racial bias, historical inaccuracies, etc. The above books violate the K-3 provisions for sexual orientation availability, gender/race guilt or shaming, and inappropriate graphic pictures. Even if these books (and others which violate the same criteria) are indeed removed from a

ECSD000035

classroom teacher's personal library, young children, who are naïve and inexperienced, could still be exposed to the above ideas while browsing in the library, etc. School employees, District employees and our School Board are indeed held accountable with protecting the innocence of children.

### "And Tango Makes Three"

"Two penguins in the penguin house were a little bit different . . . they were both boys. They didn't spend much time with the girl penguins. . . Instead Roy and Silo wound their necks around each other. Their keeper, Mr. Gramzay, noticed the two penguins and thought, 'They must be in love.' They took care of their egg. Out came their very own baby. Now Roy and Silo were fathers. We will call her Tango because it takes two to make a Tango. Tango was the very first penguin in the zoo to have two daddies."

### When Aidan Became a Brother

"When Aidan was born, everyone thought he was a girl. His parents gave him a pretty name. His room looked like a girl's room. And he wore clothes that other girls like wearing." (p. 1)

"But Aidan didn't feel like any kind girl. He was really another kind of boy." (p. 5)

"It took everyone some time to adjust, and they learned a lot from other families with transgender kids like him." (p. 6)

"Are you having a boy or a girl?" asked a lady. Aidan didn't like it when people asked if he was a boy or girl, and he hoped the baby couldn't hear yet. He was glad when Mom just smiled and said, "I'm having a baby." (p. 12)

### When Wilma Rudolph Played Basketball

"As she grew older, Wilma realized how difficult life was for most African-Americans. She saw racial discrimination everywhere. Segregation meant that black people couldn't do the same things as white people. They had to use separate drinking fountains and bathrooms. They even had to sit at the backs of buses. . . . 'There's something not right about all of this,' Wilma thought. 'White folks got all the luxury, and we black folks got the dirty work.' Wilma became determined to do something other than serve white people."

### Stella Brings the Family

"But Stella had two dads. Everyone else had a mother. Howie had two!

'Daddy and Papa read stories to me,' said Stella. . . 'I get lots of kisses when I'm hurt. Either from Papa or Daddy or Nonna or Aunt Gloria or Cousin Lucy . . . '

ECSD000036

The party was better than Stella had imagined. Howie came with his two moms, and Jonathan brought his grandmother while his mom was away. Stella had the biggest crowd of all. . . Papa was a big hit."

### Draw Me a Star

This book was submitted because of a picture of a naked man and woman that might be considered questionable and graphic. This is an art-type book, but it is found in our district's elementary libraries, not an art classroom. The nudity outlines are obvious and may be deemed age- inappropriate for primary and elementary students, especially according to state law regarding graphic images.



ECSD000037

## Legislative Guide Relating to the Use of Instructional and Library Materials

<u>HB 7</u> - **Individual Freedom**

(3) The Legislature acknowledges the fundamental truth that all persons are equal before the law and have inalienable rights. Accordingly, instruction and supporting materials on the topics enumerated in this section must be consistent with the following principles of individual freedom:

(a) No person is inherently racist, sexist, or oppressive, whether consciously or unconsciously, solely by virtue of his or her race or sex.

(b) No race is inherently superior to another race.

(c) No person should be discriminated against or receive adverse treatment solely or partly on the basis of race, color, national origin, religion, disability, or sex.

(d) Meritocracy or traits such as a hard work ethic are not racist but fundamental to the right to pursue happiness and be rewarded for industry.

(e) A person, by virtue of his or her race or sex, does not bear responsibility for actions committed in the past by other members of the same race or sex.

(f) A person should not be instructed that he or she must feel guilt, anguish, or other forms of psychological distress for actions, in which he or she played no part, committed in the past by other members of the same race or sex. Instructional personnel may facilitate discussions and use curricula to address, in an age-appropriate manner, how the freedoms of persons have been infringed by sexism, slavery, racial oppression, racial segregation, and racial discrimination, including topics relating to the enactment and enforcement of laws resulting in sexism, racial oppression, racial segregation, and racial discrimination, including how recognition of these freedoms have overturned these unjust laws. However, classroom instruction and curriculum may not be used to indoctrinate or persuade students to a particular point of view inconsistent with the principles of this subsection or state academic standards.

(4) The State Board of Education shall develop or adopt a curriculum to inspire future generations through motivating stories of American history that demonstrate important life skills and the principles of individual freedom that enabled persons to prosper even in the most difficult circumstances. This curriculum shall be known as "Stories of Inspiration" and made available to schools to implement the requirements of subsection (3).

<u>HB 1557</u> - **Parental Rights in Education**

3. Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards.

ECSD000038

**FS 847.012 Harmful materials; sale or distribution to minors or using minors in production prohibited; penalty.**

(3)  A person may not knowingly sell, rent, or loan for monetary consideration to a minor:

(a)  Any picture, photograph, drawing, sculpture, motion picture film, videocassette, or similar visual representation or image of a person or portion of the human body which depicts nudity or sexual conduct, sexual excitement, sexual battery, bestiality, or sadomasochistic abuse and which is harmful to minors; or

(b)  Any book, pamphlet, magazine, printed matter however reproduced, or sound recording that contains any matter defined in s. 847.001, explicit and detailed verbal descriptions or narrative accounts of sexual excitement, or sexual conduct and that is harmful to minors.

(5)  An adult may not knowingly distribute to a minor on school property, or post on school property, any material described in subsection (3). As used in this subsection, the term "school property" means the grounds or facility of any kindergarten, elementary school, middle school, junior high school, or secondary school, whether public or nonpublic. This subsection does not apply to the distribution or posting of school-approved instructional materials that by design serve as a major tool for assisting in the instruction of a subject or course by school officers, instructional personnel, administrative personnel, school volunteers, educational support employees, or managers as those terms are defined in s. 1012.01.

**FS 847.001 Definitions, "Harmful to minors"**

(7)  "Harmful to minors" means any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:

(a)  Predominantly appeals to a prurient, shameful, or morbid interest;

(b)  Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; **and**

(c)  Taken as a whole, is without serious literary, artistic, political, or scientific value for minors.

ECSD000039

https://www.orangecta.com/z/-
vf.0.0.0.23796.C6A1A2951FFE19DE117A38D9CB26910549695296054420EA5591C9D93F801FD3

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**EQUALITY FLORIDA**, et al.,

    *Plaintiffs,*

    v.                                        No. 4:22-cv-134-AW-MJF

**RON DESANTIS**, in his official capacity
as Governor of Florida, et al.,

    *Defendants.*

_____/

## STATE DEFENDANTS' MOTION TO DISMISS
## AND INCORPORATED MEMORANDUM OF LAW

H.B. 1557—Florida's Parental Rights in Education bill—was enacted in response to reports that some public-school officials were concealing from parents information about the sexual orientation and gender identity of their children. Once it takes effect, the bill will safeguard parents' right to direct the upbringing of their children by requiring, among other things, that public-school officials notify parents of changes in the mental health and well-being of their children and encourage children to discuss sensitive matters with their parents.

Plaintiffs challenge a provision of H.B. 1557 that removes the subjects of "sexual orientation" and "gender identity" from Florida's public-school curricula for kindergarten through the third grade and, after that, leaves teachers free to instruct on those subjects in a manner that is "age-appropriate [and] developmentally

1

ECSD000040

developmentally appropriate instruction." Memo from J. Oliva to School District Superintendents, *House Bill 1557, Parental Rights in Education, School District Responsibilities*, FLORIDA DEPARTMENT OF EDUCATION at 1 (June 6, 2022), https://info.fldoe.org/docushare/dsweb/Get/Document-9559/dps-2022-68.pdf.

Contrary to Plaintiffs' assertions, the curricular restriction for Florida's youngest public-school children, which does take effect July 1, is not discriminatory. The statute limits classroom instruction on "sexual orientation or gender identity." Nothing in that language "aims at sexual orientations and gender identities that differ from heterosexual and cisgender identities." ECF 47 ¶ 15 (emphasis omitted). To the contrary, instruction on "the normalcy of opposite-sex attraction" would equally be "instruction on sexual orientation." *Id.* ¶ 11. The statute is neutral on the proscribed subjects.

Plaintiffs denounce the curricular restriction as giving rise to "a host of" purportedly "intractable interpretive questions." ECF 47 ¶ 116. But the many "questions" Plaintiffs posit flow from their misreading of the statute. There is no merit, for example, to the suggestion that the statute restricts gay and transgender teachers from "put[ting] a family photo on their desk" or "refer[ring] to themselves and their spouse (and their own children)." *Id.* ¶ 8. Those actions are not "instruction," which is "the action, practice, or profession of teaching," *Instruction, Merriam-Webster's Dictionary* (last visited June 26, 2022), https://www.merriam-

17

webster.com/dictionary/instruction; *Instruction*, *American Heritage Dictionary* 666 (2d ed. 1985) (defining "instruction" as "[t]he act, practice, or profession of instructing"); *id.* (defining "instruct" as "[t]o furnish with knowledge; teach"); *Instruction*, *Webster's New International Dictionary* 1288 (2d ed. 1957) (defining "instruct" as "[]to impart knowledge to, esp. methodically; to teach"), much less "classroom" instruction. For the same reason, the statute does not prohibit intervention against LGBTQ bullying, participation in extracurricular activities (such as "Gay-Straight Alliances" or books fairs), and even after-hours tutoring, ECF 47 ¶¶ 8, 118–19, 121, 184, among many other examples. That is not "classroom instruction" covered by the statute.

Even "classroom instruction" is limited only if it is "*on* sexual orientation or gender identity." H.B. 1557 § 1 (emphasis added). In that familiar grammatical structure, the preposition "on" "indicate[s] the subject of study, discussion, or consideration." *Merriam-Webster's Dictionary* (last visited June 26, 2022), https://www.merriam-webster.com/dictionary/on; *American Heritage Dictionary* 868 (defining "on" as "[c]oncerning; about," as in, "a book on astronomy") (emphasis omitted); *Webster's New International Dictionary* 1701 (defining "on" as "[i]ndicating the subject"). The bill thus restricts *instruction* on particular *subjects* (sexual orientation and gender identity), not mere discussion of them. Consistent with that view, the Legislature rejected a restriction on "encourag[ing]

18

ECSD000042

classroom discussion about" the prescribed subjects in favor of a limited restriction on "classroom instruction." *Compare* An Act Relating to Parental Rights, CS/HB1557 (Jan 21, 2022), *with* H.B. 1557 § 1.

The statute thus leaves teachers free to "respond if students discuss . . . their identities or family life," "provide grades and feedback" if a student chooses "LGBTQ identity" as an essay topic, and answer "questions about their families." ECF 47 ¶¶ 8, 120. For kindergarten through grade three, they simply must not handle these situations by teaching the subjects of sexual orientation or gender identity. And like other subject-matter education, that is most naturally understood in terms of the underlying concepts. For example, teaching quadratic functions is quintessential "instruction on mathematics." So too here, "instruction on sexual orientation or gender identity" would include teaching an overview of modern gender theory or a particular view of marriage equality. But just as no one would suggest that references to numbers in a history book constitute "instruction on mathematics," no one should think that H.B. 1557 prohibits incidental references in literature to a gay or transgender person or to a same-sex couple. *Id.* ¶ 8. Such references, without more, are not "instruction on" those topics. Nor are "refer[ences] to a student's 'mom' and 'dad'" "instruction on" cisgender identity or heterosexual orientation. *Id.* ¶ 11. Such references could be to a person of any sexual orientation or gender identity.

19

ECSD000043

deposited in the District school fund and added to the District appropriation for instructional materials.

9.    School Library/Media Center and Other Educational Materials

In accordance with F.S. 1006.28(2)(d), the School Board shall establish and maintain a program of school library media services for all public schools in the district, including school library/media centers, or school library/media centers open to the public, and, in addition, such traveling or circulating libraries as may be needed for the proper operation of the district school system.

The media specialist will stay informed about appropriate new publications, by using multiple sources, such as discussions with colleagues, attendance at conferences, and reading a variety of periodicals and book reviews. The media specialist will also receive and consider suggestions or requests brought forward by other faculty, students and parents/guardians. Potential new books for the school library media center and reading lists will be evaluated to determine if they would be suitable for student needs and whether they would be appropriate for the intended grade level and age group. In considering possible new acquisitions, the media specialist will consult reputable, professionally recognized reviewing periodicals and school community stakeholders. The media specialist will also assess the level of student interest in the subject(s) presented and the ability of students to comprehend the material. Books that are selected must be free of pornography and material prohibited under F.S. 847.012. After evaluation, the media specialist will inform the principal of those books that have been evaluated and are approved for inclusion in the collections. The procedure for developing library media center and reading list collections will be posted on the website for each school in the District.

A wide choice of materials that support the instructional program shall be available to students and professional staff to allow for varying achievement levels, free choice reading interests, and teaching/learning styles. Materials should be available in a variety of formats and reading levels, offer a well-balanced coverage of subjects, and support the diverse interests, needs, and viewpoints of the school community.

School librarians, media specialists, and other personnel involved in the selection of school district library materials must complete a training program developed pursuant to F.S. 1006.29(6) before reviewing and selecting age-appropriate materials and library resources.

Upon written request, the District shall provide access to any materials or book specified in the request that is maintained in the school library and is available for review. The school principal shall arrange a convenient time to provide such access.

A.    Purpose of the Library/Media Center Materials

The library/media center shall contain a comprehensive collection of materials and equipment in a variety of media formats to:

1.    provide a broad background of information resources in all areas of knowledge; and

ECSD000044

2. support the general educational goals of the District and the objectives of specific courses, including materials that represent diverse points of view.

3. Meet the personal needs and interests of students, including materials that:

   a. nurture the development of recreational/listening/viewing, cultural appreciation, and aesthetic values;

   b. represent the many religious, racial, ethnic, linguistic, and cultural groups in our society and reflect their contributions to the heritage and culture of our civilization;

   c. foster respect for the diverse roles available to all people in today's society;

   d. provide education media that reflect differing and/or opposing viewpoints; and

   e. provide a comprehensive collection appropriate for the users of the library media center.

4. Support the professional needs of teachers and administrators; and

5. Introduce new instructional strategies into the learning environment.

B. Student Access to Library/Media Center Collections

Parents have the right to determine what they believe is and is not appropriate reading material for their student. Parents will be given the opportunity to choose Open Access, Limited Access, or No Access to the library/media center collection. The access will be noted in the Student Information System and in the Library Catalog.

Parents of middle school students, grade six (6) through eight (8) shall also have the opportunity to opt in for their student to have access to the "young adult" section in the library/media center. The access will be noted in the Student Information System and the Library Catalog.

C. Objectives of Selection

The primary objective of educational media is to implement, enrich, and support the educational program of the District; its secondary function is to contribute to the development of informed and responsible citizens. It is the duty of the District to provide a wide range of materials of different levels of difficulty, with diversity of appeal and representing different points of view taking into account the varied interests, abilities, and maturity levels of the pupils being served. The utilization of any specific item in educational media does not necessarily mean that the school or the District advocates or endorses the contents of the item.

ECSD000045

To this end, the School Board of the Escambia District affirms that school library media centers shall:

1. provide a comprehensive collection of instructional materials that will support the curriculum;

2. provide materials for teachers and students that will stimulate growth in knowledge, literacy appreciation, aesthetic values, and ethical standards;

3. provide information that will enable students to make intelligent decisions and to understand the consequences of their decisions;

4. provide education media that reflects differing and/or opposing viewpoints;

5. provide materials which reflect the ideas and beliefs of the many ethnic, religious, and political groups that have contributed to the American and world heritage and culture; and

6. provide age-appropriate materials in multiple genres to encourage students to read for pleasure and information.

D. Responsibility for Selection of Materials

Selection of educational media is a continuous process which involves teachers, administrators, lay persons, other instructional personnel, and students as appropriate.

1. The responsibility for coordinating the selection process and making the final selection for library-media materials rests with the school library media specialist who holds a valid educational media specialist certificate.

2. Beginning January 1, 2023, school library media specialists, and other personnel involved in the selection of school district library materials must complete the online training program developed by the Florida Department of Education prior to reviewing and selecting age-appropriate materials and library resources.

3. School principals are responsible for overseeing compliance with school district procedures for selecting school library media materials.

4. Teachers are responsible for fully reviewing and evaluating outside media that will be used as classroom curriculum material.

5. Final selection of classroom curriculum material shall be the responsibility of the principal or principal's designee.

E. Evaluation and Selection of Library/Media Center Materials

ECSD000046

In addition to supporting the curriculum, the school library/media center affords students the opportunity to explore areas of interest and thought not covered by the prescribed curriculum; therefore, it should contain materials that allow for free inquiry, study, and evaluation. The selection process may include consultation with school administrators, other teachers, students, and parents/guardians to assure a comprehensive collection appropriate for users of the library/media center. School principals are responsible for overseeing compliance with school district procedures for selecting school library/media center materials at the school to which they are assigned.

1.  Each book made available to students through a school district library/media center or included in a recommended or assigned school or grade level reading list must be selected by a school district employee who holds a valid educational media specialist certificate, regardless of whether the book is purchased, donated, or otherwise made available to students.

2.  Each new title purchased to be available to students through a district library/media center must be presented to the school's Library Advisory Council for input. The Library Advisory Council shall be comprised of at least the school's media specialist, two teachers, one parent and one community member. The principal will ensure the committee is representative of the school community.

3.  Materials placed in media collections shall meet the criteria set forth in Section 1006.40(3)(d) F.S. The process of evaluating materials for inclusion in collections is continuous and systematic. Selections are based upon consultation with reputable professionally recognized reviewing periodicals and school community stakeholders. Materials for inclusion shall be considered according to the following criteria:

    a.  First consideration is given to the need of the individual school based on:

        i.   reader interest;

        ii.  support of state academic standards and aligned curriculum;

        iii. existing collection;

        iv.  academic needs of students and faculty; and

        v.   requests from users of the collection (administrators, faculty, parents/guardians, students) are given high priority.

    b.  Materials for purchase are considered on the basis of overall purpose, timeliness, importance of the subject matter, quality of writing or production; readability and popular appeal; authoritativeness; reputation of the author, artists, publisher, producer, format; and cost.

    c.    In the selection of educational media, special consideration is given to the following:

        i.    Ideologies: factual information on any ideology or philosophy present in society;

        ii.    Profanity: the fact that profanity appears in media does not automatically disqualify a selection. Care is taken to exclude media using profanity in a lewd or detrimental manner;

        iii.    Religion: factual unbiased media which represents all major religions;

        iv.    Science: theories and factual information about scientific knowledge appropriate to the age level for which it is intended;

        v.    Sex: pornographic, sensation, or titillating media are not included, but the fact of sexual incidents appearing in the media does not automatically disqualify them.

            No book or other materials containing pornography shall be used or be available in the District as prohibited by Section 847.012, F.S.;

        vi.    Sex education: factual information appropriate for the age group or related to the school curriculum; and

        vii.    Stereo-type and sex biases: educational media shall be freed from stereo-type and sex biases.

    4.    Each school must publish on its website, in a searchable format prescribed by the Florida Department of Education, a list of all materials maintained in the school library/media center.

    5.    Each elementary school must publish on its website, in a searchable format prescribed by the Florida Department of Education, a list of all required school or grade level reading lists.

D.    Discontinuation of Library Media Materials

    Personnel holding responsibility for evaluation and selection of educational media should reexamine materials periodically to ensure they continue to meet selection criteria. Objective criteria for removing materials include:

    1.    condition of material (worn and damaged);

    2.    duplication of seldom-used materials;

    3.    obsolescence and/or inaccuracy of information;

    4.    inappropriate content based on age interest level;

ECSD000048

5.    lack of circulation;

6.    supersession of serial materials; and

7.    alignment to state academic standards and relevancy to curriculum; and

8.    required removal pursuant to s. 1006.28(2)(a)2., F.S.

10.    Challenged Materials

Objections Regarding Non-Adopted Instructional, Library/Media Center and/or other Educational Material.

Challenged materials may be removed from use only after the following procedures have been completed in sequence.

Interested citizens may challenge materials being used in a school according to procedures established by the Board and published in the Challenged Materials document on the Media Services website.

A.    Reconsideration of Challenged Media

1.    The School District of Escambia County supports the principles of freedom of speech and the right to a redress of grievances inherent in the First Amendment of the United States as well as appropriate Federal and State Statutes, and subsequent court decisions that have been rendered.

2.    Any parent/guardian or resident of the county of the school district may raise objections to resources used in the educational program despite the fact that the individuals selecting such resources were duly qualified to make these selections and observed the criteria for selecting resources.

3.    No parent, guardian or resident of the county has the right to determine the reading, viewing or listening resources for students other than their own children.

4.    Access to Materials Under Review

a.    Any material challenged on the basis that it contains content that is pornographic or prohibited under F.S. 847.012 shall be placed in a Restricted Access Area of the Library/Media Center until a decision has been made by the District Materials Review Committee or Board. Parent/Guardians may grant permission for their student to check out the material by completing the Permission to Access Restricted Materials form located on the Media Services website and submitting the completed form to the student's school administrator.

b.    The Superintendent, in consultation with the Coordinator of Media Services, shall retain the right to make a determination that a challenge lacks sufficient facts to support a preliminary

ECSD000049

finding that the material contains content that is pornographic or prohibited under F.S. 847.012. In such case, the challenged material will remain in circulation during the review process.

 c. All other challenged material will remain in circulation during the pendency of the review process. Parents may at any time opt their child out of all materials currently under review which remain in circulation. See section 9.B. Student Access to Library/Media Center Collections.

5. A decision to sustain a challenge shall not be interpreted as a judgment of irresponsibility on the part of the professionals involved in the original selection and/or use of the resource. Professional personnel shall not be punished or have their employment affected by decisions reached by the District Materials Review Committee or the Board.

B. Procedures for Reconsideration of Materials

Objections to some materials may be voiced by the public not withstanding the care taken in the selection process and despite the qualifications of persons selecting materials. If a complaint is made, the following procedures should be observed:

1. Inform the complainant of the selection procedures and make no comments.

2. All concerns shall be presented in writing on a printed Reconsideration of Educational Media form that is available through the principal of the school or the District website. A complainant who does not complete and return the form shall receive no consideration.

3. These procedures shall be followed for reconsideration:

 a. The completed Request for Reconsideration of Educational Media forms are submitted to the school principal or to the Coordinator of Media Services.

 b. The principal shall notify the Assistant Superintendent of Curriculum and Instruction and the Coordinator of Media Services.

 c. The availability of the challenged materials is changed to "Restricted Status" in the Library Catalog and placed in an area not accessible by students. Parent/Guardians may grant permission for their student to check out the material by completing the Permission to Access Restricted Materials form located on the Media Services website and submitting the completed form to the student's school administrator.

 d. Information regarding the challenge shall be posted on the Media Services website for additional public input.

ECSD000050

e.    A District Materials Review Committee shall be appointed by the Assistant Superintendent of Curriculum and Instruction to review the appeal.

f.    The District Materials Review Committee shall be comprised of five or more members to include community members, school administrators, teachers, parents/guardians, and media specialists of the same level(s) of school(s) containing the title. The District Materials Review Committee reserves the right to use outside expertise if necessary to help in its decision making.

g.    School Library Councils of the same level(s) of school(s) containing the title in question shall be given the opportunity to provide input for the District Materials Review Committee to consider.

h.    Challenged materials shall be read and re-evaluated by the District Materials Review Committee considering the specific objections. In the deliberations of challenged materials, the District Materials Review Committee shall consider the educational philosophy of the school district, the professional opinions of other teachers of the same subject and other competent authorities, reviews of the materials by reputable bodies, input from School Library Advisory Councils of the same level(s) of school(s) containing the title, the teacher's own stated objectives in using the materials, public input, and the objection of the complainant.

i.    The complainant shall have the right to proffer evidence, in a written format, for the District Materials Review Committee's consideration that:

      i.    An instructional material does not meet the criteria of s. 1006.31(2), F.S., or s. 1006.40(3)(d), F.S., if it was selected for use in a course or otherwise made available to students in the school district but was not subject to the public notice, review, comment, and hearing procedures under s. 1006.283(2)(b), F.S.

      ii.   Any material used in a classroom, made available in a school library, or included on a reading list contains content that is pornographic or prohibited under s. 847.012, F.S., is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level and age group for which the material is used.

j.    The District Materials Review Committee will make its decision determined by the simple majority to retain the item in the collection without restriction, move the resources to a different level, or remove the resources. This will be a secret ballot vote; however, all ballots must be maintained as public records.

ECSD000051

k.    The Assistant Superintendent of Curriculum and Instruction shall receive a written report concerning the District Materials Review Committee's decision.

l.    The Assistant Superintendent of Curriculum shall inform the complainant, in writing, by certified US mail, of the District Materials Review Committee's decision.

m.    District Materials Review Committee decisions on reconsidered materials will stand for one (1) calendar year before new requests for reconsideration of those items will be entertained, unless the decision is appealed and overturned at a higher level.

n.    The District Materials Review Committee's decision shall apply to all schools.

4.    These procedures shall be followed for an appeal to the School Board if the complainant disagrees with the decision by the District Materials Review Committee.

a.    An appeal of the decision made by the District Materials Review Committee must be made in writing to the superintendent within ten (10) days of receipt of the District Materials Review Committee's decision.

b.    Decision on the complaint will be made at the next regularly scheduled Board meeting unless the date of the decision being appealed is filed within fourteen (14) days of the Board meeting. In that instance, the matter will be heard at the following regular Board meeting. The Board reserves the right to schedule a special meeting for consideration of challenged materials.

c.    The Board shall review all evidence and materials presented at the District Materials Review Committee level. If the complainant wishes to offer any additional evidence, it must be submitted to the superintendent no less than eight (8) days prior to the meeting at which the matter will be heard.

d.    The public shall be afforded an opportunity to comment before the Board makes a final decision.

e.    The Board reserves the right to use outside expertise if necessary to help in its decision making.

f.    The Board decision will be final, and the superintendent will implement the decision.

g.    Board decisions on reconsidered materials will stand for five (5) calendar years before new requests for reconsideration of those items will be entertained.

ECSD000052

h.    The Board's decision shall apply to all schools.

Rulemaking Authority: Sections 1001.41; 1001.42; 1001.43, F.S.
Law Implemented: Sections 847.02; 1006.28; 1006.34; 1006.40; 1010.215, F.S.

ECSD000053

# FAQ - New Legislations: Reading Lists, Use of Outside Media and Library Collections

A. Yes, you can submit all media you plan to use for a lesson/unit on one form.

Q. Can a department or grade level team submit one Justification for Use of Outside Media form for all members of that department or grade level?

A. Yes, one person can submit one Justification for Use of Outside Media form for all members of that department or grade level.

Q. I want to do a novel study with my class. What do I need to do to get approval?

A. Complete and submit the Justification for Use of Outside Media form online. The form will be sent to the designated school administrator for approval or denial.

Use the ECSD parent letter template to send home a parental information and opt out Letter study **at least 7** days before the unit begins.

Q. Does a library book or other library materials that will be used in the classroom have to be approved through the Justification for Use of Outside Media Form?

A. Yes, if it will be used as a part of instruction.

Q. What about elementary book lists in the HMH curriculum and the BEST reading lists?

A. These have already been approved by grade level and do not need to be submitted using the Justification for Use of Outside Media Form. Click here for a complete list of titles.

## School Library Collections

Q. Who can add books to a school's library collection available for students?

A. A certified media specialist who has also completed Florida Department of Education training. Training will be available by January 1, 2023.

Certified school media specialists may add books to the school's

ECSD000054

SCHOOL NAME: | Choose One - Required ⌄ |

## JUSTIFICATION FOR USE OF
## EDUCATIONAL MEDIA FROM OUTSIDE SOURCES

COURSE: [ ]     GRADE: [ ]     TODAY'S DATE: [11/22/2022]

TITLE/PRODUCER/PUBLISHER/COPYRIGHT DATE/URL OF EDUCATIONAL MEDIA TO BE USED:

FORMAT: (Check one)
◯ Book ◯ Video ◯ Software ◯ Other(Specify) [ ]

HAS THIS MEDIA BEEN PREVIEWED IN ITS ENTIRETY BY THE TEACHER(S)?     ◯ Yes ◯ No

IS THIS EDUCATIONAL MEDIA TO BE USED FOR PLANNED FACE-TO-FACE     ◯ Yes ◯ No
INSTRUCTIONAL ACTIVITIES DIRECTLY RELATED TO COURSE AND CURRICULUM?

LINK LESSON PLAN(S):

I ACKNOWLEDGE THAT THE EDUCATIONAL MEDIA MEET SELECTION CRITERIA OUTLINED IN FLORIDA STATUTES,
ESCAMBIA COUNTY SCHOOL DISTRICT RULES, EDUCATIONAL MEDIA SERVICES POLICIES.     ◯ Yes

IS ANY PART OF THE INSTRUCTIONAL MATERIAL CONTROVERSIAL?     ◯ Yes ◯ No

IF YES, CITE THE CONTROVERSIAL PART(S) AND GIVE AN EXPLANATION.

Page 1 of 2

Board Appeal, And Tango Makes Three
February 20, 2023

ECSD000055

IS THIS A BOOK AND IS IT PART OF A SCHOOL, CLASS, OR GRADE-LEVEL SUGGESTED
OR REQUIRED READING LIST?                                                          ○ Yes ○ No

IF YES, ENTER THE NAME OF THE CERTIFIED MEDIA SPECIALIST WHO HAS REVIEWED AND
APPROVED THE TITLE (FLORIDA HB 1467):

IF YES, ENTER THE ALTERNATE TITLE(S) THAT WILL BE PROVIDED:

HAS THIS BEEN REVIEWED AND APPROVED BY YOUR DEPARTMENT CHAIR?          ○ Yes ○ No ○ N/A

IF YES, ENTER THE NAME OF THE DEPARTMENT CHAIR:

SIGNATURES OF TEACHERS/PERSONNEL EVALUATING/RECOMMENDING USE OF THIS SUPPLEMENTARY MATERIAL:

TEACHER EMAIL: [                    ] @ecsdfl.us  [                    ] [                    ]

PRINCIPAL EMAIL: [                    ] @ecsdfl.us  [                    ] [                    ]

TEACHER SIGNATURE:     | TEACHER SIGNATURE: |      ○ Accept Material(s)

PRINCIPAL SIGNATURE:   | PRINCIPAL SIGNATURE: |    ○ Deny Material(s)
                                                  DENIED REASON: [                    ]

Board Appeal, And Tango Makes Three                                  Pg. 37 of 67
February 20, 2023

ECSD000056

## Reviews & Awards

- ALA Notable Children's Books, 2006
- ASPCA Henry Bergh Children's Book Award, 2005
- Book Links, 01/01/10
- Booklist starred, 05/15/05
- Bulletin of the Center for Children's Books, 07/01/05
- Horn Book Magazine, 10/01/05
- Kirkus Reviews starred, 06/01/05
- New York Times, 05/19/05
- Publishers Weekly starred, 05/16/05
- School Library Journal starred, 07/01/05
- Wilson's Children, 10/01/10

---

## Full-Text Reviews

*Booklist starred (May 15, 2005 (Vol. 101, No. 18))*

cpg1252 PreS-Gr. 2. Roy and Silo were "a little bit different" from the other male penguins: instead of noticing females, they noticed each other. Thus penguin chick Tango, hatched from a fertilized egg given to the pining, bewildered pair, came to be "the only penguin in the Central Park Zoo with two daddies." As told by Richardson and Parnell (a psychiatrist and playwright), this true story remains firmly within the bounds of the zoo's polar environment, as do Cole's expressive but still realistic watercolors (a far cry from his effete caricatures in Harvey Fierstein's The Sissy Duckling0 , 2002). Emphasizing the penguins' naturally ridiculous physiques while gently acknowledging their situation, Cole's pictures complement the perfectly cadenced text--showing, for example, the bewildered pair craning their necks toward a nest that was "nice, but a little empty." Indeed, intrusions from the zookeeper, who remarks that the nuzzling males "must be in love," strike the narrative's only false note. Further facts about the episode conclude, but it's naive to expect this will be read only as a zoo anecdote. However, those who share this with children will find themselves returning to it again and again--not for the entree it might offer to matters of human sexuality, but for the two irresistible birds at its center and for the celebration of patient, loving fathers who "knew just what to do."

*Horn Book Guide (Fall 2005)*

Two male penguins at the Central Park Zoo court, build a nest, and raise their (adopted) daughter Tango. Highly anthropomorphized to maximize the sentimental but noteworthy lesson on family diversity, the story gains depth from the biological reality of same-sex penguin partnering. Gentle illustrations of the smiling penguin family add appeal, if not scientific accuracy, to this book based on a true story.

*Kirkus Reviews starred (June 1, 2005)*

In this true, straightforwardly (so to speak) delivered tale, two male chinstrap penguins at New York City's Central Park Zoo bond, build a nest and-thanks to a helping hand from an observant zookeeper-hatch and raise a penguin chick. Seeing that the penguins dubbed Roy and Silo "did everything together. They bowed to each other. And walked together. They sang to each other. And swam together," their keeper, Mr. Gramzay, thinks, "They must be in love." And so, when Roy and Silo copy the other penguin couples and build a nest of stones, it's Gramzay who brings a neighboring couple's second egg for them to tend, then names the resulting hatchling "Tango." Cole gives the proud parents and their surrogate offspring small smiles, but otherwise depicts figures and setting with tidy, appealing accuracy. Unlike Harvey

ECSD000057

Fierstein's groundbreaking The Sissy Duckling (2002), also illustrated by Cole, this doesn't carry its agenda on its shoulder; readers may find its theme of acceptance even more convincing for being delivered in such a matter of fact, non-preachy way. (afterword) (Picture book/nonfiction. 5-9)

*Library Media Connection (January 2006)*

Based on a true story, this book tells about Silo and Roy, two male chinstrap penguins who befriend each other in the Central Park Zoo and do everything together that other penguin "couples" do, except have baby penguins. Until one day, the penguin keeper gives them an egg from a penguin couple that couldn't raise it themselves, which Silo and Roy lovingly hatch and raise on their own. Throughout the book, families–both human and animal–are mentioned doing similar things despite their superficial differences. Depending on your community, you may want to brace yourself for some objections, but what makes this story all the better is the fact that it is true. As the author notes, Roy and Silo did adopt Tango and can still be seen at the zoo playing together in the penguin tank. Attractive watercolor illustrations complement the text and playfully show the penguin couple making a nest, trying to hatch a rock, and raising their family together. Overall this is a straightforward story without being overtly about homosexuality, but rather focusing on the familial relationship of Roy and Silo and acceptance of others' differences. Recommended. Allison Bernstein, Educational Materials Reviewer, Norfolk, Massachusetts

*Publishers Weekly (May 16, 2005)*

Tango has two daddies in this heartwarming tale, inspired by actual events in New York's Central Park Zoo. Two male penguins, Roy and Silo, "did everything together. They bowed to each other.... They sang to each other. And swam together. Wherever Roy went, Silo went too.... Their keeper... thought to himself, 'They must be in love.' " Cole's (The Sissy Duckling) endearing watercolors follow the twosome as they frolic affectionately in several vignettes and then try tirelessly to start a family-first they build a stone nest and then they comically attempt to hatch a rock. Their expressive eyes capture a range of moods within uncluttered, pastel-hued scenes dominated by pale blue. When the keeper discovers an egg that needs tending, he gives it to Roy and Silo, who hatch and raise the female. The keeper says, "We'll call her Tango,... because it takes two to make a Tango." Older readers will most appreciate the humor inherent in her name plus the larger theme of tolerance at work in this touching tale. Richardson and Parnell, making their children's book debut, ease into the theme from the start, mentioning that "families of all kinds" visit the zoo. This tender story can also serve as a gentle jumping-off point for discussions about same-sex partnerships in human society. Ages 4-8. (June) Copyright 2005 Reed Business Information.

*School Library Journal (July 1, 2005)*

PreS-Gr 3-This tale based on a true story about a charming penguin family living in New York City's Central Park Zoo will capture the hearts of penguin lovers everywhere. Roy and Silo, two male penguins, are "a little bit different." They cuddle and share a nest like the other penguin couples, and when all the others start hatching eggs, they want to be parents, too. Determined and hopeful, they bring an egg-shaped rock back to their nest and proceed to start caring for it. They have little luck, until a watchful zookeeper decides they deserve a chance at having their own family and gives them an egg in need of nurturing. The dedicated and enthusiastic fathers do a great job of hatching their funny and adorable daughter, and the three can still be seen at the zoo today. Done in soft watercolors, the illustrations set the tone for this uplifting story, and readers will find it hard to resist the penguins' comical expressions. The well-designed pages perfectly marry words and pictures, allowing readers to savor each illustration. An author's note provides more information about Roy, Silo, Tango, and other chinstrap penguins. This joyful story about the meaning of family is a must for any library.-Julie Roach, Watertown Free Public Library, MA Copyright 2005 Reed Business Information.

ECSD000058

*School Library Journal (July 1, 2015)*

Toddler/PreS–It's been a decade since Richardson, Parnell, and Cole told the true story of Roy and Silo, two male penguins at the Central Park Zoo who became inseparable. When zookeepers gave the pair a motherless egg, they successfully hatched baby Tango. Commemorating the book's 10-year anniversary, this edition gives even younger readers the opportunity to enjoy this pioneering picture book, which was among the first to offer an example of a same-sex family. © Copyright 2015. Library Journals LLC, a wholly owned subsidiary of Media Source, Inc. No redistribution permitted.

Taken from the **Board Book**.

ECSD000059

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | Sherwood Elementary |
|---|---|
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | aberrant behavior |
| Are questionable elements of this work an important part of the overall development of the story or text? | Yes |
| Explain your answer in a few sentences: | The two male penguins are central to the story. |
| This work is most suitable for which grades? Check all that apply: | Pre-K, K-2, 3-5 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | Yes |
| Explain your answer in a few sentences: | This book shows how the zoo responded and helped these penguins. |
| What is the overall purpose, theme, or message of the material? | The theme is that nature is varied. |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | Yes |
| Explain your answer in a few sentences: | The tone is light and inspiring rather than heavy handed. |
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | The illustrations keep the tone light and playful and appeal to young readers interested in zoo life. |
| Will reading or listening to this work result in a more compassionate understanding of human beings? | Yes |
| Explain your answer in a few sentences: | Yes, the message is one of tolerance and compassion. |

ECSD000060

| | |
|---|---|
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | No |
| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | |
| Explain your answer in a few sentences: | |

ECSD000061

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | Beulah Elementary |
|---|---|
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | manner characters are portrayed |
| Are questionable elements of this work an important part of the overall development of the story or text? | Yes |
| Explain your answer in a few sentences: | The questionable elements of the 2 male penguins hatching an egg and raising a baby penguin together was the main idea of the story. |
| This work is most suitable for which grades? Check all that apply: | K-2 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | No |
| Explain your answer in a few sentences: | |
| What is the overall purpose, theme, or message of the material? | Two male penguins are trying to start a family by taking turns sitting on an egg. |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | No |
| Explain your answer in a few sentences: | Very young students may not understand the word "male" and if they do they may be confused as to why 2 male penguins are sitting on an egg. |
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | The pictures were appropriate for this age group. |

ECSD000062

| Will reading or listening to this work result in a more compassionate understanding of human beings? | No |
|---|---|
| Explain your answer in a few sentences: | The main characters were not human beings. |
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | No |
| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | |
| Explain your answer in a few sentences: | |

ECSD000063

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | Navy Point Elementary |
|---|---|
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | |
| Are questionable elements of this work an important part of the overall development of the story or text? | No |
| Explain your answer in a few sentences: | We do not find this book to have questionable elements. |
| This work is most suitable for which grades? Check all that apply: | K-2, 3-5 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | Yes |
| Explain your answer in a few sentences: | The book provides the process of how penguins take care of their eggs. |
| What is the overall purpose, theme, or message of the material? | Diversity |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | Yes |
| Explain your answer in a few sentences: | The author gives just enough information about the situation to be clear, but does not give inappropriate details. |
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | The illustrations are well developed. |
| Will reading or listening to this work result in a more compassionate understanding of human beings? | Yes |
| Explain your answer in a few sentences: | We feel that reading this book can transfer to the same situation for humans. |

ECSD000064

| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | Yes |
|---|---|
| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | Yes |
| Explain your answer in a few sentences: | It provides the process of how penguins take care of their eggs and raise their young. |

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| | |
|---|---|
| Name of School | N.B. Cook |
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | |
| Are questionable elements of this work an important part of the overall development of the story or text? | No |
| Explain your answer in a few sentences: | There are no questionable elements. This TRUE (non-fiction) story about penguins. This book is a great example of a community. |
| This work is most suitable for which grades? Check all that apply: | Pre-K, K-2 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | Yes |
| Explain your answer in a few sentences: | Elementary school book, this book takes 2 penguins that stepped up to the plate to care for a baby penguin that they did not birth. |
| What is the overall purpose, theme, or message of the material? | This book shows that not only do human community members step up to help others but so does the animal kingdom. |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | Yes |
| Explain your answer in a few sentences: | The concepts in this book are appropriate and depict true events. |
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |

ECSD000066

| Explain your answer in a few sentences: | The illustration show the parents taking care of a baby penguin that they did not birth. |
|---|---|
| Will reading or listening to this work result in a more compassionate understanding of human beings? | Yes |
| Explain your answer in a few sentences: | Humans and animals step up to help out when needed. |
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | Yes |
| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | |
| Explain your answer in a few sentences: | |

ECSD000067

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | Pine Meadow Elementary |
|---|---|
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | sexual behavior |
| Are questionable elements of this work an important part of the overall development of the story or text? | Yes |
| Explain your answer in a few sentences: | Manner in the way the characters are portrayed. |
| This work is most suitable for which grades? Check all that apply: | 3-5 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | Yes |
| Explain your answer in a few sentences: | Scientific value through penguin behavior, manner in how they live, produce. |
| What is the overall purpose, theme, or message of the material? | Learn about penguin culture. |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | Yes |
| Explain your answer in a few sentences: | Anyone can love and care for others. |
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | Shows the normal living conditions of penguins. |
| Will reading or listening to this work result in a more compassionate understanding of human beings? | Yes |
| Explain your answer in a few sentences: | How you can be kind and help others and be a good person.(penguin) Cultlures/same sex being parents. |

ECSD000068

| | A mom can be a dad/mom and a dad can be a dad/mom, for children in a one parent house hold. |
|---|---|
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | Yes |
| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | |
| Explain your answer in a few sentences: | |

ECSD000069

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | Myrtle Grove Elementary |
| --- | --- |
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | sexual behavior |
| Are questionable elements of this work an important part of the overall development of the story or text? | No |
| Explain your answer in a few sentences: | This is a true story of real events. It represented real penguin behavior. It did not promote homosexuality, but rather companionship. |
| This work is most suitable for which grades? Check all that apply: | 3-5, 6-8 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | Yes |
| Explain your answer in a few sentences: | Penguin behavior. |
| What is the overall purpose, theme, or message of the material? | Families are families. |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | Yes |
| Explain your answer in a few sentences: | |
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | |
| Will reading or listening to this work result in a more compassionate understanding of human beings? | Yes |
| Explain your answer in a few sentences: | |

ECSD000070

| | |
|---|---|
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | Yes |
| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | |
| Explain your answer in a few sentences: | |

ECSD000071

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | C.A. Weis Elementary |
|---|---|
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | sexual behavior |
| Are questionable elements of this work an important part of the overall development of the story or text? | Yes |
| Explain your answer in a few sentences: | We found nothing really questionable about this book. There are two male penguins who are partnered and raise a penguin chick. This is based on a true story. |
| This work is most suitable for which grades? Check all that apply: | Pre-K, K-2, 3-5 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | Yes |
| Explain your answer in a few sentences: | This book has strong positive reviews from these professional sources: Horn Book, Kirkus Reviews, School Library Journal, Publishers Weekly, and ALA Booklist. This true story is a fascinating tale of animal behavior. We can relate this penguin family to same sex human couples who adopt. This book shows a happy family. |
| What is the overall purpose, theme, or message of the material? | This book shows how families don't all look the same, but can be just as loving as any other family. |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | Yes |
| Explain your answer in a few sentences: | This book is written in language that children will understand. There is no mention of sex, drugs, or anything inappropriate for children. |

ECSD000072

| | |
|---|---|
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | The beautiful illustrations do not show any sex, drugs, or anything inappropriate for children. |
| Will reading or listening to this work result in a more compassionate understanding of human beings? | Yes |
| Explain your answer in a few sentences: | This book can be a gentle introduction to families with same sex parents, or same sex couples. After reading this book, children may be more accepting of same sex couples. |
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | Yes |
| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | Yes |
| Explain your answer in a few sentences: | This book supports science and ELA standards for informational text. |

ECSD000073

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials.  The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | A. K. Suter Elementary |
|---|---|
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | |
| Are questionable elements of this work an important part of the overall development of the story or text? | No |
| Explain your answer in a few sentences: | I do not find this book offensive. It is a true story. |
| This work is most suitable for which grades? Check all that apply: | K-2, 3-5 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | Yes |
| Explain your answer in a few sentences: | True story of penguins from the New York Zoo. We have students with two moms. It is important they see themselves and family situations in books. |
| What is the overall purpose, theme, or message of the material? | Just because you are different, does not mean that you don't have a purpose. The penguins were able to take care of the egg and eventually have a family. |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | Yes |
| Explain your answer in a few sentences: | It is a sweet story. |
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | Beautiful colors! |

| | |
|---|---|
| Will reading or listening to this work result in a more compassionate understanding of human beings? | Yes |
| Explain your answer in a few sentences: | Students with two same-sex parents will feel respresented. Students who do not have same-sex parents will hopefully be more understanding. |
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | Yes |
| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | |
| Explain your answer in a few sentences: | |

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | Ensley |
|---|---|
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | manner characters are portrayed |
| Are questionable elements of this work an important part of the overall development of the story or text? | Yes |
| Explain your answer in a few sentences: | LAC Committee |
| This work is most suitable for which grades? Check all that apply: | K-2, 3-5 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | Not Applicable |
| Explain your answer in a few sentences: | LAC Committee voted against keeping book |
| What is the overall purpose, theme, or message of the material? | LAC Committee voted against book |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | No |
| Explain your answer in a few sentences: | |
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | LAC Committee voted against book |
| Will reading or listening to this work result in a more compassionate understanding of human beings? | Yes |
| Explain your answer in a few sentences: | |
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | Yes |

ECSD000076

| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | No |
|---|---|
| Explain your answer in a few sentences: | LAC Committee voted against book |

ECSD000077

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | West Pensacola Elementary |
| --- | --- |
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | sexual behavior |
| Are questionable elements of this work an important part of the overall development of the story or text? | Yes |
| Explain your answer in a few sentences: | The issue at hand is presented throughout the entirety of the book. |
| This work is most suitable for which grades? Check all that apply: | None |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | No |
| Explain your answer in a few sentences: | |
| What is the overall purpose, theme, or message of the material? | Having parents of the same sex is normal. |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | No |
| Explain your answer in a few sentences: | |
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | |
| Will reading or listening to this work result in a more compassionate understanding of human beings? | No |
| Explain your answer in a few sentences: | |
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | No |

ECSD000078

| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | No |
|---|---|
| Explain your answer in a few sentences: | |

ECSD000079

School Library Advisory Council Input

Each ECPS school has a Library Advisory Council (LAC) comprised of at least the media specialist, two teachers, one parent and one community member to provide input on school library materials. The school LACs have been given an opportunity to give input on titles being reconsidered by the District Media Review Committees.

| Name of School | Blue Angels Elementary School |
|---|---|
| Title of Book | And Tango Makes Three |
| Could this work be considered offensive in any way due to any of the following? Choose all that apply: | aberrant behavior, manner characters are portrayed, political positions, religion or portrayal of religious practicies/ideologies |
| Are questionable elements of this work an important part of the overall development of the story or text? | No |
| Explain your answer in a few sentences: | This is based on a true story and the zookeeper is the one who remarks that "they may be in love." In nature there are same sex relationships and there are children in our schools who have parents in a same sex relationship - two dads or two moms. The children need read a book that shows their family. |
| This work is most suitable for which grades? Check all that apply: | Pre-K, K-2, 3-5 |
| Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience? | Yes |
| Explain your answer in a few sentences: | The story shows how animals behave and it is based on a true story. |
| What is the overall purpose, theme, or message of the material? | This story is to tell about the relationship that two penguins developed to raise a baby chick. If the zookeeper hadn't remarked "they are in love," it would appear that two best friends are working together to raise a chick who was abandoned. You can relate adoption to this story as well. |
| Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience? | Yes |

ECSD000080

| Explain your answer in a few sentences: | The story is appropriate for elementary school. Children love stories about animals. |
|---|---|
| Are the illustrations appropriate for the suggested audience's developmental age? | Yes |
| Explain your answer in a few sentences: | The story is appropriate for elementary school. Children love stories about animals. |
| Will reading or listening to this work result in a more compassionate understanding of human beings? | Yes |
| Explain your answer in a few sentences: | There are children in our schools who have parents in a same sex relationship - two dads or two moms. The children need read a book that shows their family. This story is to tell about the relationship that two penguins developed to raise a baby chick. If the zookeeper hadn't remarked "they are in love," it would appear that two best friends are working together to raise a chick who was abandoned. You can relate adoption to this story as well. |
| Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups? | Yes |
| NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state standards? | |
| Explain your answer in a few sentences: | LGBTQ couples have to look for other ways to have a child. It also addresses adoption for couples as well as children who have been adopted. |

Comments:

This is based on true story. A sweet story of love and care that kids will enjoy. wish I could say that I don't understand why this is being challenged but clearly a statement challenge and not a content challenge.

Protective measures have been put in place that prevent LGBTQ books from being a read aloud. However, since "we are Escambia County Public Schools," we do need to be cognitive of the fact that some of our students, whose parents are tax payers, come from same-sex families and books with no sexual content should not be excluded from the library simple because someone feels that same-sex families are repulsive. Books in school libraries should mirror the population it serves.

ECSD000082

### ECPS District Review Committee Member Reconsideration Review Form

**Title:** _____

**Author:** _____

**Reviewer's Position:** _____

_A parent or community member may proffer evidence that any material used in a classroom, made available in a school library, or included in a reading list contains content that is pornographic or prohibited under F.S. 847.012, is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level or age group for which the material is being used._

_F.S. 847.012 Section 5_
_(5) An adult may not knowingly distribute to a minor on school property, or post on school property, any material described in subsection (3)._

_F.S. 847.012 Subsection 3_
_A person may not knowingly sell, rent, or loan for monetary consideration to a minor:_
  _(a) Any picture, photograph, drawing, sculpture, motion picture film, videocassette, or similar representation or image of a person or portion of the human body which depicts nudity or sexual conduct, sexual excitement, sexual battery, bestiality, or sadmosochistic abuse and which is harmful to minors; or_
  _(b) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording that contains any matter defined in s. 847.001, explicit and detailed verbal descriptions or narrative accounts or sexual conduct and that is harmful to minors._

_F. S. 847.0012 Section 7_
_(7) "Harmful to minor" means any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:_
  _(a) Predominantly appeals to prurient, shameful, or morbid interest;_
  _(b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conducts for minors; and_
  _(c) Taken as a whole, is without serious literary, artistic, political, or scientific value for minors._

1. **Could this work be considered offensive in any way due to:**

   __ profanity                __ brutality                __ language

   __ sexual behavior          __ violence                __ cruelty

   __ prurient behavior        __ aberrant behavior        __ political positions

   __ drugs/alcohol            __ manner characters are    __ religion or portrayal of
                                  presented                   religious practices/ideologies

2. **Are questionable elements of this work an important part of the overall development of the story or text?**

   __ Yes         __ No

Board Appeal, And Tango Makes Three                                    Pg. 64 of 67
February 20, 2023

ECSD000083

Explain your answer in a few sentences.

3. **This work is most suitable for which grades? (Check all that apply.)**

   __ Pre-K        __ K-2        __ 3-5        __ 6-8        __ 9-12        __ None

4. **Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience?**

   __ Yes        __ No

   Explain your answer in a few sentences.

5. **What is the overall purpose, theme or message of the material?**

6. **Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience?**

   __ Yes        __ No

   Explain your answer in a few sentences.

7. **Are illustrations appropriate for the suggested audience's developmental age?**

   __ Yes        __ No        __ Not Applicable

ECSD000084

8. **Will reading or listening to this work result in a more compassionate understanding of human beings?**

____ Yes        ____ No

Explain your answer in a few sentences.

9. **Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups?**

____ Yes        ____ No

Explain your answer in a few sentences.

10. **NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state education standards?**

____ Yes        ____ No

Explain your answer in a few sentences.

Reconsideration Ballot

Date: _____

Title: _____

Author: _____

**Select ONE option:**

____ I vote to keep the title in all elementary, middle and high school ECPS libraries

____ I vote to keep the title in middle school and high school ECPS libraries

____ I vote to keep the title in middle school young adult (opt in) and high school ECPS libraries

____ I vote to keep the title in high school ECPS libraries

____ I vote to remove the title from all ECPS libraries

**From:**    Baggett, Victoria [VBaggett@ecsdfl.us]
**Sent:**    9/25/2023 3:48:36 PM
**To:**    cleanlibraries@gmail.com
**Subject:**    Fwd: Greetings and request

---------- Forwarded message ---------
From: **Baggett, Vicki** <VBaggett@ecsdfl.us>
Date: Mon, Aug 7, 2023 at 11:28 AM
Subject: Re: Greetings and request
To: Andrew Miller <andrewmiller@economist.com>

Hello,
I have a master's degree in English and several classes toward my PhD in English as well. I have been teaching high school and college English for around 33 years. I have served in many leadership positions, including Union representative, Writing Contests Coordinator and Department Head. I am currently teaching 12th English, Honors English and Dual Enrollment English  for college credit with our local community college.

Your question about "book banning" has nothing to do with my or many others' efforts. The books that have been submitted for reconsideration are easily accessible through the public library system or any book store.  As an advocate for children, I am responsible for making sure that the content that I have available in my class  is content and age appropriate.  Even moreso, however, our entire school system is responsible also. When I realized that many books that we had available to minors were extremely sexually graphic, etc., I started notifying my district. I could not understand how some of these had fallen "through the cracks" within our system.  We have mandatory state and federal laws regarding inappropriate content, and many books certainly violated these standards.

Parental Rights are very important.  If parents want to expose their children to things that the state would consider age inappropriate, then the parents can do this at home (hopefully not violating laws).  Meanwhile, the public schools must follow state and federal law in this area. For example, there are many who feel that books with situations about rape are important for students to read because the student might connect or sadly even relate to the topic. This is true; however, the depiction of the rape should be reviewed  by those qualified to do so to make sure it is age appropriate and in the correct library -- not just available to all kids ages K-12. Some of the books that have somehow crept into our libraries, though, even contain drawings of people engaged in sexual activity and rape.  Fortunately, as these are found, citizens are submitting these, and they are being immediately restricted, awaiting review.

"According to FL Statute 847.012,
Harmful materials; sale or distribution to minors or using minors in production prohibited; penalty.—
(1)   As used in this section, "knowingly" means having the general knowledge of, reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:
(a)   The character and content of any material described in this section which is reasonably susceptible of examination by the defendant; and
(b)   The age of the minor.
(2)   A person's ignorance of a minor's age, a minor's misrepresentation of his or her age, a bona fide belief of a minor's age, or a minor's consent may not be raised as a defense in a prosecution for a violation of this section.
(3)   A person may not knowingly sell, rent, or loan for monetary consideration to a minor:
(a)   **Any picture, photograph, drawing, sculpture, motion picture film, videocassette, or similar visual representation or image of a person or portion of the human body which depicts nudity or sexual conduct, sexual excitement, sexual battery, bestiality, or sadomasochistic abuse and which is harmful to minors; or**



Exhibit 19

E-ECSD_PR 000971

(b)   Any book, pamphlet, magazine, printed matter however reproduced, or sound recording that contains any matter defined in s. 847.001, explicit and detailed verbal descriptions or narrative accounts of sexual excitement, or sexual conduct and that is harmful to minors.

(4)   A person may not knowingly use a minor in the production of any material described in subsection (3), regardless of whether the material is intended for distribution to minors or is actually distributed to minors.

(5)   An adult may not knowingly distribute to a minor on school property, or post on school property, any material described in subsection (3). As used in this subsection, the term "school property" means the grounds or facility of any kindergarten, elementary school, middle school, junior high school, or secondary school, whether public or nonpublic. This subsection does not apply to the distribution or posting of school-approved instructional materials that by design serve as a major tool for assisting in the instruction of a subject or course by school officers, instructional personnel, administrative personnel, school volunteers, educational support employees, or managers as those terms are defined in s. 1012.01.

(6)   Any person violating any provision of this section commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."



When you have pictures such as above (This is from "The Sandman Collection" by Neil Gaiman, 2018 --DC Comics) or

E-ECSD_PR 000972

this one from "Maestros" by Steve Skroce, 2018. There are also more muted examples of age or content inappropriateness as well. As far as the next question regarding my idea about the age when I think students are mature enough for themes of relationships and sexuality, my opinion really doesn't matter. What matters is the material used to bring these themes in. School districts have a grand responsibility to make sure that the material offered to students is age appropriate. Having books with discussions of rape, alcohol, oral sex, etc., are obviously not appropriate for younger children. Having books with graphic discussions of these (and especially with pictures) are not allowed by law regardless. I certainly have state-approved curriculum with some of these themes for my high schoolers. Great authors like Chaucer, Shakespeare, Dickens, etc., love these topics. The difference, however, is the literature that we pull in to approach these themes is considered appropriate and not inappropriately graphic. Great writers use innuendo instead of paragraphs or pages discussing graphic sexual situations. Your question about "And Tango Makes Three . . ." This book has been restricted in many counties in the State of Florida. Our board actually voted to remove it based on an appeal because of lines indicating sexual indoctrination, which is a violation of HB 1069. Below is from the appeal: Further it is noted, several quotes from this book indicate there is a relationship between the two male

penguins: "They did not spend much time with girl penguins . . . Instead Roy and Silo wound their necks around each other." Also, the zookeeper's comment of "They must be in love" solidifies the idea of sexual alternatives, and clearly identifies the author's purpose.This particular book is even listed under "homosexuality" genres in Destiny, the library cataloging program.  Just as a child cannot know what is in a book until he or she reads it, a school district is tasked with assisting parents who believe it is their

responsibility and not a school's responsibility to introduce alternate sexualities to their younger children at an appropriate time , thus protecting their innocence until they are more mature. My opinion or belief is irrelevant. What is important is parental rights. The parent should decide if he or she wants to expose a child to this and at what age. This book was subsequently removed in our district from school libraries. As far as risks of reading books like this , it is the same with any topic. Children are dependents and considered minors for a reason. If parents want to expose their children to this, then that should be their right, their call. It belongs to no one else. Attitudes, beliefs and expectations are

developed while a child matures. Just as trauma affects a child during those developmental years, so do other things, such as violence, exposure to pornography, etc.

We currently have a Superintendent in my local county, where I am employed, who is doing his best to follow both state and federal law, which is what parents and other citizens like me hope for.

We are lucky in Florida that we have a governor and constituents who have worked hard to come up with specific wording to help parents, teachers, and all to figure out what is age and content appropriate for minors.

Please let me know if this helps.

Vicki Baggett

On Mon, Aug 7, 2023 at 7:14 AM Andrew Miller <andrewmiller@economist.com> wrote:

Dear Vicki

Thank you again, Vicki. I hope you had a tranquil weekend. Here are a few questions--when we talk, I am likely to ask a few follow-ups, but this would be the outline.

Best wishes
Andy

-- Please could you outline your teaching background and experience?

-- As you know, some people think that removing books from school libraries, or restricting access to books within them, amounts to "book banning". I think you see it differently. Please could you explain why?

-- On the question of parental choice, what do you think of the view that, while parents clearly have a right to control what books they have at home, they don't have the same right in regards to communal settings like a library?

-- Drawing on your experience as an educator, at what age do you think readers are mature enough for themes of relationships and sexuality?

-- There has been some talk about the book "And Tango Makes Three". Access to it has been restricted in more than one county on the basis that it is age-inappropriate. If you agree with that stance, please could you say why?

-- What are the risks for young readers in reading books like this?

On Fri, 4 Aug 2023 at 17:54, Baggett, Vicki <vbaggett@ecsdfl.us> wrote:

Okay. Send me some sample questions, and then we can decide to schedule Zoom. Thanks.

On Friday, August 4, 2023, Baggett, Vicki <VBaggett@ecsdfl.us> wrote:

Hi Andrew,

I will be happy to speak with you regarding age and content inappropriate books from my viewpoint as an educator in Florida.  Please know that I am super-selective about with whom I speak because I have already been the target of a few liberal journalists; therefore, please send your questions over, and I will be happy to answer. Is this something that you would like a live feed for, or is this for print publication only?

Vicki

On Thu, Aug 3, 2023 at 12:45 PM Andrew Miller <andrewmiller@economist.com> wrote:

Dear Mrs Baggett

Greetings from The Economist magazine in London, where I am a correspondent. I am writing with a little request. I am working on an article about the issue of books in schools--in Florida and elsewhere in America--and I would love to hear your perspective as an educator. In particular it would be great to incorporate your views on the importance of parental choice and age-appropriate provision.

I would only take up a half hour or so of your time; we could speak over Zoom at your convenience. Alternatively I will be in Florida on or around Sept. 13-15 and would be delighted to meet briefly in person.

Many thanks for your attention, and best wishes.

Andrew Miller

Andrew Miller
Special correspondent
The Economist
+447770381607

This e-mail may contain confidential material. If you are not an intended recipient, please notify the sender and delete all copies. It may also contain personal views which are not the views of The Economist Group. We may monitor e-mail to and from our network.

Sent by a member of The Economist Group. The Group's parent company is The Economist Newspaper Limited, registered in England with company number 236383 and registered office at The Adelphi, 1-11 John Adam Street, London, WC2N 6HT. For Group company registration details go to http://legal.economistgroup.com

This e-mail may contain confidential material. If you are not an intended recipient, please notify the sender and delete all copies. It may also contain personal views which are not the views of The Economist Group. We may monitor e-mail to and from our network.

Sent by a member of The Economist Group. The Group's parent company is The Economist Newspaper Limited, registered in England with company number 236383 and registered office at The Adelphi, 1-11 John Adam Street, London, WC2N 6HT. For Group company registration details go to http://legal.economistgroup.com