UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

Peter Parnell, et al.,

                    Plaintiffs,                    Case No. 4:23-cv-414-AW-MAF

          v.

School Board of Escambia County,
Florida,

                    Defendant.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

**<u>TABLE OF CONTENTS</u>**

<u>Pages</u>

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF FACTS .....................................................................6

    A.    The Board's Policy Required School Libraries To Present Diverse Viewpoints And Foster Respect For All People.....................6

    B.    A District Teacher With A Demonstrated History Of Anti-LGBTQ+ Animus Challenged *Tango* .................................................8

    C.    The District Materials Review Committee Unanimously Voted To Retain *Tango* .........................................................................13

    D.    The Board Voted To Remove *Tango* For Viewpoint-Discriminatory Reasons ........................................................21

LEGAL STANDARD...........................................................................24

ARGUMENT .......................................................................................24

I.    School Officials Cannot Remove Books From School Libraries Based On Disagreement With Their Viewpoint ..........................................25

II.    There Is No Genuine Dispute Of Material Fact That Defendant Removed Tango Based Solely On Disagreement With Its Message ............30

    A.    The Board Removed *Tango* To Deny Students Access To Ideas With Which The Board Disagrees .......................................31

    B.    There Is No Evidence That *Tango*'s Removal Was Reasonably Related To A Legitimate Pedagogical Purpose ..................36

CONCLUSION .....................................................................................39

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ....................................................27, 28

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982)..................................................................*passim*

*Campbell v. St. Tammany Parish Sch. Bd.*,
  64 F.3d 184 (5th Cir. 1995) ..................................................................28

*Case v. Unified Sch. Dist. No. 233*,
  908 F. Supp. 864 (D. Kan. 1995).........................................................38

*Epperson v. Arkansas*,
  393 U.S. 97 (1968)..................................................................................5

*Fayetteville Pub. Libr. v. Crawford Cnty.*,
  684 F. Supp. 3d 879 (W.D. Ark. 2023) ...............................................28

*Hazelwood Sch. Dist. v. Kulhmeier*,
  484 U.S. 260 (1988)................................................................*passim*

*Honeyfund.com Inc. v. Governor*,
  94 F.4th 1272 (11th Cir. 2024) ...........................................................26

*Jane Doe I v. Valencia Coll. Bd. of Trustees*,
  838 F.3d 1207 (11th Cir. 2016) ...........................................................29

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*,
  538 U.S. 600 (2003)..............................................................................30

*Martin v. City of Struthers*,
  319 U.S. 141 (1943)..............................................................................26

*Mason v. Vill. of El Portal*,
  240 F.3d 1337 (11th Cir. 2001) ...........................................................31

*McCullen v. Coakley*,
  573 U.S. 464 (2014)..............................................................................35

*McDonough v. Garcia,*
    116 F.4th 1319 (11th Cir. 2024) ....................................................29, 30

*Minarcini v. Strongsville City Sch. Dist.,*
    541 F.2d 577 (6th Cir. 1976) ....................................................28

*Morse v. Frederick,*
    551 U.S. 393 (2007)....................................................26

*Nurre v. Whitehead,*
    559 U.S. 1025 (2010)....................................................28

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ....................................................26

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.,*
    711 F. Supp. 3d 1325 (N.D. Fla. 2024) ....................................................25

*Pico v. Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26,*
    638 F.2d 404 (2d Cir. 1980) ....................................................28

*Pratt v. Indep. Sch. Dist. No. 831,*
    670 F.2d 771 (8th Cir. 1982) ....................................................5, 28

*Right to Read Def. Comm. of Chelsea v. Sch. Comm. of Chelsea,*
    454 F. Supp. 703 (D. Mass. 1978) ....................................................28

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
    515 U.S. 819 (1995)....................................................26, 29, 30

*Salvail v. Nashua Bd. of Ed.,*
    469 F. Supp. 1269 (D.N.H. 1979)....................................................28

*Searcey v. Harris,*
    888 F.2d 1314 (11th Cir. 1989) ....................................................27, 29

*Smith v. Bd. of Sch. Comm'rs of Mobile Cnty.,*
    827 F.2d 684 (11th Cir. 1987) ....................................................27

*Texas v. Johnson,*
    491 U.S. 397 (1989)....................................................24

*Thomas v. Chicago Park Dist.*,
    534 U.S. 316 (2002)................................................................35

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)................................................................26

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)................................................................30

*Virgil v. Sch. Bd. of Columbia Cnty.*,
    Fla., 862 F.2d 1517 (11th Cir. 1989)................................................27

*Waddell v. Valley Forge Dental Assocs., Inc.*,
    276 F.3d 1275 (11th Cir. 2001).......................................................24

*Zukerman v. U.S. Postal Serv.*,
    567 F. Supp. 3d 161 (D.D.C. 2021)................................................34

## Statutes and Rules

Fed. R. Civ. P. 56(a).................................................................24

Fla. Stat. § 1001.42(8)(c)(3) .......................................................8

Fla. Stat. § 1006.28(2)(d) ..........................................................6

## PRELIMINARY STATEMENT

Plaintiffs—the co-authors of the critically acclaimed children's book *And Tango Makes Three* ("*Tango*") and an elementary school student interested in reading *Tango*—respectfully move for summary judgment against Defendant Escambia County School Board (the "Board") for violating the First Amendment by removing *Tango* from school libraries in the Escambia County School District (the "District") based solely on disagreement with the book's viewpoint.

First published in 2005, *Tango* tells the true story of two male penguins in the Central Park Zoo who formed a pair-bond and together hatched and raised a chick. *See* ECF 61-1; ECF 220-1 ¶ 27.[1]  Beyond its scientifically accurate depiction of penguin behavior, *Tango* celebrates family values, adoption, and parental responsibility.  ECF 220-1 ¶ 34.  The book also illustrates that same-sex parents exist, that they can adopt and raise offspring, and have happy and healthy families. The record contains uniformly glowing reviews of *Tango* in reputable, professionally recognized literary periodicals ("Professional Reviews"), which recommend the book as not only appropriate but also essential for elementary school library collections.  ECF 220-1 ¶¶ 32, 35; ECF 220-2 at 182–84.

---

[1] Record citations refer to ECF pagination, except transcript citations, which refer to internal pagination.

Consistent with these recommendations, at least six District schools acquired *Tango* for their library collections between 2006 and 2019. *See* ECF 121-2–7. These acquisitions comported with Defendant's then-operative policies, which required: (1) selection decisions to be made by certified school library media specialists ("District Media Specialists"), local librarians from the District, ECF 220-3 (School Board of Escambia County, Policy Manual § 4.06 (the "Media Policy") at 11 (revised Dec. 19, 2022)); (2) new books to be "suitable for student needs" and "appropriate for the intended grade level and age group," *id.* at 9; and (3) school library collections to "support the diverse interests, needs, and viewpoints of the school community" and "foster respect for the diverse roles available to all people in today's society," *id.* at 9–10.

Following Florida's enactment of anti-LGBTQ+ legislation and a challenge from a District teacher with a documented history of homophobia, Defendant removed *Tango* from District school libraries. There is no dispute that Defendant did so because *Tango* depicts a same-sex relationship, a viewpoint-discriminatory justification prohibited by the First Amendment and Defendant's own policy. The three Board members who voted for removal (the "Removal Board Members") ignored the uniformly positive Professional Reviews of *Tango*, the overwhelming public expressions of community support for the book, and the multitude of recommendations by the District's own book review committees that the book

remain in the District's elementary school libraries.  As the Court has recognized, the Board Members' "motives in removing *Tango* is the factual heart of Plaintiffs' claims," ECF 163 at 1 (quotations omitted), and the evidence undoubtedly shows that the Board removed *Tango* for discriminatory reasons.  When providing their bases for removing *Tango*, the Removal Board Members did not raise a single concern about the book's pedagogical or educational value and offered no basis to find the book inappropriate for elementary school students.  The Board has acknowledged that the Removal Board Members' motives are solely those stated on the record, ECF 111 at 5–6, ECF 220-4 at 72:2-11, and their only on-the-record justifications for removal demonstrated animus toward *Tango*'s positive LGBTQ+ viewpoint.

In addition, the Removal Board Members were in consistent contact with the District teacher who challenged *Tango* and never disavowed the anti-LGBTQ+ animus she expressed about *Tango* or the LGBTQ+ community generally.  Their decision followed a pattern and practice of removing or age-restricting every LGBTQ+ book appealed by that teacher, despite recommendations to the contrary by District committees specifically appointed to evaluate book challenges.

Nor did the Removal Board Members take issue with other picture books in District elementary school libraries that are materially identical to *Tango* in all respects but one—they depict opposite-sex couples:

3

| *The Emperor Lays an Egg* | *Tango* |
|---|---|
|  |  |
| "Then *shuffle, shuffle, scoop.* The father uses his beak to quickly move the egg to his own feet. He cuddles it against the bare spot on his fat body. Tucked into his brood pouch, the egg is safe and warm" | "Until one day they heard a sound coming from inside their egg. *Peep, peep. Peep, peep,* it said. Roy and Silo called back, *Squawk, squawk. Peep, peep,* answered the egg." |

| *The Emperor's Eggs* | *Tango* |
|---|---|
|  |  |
| "She starts trumpeting "hello" and the father penguin starts trumpeting "hello" and the chick whistles.<br><br>The racket goes on for hours, and it really does sound as if they're extremely pleased to see each other." | "Roy and Silo taught Tango how to sing for them when she was hungry. They fed her food from their beaks. They snuggled her in their nest at night.<br><br>Tango was the very first penguin in the zoo to have two daddies." |

ECF 220-1 ¶ 30(a)-(c).

Such blatant viewpoint discrimination violates the First Amendment under any applicable standard, whether under *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), *Hazelwood Sch. Dist. v. Kulhmeier*, 484 U.S. 260, 273 (1988), or traditional First Amendment forum analysis. Courts "apply the First Amendment's mandate [of governmental neutrality] in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). The First Amendment bars public school boards from casting a "pall of orthodoxy" over materials made available to students because, if school library materials "can be banned by those opposed to their ideological theme, then a precedent is set for the removal of any such work." *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771, 776, 779 (8th Cir. 1982).

Because Defendant's removal of *Tango* was based solely on impermissible viewpoint discrimination, Plaintiffs are entitled to summary judgment on their First Amendment claims.

## STATEMENT OF FACTS

### A.    The Board's Policy Required School Libraries To Present Diverse Viewpoints And Foster Respect For All People

The undisputed evidence establishes that school libraries are distinct from classrooms and "serve as an incubator of curiosity and an extension of student learning beyond the curriculum."  ECF 220-1 ¶ 16.  As Dr. April Dawkins, Ph.D., an Assistant Professor in the Department of Information, Library, and Research Sciences at the University of North Carolina at Greensboro, opined, "The proper purpose of a school library, including an elementary school library, is to provide students with access to a wide variety of quality materials that reflect the diverse views and experiences of not only the school district's community but also the wider world."  *Id.* ¶ 12.  School librarians (including District Media Specialists) are therefore trained to "promote intellectual freedom for their students," and "select materials that reflect both the students in their schools and the students' lived experiences, and that prepare them to function in an increasingly diverse, interconnected world."  *Id.* ¶¶ 22–23(a)-(e).

The Board's own policy in effect at the time of *Tango*'s removal mandated this approach for selecting school library materials.  *See* ECF 220-3 at 10.  The Media Policy provided that materials should "support the diverse interests, needs, and viewpoints of the school community," "foster respect for the diverse roles available to all people in today's society," and "reflect differing and/or opposing viewpoints."

ECF 220-3 at 9–10.  Pursuant to Florida law and the Media Policy, District Media Specialists were responsible for selecting books according to these priorities.  Fla. Stat. § 1006.28(2)(d); ECF 220-3 at 11.  In making selection decisions, District Media Specialists were required to assess Professional Reviews, student interest, "age-appropriate[ness]," "the ability of students to comprehend the material," ECF 220-3 at 9, and "whether a book has pedagogical value," ECF 220-5 at 57:12-17.[2]

District Media Specialists did not and should not make selection decisions based on the viewpoint contained in a book or other material.  *Id.* at 61:24–62:21. Instead, they must "provide education media that reflect[s] … opposing viewpoints" and "represent[s] the many … groups in our society," ECF 220-3 at 9–10, including the District's students, parents, teachers, and staff who identify as LGBTQ+ or have family who do, ECF 220-5 at 97:23–98:22, or who come from adoptive homes, ECF 220-1 ¶ 34(b).  Building collections that mirror the diversity in a community encourages "awareness of others, understanding," and "empathy."  ECF 220-5 at 99:4-16; ECF 220-1 ¶ 21.

Accordingly, between 2006 and 2019, at least six District Media Specialists independently determined that *Tango* has pedagogical value, is age-appropriate, and

---

[2] Michelle White was the District Coordinator of Media Services when *Tango* was challenged and ultimately removed.

is of interest to and can be comprehended by elementary school students, and therefore decided to include the book in their school library collections.  *See* ECF 121-2–7; 220-6 at 120:19-22.  Indeed, all Professional Reviews in the record describe *Tango* as "essential for most libraries and exceptional in its format or genre."  ECF 220-1 ¶¶ 32, 35.

### B.    A District Teacher With A Demonstrated History Of Anti-LGBTQ+ Animus Challenged *Tango*

Following the March 2022 enactment of Florida House Bill 1557 ("H.B. 1557"), which forbid "[c]lassroom instruction … on sexual orientation or gender identity … in kindergarten through grade 3," Fla. Stat. § 1001.42(8)(c)(3), Vicki Baggett—a District teacher with a documented history of homophobia—challenged over 100 books in the District's school libraries, including at least 36 books with LGBTQ+ content.  ECF 220-7 at 121:9-18, 125:17–126:6; ECF 220-8.  Baggett launched her campaign to remove books with LGBTQ+ themes and characters by emailing complaints directly to Board members rather than submitting formal challenges.  ECF 220-9.  In response, then-Board Chair Kevin Adams (one of the Removal Board Members) instructed former Superintendent Dr. Timothy Smith via private email to take "quick action" regarding each book Baggett questioned.  *Id.* Smith then "directed Ms. Baggett to send all concerning titles" to him directly, *id.*, providing preferential treatment that the Board's legal counsel described as exceeding his authority and "bypass[ing] the challenged materials process" mandated by

8

the Board's Media Policy and Florida law, ECF 220-10.  Baggett immediately sent

Smith a list of 33 books she sought to remove, including *Tango* and at least six other

books with LGBTQ+ content.  ECF 220-2 at 137–38.

As to *Tango*, Baggett complained that it promoted a "political gay agenda

about two gay penguins who 'fall in love' and who adopt."  *Id.* at 137.  In the formal

book challenge form she submitted, Baggett made clear that her sole basis for chal-

lenging *Tango* was its purported "LGBTQ agenda using penguins," ECF 220-2 at

158, specifically relying on H.B. 1557.  ECF 220-7 at 127:18-21 ("Q.  Have you

ever read a children's book depicting a same-sex relationship that you thought was

appropriate for elementary school students?  A.  No.  Based on 1557, no.").  She

wrote that *Tango* had no educational value or purpose besides "indoctrination."  ECF

220-2 at 158.  In Baggett's view, *Tango*'s mere portrayal of two male pair-bonded

penguins reflects "sexual innuendo concerning an alternative lifestyle."  ECF 220-7

at 24:15-24; *see also id.* at 181:16–182:1 (testifying that *Tango* "is dangerous for

elementary school kids to read" because it would "influence[]" them "to accept that

it's okay for two male penguins … [t]o fall in love and then to raise a family").[3]

---

[3] Baggett displayed anti-LGBTQ+ animus throughout her deposition.  For example, Baggett testified that the mere depiction of a same-sex wedding with "rainbows all around it" in a book "is a form of indoctrination for elementary children."  ECF 220-7 at 128:15-25.  She also claimed to know a child who "turned gay" after their father died and their mother "dresse[d] him like a girl."  *Id.* at 129:15-25.  When asked

Baggett believed that H.B. 1557, which prohibits classroom instruction on sexual orientation or gender identity in kindergarten through third grade, prohibited *Tango*'s inclusion in the libraries. *Id.* at 178:3-8, 183:3-15 (admitting that the sole reason she challenged *Tango* was H.B. 1557).

Baggett's anti-LGBTQ+ animus was well known by District officials, including the Board. ECF 220-11 (one of thousands of email complaints to District). After Baggett challenged *Tango*—but before the Board voted to remove it—*Popular Information* released an article entitled "Florida English teacher pushing book bans is openly racist and homophobic, students allege." ECF 220-2 at 95. In the article, and a related article about her challenges, Baggett stated that she challenged *Tango* because the "idea would pop into [a] second grader's mind … that these are two people of the same sex that love each other," *id.* at 98, and so children would be exposed to "alternate sexual ideologies," ECF 220-2 at 90. Soon after the articles' release, the District received "thousands of emails" "complaining about Ms. Baggett," ECF 220-6 at 125:4-6, and demanding that the Board terminate her in light of her "anti-LGBTQ and racist speech to her students," *see, e.g.*, ECF 220-11. Under substantial public pressure, the District launched a disciplinary inquiry into Bag-

---

about the harm she said would come to children from reading *Tango*, she compared the "influence[]" of the book to an instance where she watched a "scary movie" with a "rape scene." *Id.* at 179:11–181:11.

gett's actions.  ECF 220-12; ECF 220-2 at 86; ECF 220-6 at 177:13-20 (Superintendent Leonard testifying that the Board would have been made aware of the investigation).  Despite students' confirmation of at least five instances of misconduct, ECF 220-2 at 95–100, which could constitute grounds for termination under the Board's policies, ECF 220-13 at 4; ECF 220-6 at 130:16–133:14, the only disciplinary action the District took against Baggett was a "conversation" between the Assistant Superintendent and Baggett, ECF 220-6 at 175:6–176:12.

Before and during the disciplinary inquiry into Baggett, certain Removal Board Members maintained routine contact with Baggett.  Between spring 2022 and fall 2023, Baggett emailed Adams nearly 100 times, Fetsko approximately 90 times, and Williams some 60 times regarding book challenges.  In messages to all three Removal Board Members, Baggett made anti-LGBTQ+ comments with which none of the Removal Board Members indicated their disagreement or disapproval.  Adams in particular worked closely with Baggett, asking her to provide feedback on a revised version of the Board's policy, then thanking her for her feedback and "all you do for our kids!" ECF 220-2 at 141.  Adams asked Baggett to inform her "Book Disciples" group about upcoming Board votes on book removals.  ECF 220-14 at 5.

Adams and Baggett also sent dozens of emails and Facebook messages to each other between December 2022 and April 2023, including a statement by Baggett that high school books which simply portray "lesbian, gay and nonbinary relationships"

11

were more problematic than books with "graphic sex."  ECF 220-15 at 5; ECF 220-14–220-16; *see also* ECF 220-15 at 6 (liking Baggett's comment that "[t]he cisgender and nonbinary crap is alarming").  In those communications, Adams agreed with Baggett's concern about elementary school students' exposure to books equating same-sex relationships to heterosexual relationships.  For example, in an email thread addressing books that portrayed homosexual and transgender characters, Adams confirmed that he and Baggett were aligned on "books that you and I see as unsatisfactory."  ECF 220-2 at 139.  Adams reached out to Baggett and asked her to verify whether the District's libraries had "The Book is Gay."  *Id.*  Baggett replied, "[f]ortunately, we do not have" it, and noted that there were "54 books marked under the keyword 'transgender' available."  *Id.*  Additionally, after Baggett messaged him that she had challenged a book that "has pictures of two boys kissing," Adams responded, "Look [sic] like minor students will review the porn."  ECF 220-17 at 2.[4]

Adams wrote and agreed with numerous other emails and Facebook messages espousing anti-LGBTQ+ animus.  *See, e.g.*, ECF 220-18 (Adams "agree[ing]" with constituent that "[t]his group of alphabet ppl and these ridiculous pronouns need to stay out of our schools"); ECF 220-19 at 2 (liking a message from a constituent who

---

[4] During her deposition, Baggett falsely testified that she did not exchange any electronic message communications with Adams.  ECF 220-7 at 134:9-25.  Baggett's decision to lie about these communications indicates her awareness that they were inappropriate.

objected to "our elementary schools hav[ing] plenty of transgender and lesbian re-lated books in them that clearly violate the law of God"); ECF 220-14 at 6 (seeking to establish "a policy change that libraries are an extension of the classroom and must follow the same standards" of removing books about gender identity and sexuality).

Fetsko also had direct email correspondence with Baggett, in which he thanked her for sharing certain information about book removals. ECF 220-2 at 142.

## C. The District Materials Review Committee Unanimously Voted To Retain *Tango*

In response to Baggett's challenge of *Tango*, the District Materials Review Committee (the "Committee")—composed of one elementary school Media Specialist, one administrator, one teacher, one parent, and one community member—undertook an extensive review process. ECF 220-2 at 152. As a first step, and pursuant to the Board's Media Policy, every District elementary school library assembled a Library Advisory Council ("LAC") to review Baggett's challenge and provide a recommendation as to whether *Tango* should be removed. Each LAC was composed of, at least, the individual elementary school library's Media Specialist, two teachers, one parent, and one community member. *Id.* at 185. Of the 11 LACs that submitted feedback, eight determined that *Tango* had "literary, artistic, political or scientific

value for [its] suggested audience" and that it presented "concepts in a manner appropriate to the ability and maturity level of the suggested audience." *Id* at 185–205. Those LACs also provided the rationales for their determinations, including that *Tango* is a true story that "shows how animals behave" and "shows how families don't all look the same, but can be just as loving as any other family." *Id.* at 205, 197. They also noted the importance of the book to District elementary school students, stating, for example, that "[w]e have students with two moms. It is important they see themselves and family situations in books" and that *Tango* would make "[s]tudents with two same-sex parents … feel represented." *Id.* at 199–200; *see also* ECF 220-1 ¶¶ 34(c), 40(b).

The Committee assessed the feedback of all 11 LACs, conducted its own review of *Tango*, and reviewed the Board's Media Policy as well H.B. 1557, which Baggett cited in her challenge form. ECF 220-2 at 152–57; ECF 220-3 at 16. The Committee members voted *unanimously* to retain *Tango*, finding that there was "NO evidence of LGBTQ indoctrination" nor any inappropriate sexual content. ECF 220-2 at 153. The Committee also echoed certain LACs' findings that *Tango*'s representation of "2 same sex parents" is not a "questionable element[] of the story," *id.* at 152–53, because "[m]any of the students in our district have same sex parents." *Id.* Furthermore, the Committee found that (1) the book was "most suitable" for pre-kindergarten through fifth grade; (2) "the story and illustrations are easy for children

to understand and would hold their attention"; (3) "[t]he story is easy to read"; and (4) *Tango* has educational value for students in the form of "[s]cientific facts about penguins" and "penguin behaviors found in nature," and teaches "[t]olerance of differences of others." *Id.* at 152–53.[5]

The Committee's rationales for retaining *Tango* were consistent with library science best practices and the Board's Media Policy, which required library books to reflect the communities they serve and "foster respect for the diverse roles available to all people in today's society." ECF 220-3 at 9–10; ECF 220-1 ¶¶ 22–23(e).

Indeed, *Tango*'s content is materially similar to that of other picture books currently available in the District's elementary school libraries. *Tango* contains "similar information and imagery about the mating, nesting, and chick-rearing practices" as at least two other picture books about penguins that remain in the District's library collections. ECF 220-1 ¶ 30(a)-(b).[6] As depicted below, the "only discernable difference" between these books and *Tango* is that *Tango* depicts a same-sex

---

[5] The Committee also reiterated that reading *Tango* would "result in a more compassionate understanding of human beings" because it emphasizes that "[h]umans should care for neglected or abandoned children in the same way Silo and Roy cared for Tango" and noted that "[t]he book shows compassion toward a penguin that has no one to care for it. People should care for each other as well." ECF 220-2 at 154–55.

[6] Dr. Dawkins also found that *Tango* contains materially similar imagery to *City Hawk: the Story of Pale Male*, *The Lion King*, and *Beauty and the Beast*, which remain in the District's libraries. *Id.* ¶¶ 30(c), 40(c). The District's former Media

couple, *id.*, which is "an appropriate reason for inclusion—not exclusion." *Id.* ¶ 40(a).



| The Emperor Lays an Egg | Tango |
|---|---|
| "Then *shuffle, shuffle, scoop*. The father uses his beak to quickly move the egg to his own feet. He cuddles it against the bare spot on his fat body. Tucked into his brood pouch, the egg is safe and warm" | "Until one day they heard a sound coming from inside their egg. *Peep, peep. Peep, peep*, it said. Roy and Silo called back, *Squawk, squawk. Peep, peep*, answered the egg." |

Services Coordinator confirmed that elementary school books containing portrayals of two characters that love each other, or who embrace, are common in the District's libraries. ECF 220-5 at 103:14-25; 186:14-20 ("We don't remove Snow White hugging the prince at the end of the book.").

| *The Emperor Lays an Egg* | *Tango* |
|---|---|
|  |  |
| "In July, in the middle of the worst winter blizzard, the emperor's egg is ready to hatch. Chip, chip, crack! Out pops a bedraggled gray chick. The father lets the baby peek out while he cleans up the shell, but then he tucks the baby right back under. In the coldest, windiest, driest place on Earth, the father has taken care of the egg for 65 days. He is running out of energy. In his throat, he can make only a small amount of the nutritious liquid called penguin's milk to spit up for the baby. With the tiny emperor still on his feet, the father waits and waits for the mother to return." | "Out came their very own baby! She had fuzzy white feathers and a funny black beak. Now Roy and Silo were fathers. "We'll call her Tango," Mr. Gramzay decided, "because it takes two to make a Tango."" |
|  |  |
| "After another cold week, the father finally hears the trumpet song of his mate. Toodoo, twoo? In the frigid darkness, the mother waddles back from the sea with food for the baby. The father lets the tiny emperor out onto the ice. It is a dangerous moment. In just two minutes of exposure, the baby can freeze to death. Whoosh…whish. The chick shivers in the wind. But the mother scoops it up quickly and covers it with a warm flap of skin. The chick reaches into her throat to gobble the meal of fish and squid that she has spit up. She toodles to the baby and the baby whistles back as they learn each other's songs." | "Roy and Silo taught Tango how to sing for them when she was hungry. They fed her food from their beaks. They snuggled her in their nest at night. Tango was the very first penguin in the zoo to have two daddies." |

17

| The Emperor's Eggs | Tango |
|---|---|
| <br><br>"And that's how he'll stay for two whole months, until his egg is ready to hatch." | <br><br>"Roy and Silo taught Tango how to sing for them when she was hungry. They fed her food from their beaks. They snuggled her in their nest at night.<br><br>Tango was the very first penguin in the zoo to have two daddies." |
| <br><br>"His egg is starting to hatch. It takes a day or so. but finally the egg cracks right open —<br><br>and out pops a penguin chick." | <br><br>"Out came their very own baby! She had fuzzy white feathers and a funny black beak. Now Roy and Silo were fathers. "We'll call her Tango," Mr. Gramzay decided, "because it takes two to make a Tango."" |



| *The Emperor's Eggs* | *Tango* |
|---|---|
| "She starts trumpeting "hello" and the father penguin starts trumpeting "hello" and the chick whistles.<br><br>The racket goes on for hours, and it really does sound as if they're extremely pleased to see each other." | "Roy and Silo taught Tango how to sing for them when she was hungry. They fed her food from their beaks. They snuggled her in their nest at night.<br><br>Tango was the very first penguin in the zoo to have two daddies." |

60 District community members, including 12 District Media Specialists, provided input to the Committee on Baggett's challenge to *Tango*, and the Committee voted unanimously to retain the book. Despite this overwhelming support for *Tango*, Baggett appealed the Committee's decision to the Board because she thought the Committee's erred by "look[ing] at [*Tango*] as a whole" when there was "innuendo" suggesting that the male penguins were pair-bonded. ECF 220-7 at 189:10–190:16. In her appeal submission, Baggett emphasized, again, that she viewed *Tango* as a story about "sexual alternatives," and implored the Board to remove *Tango* to avoid

"introduc[ing] alternative sexualities to [parents'] younger children" and to "pro-tect[] their innocence"—justifications unquestionably grounded solely in anti-LGBTQ+ animus.  ECF 220-2 at 146–47.

Ahead of the Board's vote on Baggett's appeal, community members pro-vided additional input on *Tango*.  As was the case at the Committee stage, the public comments overwhelmingly supported retaining *Tango*.  *See* ECF 220-20 (comments emphasizing there "is nothing inherently sexual about the animals," "there is nothing in [*Tango*] to promote or push an agenda[,]" and the book is based on a true story).  Separately, however, two days before the vote, a community member contacted Re-moval Board Members Adams and Fetsko expressing her "concern[]" that *Tango* and the two other books on appeal "promote transexual decisions and *homosexual ideas*."  ECF 220-21 at 3 (emphasis added).  The day before he voted to remove *Tango*, Adams stated he "agree[d]" with this constituent's "concerns" and would "vote accordingly."  *Id.* at 2.  Adams also wrote an email to himself the week before the vote, excerpting a portion of the Wikipedia article on *Tango* describing the au-thors' belief that the book could help introduce children to the idea of same-sex re-lationships.  ECF 220-22.  Meanwhile, the morning of the vote, Williams sent a group text message stating that "[t]he book review tonight is not about African American study's [sic] but homosexuality, gender identity, and transgender books in our media centers."  ECF 220-23.

**D.    The Board Voted To Remove *Tango* For Viewpoint-Discriminatory Reasons**

Prior to the February 20, 2023 Board meeting to vote on *Tango* (the "February 2023 Meeting"), the Board Members were provided copies of Baggett's initial challenge form, the Committee and LACs' assessments of *Tango*, Baggett's appeal form, the unanimously positive Professional Reviews of *Tango*, the book itself, H.B. 1557, and an excerpt of the motion to dismiss in another case regarding H.B. 1557.  *See* ECF 220-2 at 145–211; ECF 220-5 at 140:14–141:1.  The Board was thus aware of Baggett's stated bases for challenging *Tango*, specifically that it purportedly violated H.B. 1557[7] because, according to her, it reflected an "LGBTQ agenda using penguins," was intended to "indoctrinat[e]" students, and referenced "alternate sexual ideologies."

During the Board meeting, the Board heard from approximately a dozen community members who supported keeping *Tango* in school libraries and just four who opposed.  ECF 220-24 at 57–88.  Two Board members voted to reject the appeal and

---

[7] In her appeal, Baggett explicitly argued that the book violated H.B. 1557.  ECF 220-2 at 146.  The Board itself twice expressly recognized that the challenge to *Tango* was based on H.B. 1557 and stated no disagreement with applying that law to *Tango*.  ECF 220-24 at 52:17; *id.* at 54:3.  This Court has since held that H.B. 1557 does not apply to school library books.  ECF 151 at 5–6.  But the Board has not revisited its reasoning for removing *Tango*, and has stated that its sole reasons for doing so are those stated on the record.

21

retain *Tango* without discussion. *Id.* at 86:11-17. The three Removal Board Members each explained their votes as exclusively based on the book's LGBTQ+ content.

Specifically, according to Adams, *Tango* should be removed because, after "watching … interviews" with the authors, he determined that they were "really aggressive on targeting many different books to the K–5." *Id.* at 86:19–87:6. According to Adams, the authors were "targeting K–5 students" in a similar manner to Kyle Lukoff, the author of *When Aiden Became A Brother*, another book addressed at the February 2023 Meeting.[8]

Similarly, Fetsko's vote was driven by his concern that the penguins were a same-sex couple, describing an instance from over 15 years ago wherein he watched a kindergarten teacher "enthrall the class" with *Tango*'s illustrations without "us[ing] a single word from the book." *Id.* at 87:14-17. Fetsko said the teacher's presentation of *Tango* was appropriate only because "she removed all of the innuendo of sexualizing what was going on with the penguins," including that "they were a couple, that they were in love, that they were embracing each other."[9] This made him believe the book should not be available for children to read on their own. *Id.*

---

[8] Lukoff is "a famed author of lauded youth fiction books with LGBTQ+ characters." ECF 220-1 ¶ 40(a).

[9] Notably, this story establishes that a Florida elementary school utilized *Tango* as part of its curriculum. *See* ECF 220-1 ¶ 40(c).

at 87:13–88:14.  Fetsko further stated that there was value to depicting "the compassion and the love to nurture this egg and watch it hatch, to feed the chick and raise it," but that the *only* problematic portion of *Tango* was the portion that discussed how the two male penguins "were a couple, that they were in love, that they were embracing each other."  *Id.*

Finally, the **only** reason that Williams provided for his vote to remove *Tango* was that "the fascination is still on that it's two male penguins raising a chick."  *Id.* 87:8-12.

None of the Board Members proffered any rationales for removing *Tango* based "in any legitimate developmental or pedagogical considerations or any accepted professional standard, either in library science or [American Library Association ("ALA")] standards, or even the District's own policies."  ECF 220-1 ¶ 41.  The terms "age appropriate" or "age inappropriate" were not uttered by a single Removal Board Member.  The Removal Board Members also did not voice any disagreement with or disavow Baggett's stated basis for her challenge or appeal.

Baggett has appealed the Committee's decision to retain three other District library books on the basis of their LGBTQ+ content.  In each instance, the Board

overturned the Committee's decision to reject Baggett's challenges, opting to remove or age-restrict each book.  ECF 220-5 at 150:22–152:3; ECF 220-8.[10]

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## ARGUMENT

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Texas v. Johnson*, 491 U.S. 397, 414 (1989).  There is no genuine dispute that Defendant engaged in unconstitutional viewpoint discrimination when it voted to remove *Tango*.  The record supports no reason for the Board's action other than the fact that the book depicts a same-sex relationship.  And every articulation of the governing legal standard issued by the

---

[10] Baggett has sought to remove 36 library books based on their LGBTQ+ themes or characters.  *See* ECF 220-25.  To date, the Committee has considered and denied four of those challenges, each of which the Board has overruled in response to Baggett's appeals.  *Compare* ECF 220-25 *with* ECF 220-8.

Supreme Court, the Eleventh Circuit, and every other court to consider the application of the First Amendment in this context forbids such viewpoint discrimination.[11]

## I. School Officials Cannot Remove Books From School Libraries Based On Disagreement With Their Viewpoint

As another court in this District recently explained, "[t]he applicable legal standard for evaluating alleged First Amendment violations in the school library context is not entirely clear, but the common theme in all of the potentially relevant standards (e.g., *Pico* plurality, *Hazelwood*, nonpublic forum) is that school officials cannot remove library books solely because they disagree with the views expressed in the books but that they can make content-based removal decisions based on legitimate pedagogical concerns including things like pornographic or sexual content, vulgar or offensive language, gross factual inaccuracies, and educational unsuitability for certain grade levels." *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024).

This framework is well supported by fundamental First Amendment principles repeatedly reaffirmed by the Supreme Court and the Eleventh Circuit. As this Court has already recognized, *see* ECF 151 at 25 n.12, it is well-established that

---

[11] This Court previously declined to "resolve the question" of which standard applied, finding that Plaintiffs plausibly alleged that Defendant's removal decision "turned on a disagreement with *Tango*'s viewpoint." ECF 151 at 24–26.

"[t]he right of freedom of speech and press … embraces the right to distribute liter-ature, … and necessarily protects the right to receive it." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943). When the government interferes with those rights, view-point discrimination is a motive that is "presumed to be unconstitutional." *Rosen-berger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995); *see also Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (noting that "penaliz[ing] certain viewpoints" is "the greatest First Amendment sin."); *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) ("The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis." (quota-tion omitted)).

These core principles undoubtedly apply in the context of public schools. The Supreme Court has long held that even though school officials have the "compre-hensive authority … consistent with fundamental constitutional safeguards, to pre-scribe and control conduct in the schools," that discretion is limited by the rights enshrined in the Constitution. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969); *see also Morse v. Frederick*, 551 U.S. 393, 396–97 (2007). The Eleventh Circuit has made clear that the proper balance is struck by permitting content decisions based on legitimate pedagogical purposes while prohibiting view-point discrimination based on disagreement with a message, and courts may inter-cede when "local authorities begin to substitute rigid and exclusive indoctrination

for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.* ("*ACLU*"), 557 F.3d 1177, 1226 (11th Cir. 2009); *see also Searcey v. Harris*, 888 F.2d 1314, 1325 (11th Cir. 1989) ("Although *Hazelwood* provides reasons for allowing a school official to discriminate based on *content*, we do not believe it offers any justification for allowing educators to discriminate based on viewpoint.").

The Supreme Court has only once applied these well-established principles in the context of school libraries, when a plurality of the Court held that a school board violates the First Amendment when it removes a library book (1) "to deny [students] access to ideas with which [it] disagreed"; and (2) "this intent was the decisive factor in [the school board's] decision." *Pico*, 457 U.S. at 871. Consistent with the controlling authority cited above, this standard permits school boards to make decisions about which books belong on their library shelves for "politically neutral reasons," *Smith v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 827 F.2d 684, 694 (11th Cir. 1987) (quoting *Pico*, 457 U.S. at 880 (Blackmun, J., concurring)), including by permitting, for example, the removal of books that are "pervasively vulgar" or not "educational[ly] suitab[le]," *Virgil v. Sch. Bd. of Columbia Cnty.*, Fla., 862 F.2d 1517, 1522 (11th Cir. 1989) (quoting *Pico*, 457 U.S. at 871). What it does not tolerate is removing books from the shelves of school libraries "motivated by … a desire to promote

27

political orthodoxy and by opposition to the viewpoint of the book." *ACLU*, 557 F.3d at 1227.

More than four decades have passed since *Pico*, and it remains the only standard the Eleventh Circuit has ever applied to First Amendment claims regarding book removals in public school libraries. *See id.* at 1202 (assuming, without deciding, that *Pico* applies to First Amendment claims regarding book removals).[12]  But this Court need not adopt the *Pico* plurality because *any* First Amendment analysis yields the same conclusion in this case.  Both the *Hazelwood* standard and forum analysis may permit content selection based on pedagogical purposes appropriate to a school library's forum limitations, but neither allow viewpoint discrimination based solely

---

[12] Indeed, *Pico* remains the prevailing national standard for cases like this one.  The *Pico* plurality approach was the law in the Second Circuit and in several other courts before the Supreme Court's decision, and it remains so.  *See Pico v. Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404, 417 (2d Cir. 1980), *aff'd sub nom. Pico*, 457 U.S. 853; *see also e.g.*, *Pratt*, 670 F.2d at 779; *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269, 1272 (D.N.H. 1979); *Right to Read Def. Comm. of Chelsea v. Sch. Comm. of Chelsea*, 454 F. Supp. 703, 712 (D. Mass. 1978).  Numerous other courts have affirmatively adopted it since then.  *E.g.*, *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995); *Fayetteville Pub. Libr. v. Crawford Cnty.*, 684 F. Supp. 3d 879, 909 (W.D. Ark. 2023)).  Some Supreme Court justices have also continued to highlight its viability.  *Nurre v. Whitehead*, 559 U.S. 1025 (2010) (Alito, J., dissenting from denial of certiorari) (citing positively to the *Pico* plurality for "the proposition that speech may [not] be censored" in public schools "simply because some in the audience may find that speech distasteful").

on disagreement with the material's message. *Hazelwood*, 484 U.S. at 273 (in cur-

ricular context, school boards can only suppress speech based on "legitimate peda-

gogical concerns");[13] *Rosenberger*, 515 U.S. at 830 (viewpoint discrimination "is

presumed impermissible when directed against speech otherwise within the forum's

limitations"); *McDonough v. Garcia*, 116 F.4th 1319, 1324 (11th Cir. 2024) (gov-

ernment can only "impose 'reasonable' regulations on speech in order to 'reserve

the forum for its intended purposes,' … if those restrictions are viewpoint neutral"

(quotations omitted)); *Searcey*, 888 F.2d at 1319 (describing *Hazelwood* as "merely

an application of [the nonpublic forum] standard to a curricular program").  Indeed,

the Board has conceded this point, stating that "[t]his circuit has held that public

school libraries should be characterized as nonpublic forums," where, it concedes,

the "government's ability to limit speech … is not unlimited."  ECF 220-26 (Def.'s

Interrogatory 2 Response) (quoting *ACLU*, 557 F.3d at 1202).

---

[13] Importantly, unlike this case, *Hazelwood* deals with school-sponsored curricular activities, where there may be reasons to allow schools greater latitude to engage in content discrimination.  *See Jane Doe I v. Valencia Coll. Bd. of Trustees*, 838 F.3d 1207, 1211 (11th Cir. 2016) (activity is "curricular" if "faculty supervises the activity … and the activity, by design, imparts knowledge or skills to students or audiences").  School library usage is not a curricular activity, including because it involves self-directed learning.  *See* ECF 220-1 ¶¶ 22, 25; ECF 131 at 18 (Florida State defendants distinguishing between curricular and library materials).  But even if it could be defined as a "curricular activity" (it cannot), the Board's decision is still unlawful because it was based on disagreement with *Tango*'s message and not any legitimate pedagogical concerns.

The Court should reject the Board's invocation of the government speech doctrine to avoid any First Amendment scrutiny of its actions.  Answer, ECF 153, at 37, ¶ 11.  The Board bears the burden of proving this affirmative defense but has elicited no evidence to support the legal conclusion that District Media Specialists' selection of school library books—and the Board's occasional decisions on appeals of denied removal challenges—is government speech.  *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000); *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 n.9 (2003).  To the extent that the Board attempts to argue this affirmative defense in its motion for summary judgment, Plaintiffs will respond in their response brief.

## II.    There Is No Genuine Dispute Of Material Fact That Defendant Removed Tango Based Solely On Disagreement With Its Message

There can be no dispute that a three-person majority of the Board voted to remove *Tango* because they disagreed with *Tango*'s viewpoint—a motive that is "presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.  And there is no evidence that the restriction of *Tango* was reasonably related to "reserv[ing] the [library] for its intended purposes" or any other legitimate pedagogical purpose. *McDonough*, 116 F.4th at 1324.  Indeed, Defendant has asserted that the on-the-record statements made by the Removal Board Members at the time of their vote constitutes the sole evidence of their motives for removing *Tango*, and each of those

statements make abundantly clear that the Board is liable for its majority's uncon-

stitutional motive. *See Mason v. Vill. of El Portal*, 240 F.3d 1337, 1340 (11th Cir.

2001) (entity liability is permissible where at least three individuals serving on a

five-person entity "shared the illegal motive").

### A.    The Board Removed *Tango* To Deny Students Access To Ideas With Which The Board Disagrees

The record undisputedly shows that, through voting to remove *Tango*, the Re-

moval Board Members intended to deprive students of access to the idea that same-

sex couples can be partners and parents in loving, healthy families, in the same way

as heterosexual couples.  The Removal Board Members' decisive intent is evidenced

by: (1) the anti-LGBTQ+ statements they made at the February 2023 Meeting and

in contemporaneous communications; (2) the undisturbed presence in the District's

elementary school libraries of books containing near identical stories and illustra-

tions regarding heterosexual families; (3) the Board's pattern and practice of grant-

ing Baggett's appeals for books depicting LGBTQ+ characters or themes; and (4)

the Board's unexplained rejection of District Media Specialist and community mem-

ber recommendations to include *Tango* as well as *Tango*'s unanimously stellar Pro-

fessional Reviews.

*First*, the statements of the Removal Board Members during the February

2023 Meeting are sufficient to show that they removed *Tango* because of its view-

point.

The only rationale Adams provided for his vote was that *Tango*'s authors were "really aggressive on targeting" their book to elementary school students, comparing them to Lukoff, the author of *When Aiden Became A Brother*. ECF 220-24 at 86:19–87:6. The only connection between *Tango* and *When Aiden Became A Brother* is that they both contain positive depictions of LGBTQ+ characters. Adams did not explain why he found it objectionable for *Tango*, a children's book, to be intended for children, and nothing in the record contradicts Dr. Dawkins' opinion that "*Tango* is appropriately intended for pre-Kindergarten and elementary schoolchildren," who are its "primary audience." ECF 220-1 ¶ 40(a); *see id.* ("Children's picture books should be written and illustrated to be understandable and appeal to… children aged 3 to 8 years old."). Adams's viewpoint-discriminatory motive for removing *Tango* is confirmed by an email Adams wrote to himself the week before the vote, excerpting a portion of a Wikipedia article on *Tango* that described how the authors believed the book was a useful way to introduce children to the idea of same-sex relationships. ECF 220-22. And Adams made his anti-LGBTQ+ animus clear in an email to a constituent he sent the day before the vote, in which he stated that he "agree[d] with [her] concerns" that the books on the agenda for the February 2023 Meeting,

including *Tango*, were "inappropriate" because they "promote transexual decisions and homosexual ideas," and that he would thus vote to remove them.  ECF 220-21.[14]

Turning to Fetsko, his description of a kindergarten teacher showing her class *Tango*'s illustrations and relaying the book's story without conveying that the penguin parents were both male confirms that his sole objection to *Tango* was his unsupported and viewpoint-discriminatory belief that *Tango* "sexualiz[es]" the penguins by simply portraying them as a "a couple … in love" and "embracing each other."  ECF 220-24 at 87:13-25.  Indeed, Fetsko's assertion that *Tango* has any "sexual" content is directly contrary to the Board's admission that *Tango* does not contain any content that could be considered "obscene," or otherwise depict "sexual conduct" or "sexual excitement" as defined by Florida law.  ECF 220-27 (Def.'s RFA Responses 43–45).

As for Williams, the sole basis he provided for his vote to remove *Tango* is that the book depicts two male penguins, as opposed to a male and female penguin.  ECF 220-24 at 87:8-12 ("the fascination is still on, that it's two male penguins raising a chick").  And the group text message Williams sent the day he cast his vote establishes his belief that the vote on *Tango*, and the other LGBTQ+ books addressed

---

[14] Adams wrote numerous emails and Facebook messages which establish his belief that books depicting same-sex couples should be removed for that reason alone. *Supra* Statement of Facts § B.

that day, constituted a "review … about … homosexuality, gender identity, and transgender books" in the District's libraries.  ECF 220-23.

Notably, the statements made by the Removal Board Members mirror those of Baggett, whose homophobic beliefs are well documented.  *Supra* Statement of Facts § B.  The close alignment between Baggett's and the Removal Board Members' views of *Tango* is no coincidence, as she was in regular contact with the Removal Board Members, encouraging them to remove books that portrayed LGBTQ+ characters and themes.  *Supra id.*  Not once in any of their extensive communications with Baggett, or during the February 2023 Meeting, did the Removal Board Members disagree with Baggett's anti-LGBTQ+ statements.

*Second*, the Removal Board Members' viewpoint-discriminatory intent is further evidenced by comparing *Tango* with other elementary school library books depicting families and couples, including through animal depictions, that remain undisturbed in the District's libraries.  The only difference between *Tango* and these books is that *Tango* depicts a same-sex couple, rather than a heterosexual couple.  *Supra* Statement of Facts § C.

*Third*, the Board's vote on *Tango* was part of its larger pattern of granting Baggett's book challenge appeals for books depicting LGBTQ+ characters or themes, further confirming the Board's intent in removing *Tango*.  *See Zukerman v.*

34

*U.S. Postal Serv.*, 567 F. Supp. 3d 161, 174 (D.D.C. 2021) ("[P]laintiffs may demonstrate viewpoint discrimination based on a pattern of enforcement that evinces a governmental policy or custom of intentional discrimination on the basis of viewpoint or content." (cleaned up)); *see also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002); *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014).  Between fall 2022 and 2023, Baggett appealed the Committee's decision not to remove four public school library books, including *Tango*, which she challenged solely because they contain LGBTQ+ characters or themes.  In **all** four instances, *the same three Removal Board Members* who voted to remove *Tango* voted to remove or age-restrict each LGBTQ+ book and reject the District Committee's determinations.  *See* ECF 220-8.

*Fourth*, the Board's decisive intent to prevent students' access to a positive portrayal of same-sex families is further confirmed by the fact that the Board voted to remove *Tango* despite (1) the Committee's unanimous finding that the book was appropriate for elementary school students; (2) a similar overwhelmingly positive vote in favor of the book by the LACs; (3) substantial community support for *Tango* provided in advance of and at the February 2023 Meeting; and (4) *Tango*'s unanimously excellent critical Professional Reviews, including the designation of the book as "essential" to school libraries.  ECF 220-1 ¶¶ 32, 35; *see Pico*, 457 U.S. at

874–75 (considering school board's rejection of the book review committee's advice, "the advice of literary experts, the views of librarians and teachers within the [school] system," and failure to follow policy as evidence of improper motivations). Notably, unlike the District's Media Specialists and members of the Committee and LACs, none of the Removal Board Members hold any degree in library science, have ever worked as a Media Specialist, or hold any certification to be a Media Specialist under Florida law.   ECF 220-27 (Def.'s RFA Responses 15–17).   Nonetheless, the Board overruled countless determinations by the Committee, the LACs, and Professional Reviews that *Tango* is appropriate for elementary school students, and specifically the District's elementary school children.  ECF 220-5 at 148:8-14.

### B.    There Is No Evidence That *Tango*'s Removal Was Reasonably Related To A Legitimate Pedagogical Purpose

The Board has never asserted a legally permissible justification for *Tango*'s removal.  *Cf. Pico*, 457 U.S. at 873 (noting school boards can remove books because of concerns regarding "educational suitability," or "appropriateness to age and grade level"); *Hazelwood*, 484 U.S. at 571 (in curricular context, school boards can only suppress speech based on "legitimate pedagogical concerns").  Nor could it, as the record evidence overwhelmingly shows that *Tango* had pedagogical value and is appropriate for students of all ages.

To begin with, every Professional Review of *Tango* establishes that *Tango* is developmentally appropriate for children and has exceptional illustrations, text, and

family themes.  *See* ECF 220-1 ¶¶ 32, 35, 37.  Defendant has not identified a single

Professional Review that states otherwise.  In addition, Dr. Dawkins concluded that

*Tango* has pedagogical value, is developmentally appropriate for children of all ages,

and is appropriate for inclusion in elementary school libraries, *id.* ¶¶ 27–39, includ-

ing because the book contains "much of the typical content found in elementary

school libraries exploring families, children, [and] animals," *id.* ¶ 29(a).  Defendant

has adduced no evidence to the contrary.  Instead, in addition to the six District Me-

dia Specialists who independently determined that *Tango* was appropriate for inclu-

sion in their respective District elementary school libraries, both the District's for-

mer and current Media Services Coordinators, who have a master's degree in library

science and are certified Media Specialists by the state of Florida, testified that

*Tango* is appropriate for inclusion in the District's elementary school libraries.  ECF

220-5 at 103:5-9; ECF 220-4 at 623:5-15.  And the District's former Media Services

Coordinator, in addition to Dr. Dawkins, confirmed that portrayals of two characters

that love each other, or who embrace, are common in the District's libraries.  ECF

220-5 at 103:14-25, 186:14-20; ECF 220-1 ¶ 40(c).  *Tango*'s content is no different.

　　　　To the extent that the Board now tries to argue that its majority was motivated

by permissible "educational suitability" or "pedagogical concerns," that is nothing

more than a *post hoc* rationale with "no basis in the record to believe that these Board

members mean[] by 'educational suitability' anything other than their own disagree-ment with the ideas expressed in the book." *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995).  As established in Section II.A. *supra*, the Re-moval Board Members never once uttered the phrases "pedagogical or educational value," "age appropriateness," or anything similar when voting to remove *Tango*—instead, each and every statement they made referenced solely the book's LGBTQ+ content.  But removing a critically acclaimed, pedagogically valuable, and age-ap-propriate children's book from the District's libraries simply because it contains LGBTQ+ characters or themes is not consistent with "any legitimate developmental or pedagogical considerations or any accepted professional standard, either in library science or ALA standards, or even the District's own policies."  ECF 220-1 ¶ 41.  Indeed, removing a book for its LGBTQ+ content ran contrary to the Board's Media Policy (as well as ALA and library science standards), which required all District libraries to "provide education media that reflect[s] … opposing viewpoints" and "represent[s] the many … groups in our society," ECF 220-3 at 9–10, including the substantial number of LGBTQ+ and adoptive families in the District, ECF 220-1 ¶ 34(b)-(c).  Defendant's decision to remove *Tango* based solely on the Board's per-sonal animus toward LGBTQ+ content and desire not to allow District children to have access to *Tango*'s positive LGBTQ+ themes was squarely viewpoint discrimi-nation.

## <u>CONCLUSION</u>

For these reasons, Plaintiffs are entitled to summary judgment on their claims.

## <u>WORD COUNT CERTIFICATION</u>

This Memorandum complies with word limitation set forth in Local Rule 7.1(F) because this Memorandum contains 7,983 words, excluding the parts exempted by said Local Rule.

Dated:  New York, NY
        November 22, 2024

Respectfully submitted,

SELENDY GAY PLLC

By:    /s/      *Faith E. Gay*

Faith E. Gay (FBN 129593)
Lauren J. Zimmerman*
Masha Simonova*
Alexandra Butler*
Ashley Ulrich*
Bradley Posdal*
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lzimmerman@selendygay.com
msimonova@selendygay.com
abutler@selendygay.com
aulrich@selendygay.com
bposdal@selendygay.com

Anna T. Neill (FBN 100945)
William J. Blechman (FBN 379281)
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: 305-373-1000
atn@knpa.com
wjb@knpa.com

*Counsel for Plaintiffs*

*(admitted *pro hac vice*)

40