UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

Peter Parnell, *et al.*,

                  Plaintiffs,

          v.

School Board of Escambia County,
Florida,

                  Defendant.

Case No. 4:23-cv-00414-AW-MAF

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

**Pages**

PRELIMINARY STATEMENT ..................................................................1

STATEMENT OF FACTS .......................................................................4

      A.    By Historical Tradition And Current Board Policy, District Public School Libraries Select Books In Order To Provide Access To Diverse Ideas, Populations, And Viewpoints......................4

      B.    The Board Votes To Remove *Tango* In Violation Of The Media Policy And National Library Standards ................................5

LEGAL STANDARD.............................................................................7

ARGUMENT .........................................................................................7

I.    The Board's Decision To Remove *Tango* Is Not Protected By The Government Speech Doctrine..........................................................7

      A.    The Government Speech Doctrine Does Not Apply To Public School Library Book Selection And Removal.....................7

      B.    Even If The Government Speech Doctrine Could Apply To Public School Library Material Selection And Removal, It Does Not Apply To District Material Selection Or The Board's Removal Of *Tango* ...........................................................11

            1.    The History Of Public School Libraries, Including District Libraries, Does Not Demonstrate A Tradition Of Communicating The Government's Message ........................12

            2.    Defendant Has Failed To Establish That A Reasonable Observer Would Believe That The Selection Of Diverse Materials Constitutes Endorsement Of Thousands Of Books' Messages........................................................14

            3.    Defendant Has Failed To Demonstrate Direct Control Over The Message Conveyed By The Books On District Library Shelves ........................................................20

II.    There Is No Genuine Dispute Of Material Fact That Defendant's
       Removal Of *Tango* Was Based On Unconstitutional Viewpoint
       Discrimination Under Traditional First Amendment Forum Analysis .........23

       A.    Defendant Removed *Tango* Based Solely On Viewpoint
             Discrimination ..................................................................................23

       B.    *Tango*'s Removal Was Unreasonable .................................................27

III.   Plaintiff B.G. Has Standing ..........................................................................30

CONCLUSION ........................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
   557 F.3d 1177 (11th Cir. 2009) ...................................................................10, 20

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982)......................................................................................10, 30

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*,
   115 F.4th 1266 (11th Cir. 2024) .................................................................*passim*

*Chiras v. Miller*,
   432 F.3d 606 (5th Cir. 2005) ..............................................................15, 16, 19

*Downs v. L.A. Unified Sch. Dist.*,
   228 F.3d 1003 (9th Cir. 2000) ...........................................................................19

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*,
   114 F.4th 660 (8th Cir. 2024) ..............................................................8, 15, 16

*Gundy v. City of Jacksonville*,
   50 F.4th 60 (11th Cir. 2022) ........................................................................18, 19

*Lamb's Chapel v. Cent. Moriches Union Free Sch. Dist.*,
   508 U.S. 384 (1993)............................................................................................29

*Legal Services Corporation v. Velazquez*,
   531 U.S. 533 (2001)............................................................................................10

*Little v. Llano County*,
   103 F.4th 1140 (5th Cir. 2024) ..........................................................................16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)............................................................................................31

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
   538 U.S. 600 (2003)............................................................................................11

*Matal v. Tam*,
   582 U.S. 217 (2017).....................................................................................*passim*

*McDonough v. Garcia*,
116 F.4th 1319 (11th Cir. 2024) ...................................................23, 27

*McGriff v. City of Miami Beach*,
84 F.4th 1330 (11th Cir. 2023) ...................................................14, 22

*Mech v. Sch. Bd. of Palm Beach Cnty.*,
806 F.3d 1070 (11th Cir. 2015) .........................................................14

*Osmose, Inc. v. Viance, LLC*,
612 F.3d 1298 (11th Cir. 2010) .........................................................32

*Parnell v. Nassau Cnty. Sch. Bd.*,
No. 3:24-cv-00492-WWB-MCR, ECF 35-2
(M.D. Fla. Sept. 16, 2024) ...................................................................28

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,
No. 3:23-cv-10385-TKW-ZCB, ECF 155
(N.D. Fla. Nov. 20, 2024) ...................................................................27

*PETA, Inc. v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005).........................................................19, 20

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*,
670 F.2d 771 (8th Cir. 1982) .............................................................29

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995).............................................................................23

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022).............................................................14, 16, 21

*United States v. Am. Libr. Ass'n, Inc.*,
539 U.S. 194 (2003).........................................................................8, 14

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000).............................................................................11

*Virden v. Crawford County*,
2024 WL 4360495 (W.D. Ark. Sept. 30, 2024) ................................8

*Waddell v. Valley Forge Dental Assocs., Inc.*,
276 F.3d 1275 (11th Cir. 2001) ..........................................................7

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)........................................................................................14, 18

**Statutes and Rules**

Fed. R. Civ. P. 56(a)..................................................................................................7

Fla. Stat. § 1006.28 .................................................................................................4

iii

Justin Richardson and Peter Parnell ("Author Plaintiffs"), and B.G., by and through her parent, Raymond Guillory, respectfully submit this opposition to the Board's Motion for Summary Judgment, ECF No. 216 ("Mot." or "Motion").[1]

## PRELIMINARY STATEMENT

Despite seeking summary judgment, Defendant fails to point to any record evidence supporting its defenses, instead relying on unsupported attorney assertions contradicted by the factual record and mischaracterizations of Plaintiffs' legal claims.

As a threshold issue, the Author Plaintiffs do not assert a right for their book "to be included in a library collection" or a right to "compel the Board to speak through inclusion of their book." Mot. at 2, 8. Their claim is that "[t]he removal of *Tango*," which was previously selected for inclusion in District libraries, violates the First Amendment because it "discriminat[ed] based on content and viewpoint." ECF 61 ¶ 11; *see also* ECF 151 at 1–2 (Court noting: "The main issue in this case is whether the school boards violated the First Amendment when they removed the book.").[2] The law is clear that while school districts have wide latitude to select

---

[1] Capitalized terms not herein defined have the meaning given to them in Plaintiffs' Motion for Summary Judgment and Memorandum of Law in Support of Summary Judgment, ECF 221.

[2] Record citations refer to ECF pagination, except transcript citations, which refer to internal pagination.

books—and to remove them for legitimate pedagogical purposes—they cannot use that authority to discriminate based on viewpoint. *See* ECF 221 at 25–29.

Beyond this mischaracterization of Plaintiffs' claim, each of Defendant's asserted defenses fails. *First*, decisions about which books to include in the District's libraries are not government speech. Defendant cites no authority for this proposition, and it is inconsistent with controlling case law, which makes clear that government speech is a narrow doctrine and is not intended to apply where, as here, the government is merely regulating or passing judgment on private speech. All acts of government reflect a point of view, but not all acts of government are "government speech." Moreover, despite bearing the burden of proof for this fact-intensive and highly context-specific affirmative defense, Defendant presents no evidence that the District's selection or removal of library materials has historically conveyed a government message, that a reasonable person would understand such selection as government endorsement of the message of each book (or even that a reasonable person would understand the removal of *Tango* as a specific government message), or that the Board exercises its control over libraries in a manner designed to convey government speech. In fact, the record shows the opposite.

*Second*, Defendant argues that *Tango*'s removal was constitutional by asserting—for the first time—that the Board removed *Tango* because the book introduces

the concept of "where babies come from."  This is a post-hoc, attorney-created assertion that is indisputably false: *Tango* does not address this issue.  Moreover, despite Defendant's previous assertions that the key evidence of the Removal Board Members' motives is their on-the-record, public statements, none of those statements mention this alleged basis for removing *Tango*.  Instead, the Removal Board Members' statements make clear that *Tango* was removed because of its positive portrayal of same-sex families, revealing impermissible viewpoint-based animus that is confirmed by the Board's contemporaneous communications and pattern and practice of granting Vicki Baggett's book challenge appeals.  *See* ECF 221 at 36–38.

*Third*, Defendant challenges B.G.'s standing, relying on the fact that *Tango* was not contained in B.G.'s school library.  But uncontroverted record evidence shows that the District operates an interlibrary loan program that permits students, including B.G., to access books held at other District libraries.  Accordingly, before its removal by the Board, B.G. had the ability to access *Tango* through her school library.

Accordingly, Defendant's Motion should be denied in full and, for the reasons stated in Plaintiffs' pending motion (ECF 221), the Court should grant summary judgment to Plaintiffs.

## STATEMENT OF FACTS[3]

**A.    By Historical Tradition And Current Board Policy, District Public School Libraries Select Books In Order To Provide Access To Diverse Ideas, Populations, And Viewpoints**

Pursuant to Florida law and the District's Media Policy in effect at the time of *Tango*'s removal, District Media Specialists were responsible for selecting books with the goal of promoting school libraries as places for intellectual development and the free exploration of ideas. *See* ECF 220-3 at 9–11 (requiring District library materials to "reflect differing and/or opposing viewpoints" and "represent the many religious, racial, ethnic, linguistic, and cultural groups … in our society"); Fla. Stat. § 1006.28(2)(d); ECF 219-1 ¶ 31; ECF 220-5 at 47:23–48:17. The District's Media Policy is grounded in the history and tradition of public school libraries, including elementary school libraries, of "provid[ing] students with access to a wide variety of quality materials that reflect the diverse views and experiences of not only the school district's community but also the wider world." ECF 220-1 ¶ 12.

District library material selection is not guided by any centralized assessment criteria; instead, decisions are made by Media Specialists at the "individual school level" and with community input to be responsive to the individual needs of each school and its surrounding community. *See* ECF 219-1 ¶ 65(a) (citing ECF 220-5 at

---

[3] Plaintiffs incorporate the statement of facts set forth in their motion for summary judgment, ECF 221 at 6–24, in order to focus herein on the facts most relevant to resolution of Defendant's arguments.

32–38); *see also* ECF 220-3 at 10; ECF 220-5 at 47:23–48:9, 53:16–54:1.  The Board

itself is not involved in library material selection.  *See* ECF 220-27 (Def.'s Re-

sponses to RFA Nos. 5–7) (admitting that the Board "has not held a meeting to dis-

cuss each book selected by a school for inclusion in its media center," "has not voted

on each book selected by a school for inclusion in its media center," and "does not

approve each book selected by a school for inclusion in its media center").  The

Board's role is limited to the rare instance in which a challenge to a library material

is denied by the District Review Committee and the challenger submits an appeal.[4]

ECF 220-5 at 42:6-13; ECF 220-3 at 13–17.  Indeed, the Media Policy states that

"[t]he utilization of any specific item in education media does not necessarily mean

that the school or the District advocates or endorses the contents of the item."  ECF

220-3 at 10.

### B.    The Board Votes To Remove *Tango* In Violation Of The Media Policy And National Library Standards

After Baggett appealed the Committee's decision to deny her challenge to

*Tango*, the Board voted to remove the book.  ECF 221 at 8–11, 21–23.  In doing so,

none of the Removal Board Members proffered any rationales based "in any legiti-

mate developmental or pedagogical considerations or any accepted professional

---

[4] Indeed, in 2022, there were "close to 150" library book challenges in the District, ECF 220-5 at 72:14-19.  The Board weighed in on only 10, or less than seven percent of those challenges, through the appeal process.

standard, either in library science or [American Library Association ("ALA")] stand-

ards, or even the District's own policies." ECF 220-1 ¶ 41; *see* ECF 220-24 at

86:19–87:12.[5]  The Removal Board Members also did not voice any disagreement

with Baggett's anti-LGBTQ+ basis for her challenge and appeal.  ECF 221 at 28.

Concern about discussing "where babies come from" was not cited by any of the

Removal Board Members as a reason for removing *Tango*, nor does this concept

even appear in *Tango*.[6]

As a result of *Tango*'s removal, B.G., a student at Warrington Elementary

School, has been unable to check out *Tango*.  ECF 62-3 ¶¶ 4, 11.  Prior to its removal,

*Tango* was available at five[7] District elementary schools but not hers.  *See* ECF 121-

2–7.  However, since B.G.'s school (like all District schools) participates in the in-

terlibrary loan program, *see* ECF 220-5 at 165:5–169:10, B.G. could have submitted

a request for the book through that program.  *Id.* at 168:10–169:10; ECF 220-4 at

389:10–391:6.  *Tango*'s removal made that impossible.

---

[5] Defendant relies on the ALA in its own Motion.  Mot. at 15.  Thus, Defendant concedes that ALA standards are applicable to and should be considered here.

[6] Baggett also did not cite this concept as a basis for her *Tango* challenge.

[7] While *Tango* was previously selected by Media Specialists in at least six of the District's elementary schools, *see* ECF 121-1–7, one of those six schools "weeded" the book in 2022.  ECF 215-4 ¶ 5.  "Weeding refers to systematically reviewing and removing materials from a school library's collection that are outdated, no longer accurate, damaged, or no longer relevant to the needs and interests of the school community."  ECF 219-1 ¶ 47.

Baggett appealed the Committee's decision to retain three other books that she had challenged for their positive LGBTQ+ themes.  In each instance, the Board overturned the Committee's decision to reject Baggett's challenges, opting to remove two books and to age-restrict one book, *Drama*, from elementary school libraries.  ECF 220-5 at 150:22–152:3; ECF 220-8.  Baggett argued that *Drama*—a graphic novel about a girl who loves theater and which includes two secondary characters who are gay—should be age-restricted because "[t]he book touches on the LGBTQ population."  ECF 226-1 at 4, 12–13.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## ARGUMENT

### I.    The Board's Decision To Remove *Tango* Is Not Protected By The Government Speech Doctrine

#### A.    The Government Speech Doctrine Does Not Apply To Public School Library Book Selection And Removal

"[T]he Supreme Court has not extended the government speech doctrine to

the placement and removal of books in public school libraries." *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024); *see also Virden v. Crawford County*, 2024 WL 4360495, at *5 (W.D. Ark. Sept. 30, 2024).  Indeed, Justice Alito has recently warned that the Court "must exercise great caution before extending our government-speech precedents." *Matal v. Tam*, 582 U.S. 217, 235 (2017).[8]

Defendant's Motion fails to settle on a clear description of the alleged "government speech" at issue here.  Mot. at 9–19 (pointing to several different District actions including book ownership, selection, "curation," and removal as the alleged speech).  Defendant's argument appears to focus on asserting that the government cannot be compelled under the First Amendment to select certain titles for inclusion in school libraries, *see* Mot. at 2, 8, which Plaintiffs do not argue and which, as discussed *supra*, does not engage with Plaintiffs' claim that once *Tango* was included in District libraries for almost a 20-year period, the Board could not *remove*

---

[8] Defendant misinterprets *United States v. Am. Libr. Ass'n, Inc.* ("*ALA*"), 539 U.S. 194, 204 (2003), which is not a government speech case.  Defendant quotes the Supreme Court's recitation of the lower court's discussion of the standards of book selection for government speech, Mot. at 16, including references to the types of materials collected being of "requisite and appropriate quality" and the librarian's responsibility "to separate out the gold from the garbage." *ALA*, 539 U.S. at 204. This is nothing more than a statement of the standard by which librarians select library materials.  *ALA* does not hold that library material selection constitutes government speech.

the book for discriminatory reasons.  ECF 61 ¶ 11.  None of these arguments relates to the applicability of the government speech doctrine.

Instead, Defendant's assertion that the government message conveyed was the "suitability" of *Tango*, Mot. at 10, underscores its fundamental misunderstanding of the government speech doctrine.  This "message" is not a description of government speech but of government regulation.  Conflating these two concepts would exempt most government action from the First Amendment, as any government decision represents a position on the matter decided, threatening to radically alter centuries of precedent prohibiting viewpoint discrimination in government-regulated forums.

The Supreme Court has made clear that the government speech doctrine does not apply when the government regulates private speech—including where the government is passing judgment.  In *Matal*, the Court held that federally registered trademarks are private, not government, speech even though they are administered by trademark examiners working at the Patent and Trademark Office ("PTO") who handle the approval process.  582 U.S. at 227.  The Court observed that a trademark examiner could not reject a mark based on viewpoint and that, once registered, the government could not remove a mark from the register absent certain procedures.  *Id*. at 235–36.  The "examiner does not inquire whether any viewpoint conveyed by a mark is consistent with Government policy or whether any such viewpoint is consistent with that expressed by other marks already on the principal register."  *Id.* at

9

235.  The same is true for District library material selection.  As multiple District employees testified, library books are not selected to convey or match any Board message.  *Supra* at 3–5.  Instead, the Media Policy states that Media Specialists are required to select a diverse set of school library materials, and those decisions can be challenged via a specific procedure.

Similarly, in *Legal Services Corporation v. Velazquez*, the Court found that government speech is not necessarily applicable "to subsidies for private speech in every instance," especially where it would "effect [a] serious and fundamental restriction on advocacy of attorneys and the functioning of the judiciary."  531 U.S. 533, 542–44 (2001).  Applying the government speech doctrine here would similarly effect a serious and fundamental restriction on the functioning of public school libraries, fueling censorship and undermining the historical role of libraries as places for intellectual exploration.[9]

---

[9] Defendant argues, Mot. at 13, that Plaintiffs' reliance on *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) is misplaced because *Pico* predates the government speech doctrine.  But Defendant points to no subsequent case addressing government actions in the public school library context that abrogates *Pico*.  Nor are Plaintiffs aware of any.  *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.* ("*ACLU*"), which could have been decided as a government speech case, was not.  557 F.3d 1177, 1201 (11th Cir. 2009).

**B.  Even If The Government Speech Doctrine Could Apply To Public School Library Material Selection And Removal, It Does Not Apply To District Material Selection Or The Board's Removal Of *Tango***

Even if the government speech doctrine could apply to public school library material selection, Defendant's argument fails because the application of the doctrine is a fact-intensive inquiry and Defendant has not met its burden to show that it applies here.  *See Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1288 (11th Cir. 2024) ("Whether speech is government speech is inevitably a context specific inquiry." (quotation omitted)).  Defendant bears the burden of proving this affirmative defense, which Defendant's Motion fails to acknowledge.  *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 n.9 (2003).

To evaluate whether an action constitutes government speech, the Court evaluates three factors: (1) the "history of the expression at issue"—here, the removal of a school library book, (2) the implication of "government endorsement"—here, the public's view on the Board's relationship to books in District libraries, and (3) "whether the relevant government unit"—here, the Board—"maintains direct control over the messages conveyed through the speech in question."  *Cambridge Christian*, 115 F.4th at 1288–89, 1291, 1293 (cleaned up).  All three factors weigh against

11

finding government speech here.

> ### 1. The History Of Public School Libraries, Including District Libraries, Does Not Demonstrate A Tradition Of Communicating The Government's Message

The history factor "ask[s] whether the type of speech under scrutiny has tra-ditionally 'communicated messages' on behalf of the government." *Id.* at 1289. Choosing library books has not traditionally communicated any specific government messages. To the contrary, pursuant to Florida law and the District's Media Policy, District libraries have historically fostered the free exchange of ideas and served to fulfill students' intellectual curiosity about a diversity of subjects. *See supra* at 4. The Media Policy is grounded in the history and tradition of public school libraries of "provid[ing] students with access to a wide variety of quality materials that reflect the diverse views and experiences of not only the school district's community but also the wider world." ECF 220-1 ¶ 12.

Defendant cites no record evidence to the contrary. Rather, Defendant points to the long history of public schools in Florida and the fact that the Media Policy was adopted 30 years ago to argue that "[s]ince school boards have long had the authority to maintain and curate the content within public school libraries in Florida,

these libraries have traditionally communicated messages on the government's be-half." Mot. at 15–16.[10]  But the mere fact that Florida public schools have existed for a long time says nothing about there being a tradition of school libraries convey-ing a government message.  Nor does the fact that the Media Policy was allegedly adopted based on a state law "requiring district school boards to '[e]stablish and maintain a program of school library media services.'"[11]  *Id.* at 15 (citing Fla. Stat. § 1006.28).  Indeed, Plaintiffs are not challenging the Board's authority to create a school library program or adopt a related policy—which, as argued above, is gov-ernment regulation, not speech.  Any tradition reflected in the Media Policy effective at the time of *Tango*'s removal clearly disavowed any government message and es-tablished a commitment to "reflect[ing] differing and/or opposing viewpoints."  ECF 220-3 at 10; ECF 220-5 at 60:25–61:9, 62:23–64:3.

---

[10] Defendant misuses the term "curation" throughout its Motion.  In the school library context, "curation" refers to a process whereby libraries "creat[e] an experience around a subset of library resources within the collection," not where they select materials for purchase.  ECF 219-1 ¶¶ 44–45.  The Board's repeated misapplication of this term underscores its lack of understanding of the District's library selection process, including that the process in no way sends a message on Defendant's behalf.

[11] Defendant's Motion fails to provide *any* evidentiary support for what the Media Policy looked like or contained when it was initially adopted or subsequently revised up through December 19, 2022.  *See* Mot. at 15.  Counsel cannot testify to these facts.

Defendant's case support is also inapt.  Defendant cites *ALA*, 539 U.S. at 204, for the proposition that "the Board long exercised control over the selection of its library materials, conveying the message the chosen materials are of the 'requisite and appropriate quality,'" Mot. at 16, but that case did not apply the government speech doctrine, undermining Defendant's effort to apply it here.  Likewise, *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1335 (11th Cir. 2023), merely restates the "history" prong of the government speech analysis.  Defendant fails to cite any case or any record evidence establishing the sort of longstanding history of government-controlled messages found, for example, in the selection of monuments in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), or statements on license plates in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015).

**2.    Defendant Has Failed To Establish That A Reasonable Observer Would Believe That The Selection Of Diverse Materials Constitutes Endorsement Of Thousands Of Books' Messages**

Endorsement asks whether the selection of books in District libraries would lead "observers [to] reasonably believe the government has endorsed the message" of those books.  *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1076 (11th Cir. 2015).  The evidence shows the answer is no.

*First*, no reasonable observer could conclude that the Board's actions endorse the messages of every book on District public school library shelves.  Defendant's

own Media Policy stated that the District does not necessarily "advocate[] or en-dorse[] the contents" of its educational media. ECF 220-3 at 10. This fact alone should end any government speech analysis. Moreover, Defendant ignores the current and former District Coordinator of Media Services' testimony that Media Specialists do not select books for District libraries to align with any government message or viewpoint. *See* ECF 220-5 at 54:2-19, 63:10-14; ECF 220-4 at 512:24–513:2. District libraries include books with messages that cannot be reconciled, such as Karl Marx's *Das Kapital* and Adam Smith's *Wealth of Nations*. *See* ECF 226-2 at 2–3. *Mein Kampf* is also in the District's collection. *See id.* at 4. The inclusion of *Das Kapital* and *Mein Kampf* in the District's public school libraries makes it "doubtful that the public would view the placement and removal of books in public school libraries as the government speaking." *GLBT Youth*, 114 F.4th at 668.

*Second*, no reasonable observer would understand a determination that "books [are] age-appropriate and suitable for students," Mot. at 17, as government speech. The Supreme Court has made clear that when the government engages in a limited review for "offensive" or inappropriate content in a government registration system, no reasonable person would associate the government with that message. *See Matal*, 582 U.S. at 234–39. Defendant relies on *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005), but the contrasting facts there undermine the Board's case: in *Chiras*, the board of education was actively involved in "devis[ing] the state curriculum" not

only by selecting textbooks but also by requiring revisions to the books' contents. *Id.* at 609, 614. The board was not "encourag[ing] a 'diversity of views,' … but instead 'enlist[ed] private entities to convey its own message'"—a message clearly articulated in the Texas Education Code and tied to the "adoption of textbooks." *Id.* at 615 (emphasis omitted). Here, the Board's Media Policy specifically stated the opposite.

Defendant fails to address the long line of authority that says selection of large volumes of items—like the selection of multitudes of books here—tends *not* to be associated with the government's endorsement of a message. Unlike the selection of a small number of monuments for a city park, "signaling that 'the City intends the monument[s] to speak on [the government's] behalf,'" "[t]he same cannot be said about library collection decisions, … which are too numerous to keep track of and often occur behind closed doors." *Little v. Llano County*, 103 F.4th 1140, 1152 n.11 (5th Cir. 2024), *reh'g en banc granted*, *opinion vacated*, 106 F.4th 426 (5th Cir. 2024). Indeed, "if placing … books on the shelf of public school libraries constitutes government speech, the [government] 'is babbling prodigiously and incoherently.'" *GLBT Youth*, 114 F.4th at 668 (quoting *Matal*, 582 U.S. at 236); *see also Shurtleff*, 596 U.S. at 273 (Alito, J., concurring) (noting that mere dozens of flags flown outside Boston City Hall "reflected a dizzying and contradictory array of perspectives that cannot be understood to express the message of a single speaker").

16

As in *Matal*, Defendant provides zero evidence that the public associates either the contents of the District's public school library books, or the collection as a whole, with any Board message. *See* 582 U.S. at 237–39. District library materials are selected by each school's Media Specialist(s) based on their individual judgment, as well as input from their individual school communities.[12] *See* ECF 220-3 at 11. Defendant suggests library materials' "location on the shelves" conveys a message of suitability and approval, Mot. at 17, but there is no record evidence regarding how books are organized on library shelves or what message their presence conveys other than that they are available to check out. At best, the fact that books are maintained on shelves reflects that they are in circulation and remain in readable condition, *i.e.*, are not showing signs of ordinary wear and tear. Defendant suggests that an unidentifiable "barcode" and "property stamp" indicates endorsement, Mot. at 17,[13] but there is no evidence in the record regarding the purpose, meaning, or usage of the barcode or property stamp, including whether all District public school libraries use them or are required to; what connection, if any, the Board has to these marks; and

---

[12] The fact that community members provide input regarding library material selection further belies the argument that those same community members would understand library materials to reflect a government message.

[13] In discovery, Defendant produced a single, uncontextualized photo of (1) a barcode that includes the school name "Pine Meadow Elementary School" and (2) a book stamp that reads "Kingsfield Elementary Innovation Center" and its address. *See* ECF 226-3. Neither item makes any reference to the District or the Board.

17

whether either were in use at the time of *Tango*'s removal.[14]  Even if there were

record evidence of what books bear these items and when, and if the Board has any

involvement in their creation or usage, Defendant has failed to address the distinc-

tion that courts draw between "simply managing government property," like placing

barcodes and property stamps on documents, which is not sufficient for "endorse-

ment," from "expressive conduct," like placing a state's emblem on an item con-

trolled by the government.  *See, e.g.*, *Walker*, 576 U.S. at 212, 216.  "If private

speech could be passed off as government speech by simply affixing a government

seal of approval, [the] government could silence or muffle the expression of disfa-

vored viewpoints."  *Matal*, 582 U.S. at 235.

    *Third*, Defendant's case support for the "endorsement" prong is distinguisha-

ble.  *Gundy v. City of Jacksonville* addresses a challenge to speech by an invited

guest speaker at a city council meeting, implicating the "unique role of legislative

invocations in our country's history and tradition," which is not at issue here.  50

F.4th 60, 64 (11th Cir. 2022).  There, the City Council had a long history of solem-

nizing proceedings, which was addressed in a City Council memorandum it main-

tained that set forth criteria for soliciting speakers and what their messages could

---

[14] Defense counsel's attempts, throughout the Motion, to testify to facts not in the record should be summarily rejected.

contain. *Id.* There was a long history of communicating the message and tight control of the message. *Id*. Defendant has made neither showing here.

*Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000), is also distinguishable. In *Downs*, the Ninth Circuit held that government speech applied to the contents of school bulletin boards where the district had publicized a memorandum requiring that those bulletin boards address Gay and Lesbian Awareness Month. *Id.* at 1006, 1012. The Ninth Circuit determined the bulletin boards were being used to "manifest[]" a school board's *specific and memorialized* policy of promoting tolerance. *Id.* at 1012; *see also Chiras*, 432 F.3d at 609, 614–15 (discussing textbook selection and "editorial judgment" according to a clearly stated government message within the Texas Education Code). Here, the Board has neither expressed nor in any way memorialized a similarly specific, particularized message, and the selection of an array of books reflecting "differing and/or opposing viewpoints" is simply not analogous to a discrete bulletin board. ECF 220-3 at 10.

*Finally*, Defendant's reliance on dicta from *PETA, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005), suggesting that library "curation" is government speech (Mot. at 11–12), is irrelevant because (1) it was decided prior to the Supreme Court's contemporary test for government speech, and (2) the Eleventh Circuit declined to

apply *Gittens*'s dicta to resolve First Amendment claims challenging a book removal, *see ACLU*, 557 F.3d at 1202, 1207, which is precisely at issue here.[15]

### 3.    Defendant Has Failed To Demonstrate Direct Control Over The Message Conveyed By The Books On District Library Shelves

The control factor "asks whether the relevant government unit maintains direct control over the messages conveyed through the speech in question." *Cambridge Christian*, 115 F.4th at 1293 (quotations omitted). Defendant claims that this factor is met because the Board "provides and controls the library space itself: it purchases and takes ownership of the books and materials within, and subjects those materials to Board approval." Mot. at 18. But Defendant's argument fails to engage with the purpose of assessing "control" in this context.

As discussed above, the sort of control the Board exercises over book selection is regulatory in nature, a type of "control" the Supreme Court has found does not trigger the government speech doctrine. *See Matal*, 582 U.S. at 235. It also lacks the attributes of control *over the disputed message*—here, *Tango*, and more broadly the District's library materials—that characterize government speech. The

---

[15] The facts of *Gittens* are also unlike the facts here. In *Gittens*, a government commission "invited artists to submit designs" for "preformed sculptures of 100 donkeys and 100 elephants" provided by the government and "retained ownership of the … donkeys and elephants" after they were decorated pursuant to designs selected by the commission. 414 F.3d at 25. The government, in soliciting designs, also clarified that it "reserve[d] the right of design approval." *Id.* at 30.

District's Media Policy does not dictate what views should or should not be expressed or that selection decisions should be made in accordance with a singular Board message.  Instead, the policy requires inclusion of "differing and/or opposing viewpoints"—a criteria that intentionally relinquishes control over messaging in favor of promoting a diversity of views and liberty of expression.  ECF 220-3 at 10. Moreover, the record evidence shows that collection decisions are not made in a uniform, District-wide manner consistent with a desire to convey a consistent government message, but on a school-by-school basis depending on the diverse needs and input of each individual school community.

Control of the forum, which is what Defendant's arguments about control address, is not the kind of "control" that turns speech into government speech.  In *Shurtleff*, the Court noted that although the city of Boston "maintained control over the plaza's physical premises," the question of government speech turned on its lack of "control over the flags' content and meaning."  596 U.S. at 256.  Similarly, here, the fact that the government "controls the library space," Mot. at 18, does not "indicate that [the Board] meant to convey the [books'] messages," or anything about its broad collection.  *See Shurtleff*, 596 U.S. at 256.

Nor is the Board's control over library book selection the sort of "direct control over the messages conveyed" found in *Cambridge Christian*, where the relevant government entity controlled the content of the messages delivered at high school

21

football playoff games over the PA system.  115 F.4th at 1293–94.  The only person making announcements was the designated announcer, whose "announcements were entirely scripted" by a Florida High School Athletic Association employee who was conveying the Association's message.  *Id.*  The Board's limited involvement here bears no resemblance to this level of control over either the specific speakers (the authors) or the particular messages conveyed in each selected or removed book. ECF 220-3 at 10.  Similarly, in *McGriff*, the Eleventh Circuit recognized government speech in the context of a city art installation only because the city commissioned specific artwork *before it was created* and the city manager exercised direct control over the content, which was requested by and made for the city for a particular purpose.  84 F.4th at 1335–36.  And the city's purchase agreements gave the city exclusive rights to the content of the artwork, stating that "[a]ll rights previously possessed by the [production companies were] relinquished."  *Id.* at 1334.  Here, by contrast, books included in District libraries are neither created for or at the Board's request; the authors retain all rights to distribute and use their material; and the Board is not involved at all in developing the content of the books' messages.  Accordingly, the requisite control over the disputed message is not present here.

## II.    There Is No Genuine Dispute Of Material Fact That Defendant's Removal Of *Tango* Was Based On Unconstitutional Viewpoint Discrimination Under Traditional First Amendment Forum Analysis

Defendant argues, Mot. at 23–25, that even if its affirmative defense of government speech fails, Defendant's removal of *Tango* was constitutional because the government may "impose 'reasonable' regulations on speech in order to 'reserve the forum for its intended purposes,' … if those restrictions are viewpoint neutral." *McDonough v. Garcia*, 116 F.4th 1319, 1324 (11th Cir. 2024) (quoting *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).[16]  However, there is no question that a majority of the Board voted to remove *Tango* because they disagreed with *Tango*'s viewpoint—a motive that is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

### A.    Defendant Removed *Tango* Based Solely On Viewpoint Discrimination

Defendant's litigation position that the Board did not remove *Tango* because it disagreed with the book's viewpoint, Mot. at 29, fails to address the abundance of record evidence proving the contrary.[17]  For instance, despite previously asserting

---

[16] As Plaintiffs explained in their motion for summary judgment, "*any* First Amendment analysis," including traditional "forum analysis," prohibits "viewpoint discrimination based solely on disagreement with the material's message."  ECF 221 at 33–34.

[17] Plaintiffs do not dispute Defendant's assertion that Plaintiffs must show "that *all three* [Removal] Board [M]embers … voted to remove *Tango* … for viewpoint

that the most relevant evidence to Plaintiffs' claims are the Board Members' February 2023 public statements, Defendant's Motion fails to engage with a single word of them, because those statements establish that the decision to remove *Tango* was based on viewpoint discrimination.  *See* Motion to Dismiss H'rg Tr. 19:13-25; *see also* ECF No. 220-4 at 72:2-11; ECF No. 111 at 5–6.

Defendant claims that Removal Board Member "Fetsko's statements make plain that his reason for removal was based on introduction of the concept of 'where babies come from' at a young age," as opposed to his anti-LGBTQ+ animus.  Mot. at 32 (citing ECF 93-1 at 11:13–12:15).  Despite placing quotation marks around the phrase "where babies come from," no such words ever appear in the transcript, as no such idea was ever discussed.  That should come as no surprise, as *Tango* does not explore "where babies come from."

The transcript makes clear that Fetsko's sole objection to *Tango* was his viewpoint-discriminatory belief that *Tango* "sexualiz[es]" the penguins by simply portraying them as "a couple … in love" and "embracing each other."  ECF 220-24 at 87:13-25.  The Board's sworn admission that *Tango* does not contain any content that could be considered "obscene," or otherwise "sexual" under Florida law, ECF 220-27 (Def.'s RFA Responses 43–45), confirms that the only issue Fetsko had with

discriminatory reasons."  Mot. at 30; *see* ECF 221 at 36 (citing *Mason v. Vill. of El Portal*, 240 F.3d 1337, 1340 (11th Cir. 2001)).

*Tango* is its positive portrayal of a same-sex couple.

As for the other two Removal Board Members (Adams and Williams), Defendant does not engage with their statements at all. As detailed in Plaintiffs' summary judgment motion (at 32–33), the only reasons Adams and Williams provided for removing *Tango* were their disagreement with *Tango*'s positive message about LGBTQ+ families. ECF 220-1 ¶¶ 40–41; ECF 219-1 ¶¶ 93–97.

Instead of addressing the actual content of the Removal Board Members' statements, Defendant attempts to hide the facts behind "a presumption of constitutionality." Mot. at 31. However, none of the cases Defendant cites for this proposition address how to analyze public statements made by government officials that establish viewpoint discrimination—nor do they even suggest that the Court should ignore that evidence. *See id.* at 31–32 (citing *Close v. Glenwood Cemetery*, 107 U.S. 466, 475 (1883); *McDonald v. Bd. of Election*, 394 U.S. 802, 809 (1969); *United States v. Morrison*, 529 U.S. 598, 607 (2000)).[18]

Defendant further argues that, notwithstanding the Removal Board Members' public statements, their vote was not based on viewpoint discrimination because, the

---

[18] Defendant's argument (at 29) that Plaintiffs have not challenged the facial validity of Fla. Stat. § 1006.28(2)(a)2. (2022)—the statute allowing for book challenges—is a red herring. Plaintiffs take no position on whether that statute is constitutional and need not do so to prevail on their claims.

following month, four Board Members, excluding Adams,[19] voted to retain *Drama*—a graphic novel challenged by Baggett that includes "same-sex characters [*sic*]"—in middle and high school libraries. Mot. at 32–33; *see* ECF 215-8.[20] But a decision to allow one book with some LGBTQ+ characters to remain in a library for older children cannot negate the specific animus the Removal Board Members themselves cited as the sole basis for their decision to remove *Tango* from elementary school libraries. Tellingly, Defendant buries in a footnote the fact that the Board voted to remove *Drama* from elementary school libraries, Mot. at 33 n.6, presumably in agreement with Baggett's objection to its inclusion of two gay characters. *See* ECF 226-1 at 4. Thus, the Board's action on *Drama* only reinforces Plaintiffs' evidence of animus.

Finally, while the Removal Board Members' statements alone establish their viewpoint-discriminatory motive, the record is replete with further evidence supporting it, which Plaintiffs incorporate herein. ECF 221 at 17–18, 34–36; ECF 220-1 ¶ 14; ECF 219-1 ¶¶ 86–97. Defendant addresses none of this evidence, which is not only sufficient to withstand summary judgment on viewpoint discrimination, but

---

[19] Adams voted to remove *Drama* from all school libraries, not just elementary school libraries. ECF 215-8.

[20] Notably, Defendant previously stated that other District book challenge appeals were irrelevant to determining whether *Tango* was removed based on viewpoint discrimination. *See, e.g.*, ECF 201-2 at 6–10, 12. Defendant does not explain its about-face.

also conclusively establishes it as a matter of law.[21]

### B.  *Tango*'s Removal Was Unreasonable

Because the Board's removal decision was not viewpoint-neutral, there is no need to inquire into the decision's reasonableness.  *McDonough*, 116 F.4th at 1324. Nonetheless, the evidence shows the decision was not reasonable, and Defendant identifies no evidentiary support to the contrary.  *See* Mot at 25–27.

For a speech restriction to be reasonable, "the government must avoid [its] haphazard and arbitrary enforcement."  *Cambridge Christian*, 942 F.3d at 1243.  Defendant argues its conduct was reasonable because the Board removed *Tango* after "determin[ing], in its discretion, that *Tango* was not suitable or appropriate for elementary school students," Mot. at 26, because it explores the concept of "where babies come from."  Mot. at 31.  In addition to the arguments set forth above that (1) this is a post-hoc, attorney-created rationalization that flatly contradicts record evidence and (2) *Tango* does not even address this subject, there is copious evidence of

---

[21] Plaintiffs preserve their objection to the Court's ruling on legislative privilege, ECF 191, which becomes material if the Court believes that there are disputed facts on the issue of the Removal Board Members' intent in removing *Tango*, including whether the Board believed it was conveying a government message through such action and what that message was.  Plaintiffs note that the court in *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, No. 3:23-cv-10385-TKW-ZCB, ECF 155 (N.D. Fla. Nov. 20, 2024) found that legislative privilege did not apply, and Defendant requested and received a stay of that matter while the Board appeals.  Plaintiffs may likewise request a stay should the Court believe further evidence should be adduced at trial to resolve Plaintiffs' claims.

27

the Board enforcing this alleged rule in a "haphazard and arbitrary" way.

If the Board were truly interested in restricting books that discuss "where babies come from," it would have reviewed other books in District libraries that contain such content and treated them similarly. The Board did not do so and, to date, there are several other books in District elementary school libraries with content that explains "where babies come from," including *Where Do Chicks Come From?*, *Sometimes It's Storks*, and *The Baby Tree*, the latter of which "[i]ncludes advice on answering questions about reproduction" asked by elementary school children.[22] ECF 226-2 at 6–8.

Defendant's argument that its conduct was not "haphazard or arbitrary" is also flatly contradicted by its differential treatment of books with LGBTQ+ ideas. District libraries have numerous books depicting families and couples, including as animals, which remain undisturbed on library shelves. The only difference between *Tango* and these books is *Tango*'s positive message about LGBTQ+ families. *See* ECF 221 at 15–19.

Moreover, *Tango*'s inclusion in public school libraries throughout Florida is further evidence of the unreasonableness of the Board's removal. *See Parnell v.*

---

[22] *Where Do Chicks Come From*? by Amy E. Sklansky is available in at least five District elementary school libraries. ECF 226-2 at 5. *The Baby Tree* by Sophie Blackall is available in two, and *Sometimes It's Storks* by L.J.R. Kelly is available in one. *Id.* at 6–8.

*Nassau Cnty. Sch. Bd.*, No. 3:24-cv-00492-WWB-MCR, ECF 35-2 at 3 (M.D. Fla. Sept. 16, 2024) (Nassau County School Board stating that *Tango* has no "obscene" material … is appropriate for students of all ages, and has pedagogical value"); ECF 39-1 ¶¶ 16–17 (Lake County School Board restoring elementary school access to *Tango*); *see also, e.g.*, ECF 226-4 (Alachua and Pinellas Counties).

Defendant's remaining arguments also fail. Defendant's assertion (at 27) that potential readers of *Tango* can access the book through other means is irrelevant to the reasonableness analysis. As the Court has made clear, the practical reality that the Author Plaintiffs could distribute and B.G. could access the book elsewhere does not affect the constitutional claims at issue. ECF 151 at 8; *see, e.g.*, *Lamb's Chapel v. Cent. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 387, 394 (1993); *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir. 1982).

Likewise, Defendant's proclamation (at 27–28) that "school administrators … stand[] in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them," has no relation to the reasonableness of a speech restriction, which asks whether enforcement was "haphazard and arbitrary." Defendant also argues (at 28) that if the Board removed *Tango* based on H.B. 1557, that would confirm that "such a decision is not unreasonable." But the Court already determined that H.B. 1557 does not apply to the claims at issue (ECF No. 151 at 4–5), and Defendant has stated throughout this litigation that the

29

Board in no way relied on H.B. 1557 when removing *Tango*, *e.g.*, ECF 108 at 27, and that H.B. 1557 has no bearing on Plaintiffs' claims, ECF 201-2 at 19–20.

## III.    Plaintiff B.G. Has Standing

Defendant's standing arguments as to B.G. are incorrect, recapitulate failed arguments, and omit key record evidence.

*First*, Defendant utilizes its mischaracterization of the Author Plaintiffs' First Amendment claim—a right to be included in a library collection—as a means of challenging B.G.'s standing.  Mot. at 8.  But Author Plaintiffs' claim is that "[t]he removal of *Tango*," which was previously selected for inclusion in District public school libraries, violates their constitutional rights because it "interfere[d] with the[ir] ability to distribute published materials to [their] intended audience," ECF 151 at 7, and that the removal "discriminat[ed] based on content and viewpoint," ECF 61 ¶ 11; *see also* ECF 151 at 1–2.  Thus, the fact that the origin of the right to express ideas and the right to receive them "follow[]" from each other and are "inherent corollary … rights" in no way requires Plaintiffs to assert both rights in order to advance a claim.  *See, e.g.*, *Pico*, 457 U.S. at 867 (discussing origin of right to express versus receive information).  The Court has already ruled that there are separate rights to express ideas versus to receive information, and Defendant has not

distinguished that prior ruling.  ECF 151 at 25 & n.12.[23]

*Second*, undisputed evidence shows that students have access to books held at all of the District's libraries through the District's interlibrary loan program.  ECF 220-4 at 389:10–390:6, 518:1–519:15, ECF 220-5 at 162:10–169:1.  Accordingly, if a book is not held at a District school library, students can request the book from another school's library through the interlibrary loan program, ECF 220-5 at 168:16–23; ECF 220-4 at 389:10–391:6, which applies to every District school, ECF 220-5 at 162:10–169:1.  As a result, because *Tango* was available at five elementary school libraries prior to being removed—which Defendant admits (at 5)—it was available to B.G. through the interlibrary loan program.  Tellingly, Defendant ignores the interlibrary loan program in its Motion.

An order from the Court returning *Tango* to any of the District elementary schools where it was previously available would make the book available to B.G. at her school.  Notably, the Court previously held that "Plaintiffs have … sufficiently alleged redressability" and "their injuries are directly traceable to the [Board's]

---

[23] While unaddressed by Defendant, as this Court has recognized, "Interference with the ability to distribute published material to an intended audience can give rise to an injury sufficient for Article III standing."  ECF 151 at 7.  The Author Plaintiffs wished to distribute *Tango* to students in District schools and were prevented from doing so by its removal.  ECF 226-5, Parnell Dep. 31:14–32:7.  *Tango*'s removal thus presents a cognizable injury, caused by Defendant, and which will be redressed by *Tango*'s restoration to District libraries.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

removal of *Tango*, and an injunction requiring the book's return would redress those injuries." ECF 151 at 8. Record evidence now supports those standing allegations. Defendant's argument that B.G. somehow lacks standing therefore fails.[24]

## CONCLUSION

For these reasons, the Court should deny Defendant's Motion.

## WORD COUNT CERTIFICATION

This Memorandum complies with the word limitation set forth in Local Rule 56.1(C) because this Memorandum contains 7,759 words, excluding the parts exempted by Local Rule 7.1(F).

---

[24] Defendant also argues that "the relief sought" by Plaintiffs through a request for an injunction "is broader than B.G.'s standing," Mot. at 22, but the proper scope of an injunction is decided *after* a finding of liability. *See Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1323 (11th Cir. 2010). In any event, Defendant's argument (at 23) that Plaintiffs cannot request an injunction that restores *Tango* to the District libraries from which it has been removed is meritless. Author Plaintiffs are affected by the removal of *Tango* in each District library and, as discussed *supra*, the Board's decision to remove *Tango* from those libraries made it unavailable through the interlibrary loan program. Thus, to remedy the constitutional harm to all Plaintiffs, the book must be restored for all students.

Dated:  New York, NY
        December 13, 2024

Respectfully submitted,

SELENDY GAY PLLC

By:    /s/            *Faith E. Gay*
       Faith E. Gay (FBN 129593)
       Lauren J. Zimmerman*
       Masha Simonova*
       Alexandra G. Butler*
       Ashley Ulrich*
       Bradley Posdal*
       SELENDY GAY PLLC
       1290 Avenue of the Americas
       New York, NY 10104
       Tel: 212-390-9000
       fgay@selendygay.com
       lzimmerman@selendygay.com
       msimonova@selendygay.com
       abutler@selendygay.com
       aulrich@selendygay.com
       bposdal@selendygay.com

       Anna T. Neill (FBN 100945)
       William J. Blechman (FBN 379281)
       SPERLING KENNY NACHWALTER, PA
       1441 Brickell Avenue, Suite 1100
       Miami, FL 33131
       Tel: 305-373-1000
       aneill@sperlingkenny.com
       wblechman@sperlingkenny.com

       *(admitted *pro hac vice*)

       *Counsel for Plaintiffs*

33