IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**PETER PARNELL, et al.,**

    **Plaintiffs,**

v.                                                      Case No. 4:23-cv-414-AW-MAF

**SCHOOL BOARD OF ESCAMBIA
COUNTY, FLORIDA,**

    **Defendant.**

_____/

## **FINAL ORDER**

The Escambia County School Board decided to remove from its school libraries a children's book called *And Tango Makes Three*. The book follows two male penguins who adopt, hatch, and raise Tango, a penguin chick. The book's coauthors, along with an elementary school student, sued over the book's removal. In their view, *Tango* "illustrates that same-sex parents exist, that they can adopt and raise offspring, and have healthy and happy families." ECF No. 221 at 6. And, they claim, the Escambia County School Board violated the First Amendment by removing *Tango* "based solely on disagreement with the book's viewpoint."[1] *Id*.

---

[1] Plaintiffs attached a complete copy of *And Tango Makes Three* to their operative complaint. ECF No. 61-1.

1

Both sides moved for summary judgment. ECF Nos. 216, 221. Now, having carefully considered the parties' arguments, I deny Plaintiffs' motion and grant summary judgment for the Escambia County School Board.

I.

There are three Plaintiffs: Peter Parnell and Justin Richardson, who co-wrote *Tango*, and B.G., a young student who sought to borrow *Tango* from her school library. A broader group of plaintiffs initiated this case in the Middle District of Florida, suing Lake County School Board officials, the Florida Education Commissioner, and all members of the State Board of Education. ECF No. 1. An amended complaint added the Escambia County School Board and Superintendent. ECF No. 61.

Plaintiffs moved for a preliminary injunction. ECF No. 62. Later, the United States District Court for the Middle District of Florida transferred the case here pursuant to 28 U.S.C. § 1404(a). ECF No. 79. This court then held a hearing to determine a schedule and procedures for resolving Plaintiffs' preliminary-injunction motion. ECF Nos. 94, 101. It then set an evidentiary hearing on the motion. ECF No. 101. Shortly before the hearing, however, Plaintiffs withdrew the motion. ECF No. 118.

After a hearing on several motions to dismiss, the court dismissed all claims against the Florida Education Commissioner and members of the Florida Board of

Education for lack of subject-matter jurisdiction. ECF No. 151. It dismissed individual-capacity claims against the Escambia County Superintendent for the same reason. *Id.* It dismissed claims against the Lake County Superintendent in her individual capacity based on qualified immunity, and it dismissed official-capacity claims against her and the Escambia County Superintendent as duplicative of claims against the respective School Boards. *Id.* It dismissed claims against the Lake County School Board on the merits, based on *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.* Finally, it dismissed for lack of standing Plaintiffs' claims challenging the constitutionality of a Florida statute Plaintiffs contended caused their harm. *Id.*

That left the Escambia County School Board as the sole Defendant, and it left only Plaintiffs' First Amendment claims regarding *Tango*'s removal. Count One alleges that removing *Tango* violated the authors' First Amendment speech rights by discriminating based on content and viewpoint. ECF No. 61. Count Two alleges that the removal violated B.G.'s First Amendment right to receive information. *Id.* This order resolves those claims.

## II.

Before dealing with the merits, I must determine whether the court has jurisdiction to do so. *See Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (noting court must assure itself of jurisdiction "before proceeding to consider

the merits of [any] claim, no matter how weighty or interesting"). The court has jurisdiction only if Plaintiffs have established the "irreducible constitutional minimum of standing": injury, traceability, and redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Lewis*, 944 F.3d at 1296. The board does not question the authors' standing, and I conclude, as I did at the motion-to-dismiss stage, that the authors have standing to sue the board. *See* ECF No. 151 at 7-8. But the board argues again that B.G. has not established standing.[2]

Specifically, the board contests redressability as to B.G.'s claim. It contends that because *Tango* was never in B.G.'s school library, B.G. has no standing to seek its return. ECF No. 216 at 22 (citing ECF No. 119-1 ¶ 6). But although B.G.'s school did not keep its own copy of *Tango*, Escambia County operates an interlibrary loan program that allowed B.G. and other district students access to the book. Therefore,

---

[2] When plaintiffs seek only prospective relief, a court need only ensure a single plaintiff has standing, provided all plaintiffs seek the same relief. *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Here, B.G. seeks nominal damages, ECF No. 61 ¶ 135, and she must demonstrate her own standing for that claim. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (cleaned up)). Regardless, I conclude B.G. has standing.

4

B.G.'s requested relief—an injunction requiring Escambia County to allow her access to *Tango*—would redress her ongoing injury.[3]

The board advances no injury or traceability arguments as to B.G. At any rate, B.G. has shown a sufficient injury (lack of access to *Tango*) that is fairly traceable to the board. Thus B.G. has standing.

### III.

With jurisdiction resolved, I can proceed to the merits. When, as here, parties have filed cross-motions for summary judgment, courts view the facts in the light most favorable to the non-moving party on each motion. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath'n, Inc.*, 115 F.4th 1266, 1287 (11th Cir. 2024). Either side is entitled to summary judgment only if, viewed in that light, the evidence does not create a genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.*; *see also* Fed. R. Civ. P. 56(a). Here, there is no view of the facts that could support Plaintiffs' claim that the board engaged in unconstitutional viewpoint discrimination or otherwise violated the First Amendment with respect to *Tango*.

---

[3] The board also argues that B.G's requested relief—unrestricted access to *Tango* in Escambia County schools—is broader than whatever standing she might have. ECF No. 216 at 22-23. But it is enough for now to conclude that an injunction could redress B.G.'s injury.

The board's lead argument is that school library curation does not implicate any students' or authors' First Amendment rights at all. Thus, the argument continues, even if the board removed a book based on its viewpoint, the removal would not be unlawful. I agree, and that is enough to resolve this case. I conclude, as the *en banc* Fifth Circuit recently did, that a public library's removal of books does not implicate the First Amendment right to receive information. *Little v. Llano County*, 138 F.4th 834, 850 (5th Cir.) (en banc), *cert. pending*, No. 25-284 (2025). Nor does it implicate any author's First Amendment rights.

The board argues that any speech at issue here is government speech. It argues, with some force, that a school library's decision on which books to collect (or not collect) constitutes its own expression about which books belong in the library or which books students should be reading. If the collection constitutes government speech, then Plaintiffs' speech rights are not implicated. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny."). This is because when the government itself is speaking, it is "entitled to say what it wishes." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995).[4]

---

[4] Of course, just as with private parties, the government's right to speak extends beyond a strict definition of "speech" and reaches expression more broadly. Courts have found government speech in statues, artwork, and license plates, among other examples. *See, e.g., Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 464

At the motion-to-dismiss stage, I noted the undeveloped record and the uncertain case law regarding whether the government-speech doctrine applies in the context of school-library book-selection decisions. I declined at that stage to hold that the government-speech doctrine applied, but I suggested that "[o]n a developed record, there may be a different answer." ECF No. 151 at 23. Now, with the benefit of a more developed record, the board reasserts the argument.

A recent *en banc* Fifth Circuit decision strongly supports the board's government-speech argument. *See Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc).[5] In that case, a plurality held "that a public library's collection decisions are government speech." *Id.* at 865 (plurality). It did so after examining numerous precedents and applying the *Shurtleff* factors. *Id.* at 860-65 (citing *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022)); *see also Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021) (noting that courts evaluating government-speech issues consider (1) whether that type of speech has traditionally communicated a government message; (2) whether a reasonable observer would think the government endorsed the speech's message; and (3) whether the government maintains direct control over the speech).

---

(2009); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 211 (2015).

[5] The *Little* decision issued after summary-judgment briefing here concluded. But both sides addressed it through supplemental filings. ECF Nos. 255, 256.

In *Little*, the plurality considered the history of public libraries, explaining that throughout their history, public libraries were speaking "by shaping their collections." *Little*, 138 F.4th at 862 (plurality) ("[T]he public library's view on edifying literature was quintessential government speech."); *see also People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude.") (quoted in *Little*); *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries, broadcasters, newspapers, museums, schools, and the like.'" (citing *Gittens*)). It considered the public perception, concluding that "[p]eople know that publicly employed librarians, not patrons, select library materials for a purpose." *Id.* at 864 (quoting amici brief). And it considered the extent of government control. *Id.* at 865 ("[L]iterally from the moment they arose in the mid-19th century, public libraries have been shaping their collections for specific educational, civic, and moral purposes. They still do today."). The plurality also considered "whether a library's collection creates a public forum for third-party speech, which is often the flip side of the government speech question," *Id.* at 851, but quickly concluded it did not:

8

> Library shelves are not a community bulletin board: they are not places set aside for public expression of particular kinds or by particular groups. If they were, libraries would have to remain viewpoint neutral when choosing books. That would be absurd. Libraries choose certain viewpoints (or range of viewpoints) on a given topic. But they may exclude others. A library can have books on Jewish history without including the Nazi perspective. Forum analysis has no place on a library's bookshelves.

*Id.* at 859 (cleaned up).

In the end, the *Little* plurality concluded "a public library's collection decisions are government speech." *Id.* at 865. It did so based on "precedents teaching that a speaker, including a government speaker, engages in expressive activity by selecting and presenting a curated collection of third-party speech," its conclusion (quoted above) that a library collection does not constitute a public forum, and its consideration of the *Shurtleff* factors, "which show that libraries' collection decisions have traditionally expressed libraries' own views about what constitutes worthwhile literature." *Id.*[6]

---

[6] The *Little* plurality rejected many arguments Plaintiffs make here. Among those was Plaintiffs' argument here that book-selection decisions cannot communicate a message because libraries "have historically fostered the free exchange of ideas and served to fulfill students' intellectual curiosity about a diversity of subjects." ECF No. 227 at 18. But the fact that libraries typically encompass diverse views does not defeat a government-speech argument. To communicate, the government need not select only speech that represents a particular viewpoint. In a parade or a license-plate program, for example—both of which have been recognized as government speech—the floats or license-plate slogans may express competing views and still constitute government speech. Likewise, the government's selection of diverse books can send a message that is

9

The *Little* plurality offers a persuasive explanation as to why a public library's book selections constitute government speech. And the parties in our case point to nothing in the summary-judgment record suggesting Escambia County school libraries operate differently from other public libraries in any meaningful way. Still, there are differing opinions on the book-curation-is-government-speech issue. Less than a majority of the *en banc* Fifth Circuit concluded book curation was government speech. And a recent Eighth Circuit case concluded it was not. *See GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024).

There are fair arguments that a library's selecting books is not expressive at all. School officials decide what books to have in the library, just as they decide what furniture to have in the classroom and what food to provide for school lunch. At some level, any decision could be considered expressive: one could argue that a school district's decision to have peas and carrots for lunch constitutes its saying it thinks peas and carrots are worth eating. *Cf. Little*, 138 F.4th at 837 (plurality) ("What the library is saying is: 'We think these books are worth reading.'").

To be sure, compiling others' speech can itself be expressive. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) ("An entity exercising editorial discretion in the selection and presentation of content is engaged in speech activity. . . .

---

separate from the books' actual content. It may simply communicate, for example, that the books have been deemed appropriate for the library.

10

Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." (cleaned up)). And libraries unquestionably compile others' speech. But "[b]ecause not all compilers express a message of their own, not all compilations are protected by the First Amendment." *Id*. at 781 (Alito, J., concurring). Thus, the First Amendment is implicated for compilations only if they "are inherently expressive in their own right, meaning that they select and present speech created by other persons in order to spread the compiler's own message." *Id.* (cleaned up); *cf. also Matal v. Tam*, 582 U.S. 218, 235 (2017) ("[W]e must exercise great caution before extending our government-speech precedents.").

It is true that school library books are closer to curricular materials, which often are considered government speech. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message."); *Chiras v. Miller*, 432 F.3d 606, 618 (5th Cir. 2005) ("[W]e conclude that the selection of curricular materials by the Board is clearly government speech."). And of course books themselves are expressive, unlike most school lunches. All of this

11

is to say that it is unclear whether making library books available in school libraries constitutes expression.

The good news is I need not decide the difficult government-speech issue to resolve the case. If book curation is government speech, the board wins on the merits because the First Amendment would not reach its speech. *See Johanns*, 544 U.S. at 553. And even if book curation is *not* government speech, the board still wins on the merits: when the government decides which books to choose, it is not creating a forum for others to speak, and it is not otherwise implicating Plaintiffs' First Amendment rights. Either way, the First Amendment offers Plaintiffs no protection, and the board is entitled to summary judgment.

In *United States v. American Library Association, Inc.*, the Supreme Court "examine[d] the role of libraries in our society." 539 U.S. 194, 203 (2003) (plurality). It recognized that public libraries "pursue the worthy missions of facilitating learning and cultural enrichment," that they "must have broad discretion to decide what material to provide to their patrons," and that they "collect only those materials deemed to have 'requisite and appropriate quality.'" *Id.* at 203-04 (cleaned up). In other words, curating a library inherently requires an "exercise of judgment in selecting the material" in the library, so "forum analysis and heightened judicial scrutiny are incompatible" with the role of a public library. *Id.* at 205. Libraries do not exist primarily to encourage diverse views of private speakers or to "provide a

public forum for the authors of books." *Id.* at 206. Instead, libraries collect books that the government deems to be of "requisite and appropriate quality." *Id.*

Although only a plurality in *Little* concluded book-selection decisions constituted government speech, a majority of the *en banc* court concluded plaintiffs could not challenge such decisions based on the First Amendment. 138 F.4th at 850-51. As the majority explained, there is a difference between asserting the right to receive information and demanding that the government provide that information. 138 F.4th at 845. And "by removing a book, the library does not prevent anyone from 'receiving' the information in it." *Id.* at 848. Moreover, the government does not create a forum for others' speech by purchasing books for a public library. *Little*, 138 F.4th at 859-60 (plurality). The Author Plaintiffs have no First Amendment right to speak through the library, and B.G. has no First Amendment right to receive the Author Plaintiffs' message through the library. *Cf. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both."). Nor do the Author Plaintiffs have a First Amendment right to demand the library ignore the book's viewpoint when determining whether to include it in its collection. *See Little*, 138 F.4th at 848 ("By definition, libraries must have discretion to keep certain ideas—certain viewpoints—off the shelves."); *accord Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009) ("It is the

very business of government to favor and disfavor points of view" (quoting in parenthetical *National Endowment for Arts v. Finley,* 524 U.S. 569, 598 (1998) (Scalia, J., concurring))).

In arguing otherwise, Plaintiffs rely on *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 870 (1982), a fractured decision that addressed school-library-book removals. But the law in this Circuit is that "*Pico* is a non-decision so far as precedent is concerned. It establishes no standard." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009). Still, Plaintiffs say, the Eleventh Circuit applied a *Pico* standard in *ACLU*. ECF No. 221 at 33. But in *ACLU*, the court merely concluded that "[e]ven if the plaintiffs won the argument about the applicable standard and got the one of their dreams," those plaintiffs would lose. 557 F.3d at 1202. Thus, the court found "no need to resolve" the "question of what standard applies to school library book removals." *Id.* The bottom line is that neither *Pico* nor *ACLU* supports Plaintiffs' position.

Next, although not constitutionally dispositive, I agree with *Little*'s observations about the practical problems that a contrary decision would invite. Distinguishing between "pedagogical appropriateness," which Plaintiffs argue is a permissible consideration, and "viewpoint," which Plaintiffs argue is not, would be impossible. If a library rejected a book espousing racist views, how could one tell if

14

it acted based on a disagreement with the viewpoint behind those racist views versus a pedagogical determination that such views are educationally inappropriate? *Cf. Little*, 138 F.4th at 847 (considering David Duke book titled "Jewish Supremacism: My Awakening on the Jewish Question": "Can it be removed? If the library deems the book 'inaccurate' or 'educationally unsuitable,' yes. But if the library dislikes its content or viewpoint, no. The problem is obvious: deeming a book 'inaccurate' or 'unsuitable' is often *the same thing* as disliking its 'content' and 'viewpoint.' Judges might as well flip a coin.").

The answer would not be based on opinions of "experts" about what is appropriate for children and what is not, as Plaintiffs might hope. *See* ECF No. 217-1 at 5 (report of Plaintiffs' expert concluding "*Tango* is developmentally and pedagogically appropriate for children of all ages" and that "a depiction of a same-sex relationship is not inappropriate for children of any age"). The Eleventh Circuit has rejected a claim "that federal courts may substitute their own findings and opinions about educational suitability for those of a school board whenever the board's motive for an action is questioned." *ACLU*, 557 F.3d at 1227. It noted that this "approach would eviscerate the precedent that cautions against second-guessing educational suitability decisions of local school boards, because it would allow federal courts to make those decisions whenever a litigant questions the motive behind a board decision. And motive can always be questioned in these kind of

15

cases." *Id.* If we went that direction, "federal courts instead of school boards would always end up making the final educational suitability decision." *Id.* This would be problematic because, as the Eleventh Circuit reminds us, federal courts "are neither qualified nor constitutionally authorized to do that." *Id.*

Finally, there is no principled reason to distinguish book removals from decisions rejecting additions. *See Little*, 138 F.4th at 845 ("[I]f people can challenge which books libraries remove, they can challenge which books libraries buy."); *see also Pico*, 457 U.S. at 892 (Burger, C.J., dissenting) ("[I]f the First Amendment commands that certain books cannot be *removed*, does it not equally require that the same books be *acquired*?"); *id.* at 895 (Powell, J., dissenting) ("If a 14-year-old child may challenge a school board's decision to remove a book from the library, upon what theory is a court to prevent a like challenge to a school board's decision not to purchase that identical book?"). Plaintiffs argue their claim would say nothing about whether a public library could "be compelled under the First Amendment to select certain titles for inclusion in school libraries," ECF No. 227 at 14, but they offer no convincing justification to limit the argument to just removal decisions. *Cf. Little*, 138 F.4th at 846 (rejecting attempts to distinguish book removals).

In sum, the board did not violate the First Amendment when it decided to remove *Tango* from its school libraries. This does not, of course, keep the book (or any viewpoint in it) from B.G. or any other student. "If a disappointed patron can't

16

find a book in the library, he can order it online, buy it from a bookstore, or borrow it from a friend." *Id.* at 838. The Escambia County School Board has simply decided students wanting this particular book will have to get it elsewhere. In that way, what the board "has done here is what libraries have been doing for two centuries: decide which books they want in their collections." *Id.* And as the Fifth Circuit concluded, "[t]hat is what it means to *be* a library—to make judgments about which books are worth reading and which are not, which ideas belong on the shelves and which do not." *Id.*

## CONCLUSION

The board's decision to remove *Tango* is not subject to First Amendment scrutiny. Therefore, Plaintiffs' claim cannot succeed regardless of the motivation for the removal. There is no remaining fact issue for trial, so summary judgment is appropriate.

Defendants' motion for summary judgment (ECF No. 216) is GRANTED. Plaintiffs' motion (ECF No. 221) is DENIED. All other pending motions are DENIED as moot.

The clerk will enter judgment stating, "This case was resolved in part at the summary-judgment stage and in part at the motion-to-dismiss stage. Plaintiffs' First Amendment claims against the Escambia County School Board are dismissed on the merits. The claims against the Florida Education Commissioner and all members of

the Florida Board of Education are dismissed without prejudice for lack of subject-matter jurisdiction. The claims against the Lake County Superintendent in her individual capacity are dismissed on the merits based on qualified immunity. The claims against the Lake County Superintendent in her official capacity are dismissed as duplicative of claims against the Lake County School Board. The claims against the Lake County School Board are dismissed on the merits based on *Monell*. The claims against the Escambia County Superintendent in his individual capacity are dismissed without prejudice for lack of subject-matter jurisdiction. The claims against the Escambia County Superintendent in his official capacity are dismissed as duplicative of the claims against the Escambia County School Board. Counts III and IV are dismissed without prejudice for lack of subject-matter jurisdiction."

The clerk will close the file.

SO ORDERED on September 30, 2025.

                                     s/ *Allen Winsor*
                                     Chief United States District Judge